IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br>Oakwood Homes Corporation,<br>et al.,<br><br>          Debtors. | Chapter 11<br><br>Case No. 02-13396 (PJW)<br><br>Jointly Administered |
| OHC Liquidation Trust,<br><br>                    Plaintiff,<br><br>          v.<br><br>Credit Suisse (f/k/a Credit<br>Suisse First Boston, a Swiss<br>banking corporation), Credit<br>Suisse Securities (USA), LLC<br>(f/k/a Credit Suisse First<br>Boston LLC), Credit Suisse<br>Holdings (USA), Inc. (f/k/a<br>Credit Suisse First Boston,<br>Inc.), and Credit Suisse (USA),<br>Inc. (f/k/a Credit Suisse First<br>Boston (U.S.A.), Inc.), the<br>subsidiaries and affiliates of<br>each, and Does 1 through 100,<br><br>                    Defendants. | Adversary Proceeding<br>No. 04-57060<br><br>**Re: Adv. D.I. No. 207, 208** |

**DEFENDANTS' MOTION FOR LEAVE TO APPEAL**

## TABLE OF CONTENTS

                                                          **PAGE**

TABLE OF AUTHORITIES...............................................................ii

INTRODUCTION..................................................................... . . 1

JURISDICTION..................................................................... . . 3

STATEMENT OF FACTS............................................................ . . 3

STATEMENT OF ISSUES ON APPEAL............................................ . . 7

ARGUMENT......................................................................... . 8

    I. LEAVE TO APPEAL SHOULD BE GRANTED............................. . 8

        A. Controlling Question of Law.................................. . 9

        B. Substantial Ground for Difference of
        Opinion.................................................................10

        C. Appeal Will Advance the Litigation and
        Avoid Inefficiency................................................15

        D. Exceptional Circumstances.................................15

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abel v. Shugrue* (In re Ionosphere Clubs, Inc.), 179
    B.R. 24 (S.D.N.Y. 1995) .................................11

*Billing v. Ravin, Greenberg & Zackin*, 22 F.3d 1242 (3rd
    Cir. 1994) .................................13, 14, 15

*Bowie Produce Co. v. Magic America Caf, Inc.* (In the
    matter of Magic Restaurants, Inc.), 202 B.R. 24 (D.
    Del. 1996) .................................................11

*Chaplin v. The Harbison Group*, 119 B.R. 433(S.D.N.Y.
    1990) .....................................................12

*Citicorp N. America v. Finley* (In re Wash. Mfg. Co.),
    133 B.R. 113 (M. D. Tenn. 1991) ......................14

*Frost, Inc. v. Miller, Canfield, Paddock & Stone* (In
    re Frost), 145 B.R. 878 (Bankr. W.D. Mich. 1992) ...13, 14

*Germain v. Conn. National Bank*, 988 F.2d 1323 (2d Cir.
    1993) .....................................................15

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .....14

*In re Jensen*, 946 F.2d 369 (5th Cir. 1991) ................15

*Katchen v. Landy*, 382 U.S. 323 (1966) ....................14

*Langenkamp v. Culp*, 498 U.S. 42 (1990)  ..................14

*Longo v. McLaren* (In re McLaren), 3 F.3d 958 (6th Cir
    1993) .....................................................15

*N.I.S. Corp v. Hallahan* (In re Hallahan), 936 F.2d
    1496 (7th Cir. 1991) ....................................15

*Offic. Committee of Unsecured  Creditors v. Qwest
    Communications Corp.* (In re A.P. Liquidating Co.),
    350 B.R. 752 (E.D. Mich. 2006) ........................11

*Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005) ...........12

*Rafoth v. National Union Fire Insurance Co.* (In re
 Baker & Getty Financial Srvcs.), 954 F.2d 1169 (6th
 Cir. 1992) .............................................18

*In re Sandenhill, Inc.*, 304 B.R. 692 (E.D. Pa 2004) ......11

## UNREPORTED CASES[1]

*Cantor v. Perelman*, Civ. No. 97-586-KAJ, 2006 WL
 318666 (D. Del Feb. 6, 2006) ..........................12

*Schwartz v. Prudential Insurance Co. of America* (In
 re: Kridlow), No. 97-35168DAS, 1999 WL 97939 (Bankr.
 E.D. Pa. Feb. 19, 1999) ...............................15

## FEDERAL STATUTES

11 U.S.C. §§ 544 .........................................6

11 U.S.C. §§ 547 .........................................6

11 U.S.C. §§ 548 .........................................6

28 U.S.C. § 1292 ........................................11

28 U.S.C. §§ 157 .........................................5

28 U.S.C. § 158 ...................................3, 5, 10

Fed. R. Bankr. P. 8001, 28 U.S.C. § 158 .................10

---

[1]    Unreported decisions are attached hereto as Exhibit D.

Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants" or "Credit Suisse"), respectfully submit this motion for leave to appeal (the "Motion"), pursuant to 28 U.S.C. § 158(a) and Bankruptcy Rules 8001, 8002 and 8003 from the Bankruptcy Court's decision and order dated and entered on the docket on November 15, 2007 (the "Decision & Order"). (Adv. D.I. No. 207, 208.) The Decision & Order granted Plaintiff OHC Liquidation Trust's Motion for Determination of Plaintiff's Rights to a Jury Trial, finding that Plaintiff was entitled to a jury trial on three of its ten pleaded causes of action.[2]

### INTRODUCTION

1. Nearly three years after Plaintiff commenced this claim objection and adversary proceeding in the Bankruptcy Court, and one month before the scheduled trial date, Plaintiff belatedly recollected its alleged right to a jury trial. In a status report filed shortly before the pre-trial order was due, for the first time since it filed Objections and Counterclaims in the Bankruptcy Court, Plaintiff asserted that it intended to demand a

---

[2]    A copy of the Decision & Order is attached hereto as Exhibit A.

jury trial and wished to brief the issue before the Bankruptcy
Court.  Plaintiff succeeded in substance and in tactics:  Less
than two weeks prior to the trial date, the Bankruptcy Court
notified the parties that it believed Plaintiff had a right to a
jury trial on three of its ten counterclaims.  That essentially
put off the trial indefinitely, and it did so before Plaintiff
was compelled to commit itself to its proof by filing a pretrial
order in the Bankruptcy Court.

2. Plaintiff asserted its right to a jury trial, and the
Bankruptcy Court agreed with certain of its arguments,
notwithstanding that (i) Plaintiff voluntarily chose to commence
this adversary proceeding in the Bankruptcy Court, a forum that
cannot hold jury trials; (ii) the Trust's counterclaims involve a
mixture of legal and equitable claims and remedies; (iii) the
counterclaims were pleaded as objections to a proof of claim and
as the grounds for equitably subordinating the proof of claim;
and (iv) Plaintiff is bound by an express contractual jury trial
waiver that applies to this action.  Each of these factors
independently forecloses a jury trial in this action. The
Decision & Order was therefore in error.

3. Leave to appeal should be granted because (a) the
Decision & Order concerns the right to a jury trial, which is a
controlling question of law, (b) there are substantial grounds
for difference of opinion about the bases for the Bankruptcy

2

Court's determination that a jury trial right exists; (c) an immediate appeal from the Decision & Order is necessary to materially advance the ultimate determination of this adversary proceeding and avoid the unnecessary expenditure of judicial and party resources in convening a jury trial, which ultimately would be reversible error requiring a new trial; and (d) Plaintiff's belated, tactical use of its jury trial demand three years after it commenced this adversary proceeding deserves to be examined anew.

**JURISDICTION**

4. This adversary proceeding arises out of and is related to the above-captioned chapter 11 cases pending before this Court. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

5. Defendants are entitled to the relief requested by the Application pursuant to 28 U.S.C. §§ 158(a) and Rules 8001, 8002 and 8003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**STATEMENT OF FACTS**

6. On November 15, 2002 (the "Petition Date"), Oakwood Homes Corporation ("Oakwood") and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The remaining Debtors filed for chapter 11 protection on March 5, 2004. The Debtors' chapter 11 cases were jointly

3

administered before the Bankruptcy Court as Case No. 02-13396
(PJW).

7. By order entered on March 31, 2004, the Bankruptcy Court
confirmed the Debtors' "Second Amended Joint Consolidated Plan of
Reorganization of Oakwood Homes Corporation and Its Affiliated
Debtors and Debtors in Possession" (the "Plan"). Plaintiff is
the Debtors' successor-in-interest pursuant to the Plan and the
related Liquidation Trust Agreement dated April 13, 2004.

8. Defendant Credit Suisse Securities (USA), LLC ("CSS")
timely filed four identical proofs of claim in the Oakwood Homes
Corporation bankruptcy proceeding (the "Proof of Claim"). The
Proof of Claim sought payment of fees and expenses under an
agreement between CSS and Oakwood Homes that was executed on
August 19, 2002 (the "Financial Advisory Agreement").

9. On November 15, 2004, Plaintiff, the Trust, filed in the
Bankruptcy Court an Objection to the Proof of Claim and
Counterclaims for (1) Breach of Fiduciary Duty; (2) Negligence;
(3) Unjust Enrichment; (4) Equitable Subordination; (5) Avoidance
and Recovery of 90 Day Preferential Transfers Pursuant to 11
U.S.C. §§ 547 and 550; (6) Avoidance and Recovery of One Year
Preferential Transfers Pursuant to 11 U.S.C. §§ 547 and 550; (7)
Avoidance and Recovery of Fraudulent Transfers Pursuant to 11
U.S.C. §§ 548 and 550; (8) Avoidance and Recovery of Fraudulent
Transfers Pursuant to 11 U.S.C. §§ 544 and 550 and Applicable

4

State Law; (9) Breach of Implied and Express Contract; and (10) Deepening Insolvency (the "Objections and Counterclaims").[3]

10.   The Objections and Counterclaims sought recovery of almost $600 million in alleged preferential payments and fraudulent transfers, and requested that the Bankruptcy Court disallow or equitably subordinate CSS's claims.

11.   The Objections and Counterclaims specified the relief sought from the Bankruptcy Court as follows: (A) "For disallowance in its entirety of the CSFB Claims"; (B) "That CSFB's Claims be subordinated for all purposes to the claims of all other creditors in the Bankruptcy Case"; (C) "Disgorgement of all fees, sums, payments to CSFB and any profits derived unjustly thereon by all the Oakwood Companies"; and (D) "Damages according to proof"; as well as avoidance of certain preferences and fraudulent transfers. (Objection and Counterclaims at 36-37.)

12.   Plaintiff has never sought leave to amend the Objections and Counterclaims.

13.   Substantially all fact discovery in the case was completed a year ago, by November 2006. Certain outstanding expert discovery issues were resolved by October 2007.

14.   At a status conference on September 25, 2006, Plaintiff requested that the Bankruptcy Court set a date for trial.

---

[3]    A copy of the Objections and Counterclaims is attached as Exhibit B.

(Transcript of Sept. 25, 2006 Conf. at 33-34.)[4]  The Bankruptcy
Court scheduled the trial for the week of November 5, 2007, with
a status conference to be held on September 25, 2007 (id. at 35-
36), but which was subsequently rescheduled to October 4, 2007
(Adv. Proc. D.I. No. 193).

   15.  In connection with the October 4, 2007 status
conference, the parties submitted a joint status conference
report.  In that report, literally 30 days before trial,
Plaintiff announced that it intended to demand a jury trial.
(Adv. Proc. D.I. No. 195.)  Defendants argued that Plaintiff did
not have a right to a jury trial on any asserted claims, and in
any event, the Bankruptcy Court — Plaintiff's chosen forum —
could not conduct jury trials because the Bankruptcy Court has
not been specially designated to conduct jury trials by the
District Court.

   16.  All parties and the Bankruptcy Court recognized and
acknowledged that the consequence of any jury trial right was the
need for Plaintiff to move for withdrawal of the reference. (See
Adv. Proc. D.I. No. 206.)

   17.  At the October 4 status conference the Bankruptcy Court
requested expedited briefing on Plaintiff's right to a jury
trial.  The Court maintained the November 5, 2007 trial date and

---

[4]    A copy of the transcript of the September 25, 2006 conference is
       attached as Exhibit C; the transcript was not entered on the adversary
       proceeding docket.

ordered the parties to file their Local Rule 7016-2 pre-trial
order on or before October 26, 2007. (Adv. Proc. D.I. No. 199.)

   18.  The parties briefed the jury trial issue on an
expedited basis with briefing completed on October 17, 2007.
(Adv. Proc. D.I. Nos. 198, 201, 203.)  On October 25, 2007, the
Bankruptcy Court scheduled a telephonic conference at which the
parties were informed of the Court's intention to rule that
Plaintiff was entitled to a jury trial on certain claims.

   19.  Following the telephonic conference, the parties
stipulated that pretrial deadlines in the Bankruptcy Court were
suspended as a result of the ruling and the required future
proceedings before the District Court.  Consequently, no pre-
trial order was ever filed.

   20.  On November 15, 2007, the Bankruptcy Court issued the
Decision & Order. (Adv. Proc. D.I. No. 207, 208.)

                **STATEMENT OF ISSUES ON APPEAL**

   21.  Did the Bankruptcy Court err in concluding that
Plaintiff was entitled to a jury trial on each of Plaintiff's
breach of implied contract, negligence, and breach of fiduciary
duty claims even where the claims are a mix of law and equity and
the relief sought is primarily equitable in nature?

   22.  Did the Bankruptcy Court err in concluding that the
counterclaims at issue, although asserted as an objection to a

                            7

proof of claim, are not part of the claims allowance process and therefore may be tried to a jury?

23. Did the Bankruptcy Court err in concluding that Plaintiff was entitled to a jury trial even though Plaintiff chose to file all of its claims in a Bankruptcy Court that is not permitted to hold jury trials, rather than to file those claims that it asserts require jury determination in another federal or state forum?

24. Did the Bankruptcy Court err in concluding that the contractual jury trial waiver did not apply to any of the counterclaims in this litigation?

## ARGUMENT

### I. LEAVE TO APPEAL SHOULD BE GRANTED

25. Pursuant to 28 U.S.C. § 158, the United States district courts are vested with jurisdiction to hear appeals from bankruptcy courts. Section 158(a)(3) allows parties to appeal interlocutory orders and decrees of a bankruptcy court with leave of the district court. Defendants hereby request leave to appeal the Decision & Order.[5]

26. Although § 158(a) fails to provide criteria for determining when leave to appeal should be granted, courts faced with interlocutory appeals in a bankruptcy context have applied

---

[5]    An appeal from an interlocutory judgment, order, or decree of the Bankruptcy Court is commenced by filing a notice of appeal and a motion for leave to appeal pursuant to Bankruptcy Rule 8003 and 28 U.S.C. 158(a). See Fed. R. Bankr. P. 8001, 28 U.S.C. § 158(a).

by analogy the standards set forth in 28 U.S.C. § 1292(b)
governing interlocutory appeals from district courts to the
courts of appeal. See Bowie Produce Co. v. Magic Am. Café, Inc.
(In the matter of Magic Restaurants, Inc.), 202 B.R. 24, 26 (D.
Del. 1996). "Under § 1292(b) leave to file an interlocutory
appeal can be granted when the order at issue (1) involves a
controlling question of law upon which there is (2) substantial
difference of opinion, and (3) when immediate appeal from the
order may materially advance the ultimate termination of the
litigation." Id. See also In re Sandenhill, Inc., 304 B.R. 692,
693-94 (E.D. Pa. 2004); Abel v, Shugrue (In re Ionosphere Clubs,
Inc.), 179 B.R. 24, 28(S.D.N.Y. 1995). "Additionally, a district
court shall entertain an appeal of an interlocutory judgment only
where the appellant establishes that exceptional circumstances
justify a departure from the basic policy of postponing the
review until after the entry of final judgment." Id.

### A.    Controlling Question of Law

27. "An order is said to involve a controlling question of
law if, on appeal, a determination that the decision contained
error would lead to a reversal." In re Sandenhill, Inc., 304
B.R. at 694. As the allowing of a jury trial where no jury right
exists would plainly be reversible error, courts have concluded
that an order concerning a right to a jury trial constitutes a
controlling question of law. See Offic. Comm. of Unsecured

Creditors v. Qwest Communications Corp. (In re A.P. Liquidating

Co.), 350 B.R. 752, 755 (E.D. Mich. 2006) ("As the current matter

involves the right to a jury trial, the Bankruptcy Court's Order

Striking the Jury Demand raises a controlling question of law.");

Chaplin v. The Harbison Group, 119 B.R. 433, 434 (S.D.N.Y. 1990)

("The Second Circuit has held that review of interlocutory orders

striking a jury demand is appropriate in that it serves to avoid

an unnecessary trial.").

### B.   Substantial Ground for Difference of Opinion

28.   Each of the legal conclusions reached in the Decision &

Order implicates substantial grounds for difference of opinion.

First, the question of whether the specific claims at issue here

require a jury trial turns on an analysis of a mixture of legal

and equitable claims and remedies.  This type of analysis

focusing on the historical context of specific claims and

remedies has produced inconsistent results, especially where

issues of law and equity are mixed as they are here.  Compare

Pereira v. Farace, 413 F.3d 330, 339 (2d Cir. 2005) (analyzing a

mixture of legal and equitable claims and finding a jury trial

right); with Cantor v. Perelman, Civ. No. 97-586-KAJ, 2006 WL

318666 (D. Del. Feb. 6, 2006) (analyzing a mixture of legal and

equitable claims and relief and finding no jury trial right).

Given that courts have produced contradictory opinions on this

issue, there is plainly substantial ground for difference of

10

opinion. This is particularly true here. For example, the
Bankruptcy Court determined that the primary relief sought by the
Trust was in the form of compensatory damages, but that is
contrary to the express relief sought in Plaintiff's Objections
and Counterclaims.[6]

29. <u>Second</u>, the question of whether Plaintiff is entitled
to a jury trial raises the issue of whether counterclaims filed
by a liquidation trust in response to a proof of claim are
inextricably linked to the claims allowance process, and are
therefore subject to the Bankruptcy Court's equitable
jurisdiction. The Bankruptcy Court concluded that the
counterclaims at issue here, although pleaded as part of an
objection to a proof of claim and the foundation for an equitable
subordination claim, were not part of the claims allowance
process. The Court's conclusion is contrary to the weight of
authority on this issue, which generally holds that when causes
of action implicate the claims allowance process, no jury trial
right exists. See <u>Billing v. Ravin, Greenberg & Zackin</u>, 22 F.3d
1242, 1253 (3d Cir. 1994); <u>Frost, Inc. v. Miller, Canfield</u>,

---

[6]    The Bankruptcy Court's conclusion that Plaintiff seeks legal relief in
the form of compensatory damages is belied by Plaintiff's own
formulation of its case. (See Decision & Order at 17.)    Plaintiff's
Objections and Counterclaims specifically seek "disgorgement" of fees
and profits derived by Defendants and any other damages according to
proof. (Objections and Counterclaims at 37.)  Plaintiff has never moved
to amend its initial Objections and Counterclaims.  Therefore by its own
description of its case, Plaintiff asked the Bankruptcy Court primarily
for the equitable remedy of disgorgement, not the legal remedy of
compensatory damages.

Paddock & Stone (In re Frost), 145 B.R. 878, 882 (Bankr.

W.D.Mich. 1992); Citicorp N. Am. v. Finley (In re Wash. Mfg.

Co.), 133 B.R. 113, 115-17 (M.D. Tenn. 1991).[7]  Moreover, despite

the fact that Plaintiff has never sought leave to amend the

Objections and Counterclaims, the Bankruptcy Court simply

credited Plaintiff's assertions in the jury trial briefing about

how its case was actually different from what it had pleaded in

the Objections and Counterclaims.

30.  Third, the Bankruptcy Court concluded Plaintiff had not

waived or otherwise forfeited any jury trial rights by pursuing

its claims in the Bankruptcy Court.  The question of whether a

debtor or trustee forfeits any jury trial rights by bringing an

action in a bankruptcy court when alternative forums exist is the

subject of inconsistent case law, and at least in part, a split

among the Circuit Courts of Appeal.

31.  In particular, the Bankruptcy Court's holding is

inconsistent with other case law in this Circuit, which has held

that where "parties choose the bankruptcy forum when alternative

---

[7]     The Supreme Court has squarely endorsed the position advanced by
Defendants in the context of fraudulent conveyance or preference claims
in an adversary proceeding.  See Langenkamp v. Culp, 498 U.S. 42, 44-45
(1990); Granfinanciera, S.A. v. Nordberg,492 U.S. 33, 58-59 (1989);
Katchen v. Landy, 382 U.S. 323, 330 (1966).  This Circuit has applied
this principle to actions beyond preference and fraudulent conveyance
claims, specifically to a legal malpractice action.  Billing v. Ravin,
Greenberg & Zackin, 22 F.3d 1242, 1253 (3d Cir. 1994).  Other bankruptcy
courts have also held that an affirmative claim that arises in or
implicates the claims allowance process holds no jury trial rights.
Frost, Inc. v. Miller, Canfield, Paddock & Stone (In re Frost), 145 B.R.
878, 882 (Bankr. W.D. Mich. 1992); Citicorp N. Am. v. Finley (In re
Wash. Mfg. Co.), 133 B.R. 113, 115-17 (M.D. Tenn. 1991).

12

forums exist, they should be prepared to forfeit their right to a jury trial". Schwartz v. Prudential Ins. Co. of Am. (In re: Kridlow), No. 97-35168DAS, 1999 WL 97939 (Bankr. E.D. Pa. Feb. 19, 1999). The Bankruptcy Court noted that a split exists among the Circuit Courts of Appeals as to whether a debtor waives all jury trial rights at the filing of the bankruptcy petition, compare Longo v. McLaren (In re McLaren), 3 F.3d 958 (6th Cir. 1993) (filing of petition waives jury trial rights in debtor's claims against third parties); N.I.S. Corp v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th Cir. 1991) (same); with Germain v. Conn. Nat'l Bank, 988 F.2d 1323, 1330 (2d Cir. 1993) (filing of petition does not waive debtor's jury trial rights); In re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (same), but concluded that Third Circuit precedent did not support Defendants' position with respect to jury trial rights at issue here. The Bankruptcy Court reached this decision even though the Third Circuit has not expressly resolved this split. See Billing, 22 F.3d at 1252. Moreover, the specific issue giving rise to the split among the Circuits is not necessarily implicated here because Defendants have not argued that jury trial rights were forfeited by the Debtors' filing of the bankruptcy petition, which is the subject of the split among courts of appeal, but rather by filing the Objections and Counterclaims seeking to disallow the Proof of Claim. Notwithstanding the filing of the

13

Petition, Defendants do not take the position that Plaintiff forfeited the right to a jury trial in another forum, but its choice of filing claims objections and counterclaims in the Bankruptcy Court, which does not permit jury trials, forfeited the right in this case. As such, inconsistent and conflicting authority surrounding this issue provides substantial ground for a difference of opinion.

32. _Finally_, the Bankruptcy Court concluded that an express contractual jury trial waiver did not operate to preclude a jury trial as to any claims in this action. The Bankruptcy Court reached its decision even though the primary liquidity facility provided by Credit Suisse to the Debtors, and a primary relationship associated with Plaintiff's common law counterclaims, contained an express jury trial waiver provision which stated:

> EACH OF THE SELLER, THE SERVICER, THE ISSUER, THE DEPOSITOR, THE TRANSFEROR, THE AGENT AND THE PURCHASERS HEREBY IRREVOCABLE AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Decision & Order at 22.)

33. Although it is well settled that a jury trial right can be waived by contract if the waiver is knowing, voluntary and intelligent, _see, e.g., Tracinda Corp. v. DaimlerChrysler AG (In_

14

re Daimler Chrysler AG Sec. Litig.), Civ. No. A 00-993-JJF, 2003
WL 22769051, at *2 (D. Del. Nov. 19, 2003), aff'd — F.3d — ,
2007 WL 2701965 (3d Cir. Sept. 18, 2007), the Bankruptcy Court
concluded that that the contractual waiver was inoperative with
respect to this litigation.  Given that the waiver is both broad
and explicit, and was executed by Oakwood Homes Corporation, the
primary debtor in this proceeding, the Bankruptcy Court's
conclusion that the contractual waiver is wholly inapplicable
provides substantial ground for difference of opinion.

### C.    Appeal Will Advance the Litigation and Avoid Inefficiency

34.    A decision reversing the Decision & Order will
materially advance the ultimate determination of the litigation
because this action will proceed to trial and ultimate resolution
before the Bankruptcy Court in an expedited manner.  In contrast
to the Bankruptcy Court's ability to hold a bench trial in a
reasonably prompt time-frame, the docket and trial schedule in
the District Court will not afford a trial date for a number of
months.

### D.    Exceptional Circumstances

35.    This case presents exceptional circumstances that
distinguish it from the general policy of deferring appeals until
final judgment.  If leave to appeal is not granted, this action
could proceed to motion practice and a subsequent jury trial in

the District Court when no such jury trial right exists.
Following a verdict and judgment, the jury trial right
determination may be reversed on appeal, thereby invalidating the
original jury trial verdict and returning this action for yet
another full trial on the merits.  This scenario is precisely the
potential gross inefficiency that discretionary interlocutory
appellate review is meant to avoid. See, e.g., Rafoth v. National
Union Fire Ins. Co. (In re Baker & Getty Financial Srvcs.), 954
F.2d 1169, 1172 (6th Cir. 1992) (noting that interlocutory appeal
of jury trial determination will avoid potential duplicative
trials averting "protracted and expensive litigation").  An
immediate appeal of the Decision & Order will ensure that this
action is tried to the appropriate trier of fact in the first
instance and avoid an exceptional delay and unnecessary
additional proceedings.

*        *        *        *

WHEREFORE, Defendants respectfully request that the Court (A) grant Defendants leave to appeal the Decision & Order, and (B) grant such other and further relief as the Court deems just, proper and equitable.

Dated: November 26, 2007

By: _____

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
(302) 651-7700

- and -

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, New York  10105
(212) 903-9000

Attorneys for Defendants

17

EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Mark D. Collins
Russell C. Silberglied
Lee E. Kaufman
Christopher M. Samis
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Marla Rosoff Eskin
Kathleen Campbell Davis
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

2

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, New York 10105

Attorneys for Defendants,

Tony Castanares
Stephan M. Ray
Scott H. Yun
Whitman L. Holt
Stutman, Treister & Glatt P.C.
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Special Counsel for the OHC
Liquidation Trust


Date: November 15, 2007

3

**Walsh, J.**

        This opinion is regarding the motion of OHC Liquidation Trust ("Plaintiff" or "Trust") for determination of Plaintiff's right to a jury trial (Doc. # 198) in this adversary proceeding. Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC,(f/k/a Credit Suisse First Boston LLC), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants") oppose the motion. For the reasons stated below, the Court will grant the motion.

## Background

        Oakwood Homes Corporation ("OHC") together with its subsidiaries and affiliates ("Debtors" or "Oakwood Companies") designed and manufactured various models of homes at a modest or affordable price. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 12). As part of their business, Oakwood Companies also provided their customers with mortgage financing or retail installment sales contracts (collectively "installment contracts"). Oakwood Companies obtained the necessary funds for the installment contracts through a two-step, asset-backed securitization process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). Defendants were the underwriter for this process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). The asset-backed securitization process was commenced by Oakwood Companies using the installment contracts as collateral to

4

borrow against the warehouse facility ("Warehouse Facility")[1].
Warehouse Facility was a short-term facility used specifically to
fund the mortgages for manufactured home buyers.  (Doc. # 202,
Decl. Murphy, Ex. A, ¶ 17.b).   Once the Warehouse Facility had
accumulated a sufficient amount of installment contracts, usually
about $150 million to $200 million, the installment contracts were
bundled and sold to private and institutional investors through a
real estate mortgage investment trust.  (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 14).

        The Warehouse Facility was one of three lines of credit
Oakwood Companies used to finance their operations; they also had
a revolving line of credit and a servicer advance facility.  (Doc.
# 202, Decl. Murphy, Ex. A, ¶ 17.a-c).  The Warehouse Facility was
provided by an affiliate of Bank of America until 2001. (Doc. #
202, Decl. Murphy, Ex. A, ¶ 17.b).

        Starting in 1999 the manufactured home industry was going
through a difficult period, and Oakwood Companies' businesses were
struggling.  By the second half of 2000, Bank of America wanted to
cease its role as the warehouse lender.  (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 26).  This was a critical junction for Oakwood Companies,
if they did not have the Warehouse Facility, their securitization
business would have collapsed.  (Doc. # 202, Decl. Murphy, Ex. A,

---

        [1] Defendants refer to the Warehouse Facility as the Loan
Purchase Facility.

5

¶ 26).  Eventually after some negotiations, Defendants agreed to assume the role of lender and agent on the Warehouse Facility.  On February 9, 2001, Oakwood Companies and Defendants signed various documents to finalize Defendants' new role.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 26).  The main document was a Class A Note Purchase Agreement ("Note Purchase Agreement").

The business continued to slump.  On November 15, 2002, Oakwood Companies filed petition for bankruptcy protection under chapter 11 of title 11 of the United State Code, 11 U.S.C. §§ 101 et seq.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 37).  Defendants filed four proofs of claim, seeking payments of fees and expenses stemming from an August 19, 2002 letter agreement ("Engagement Letter").  Pursuant to the Engagement Letter, Oakwood Companies employed Defendants as the exclusive financial advisor for the contemplated restructuring transaction.  (Doc. # 202, Decl. Murphy, Ex. B, ¶ 3).

On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims.  The objections and counterclaims are: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) equitable subordination; (5) avoidance and recovery of 90 day preferential transfers pursuant to 11 U.S.C. §§ 547, 550; (6) avoidance and recovery of one year preferential transfer pursuant to 11 U.S.C. §§ 547, 550; (7) avoidance and recovery of fraudulent

6

transfers pursuant to 11 U.S.C. §§ 544, 550, and applicable state law; (9) breach of implied and express contract; and (10) deepening insolvency. (Doc. # 201, pp. 2-3). The alleged facts giving rise to this extensive list occurred both prior to and after the Engagement Letter. (Doc. # 198, p. 2).

Plaintiff is prepared to litigate various causes of action arising from two sets of distinct nucleus of operative facts. The first set of facts is centered around the parties' relationship pre-Engagement Letter. According to Plaintiff: (1) Prior to the Engagement Letter, Oakwood Companies and Defendants "enjoyed a close and intimate relationship," (Doc. # 198, p. 2), which presumably is because of Defendants' role as the underwriter and then a secured lender to Oakwood Companies. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 11). (2) Plaintiff alleged that the trust and confidence between the parties created both a fiduciary duty and an implied advisory contract. (Doc. # 198, p. 2). (3) Defendants, however, did not exercise reasonable care in carrying out their obligations. (Doc. # 198, p. 3).

For Defendants' alleged failures, Plaintiff claims that they earned massive fees and caused substantial economic damage to the Oakwood Companies. (Doc. # 198, p. 3). For Defendants' alleged breach of fiduciary duty, negligence, and breach of implied contract claims, Plaintiff is requesting recovery of all fees and other remuneration paid to Defendants, <u>and</u> actual and consequential

7

damages.  (See Doc. # 201, pp. 4-5).

The second set of facts is based on the performance under the Engagement Letter.  Plaintiff accuses Defendants of not fulfilling their obligations under the Engagement Letter; therefore their claim should be disallowed.  Plaintiff wants to be awarded additional damages, and recovery under 11 U.S.C. §§ 547 & 548. (Doc. # 198, p. 3).

Plaintiff's complaint asserts a right to a jury trial. Plaintiff has moved to have a jury trial for the causes of action related to the first set of operative facts. (Doc. # 198, pp. 3-4). The causes of action related to the second set of facts are not covered by the motion because they relate to the allowance of Defendants' claims.  (Doc. # 198, pp. 3-4).

## Discussion

Generally, "the bankruptcy court is an appropriate tribunal for determining whether there is a right to a trial by jury of issues for which a jury trial is demanded." Official Comm. Of Unsecured Creditors v. TSG Equity Fund L.P. (In re EnvisionNet Computer Servs.), 276 B.R. 1, 6-7 (D. Me. 2002); In re Wash. Mfg. Co., 128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991).

Defendants put forth a number of grounds contesting Plaintiff's motion.  First, the types of claims and forms of relief Plaintiff is raising are equitable rights, thus there is no right to a jury trial attached.  Second, even if Plaintiff has the right

8

to jury trial it is unenforceable because the claims are part of the "claims-allowance process." Third, in connection with the Note Purchase Agreement, several of the Oakwood Companies executed contracts in which they waived the right to a jury trial. Finally, Defendants argue that because Plaintiff brought these actions in a court of equity, Plaintiff has forfeited its right to a jury trial.

<u>Right To a Jury Trial</u>

The right to a jury trial in a civil case is preserved in the Seventh Amendment of the U.S. Constitution. It states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." <u>U.S. Const. amend. VII</u>. As for the meaning of "suits at common law," the Supreme Court has interpreted it to mean "'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" <u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33, 40-41 (1989) (quoting <u>Parsons v. Bedford</u>, 3 Pet. 433, 447 (1830)). In other words, a right to a jury trial attaches to those cases involving legal right and not those involving only equitable claims and remedies. <u>Billing v. Ravin, Greenberg & Zackin, P.A.</u>, 22 F.3d 1242, 1245 (3d Cir. 1994).

The Supreme Court in <u>Granfinanciera</u> provided the analytical framework to determine whether there is a right to a

9

jury trial:

> First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.  Second, we examine the remedy sought and determine whether it is legal or equitable in nature.  The second stage of this analysis is more important than the first.  If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment, we must decide whether

Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as fact finder.

Granfinanciera, 492 U.S. at 43.  The determination is a matter of federal law.  Simler v. Conner, 372 U.S. 221, 222 (1963); Byrd v. Blue Ridge Rural Elec. Coop., 365 U.S. 525, 537-39 (1958).  When a court is deciding if there is a right to a jury trial, it must remember that because "the right to jury trial is a constitutional one, . . . while no similar requirement protects trials by the court, [the court's] discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial.  Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510 (1959); Turner v. Johnson & Johnson, 809 F.2d 90,99 (1st Cir. 1986)("[I]f we must err, we choose to do so on the side of preserving plaintiffs' right to a jury trial."); Prudential Oil Corp. v. Phillips Petrol. Co., 392 F.Supp. 1018, 1022 (S.D.N.Y. 1975)("[T]he inescapable teaching of recent Supreme Court decisions is that there is a clear federal policy in light of the Seventh Amendment favoring jury trials and that, in doubtful cases, that policy should be favored.").

10

First Stage: Legal or Equitable Claims

        For the first stage of the Granfinanciera analysis, this
Court must determine whether Plaintiff's claims of negligence,
breach of implied contract, and breach of fiduciary duty would have
been considered legal or equitable claims in 18th century English
courts.   Plaintiff characterizes the negligence and breach of
implied contract claims as historically legal actions, while the
breach of fiduciary claim as an equitable claim.  (Doc. # 198, p.
10)   Defendants do not challenge the characterization in their
brief.  (Doc. # 201, pp. 7-8).   They do, however, contest that
because the negligence and breach of implied contract claims arose
from the same nucleus of operative facts as the breach of fiduciary
duty claim they are not separate and independent causes of action.
(Doc. # 202, p. 11-12).   Rather, they are just breach of fiduciary
duty claim in different names, hence, are equitable claims.

        I disagree.  The notion that a single act of malfeasance
can violate several distinct equitable and legal duties is a
fundamental principle of Anglo-American jurisprudence. See Germain
v. Conn. Nat'l Bank, 988 F.2d 1323, 1329 (2nd Cir. 1993) (stating
that both legal and equitable claims can arise from the same fact).
For example, it is possible that a jury could conclude that
although the parties enjoyed a close relationship, it was not
enough to create a fiduciary duty.  Such a finding would not
preclude a finding of negligence or of breach of contract with

11

respect to an implied advisory contract.  Likewise, Defendants always owed Oakwood Companies a duty of reasonable care in rendering their services, the breach of which could give rise to damages even in the absence of any fiduciary relationship.  <u>See</u>, <u>e.g.</u>, <u>Balaber-Strauss v. N.Y. Tel.</u> (<u>In re Coin Phones, Inc.</u>), 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996).  Thus, the claims are each separate and independent, and must be characterized individually.

Plaintiff's characterization of each claim is accurate. It has been well settled that tort claims, such as negligence, are legal actions.  <u>See</u> <u>City of Monterey v. Del Monte Dunes</u>, 526 U.S. 687, 710 (stating that the Seventh Amendment covers all actions that "sound basically in tort"); <u>Arkwright Mut. Ins. Co. v. Phila.</u> <u>Elec. Co.</u>, 427 F.2d 1273, 1275 (3d Cir. 1970)(stating in common law a jury is required for negligence cases);  8-38 MOORE'S FED. PRACTICE § 38.30.  This is applicable to persons as well as to corporate parties.  <u>See</u>, <u>e.g.</u>, <u>Ross v. Bernhad</u>, 396 U.S. 531, 542 (1970)(explaining how a corporation "would have been entitled to a jury's determination, at a minimum, . . . of its rights against its own directors because of their negligence").

Claims for breach of contract, expressed or implied, are also legal rights under the common law.  <u>Donovan v. Robbins</u>, 579 F.Supp. 817, 822 (N.D. Ill. 1984) (claims seeking "money damages for breach of express or implied contracts . . . are clearly legal and [] the Seventh Amendment would require a jury trial as to

12

them"); 8-38 Moore's Fed. Practice § 38.30 ("Actions for money damages for breach of contract are legal in nature and are triable to a jury.").

Claims for breach of fiduciary duty, however, are historically equitable rights. Pereira v. Farace, 413 F.3d 330, 338 (2d Cir. 2005), cert denied, 126 S. Ct. 2286 (2006); In re Hutchinson, 5 F.3d 750, 757 (4th Cir. 1993). The best evidence in support, as Defendants point out in their brief, is that the Delaware Chancery Court still has exclusive jurisdiction to hear breach of fiduciary duty cases. Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163 (Del. Ch. 2002).

With two legal rights and one equitable right Plaintiff has a mixture of claims. In such situation "a party will not be denied a jury trial just because other claims arising out of the same facts are equitable." Germain, 988 F.2d at 1329. The "right to jury trial on the legal claims . . . must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." Ross, 396 U.S. at 538. Meaning, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 422-23 (5th Cir. 1998); Mirant Corp. v. Southern Co., 337 B.R. 107, 120 (N.D. Tex. 2006)("[J]oinder of

13

equitable claims with legal claims does not deprive a party of the right to a jury trial on the legal claim."). Consequently, even though Plaintiff asserts an equitable right, under the first prong of the Granfinanciera analysis it still retains its right to a jury trial as to the two legal rights.

Second Stage: Legal or Equitable Relief

The second stage of the Granfinanciera analysis requires this Court to characterize the type of remedy sought. This stage is more important than the first stage. Granfinanciera, 492 U.S. at 42. Plaintiff argues that the relief it seeks is a legal remedy because it is for compensatory money damages. (Doc. # 198, pp. 11-12). Even though Plaintiff has a mix of legal and equitable claims, he argues that when the relief for the breach of fiduciary duty claim is a legal remedy, the "action assumes legal attributes." Mirant, 337 B.R. at 120.

Plaintiff cites the Second Circuit Court of Appeals's Pereira case in support. In Pereira, the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. 413 F.3d at 335-37. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace under the defendants' watch. Id. at 336. The defendants maintained "that they were entitled to a jury trial on the [t]rustee's beach of fiduciary duty claim because

14

the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution." Id. at 337. The district court rejected this argument.   It classified the remedy as restitution, thus, equitable, and the defendants were not entitled to a jury trial.   See id. at 339.   The Second Circuit reversed the district court's holding. Applying the Granfinanciera test, the court concluded that for the first stage the breach of fiduciary duty claim "would have been equitable in 18th century England."   Id. at 339.   For the second stage, the Second Circuit looked to Great-West Life & Annuity Insurance Company v. Knudson, 534 U.S. 204 (2002), for guidance.   In Great-West, the Supreme Court stated that "'for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.'"   Pereira, 413 F.3d at 340 (quoting Great-West, 534 U.S. at 214).   Because the trustee's claim was for compensatory damages, rather than any particular property in the defendants' possession, the second prong of the Granfinanciera test rendered his suit legal in nature and required a jury trial.   Id. at 341.

Here, Defendants contend that the relief sought is  a mix of legal and equitable remedies, thus Plaintiff is not entitled to a jury trial.   (Doc. # 202, pp. 8-11).   Defendants try to distinguish the Pereira case from the present case on account that

15

the defendants in <u>Pereira</u> were not personally enriched from the breach of fiduciary duty, therefore, the relief was for damage. Whereas, in the present case Defendants enriched themselves and Plaintiff is seeking "classically equitable remedies, including disgorgement and equitable subordination." (Doc. # 201, p. 9).

For support, Defendants offer <u>Cantor v. Perelman</u>, No. Civ.A.97-586-KAJ, 2006 WL 318666 (D. Del. Feb.6, 2006). In <u>Cantor</u>, the trustee sued the directors of a corporation for breach of fiduciary duty and aiding and abetting in the breach. <u>Id.</u> at *2. The trustee sought to recover "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." <u>Id.</u> The court applied the <u>Granfinanciera</u> test. The first prong weighed against right to a jury trial because both of the plaintiff's claims were historically equitable. <u>Id.</u> at *7. The second prong resulted in a mix of equitable and legal remedy. <u>Id.</u> at *9. The court concluded, after commenting on the <u>Pereira</u> decision, that "compensatory damages" was legal in nature, while "benefits obtained by defendants" was an equitable remedy. <u>Id.</u> at *8-9. In its final balancing the court held that where the claims were equitable and the relief sought were both legal and equitable, it weighed against right to jury trial.

The <u>Cantor</u> case is not the proper comparison for the

present case.  First, in Cantor there were only two historically equitable claims at issue; breach of fiduciary duty and aiding and abetting the same.  The court noted that its analysis would have been impacted "if at least one of Plaintiff's claims [had been] legal rather than equitable."  Id. at *7 n.7.  That is the case here.  Plaintiff has two causes of action that have always been legal in nature and one that is historically equitable.  Second, the trustee in Cantor was clearly focused on recovering specific sums received by the directors in connection with certain transactions, see id. at *1, which made the remedy equitable.  See id. at *9.  Here, in contrast, the thrust of Plaintiff's case is on remedying the alleged harm incurred by the Debtors, rather than on merely recovering illicit gains.  Thus, Cantor is distinguishable from the present case.

The more appropriate case for this Court to look to is Pereira.  Plaintiff is seeking to recover fees and other remuneration paid to Defendants, and actual and consequential damages.  This relief is very similar to the relief the trustee in Pereira sought; for monetary damage and improperly transferred fees. The Second Circuit held that to be legal relief.  Applying the Great-West test, the relief that Plaintiff is seeking is to impose personal liability on Defendants for the damage they have caused, it is not to recover any particular fund that Defendants have in their possession.  Thus, the relief Plaintiff seeks is

compensatory monetary damages, which is "the classic form of legal relief." <u>Great-West</u>, 534 U.S. at 210 (quoting <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 255 (1993)); <u>see also, e.g.</u>, <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469, 477 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed."); <u>Billing</u>, 22 F.3d at 1245.

Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has right to a jury trial. Plaintiff in this case has presented two legal and one equitable claim and is seeking legal relief. Thus, the weighing clearly favors Plaintiff having the right to a jury trial. In sum, after balancing the two prongs of the <u>Granfinanciera</u> analysis, this Court holds that Plaintiff has the right to a jury trial.

<u>Third Stage: Claim-allowance Process or Not</u>

The third step in the <u>Granfinanciera</u> analysis is to determine whether this is a matter that Congress has assigned to a non-Article III court for adjudication without a jury. The Third Circuit has extrapolated from this prong an embedded limitation on the Seventh Amendment right. <u>Billing</u>, 22 F.3d at 1247. The limitation arises when a cause of action "falls within the process of the allowance and disallowance of claims." <u>Id.</u> at 1253. There, neither the debtor's estate nor the defendant has a Seventh

18

Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." Id.; Germain, 988 F.2d at 1330 ("For waiver to occur, the dispute must be part of the claims-allowance process.... Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue."). This limitation originated from Katchen v. Landy, 382 U.S. 323 (1966). The Supreme Court in Katchen noted that part of Congress's intent for the Bankruptcy Act of 1898 was to place the resolution of disputed claims in summary proceeding in the bankruptcy court rather than proceeding at law. Id. at 329; see Billing, 22 F.3d at 1247. It was intended to promote expediency and judicial efficiency. See Katchen, 382 U.S. at 328.

Plaintiff asserts that the subject counterclaims are not part of the claim-allowance process and offers two reasons in support. First, the causes of action are unrelated to the Engagement Letter and are not products of the Bankruptcy Code. Instead, they are state law claims that could have been asserted by Oakwood Companies against Defendants prior to the Engagement Letter. (Doc. # 198, p. 18). Second, the success or failure of Plaintiff's counterclaims would not affect the allowance or disallowance of Defendants' claims under 11 U.S.C. § 502(d). (Doc. # 198, p. 18). If Plaintiff succeeds or fails on its non-bankruptcy legal claims, only the size of the Debtors' estate would

19

be affected.

Defendants hold the opposing view.  They contend that Plaintiff's counterclaims are in response to Defendants' proofs of claim, and the relief Plaintiff seeks is a resolution of Defendants claims.  (Doc. # 201, p. 18).  They also argue that when Plaintiff requested the Court to disallow or otherwise equitably subordinate Defendants' proofs of claim it has invoked and submitted to the equitable jurisdiction of this Court.  (Doc. # 201, p. 15).  According to Defendants, the fact that Plaintiff seeks affirmative recovery on his counterclaims and could have brought his counterclaims in other forum does not affect their conclusion. (Doc. # 201 pp. 15, 18).

Claim-allowance process means that "the resolution of the dispute in which a jury trial is sought must affect the allowance of the creditors's claim in order to be part of that process." Germain, 988 F.2d at 1327.  An action that "would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process." Id. The action is only augmenting the estate "if [the trustee] wins, the estate is enlarged, and this may affect the amount . . . creditors ultimately recover on their claims, but it has no effect whatever on the allowance of the [defendant's] claim." Id. Generally, lender liability actions augment the estate. Id.

The Court is persuaded that the subject counterclaims are

20

not part of the claim-allowance process.  As Plaintiff carefully
points out in its motion, the claims that Defendants assert arise
from the Engagement Letter, whereas the subject counterclaims that
Plaintiff asserts originate from the period prior to the Engagement
Letter.  The subject counterclaims are based on the financial
institutions' alleged misconduct, separate from Defendants' proofs
of claim for services performed pursuant to the Engagement Letter.
Furthermore, Plaintiff's subject counterclaims only augment the
estate.  Plaintiff may raise the counterclaims in a separate trial,
under applicable state law, and succeed on some or all of the
counterclaims, yet it would not affect the allowance of Defendants'
claims.  The only effect that will result is that if it wins, the
estate will be augmented by the compensatory monetary damage from
Defendants.  Thus, Plaintiff's counterclaims are not part of the
claim-allowance process, and do not limit its right to a jury
trial.

Legal Claims in a Court of Equity

        As for Defendants' argument that Plaintiff submitted
itself to the equitable jurisdiction of this Court by raising these
counterclaims, the Court does not agree.  Defendants argue that the
Trust's choice to combine claim objections with affirmative
litigation before this Court somehow makes the entire adversary
proceeding part of the claims-allowance process or otherwise
triggered a categorical submission to the equitable jurisdiction of

this Court.

Circuits are split on Defendants' core proposal - that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates any and all of the estate's jury trial rights forever. See Germain, 988 F.2d 1330 ("We conclude that neither precedent nor logic supports the proposition that either the creditor or the debtor automatically waives all right to a jury trial whenever a proof of claim is filed."); In re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (debtor's petition in the bankruptcy court does not affect its right to a jury trial). But see N.I.S Corp. v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th Cir. 1991) (holding debtor consented to jurisdiction by filing bankruptcy petition and thereby waived right to jury trial); Bayless v. Crabtree Through Adams, 108 B.R. 299, 305 (Bankr. W.D. Okla. 1998), aff'd, 930 F.2d 32 (10th Cir. 1991) (holding legal assertions, otherwise subject to jury trial, brought by trustee or debtor are "open to adjudication in equity by Bankruptcy Judges under their power to afford complete relief").

The Third Circuit has not adopted Defendant's position.

The fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis. A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims. See Katchen, 382 U.S. at 336, 86 S.Ct. at 476.

22

_Billing_, 22 F.3d at 1252, n. 14.    This Court believes that Defendants' core proposal flies in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." _Ross_, 396 U.S. at 538.    Thus, the Court rejects Defendants' position.

Contractual Waiver of Jury Trial

The last ground that Defendants raise in opposition is that Plaintiff contractually waived its right to a jury trial.    In connection with the Note Purchase Agreement, on February 9, 2001, two Oakwood Companies (OHC and Oakwood Acceptance Corporation, LLC) executed agreements with a Credit Suisse entity.    Those agreements contain a jury trial waiver whereby each party

> HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PRECEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Doc. # 202, Decl. Murphy, Ex. E, p. 6).    According to Defendants, Plaintiff, in charge of liquidating the Debtors' estates, is the successor in interest to these two Oakwood Companies, and is prohibited by the waiver from seeking a jury trial on any claims "related directly or indirectly to the Note Purchase Agreement or any of the contracts related thereto under the loan purchase facility."    (Doc. # 201, p. 22).

There are several reasons why this contractual waiver does not apply here. The first is the identity of the contracting parties. The purported waiver only involves two of the Debtors. The Trust succeeded to the rights of fifteen Debtor entities[2] pursuant to a plan of reorganization that effected a substantive consolidation of all the Debtors. The Credit Suisse entity that is a party to the two agreements bears the name of "Credit Suisse First Boston, New York Branch," as agent for the warehouse facility. (Doc. # 202, Decl. Murphy, Ex. "D" at signature page, Ex. "E" at signature page.) None of Defendants here bear that name.

In their answer to the complaint (Doc. # 132), Defendants very carefully note their separateness. Footnote 1 on p. 2 of the answer states:

> The Defendants' use of "Defendants" to refer to the named Credit Suisse affiliated defendants is used for convenience only and is not an admission that any one of the Defendants is not a distinct and separate entity, or that any one of the Defendants is responsible for the liabilities of any other Defendant. Nor is any reference to "Defendants" an admission that any Defendant named or referenced in the Complaint

---

[2] These are: Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, and Oakwood MHD4, LLC.

24

> participated in any of the acts alleged in the
> complaint, except as specifically admitted
> herein.

In their response to the motion, Defendants specifically identify "Credit Suisse Securities (USA), LLC" as the target of the jury trial counts: "The remaining claims - on which the Trust now seeks a jury trial - are claims arising out of the relationship between Oakwood and [Credit Suisse Securities (USA), LLC] prior to August, 2002." (Doc. # 201, p. 7).  Obviously, Credit Suisse Securities (USA), LLC is not a party to the two agreements containing the jury trial waiver and thus it has no standing to enforce the waiver even if the Trust were bound by the commitment of two of the fifteen Debtors.

          It is fundamental that, "[g]enerally, a jury waiver provision in a contract or lease affects only the rights of the parties to that contract or lease," Hulsey v. West, 966 F.2d 579, 581 (10th Cir. 1992) (guarantor of corporate loan was not bound by jury waiver in an agreement that he did not execute in his personal capacity).  Thus, Defendants, including Credit Suisse Securities (USA), LLC, cannot all claim shelter in a waiver signed only by Credit Suisse First Boston, New York Branch.  Nor can that waiver diminish the rights of thirteen Debtors that did not sign it - rights that now belong to the Trust.

          Even if one were to ignore the "New York Branch"

25

identification, the result remains the same.  If the two agreements are read to intend that the Credit Suisse entity is simply "Credit Suisse First Boston, a Swiss banking corporation," the caption of this case identifies "Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation)" as a Defendant, but Defendants acknowledge that the target of the jury trial counts is the Defendant "Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC)."

The second problem relates to the scope of the waiver itself.  At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the Warehouse Facility.  But the legal claims are not about any breach of those agreements, or about whether Credit Suisse First Boston, New York Branch adequately performed thereunder.  Rather, it is about whether Defendants breached far broader duties, not arising from any written contract, by partaking a myriad of alleged illicit transactions with the Oakwood Companies.

Because this action is about much more than the Warehouse Facility and related agreements, it falls outside the scope of the purported waiver.  Other courts have reached the same conclusion in similar circumstances.  See, e.g., Nichols Motorcyle Supply Inc. v. Dunlop Tire Corp., 913 F. Supp. 1088, 1146-47 (N.D. Ill. 1995) (broad jury waiver in "Distributor Agreement" did not encompass any "claims that do not directly arise or have their basis in the

Distributor Agreement"); <u>Nat'l Acceptance Co. v. Myca Prods., Inc.</u>, 381 F. Supp. 269, 269-70 (W.D. Pa. 1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); <u>see also</u> <u>OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)</u>, 340 B.R. 510, 519-20 (Bankr. D. Del. 2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties).  The purported contractual waiver is far too limited to apply here.

          The final problem with Defendants' contractual waiver theory is that Defendants have not proffered any evidence to meet their burden of showing that there was no gross disparity in power between the two Oakwood Companies and Credit Suisse First Boston, New York Branch.

          The Supreme Court and the Third Circuit all agree that "because the 'right of jury trial [in a civil case] is fundamental, courts [should] indulge every reasonable presumption against waiver.'" <u>Tracinda Corp. V. DaimlerChrysler AG.</u>, 2007 U.S. App. LEXIS 22221, *22-23 (3d Cir. Sept. 18, 2007) (quoting <u>Aetna, Inc. v. Kennedy</u>, 301 U.S. 3890, 393 (1937)); <u>Collins v. Gov't of Virgin Islands</u>, 366 F.2d 279, 284 (3d Cir. 1966).  A valid, enforceable waiver clause must meet the knowing and voluntary standard, which requires that: (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business

27

entities; (3) the parties had opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous. <u>First Union Nat'l Bank v. United States</u>, 164 F.Supp. 2d 660, 663 (E.D. Pa, 2001); <u>Tracinda Corp.</u>, 2007 U.S. App. LEXIS 22221 at *23. Given the presumption against waiver "the burden of proving that a waiver was done knowingly and intelligently falls upon the party seeking enforcement of a waiver . . . clause." <u>First Union Nat'l Bank</u>, 164 F.Supp. 2d at 663.

In this case Defendants bear the burden of proving the waiver clause is enforceable. Looking at the factors, there is no question as to the sophistication and intelligence of the parties who entered into the agreements. Question arises, however, regarding the bargaining positions of the parties when they entered into the Note Purchase Agreement.

Plaintiff points to a video deposition by Mr. Douglas R. Muir, a officer of OHC. In the deposition Mr. Muir stated that finding a successor facility to its then credit providers, Bank of America, was critical and had to be done. (Doc. # 204, Decl. Holt, Ex. B, at 52:13-16). However, there was not "a half a dozen credit providers lined up at the door, each of which was offering to do [the] transaction. At the time [Defendants] w[ere] the only game in town." (Doc. # 204, Decl. Holt, Ex. B, at 51:13-16). Additionally, there was pressure from Bank of America to take it out of the facility, or it would have charged Oakwood Companies

28

large fees.   (Doc. # 204, Decl. Holt, Ex. B, at 52:6-12).   Given the critical nature of the transaction, the lack of candidates, and the pressure from Bank of America, there is a good argument that the two Oakwood Companies were at a severely disadvantaged bargaining possession.   Thus, they did not have any leverage to fairly negotiate the terms of the Note Purchase Agreement.   Because Defendants did not offer any evidence to the contrary, Defendants failed to meet its burden of proof that the parties had equal bargaining position.   Consequently, because this Court must construe the waiver narrowly and any ambiguity is to be decided against the waiver, the waiver is not enforceable here.

## **Conclusion**

For the reasons stated above, Plaintiff's motion for determination of Plaintiff's rights to a jury trial is granted. Plaintiff does have the right to a jury trial on three of its 10 counts.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, | ) Case No. 02-13396 (PJW) |
| et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adv. Proc. No. 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit | ) |
| Suisse First Boston, a Swiss | ) |
| banking corporation), Credit | ) |
| Suisse Securities (USA), LLC | ) |
| (f/k/a Credit Suisse First | ) |
| Boston LLC), Credit Suisse | ) |
| Holdings (USA), Inc. (f/k/a | ) |
| Credit Suisse First Boston, | ) |
| Inc.), and Credit Suisse (USA), | ) |
| Inc. (f/k/a Credit Suisse First | ) |
| Boston (USA), Inc.), the | ) |
| subsidiaries and affiliates of | ) |
| each, and Does 1 through 100, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

For the reasons set forth in the Court's memorandum opinion of this date, the motion of OHC Liquidation Trust for determination of Plaintiff's rights to a jury trial (Doc. # 198) is granted to the extent that three of the 10 counts in the complaint are entitled to a jury trial.

Peter J. Walsh
United States Bankruptcy Judge

Date: November 15, 2007

**EXHIBIT B**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | Adversary Proceeding No. 04-_____ (PBL) |
| Credit Suisse First Boston, a Swiss banking | ) | |
| corporation, Credit Suisse First Boston LLC, a | ) | |
| Delaware limited liability corporation, Credit | ) | |
| Suisse First Boston, Inc., Credit Suisse First | ) | |
| Boston (U.S.A.), Inc., a Delaware corporation | ) | |
| and a wholly owned subsidiary of Credit Suisse | ) | |
| First Boston Inc., the subsidiaries and affiliates | ) | |
| of each, and Does 1 through 100, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**OBJECTION TO PROOFS OF CLAIM FILED BY CREDIT SUISSE FIRST BOSTON LLC; COUNTERCLAIMS FOR (1) BREACH OF FIDUCIARY DUTY; (2) NEGLIGENCE; (3) UNJUST ENRICHMENT; (4) EQUITABLE SUBORDINATION; (5) AVOIDANCE AND RECOVERY OF 90 DAY PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550; (6) AVOIDANCE AND RECOVERY OF ONE YEAR PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550; (7) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548 AND 550; (8) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 544 AND 550 AND APPLICABLE STATE LAW; (9) BREACH OF IMPLIED AND EXPRESS CONTRACT; AND (10) DEEPENING INSOLVENCY; AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page(s)**

I. JURISDICTION AND VENUE ...................................................................................... 1

II. THE PARTIES .............................................................................................................. 1

    A.    Plaintiff. ............................................................................................................ 1

    B.    Defendants. ....................................................................................................... 3

III. INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS
     AND COUNTERCLAIMS FOR RELIEF ................................................................. 6

    A.    Brief background of the Debtors' business. ....................................................... 6

    B.    The financing of retail home sales. .................................................................... 6

    C.    Funding for short-term liquidity needs. ............................................................ 9

    D.    CSFB encouraged the Debtors to ramp-up the loan assumption
          program. .......................................................................................................... 10

         1.    Manufactured housing faced challenging market conditions. ................... 10

         2.    CSFB encouraged Debtors to aggressively use the loan
             assumption program. ............................................................................... 11

         3.    CSFB provided underwriting services in connection with the
             Debtors' public term securitizations from 1994 through 2002 .................. 14

         4.    Beginning in 2001, CSFB took on the added role of the
             Oakwood Companies' lead lender on the warehouse facility. ................... 15

         5.    In exchange for agreeing to provide the warehouse facility,
             among other things, CSFB demanded and received warrants
             in the Debtors with a value just under 20%. ............................................. 17

         6.    At all relevant times, CSFB provided the Debtors with
             restructuring and financial advisory services. ........................................... 18

    E.    Debtors' road to bankruptcy ........................................................................... 21

    F.    CSFB's proofs of claim. .................................................................................. 22

    G.    Transfers to CSFB. ......................................................................................... 23

IV. OBJECTIONS TO CSFB-LLC CLAIMS ................................................................... 25

V. COUNTERCLAIMS ................................................................................................ 26

    FIRST COUNTERCLAIM FOR RELIEF  (Breach Of Fiduciary Duty
    Against All Defendants) ................................................................................... 26

    SECOND COUNTERCLAIM FOR RELIEF  (Negligence Against All
    Defendants) ...................................................................................................... 28

    THIRD COUNTERCLAIM FOR RELIEF  (Unjust Enrichment Against
    All Defendants) ................................................................................................ 28

    FOURTH COUNTERCLAIM FOR RELIEF  (Equitable Subordination
    Against Defendant CSFB-LLC) ...................................................................... 29

    FIFTH COUNTERCLAIM FOR RELIEF  (Avoidance And Recovery Of
    Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All Defendants) ..... 30

    SIXTH COUNTERCLAIM FOR RELIEF  (Avoidance and Recovery of
    Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All
    Defendants) ...................................................................................................... 31

    SEVENTH COUNTERCLAIM  (Recovery of Fraudulent Transfer,
    11 U.S.C. §§  548 and 550 Against All Defendants) ......................................... 32

    EIGHTH COUNTERCLAIM  (Fraudulent Transfer Under 11 U.S.C. § 544
    And State Law Against All  Defendants) ......................................................... 33

    NINTH COUNTERCLAIM  (Breach of Implied and Express Contract
    Against All Defendants) ................................................................................... 34

    TENTH COUNTERCLAIM  (Deepening Insolvency Against All
    Defendants In The Event This Is Determined To Be A Separate Claim For
    Relief Rather Than A Form Of Damages) ........................................................ 35

VI. PRAYER FOR RELIEF ...................................................................................... 36

DEMAND FOR JURY TRIAL .................................................................................. 38

In support of its objection to the proofs of claim filed by Credit Suisse First Boston LLC, successor to Credit Suisse First Boston Corporation, and counterclaims against those and other entities within the Credit Suisse Group (as defined below), the OHC Liquidation Trust ("Liquidation Trust" or "Plaintiff") by and through its duly appointed trustee Alvarez & Marsal, LLC, hereby alleges as follows:

## I.

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1334 and 157, in that this adversary proceeding is a civil proceeding arising under and/or relating to cases arising under title 11 of the United States Code, jointly administered under In re Oakwood Homes Corporation, et al., Case No. 02-13396 (PJW) (collectively, the "Bankruptcy Cases").

2.     Venue in this District is proper under 28 U.S.C. § 1409 because the Bankruptcy Cases to which this action relates are pending before this Court.

3.     This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Plaintiff demands a jury trial of any issue triable by a jury.

## II.

### THE PARTIES

A.     **Plaintiff.**

4.     Oakwood Homes Corporation ("OHC," and together with all of its subsidiaries and affiliates the "Oakwood Companies") and certain of its subsidiaries and affiliates are the above-captioned reorganized debtors (collectively, the "Debtors") in the Bankruptcy Cases

currently pending in the United States Bankruptcy Court for the District of Delaware (the

"Court").  The Debtors' Bankruptcy Cases are jointly administered under Case Number 02-13396

(PJW).  OHC Liquidation Trust, defined earlier as "Liquidation Trust" is Plaintiff and is

authorized to bring and prosecute this adversary proceeding, as described below.

      5.    OHC was a North Carolina corporation with its principal place of business

in Greensboro, North Carolina.  At all times relevant to this adversary proceeding, the Debtors

designed, manufactured, marketed, and, in some instances, financed, manufactured and modular

homes.  At the time of the chapter 11 filing, the Debtors had manufacturing plants in multiple

states including Texas, North Carolina, Georgia, Indiana, Oregon, Arizona, Pennsylvania,

California, Colorado, Kansas, Minnesota and Tennessee.  The homes manufactured by the Debtors

were sold under the registered trademarks "Oakwood," "Freedom," "House Smart," "Golden

West," "Schult," "Crest," "Marlette," and the trade name "Victory."

      6.    On November 15, 2002 (the "Petition Date") certain of the Debtors filed

with Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The remaining

Debtors filed for chapter 11 protection on March 5, 2004.

      7.    By order ("Confirmation Order") entered on March 31, 2004, the Court

confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood

Homes Corporation and Its Affiliated Debtors and Debtors in Possession" ("Plan").  The Plan

became effective as to all but one of the Debtors on April 13, 2004 (the "Effective Date"), and for

the remaining Debtor on April 27, 2004.

      8.    Pursuant to Paragraph 40 of the Confirmation Order, Section 6.3(b) of the

Plan, and the Liquidation Trust Agreement dated April 13, 2004 (the "LTA"), the executed version

of which was annexed to the Plan Supplement filed on April 14, 2002 [Docket No. 3972], the

Liquidation Trust was deemed established as of the Plan's Effective Date.

9.      Pursuant to the Confirmation Order, the Plan, and the LTA, the Liquidation

Trust holds the right to prosecute, compromise, and settle all of the Debtors' Estate's Claims and

Causes of Action (as defined in Sections 1.1(54) and 1.1(52) of the Plan, respectively).  This

objection and the related counterclaims against Defendants described below are properly brought

by the Liquidation Trust pursuant to the above provisions of the aforementioned documents.  Each

of the counterclaims are Claims or Causes of Action with which the Liquidation Trust was vested

as of the Effective Date, and which the Liquidation Trust has full right and title to prosecute,

compromise, and/or settle.

**B.      Defendants.**

10.      <u>Defendant Credit Suisse First Boston</u> is a Swiss banking corporation

("CSFB-Swiss"). CSFB-Swiss is identified in a certain note purchase agreement dated February 9,

2001, as the agent.  Plaintiff is informed and believes, and on that basis alleges, that CSFB-Swiss

is the indirect parent of Defendant Credit Suisse First Boston (USA), Inc. and certain of its

subsidiaries and affiliates.  Plaintiff is informed and believes, and on that basis alleges, that CSFB-

Swiss, directly and through its subsidiaries and affiliates, engaged in the conduct described in the

allegations below.  Plaintiff is informed and believes, and on that basis alleges, that each and all of

the Credit Suisse First Boston entities named as defendants or involved in any fashion in this

adversary proceeding are related to CSFB-Swiss under the umbrella designation of the Credit

Suisse Group.  If that understanding is error, these pleadings shall be amended to correct this

information.

Defendant Credit Suisse First Boston, LLC ("CSFB-LLC"), the successor to Credit Suisse First Boston Corporation, is the "creditor" identified on the proofs of claim to which the Liquidation Trust hereby objects. Plaintiff is informed and believes, and on that basis alleges, that CSFB-LLC, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant Credit Suisse First Boston (USA), Inc. ("CSFB-USA"), a Delaware corporation, and its subsidiaries and affiliates, is an integrated investment bank serving institutional, corporate, government and high-net worth individual clients. This Defendant provides its clients with a broad range of products and services that includes securities underwriting, sales and trading, financial advisory services, restructuring advisory services, private equity investments, full-service brokerage services, derivatives and risk management products and investment research. Plaintiff is informed and believes, and on that basis alleges, that Defendant CSFB-USA is the parent of various subsidiaries relevant to this adversary proceeding. Plaintiff is informed and believes, and on that basis alleges, that CSFB-USA, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below.

Defendant Credit Suisse First Boston, Inc. ("CSFBI") owns all of the outstanding voting Common Stock of Credit Suisse First Boston (USA), Inc. Plaintiff is informed and believes, and on that basis alleges, that CSFBI, directly and through its subsidiaries and affiliates, engaged in the conduct described in the allegations below. Collectively, the Credit Suisse Group of Defendants shall be referred to throughout as "CSFB" or "Defendant" unless specific delineation is known and otherwise material.

Defendants, Does 1 through 100 ("Does") are believed to be the subsidiaries or affiliates of the CSFB defendants. Plaintiff is informed and believes, and on that basis alleges, that the Doe defendants acted in concert with and at the direction of the CSFB defendants as CSFB agents. Throughout this complaint, by this reference, the conduct ascribed to CSFB shall also be ascribed to the Doe defendants. Should there be an error or mistake as to the name of the entities for which culpable conduct may be ascribed, these pleadings will be amended to correct that mistake by correctly identifying a Doe defendant.

11. Since at least 1994, CSFB was the Oakwood Companies' securities underwriter. In this capacity, CSFB wrote more than approximately $7.5 billion in Oakwood Companies' securities, including underwriting more than $1.5 billion in Oakwood Companies' securities while also serving as the Oakwood Companies' primary lender and the Debtors' restructuring and financial advisor. In or about February 2001, CSFB became a secured lender to the Oakwood Companies pursuant to what is commonly referred to as the $200 million "CSFB Warehouse Facility." In connection with becoming the Oakwood Companies' warehouse lender, CSFB demanded and received, in or about February 2001, warrants to purchase OHC's common stock (the "CSFB Warrants"), which, if exercised by CSFB, would have a value of just under 20% of the then-outstanding common stock of OHC. Plaintiff is informed and believes, and on that basis alleges, that CSFB stood in the role of restructuring and financial advisor since at least in or about 2000. On or about August 19, 2002, CSFB formalized a role it had held implicitly for some time and, pursuant to a letter agreement, CSFB became the Debtors' exclusive restructuring and financial advisor. As described in more detail below, in these various capacities, Defendants occupied both a fiduciary position, and that of an "insider" of the Debtors as that term is defined in Bankruptcy Code section 101(31) and applicable state law. Moreover, because the Debtors were

within the vicinity or zone of insolvency since at least 2000, and because CSFB occupied both a

fiduciary position and that of an insider vis-à-vis the Debtors, CSFB also occupied a fiduciary

position and duty to the Debtors' creditors.

## III.

## INTRODUCTORY ALLEGATIONS COMMON TO ALL OBJECTIONS AND COUNTERCLAIMS FOR RELIEF

**A.       Brief background of the Debtors' business.**

12.    From their origin in 1947, the Oakwood Companies provided modest or

affordably priced housing.  The Debtors designed and manufactured a number of models of

homes, including single- and double-wide units.  As of September 30, 2002, the Debtors sold

manufactured homes through 224 company-owned and -operated sales centers located in 26 states,

primarily in the Southeast and Southwest United States.  The Debtors also sold their homes to

approximately 600 independent retailers located throughout the United States.

**B.       The financing of retail home sales.**

13.    The Oakwood Companies served as the mortgage lender, or "bank," for the

majority of the homes sold through the Debtors' retail sales centers and a portion of the homes sold

through independent dealers.  During the Debtors' fiscal year 2002, approximately 72% of the

units sold through the Debtors' retail centers were financed by mortgage loans provided to the

purchaser of the home by the Debtors.

14.    The Oakwood Companies' ability to offer their customers mortgage

financing or retail installment sales contracts (collectively, "RICs") was dependent on the amount

of funds available to the Debtors.  The Debtors obtained the funds necessary to provide their

customers with financing primarily through a two-step, asset-backed securitization process

conceived, arranged, controlled, implemented and underwritten by CSFB.  Initially, the Debtors

obtained financing on the RICs by using the RICs as collateral to borrow against the warehouse

facility (beginning in 2001 CSFB, was a lender and agent on the CSFB Warehouse Facility).

Once the Warehouse Facility had accumulated a sufficient amount of RICs (typically $150 million

to $200 million), the RICs would be bundled through a series of complex transfers and

transactions involving various of the Oakwood Companies which included both Debtor and non-

Debtor affiliates and others[1] for sale to private and institutional investors through a real estate

mortgage investment trust ("REMIC") which issued "REMIC Certificates."  For example, during

fiscal 2001, $854 million of the Oakwood Companies' REMIC Certificates were sold and

underwritten by CSFB, and during 2002, $853 million of the Oakwood Companies' REMIC

Certificates were sold and underwritten by CSFB.  In theory, the Debtors were not to have credit

exposure with respect to these securitized contracts, REMIC Certificates, except (i)  with respect to

breaches of representations and warranties, (ii) to the extent of any retained interest in a REMIC,

(iii) with respect to required servicer advances, (iv) with respect to the servicing fee (which was

subordinated), and (v) with respect to any REMIC security the Debtors had guaranteed.  In

practice, under the loan assumption program, described below, the Debtors shouldered a much

greater credit exposure.

     15.  Payments of principal and interest on the REMIC Certificates were funded

by payments of principal and interest that were made by obligors on the underlying RICs (i.e., the

---

[1]  Oakwood Acceptance Corporation ("OAC"), one of the Debtors, sold the RICs to Ginkgo
Corporation.  Ginkgo Corporation, in turn, sold them to Oak Leaf Holdings, LLC.  Oak Leaf
Holdings, LLC then sold them to OMI Note Trust, which pledged them to OMI Note Trustee
under the terms of an indenture, to secure the trust's debt to CSFB and its affiliates under the
2001-A Class A Notes.  Ginkgo Corporation, Oak Leaf Holdings, LLC and OMI Note Trust

purchasers of the homes).[2]  Each REMIC trust typically issued various tranches of REMIC

Certificates, each with a different level of seniority and credit quality.  Although the entire pool of

RICs owned by a particular REMIC trust would fund payments on all REMIC Certificates issued

by that trust, the credit quality and seniority of a particular tranche of REMIC Certificates would

vary; that was determined in advance of purchase by a "waterfall" of payment priorities.  In

exchange for higher risk that followed from agreeing to subordinate their payment priority to

senior tranches, holders of subordinated tranches generally received higher interest rates.

Generally speaking, the Debtors, with CSFB's assistance and participation, would sell the higher-

rated tranches of REMIC Certificates in a public offering and sell the most subordinated tranches

of REMIC Certificates (collectively, the "B-Piece REMIC Certificates") in a private offering.

When the underwriters were unable to sell the B-Piece REMIC Certificate resulting from a

particular securitization, that piece would be transferred to a special purpose subsidiary, Oakwood

Financial Corporation ("OFC"), in exchange for cash in the amount of its fair market value.

      16.    To enhance the marketability of the B-Piece REMIC Certificates, OHC

provided a limited guaranty of principal to an aggregate amount of approximately $275 million

plus interest on certain of the B-Piece REMIC Certificates (collectively, the "B-2 Guarantees").

Under the terms of the B-2 Guarantees, generally, if the underlying RICs owned by the REMIC

trust did not generate enough cash to make all required payments on the B-Piece REMIC

Certificates (i.e. if the default rates on the underlying mortgages reached a level that resulted in

---

were all special purpose entities.

[2]    As will be discussed in greater detail herein, in certain circumstances where the customers or
obligors defaulted on their loan payments, the Debtors' made the necessary payments on the
securitized RICs.

insufficient cash available to service all of the tranches), OHC was obligated to eventually make

up the difference by making payments directly to the holders of B-2 Guarantees.  As of 2001,

National Indemnity Company, an affiliate of Berkshire Hathaway, Inc., and, therefore, directly or

indirectly Berkshire, was one of the largest institutional holders of B-Piece REMIC Certificates.

As further inducement to sell certain REMIC Certificates, the Debtors provided an additional

guarantee that, upon default, all payments would be accelerated.

**C.    Funding for short-term liquidity needs.**

    17. In order to provide financing for its products and meet cash needs for

operations, the Oakwood Companies maintained three lines of credit that were used to meet short-

term liquidity needs.

       a. <u>The Revolving Line of Credit</u>:  Plaintiff is informed and believes,

and on that basis, alleges that initially, First Union National Bank ("First Union") provided

a revolving line of credit.  However, when First Union sought to be replaced, beginning in

about January 2002, the Debtors obtained a Sixty-Five Million Dollar ($65,000,000)

revolving line of credit ("Revolving Line") with a group of syndicated lenders, the agent of

which was Foothill Capital Corporation ("Foothill"), one of the syndicated lenders.  This

Revolving Line was supposed to be used predominantly to meet the capital operating needs

of OHC; however, during all material time periods, this line was also, at times, used to

fund the loan assumption program ("LAP").  All borrowings under the Revolving Line

were secured by substantially all of the Debtors' assets, tangible and intangible, real and

personal, excluding loans held for sale by the Debtors.

       b.   <u>The Warehouse Facility</u>:  The second source of funding was what the Debtors referred to as their "Warehouse Facility."  Unlike the Revolving Line, which was used to fund the Debtors' general capital operating needs on a short-term basis, the Warehouse Facility was a short-term facility used to fund the mortgages that were made available to manufactured home buyers.  The Warehouse Facility was initially provided by an affiliate of Bank of America ("BofA"), Enterprise Funding Corporation.  Plaintiff is informed and believes, and on that basis, alleges that when BofA determined not to renew the Warehouse Facility, in or about February 2001, CSFB stepped into the role of agent and lender on the "CSFB Warehouse Facility" in addition to maintaining its lucrative position as securities underwriter.  The Warehouse Facility acted much like the revolving line of credit, but with important differences that are discussed in greater detail herein below.

       c.   <u>The Servicer Advance Facility</u>:  OAC, a wholly owned subsidiary of OHC, financed the performance of certain of its principal and interest advance ("P&I Advance") obligations under the Pooling and Servicing Agreements pertaining to each REMIC trust and the Warehouse Facility agreements by securitizing the receivable represented by its right to reimbursement of P&I Advances from the REMIC trusts through a devoted "Advance Line" provided by Prudential Investment Management, Inc.

**D.     CSFB encouraged the Debtors to ramp-up the loan assumption program.**

     **1.     Manufactured housing faced challenging market conditions.**

     18.   Since at least 1999, the manufactured housing industry has faced challenging market conditions.  For example, industry shipments in 2001 were approximately half the industry's peak in 1998.  For the Oakwood Companies, these challenging market conditions

translated into declining revenues and cash flows. The Oakwood Companies' total revenues of $1.1 billion for fiscal 2001 fell relative to fiscal year 2000 total revenues. This decline in revenue reflected weakness in both retail and wholesale sales as well as a decline in financial services income. Economic conditions, among other factors, contributed to a rise in delinquencies and repossessions during this period as well. One of the biggest challenges the Debtors faced was to maintain sufficient liquidity during the downturn in order to position themselves to take advantage of the hoped-for upturn.

19.    Plaintiff is informed and believes, and on that basis alleges that, fully aware of the challenges facing the Debtors and the manufactured housing industry, armed with insider information, and in breach of its fiduciary duties, CSFB sought to further enrich itself, through exorbitant fees and other remuneration, by at a minimum negligently prolonging the life of the Debtors' securitization program that not only deepened the insolvency of the Debtors but, eventually drove them into bankruptcy.

### 2.    CSFB encouraged Debtors to aggressively use the loan assumption program.

20.    One of the key statistics for purchasers of REMICs is the repossession and default rates on the RICs. For example, the higher the Debtors' historical repossession or default rates, the larger the discount to par or corporate guarantee from the Debtors necessary to successfully securitize the RICs. Additionally, repossessions usually resulted in a shortfall in cash flow available to service all of the tranches of the REMIC Certificates. By way of example, upon a borrower default, and before the LAP was used as aggressively as it was between 2000 and 2002, OAC (as servicer of the RICs) would repossess, refurbish and resell the home. Usually the cash received from the sale of the repossessed home was less than the outstanding balance on the

defaulted loan. When OAC believed it had collected everything it could to satisfy the underlying, defaulted loan, the loan was removed from the REMIC trust and replaced with the cash realized by OAC from the sale of the repossessed home. Repossessed manufactured homes, even when sold at retail rather than wholesale, typically sell for less than a new manufactured home and usually less than the outstanding balance on the defaulted loan. The REMIC trust recorded, as a loss, the shortfall between the outstanding balance on the defaulted loan and the cash received from the sale of the repossessed home. This shortfall in turn meant that there would be less, and perhaps insufficient, cash available to pay the obligations of the REMIC trusts (including OAC's Servicing Fees and the interest-only certificates retained by the Debtors, which had been subordinated).

21.    As a result of the increased loan defaults, and with either CSFB's implicit or explicit encouragement, the Debtors ramped up the use of a program called the loan assumption program ("LAP"). A distant variant of the LAP had been used infrequently by the Debtors prior to 2000 and only in those cases where the existing obligor found a third-party with satisfactory credit to assume its loan at a minimum cost. Accordingly, instead of the Debtors repossessing the home once the borrower became delinquent on its loan payments, the original obligor would find a third-party to purchase the home and assume the remaining payments on the underlying RIC. However, during the period the Debtors were insolvent or in the zone of insolvency, the LAP morphed into a grossly overused program that became not only unsustainable, but also resulted in the expenditure of a significant amount of cash that could otherwise have been used in the Debtors' operations.

22.    CSFB knew of and/or encouraged the Debtors use of LAP to subsidize the cash flows to the REMICs resulting from increasing defaults on the underlying mortgages or RICs. CSFB knew or should have known that the Debtors increasing use of LAP was not sustainable in light of the continued decline in the Debtors operations and the manufactured home

market as a whole.  The Debtors use of LAP to subsidize the REMIC cash flows served to, among other things, delay the calling of the B-2 Guarantees and the acceleration of the guarantee payments under the Lotus B-Piece Certificates.  During the Debtors' extensive use of LAP, the Debtors' were clearly insolvent or in the zone of insolvency; therefore, the calling of the B-2 Guarantees or the acceleration of the guarantee payments under the Lotus B-Piece Certificates would have had a number of negative effects in light of the Debtors' tenuous position; including limiting if not eliminating the Oakwood Companies' ability to continue to access the asset backed securities market which CSFB had developed into a continuous and very lucrative business with respect to the Oakwood Companies and, upon information and belief, other companies in the manufactured home industry.  If evidence is discovered that CSFB deliberately overlooked or concealed material information, in order keep the Debtors' business afloat and to pocket fees, or generate other internal profit taking, for securitizations and loans that should not have been permitted to occur, these allegations will be amended.

23.    As discussed briefly above, over the years, CSFB developed a multi-layered relationship with the Debtors in which trust and confidence was bestowed upon and accepted by CSFB.  The relationship began as early as 1994 when CSFB became the Debtors' securities underwriter.  Over the course of at least 25 securitizations in excess of $7 billion, CSFB gained a thorough understanding of the manufactured home industry and the Debtors' business as well as the strengths and weaknesses of each.  This relationship between the Oakwood Companies, including Debtors, on the one hand, and CSFB, on the other, grew to that of an insider and a fiduciary when CSFB became the agent and the lender on the CSFB Warehouse Facility, a substantial and powerful warrant holder, and the Debtors' restructuring and financial advisor.  Despite its position as both a fiduciary and an insider, CSFB breached the duties associated with

the Debtors' repose of trust and confidence, and failed in its role as restructuring and financial advisor, causing the Debtors' irreparable financial harm.

      **3.**      **CSFB provided underwriting services in connection with the Debtors' public term securitizations from 1994 through 2002.**

      24.      In or about 1994, CSFB assumed the obligation to provide securities underwriting services to the Oakwood Companies. During the life of this relationship, CSFB participated in more than 25 offerings and collected underwriting fees of at least $30 million. CSFB's services included, but were not limited to, advising and assisting management and the directors of the Oakwood Companies with setting the terms of the sales of securities, effecting the sale, and conducting reasonable due diligence into the accuracy of written representations in the prospectus, testing the financial information contained in the prospectus by examining the basis for reporting that information directly relevant to the likelihood of default or stress testing the asset pools (the "Underwriting Services"). Pursuant to the underwriting agreement standard provisions dated May 1999 (the "Standard Provisions Underwriting Agreement"), CSFB and other underwriters, agreed to purchase, from Debtor Oakwood Mortgage Investors ("OMI") the aggregate outstanding principal amount of the underwritten certificates. The certificates would be issued by the trust established by OMI pursuant to a Pooling and Servicing Agreement and for which Chase Manhattan Trust Company, National Association would act as trustee. These certificates would be resold in the capital markets.

      25.      In connection with each asset-backed securitization ("ABS") offering, with a great deal of assistance from, if not under the direction of CSFB personnel, a prospectus was prepared that provided prospective investors with information pertaining to each asset in the securitized pool of assets. Prior to issuing the prospectus, Plaintiff is informed and believes, and

on that basis, alleges that the Debtors provided CSFB personnel with enormous amounts of confidential information. This detailed information, included among other things, the historical loss experience of the securitized pool of assets, the repossession and foreclosure rates, and the credit quality of each manufactured home buyer. As part of the process of preparing the prospectus, CSFB thoroughly examined, the data for public dissemination. In addition, CSFB provided the rating agencies (e.g., Standard & Poors and Moody's and Fitch) with information sufficient to obtain bond ratings for each tranche of REMIC Certificates to be issued. Plaintiff is informed and believes, and on that basis alleges that CSFB was given access to all deal files and closing binders on all RICs to be included in each securitized asset pool. It had access to prior deal files and monthly tracking reports. CSFB had access to information not otherwise publicly available.

   4.    **Beginning in 2001, CSFB took on the added role of the Oakwood Companies' lead lender on the warehouse facility.**

   26.    In the second half of 2000, at a critical time for the Oakwood Companies, when the Oakwood Companies' current warehouse lender was abandoning them which would have led to the immediate collapse of its securitization business, CSFB began negotiations to assume the role of lender and agent on the Warehouse Facility. Pursuant to the (a) Custodial Agreement dated February 9, 2001, (b) the Class A Note Purchase Agreement dated February 9, 2001, (c) the Sale and Servicing Agreement dated February 9, 2001, (d) the Trust Agreement dated February 9, 2001, and (e) the Indenture dated February 9, 2001 (all as amended from time to time, collectively, the "CSFB Warehouse Facility Documents"), the Oakwood Companies obtained a receivables purchase facility from CSFB (called the "CSFB Warehouse Facility" or "CSFB Warehouse Line") for interim liquidity needs primarily related to their mortgage financing operations. Pursuant to the Class A Note Purchase Agreement, CSFB, as agent, agreed with the

Oakwood Companies (in various roles as issuer, depositor, and transferor) to provide the borrowing necessary to ensure the Debtors had sufficient liquidity to access the asset-backed securitization markets and maintain their pre-securitization financing operations in connection with the sale of manufactured housing. Plaintiff is informed and believes, and on that basis alleges that CSFB was paid significant fees in its role as lender under the CSFB Warehouse Facility in addition to the fees paid to CSFB with respect to its role as underwriter and restructuring advisor.

   27. The CSFB Warehouse Facility operated effectively like the Revolving Line. OAC would originate a home loan by selling a manufactured home to a buyer and agreeing to finance it through RICs. In principle, CSFB would advance funds to the Debtors based on the size of the RIC, so long as the RIC fell within the definition of an "eligible" receivable described in the Sale and Servicing Agreement, and so long as the aggregated total of these home loans did not exceed the available "borrowing base" also defined contractually in the Sale and Servicing Agreement. CSFB's advances on the RICs were secured by issuer notes secured by loans and funneled through a series of Debtor-affiliated and non-Debtor entities, e.g., from OAC (the Seller and Servicer, and a wholly owned subsidiary of OHC) to Ginkgo Corporation (the Transferor, and an unaffiliated special-purpose entity owned by Lord Securities, secretly recommended by CSFB), to Oak Leaf Holdings LLC (the Depositor, and 100% owned by Oakwood Capital Corporation), to OMI Note Trust (the Issuer, and special-purpose entity wholly owned by Oak Leaf), until it arrived back at OAC for financing. Plaintiff is informed and believes, and on that basis alleges, that the notes issued by OMI Note Trust and secured by the RICs were "purchased" by Alpine Securitization Corp. ("Alpine"), owned by Global Securitization LLC, on an "uncommitted" basis, and CSFB on a "committed" basis. Plaintiff is informed and believes, and on that basis, alleges

that Alpine is a CSFB affiliate.  CSFB acted as the ultimate decision maker with respect to shutting down the CSFB Warehouse Facility in the event of a default of the loan indenture or a termination event.  In other words, CSFB acted as agent for Alpine as well as lender and agent for the Oakwood Companies.

28.    Central to this continuous funding activity was the availability of advances based on the loan commitment and a calculation of the borrowing base under the CSFB Warehouse Facility.  Once the loan commitment was reached or the available borrowing base was exhausted, the CSFB Warehouse Line had to be "cleared" so that further borrowing could take place.  Plaintiff is informed and believes, and on that basis, alleges that Alpine would continue to build its purchase of notes for a period of about three months, until CSFB was ready to market the next securitization.  Once cleared, the CSFB Warehouse Facility was again available for borrowings, and the process started again.

29.    Plaintiff is informed and believes, and on that basis, alleges that just before the bankruptcy filing, CSFB suddenly, and surprisingly suspended the CSFB Warehouse Facility.  Then days following the bankruptcy filing, CSFB attempted to collect a  $3 million-dollar fee but this time said it was to "restart" the CSFB Warehouse Facility it had unexpectedly shut down the day the Debtors sought bankruptcy protection.

**5.    In exchange for agreeing to provide the warehouse facility, among other things, CSFB demanded and received warrants in the Debtors with a value just under 20%.**

30.    In addition to the other various fees and reimbursements requested by CSFB in connection with the Warehouse Line, CSFB demanded that it receive warrants covering a significant number of shares of OHC's common stock as additional compensation.  On or about

December 20, 2000, OHC's board of directors ("OHC Board") voted to approve the Debtors' entry

into the CSFB Warehouse Facility.  On or about December 20, 2000, the OHC Board entered a

resolution providing that the warrant and registration rights agreement ("CSFB Warrant

Agreement") that had been described in the Warehouse Facility term sheet with CSFB was

authorized and approved.  The OHC Board further resolved, authorized and approved all deeds

necessary to issue and register the warrants under both State and Federal securities laws.  Finally,

OHC reserved approximately 9.5 million shares of common stock for issuance upon exercise of

the warrants without the need for further resolutions from the OHC Board.  The number of shares

described in the CSFB Warrant, if and when exercised, provided CSFB with an ownership interest

in OHC of just under 20%, which, pursuant to New York Stock Exchange regulations, was the

largest amount that could be granted by the Debtors without obtaining general shareholder

approval.  Thereafter, on or about February 26, 2001, the CSFB Warrant Agreement was executed.

31.    CSFB's Warrant, exercisable at any time through 2009, for just under 20%

of OHC's common stock, provided CSFB with enormous leverage by the shear magnitude of its

potential ownership interest.  Together with its role as restructuring and financial advisor, lender

on the CSFB Warehouse Facility, and the Debtors' primary underwriter of its securitization

program, Plaintiff is informed and believes, and on that basis, alleges that CSFB was a controlling

force and literally had the ability to shut down the Debtors' business.

**6.    At all relevant times, CSFB provided the Debtors with restructuring and financial advisory services.**

32.    The Debtors' financial problems were a result of, among other factors,

CSFB's encouragement of the continued use of LAP, a downturn in the manufactured housing

industry, a weakened economy, and, as it turns out, at least in part from borrowing, lending, loan

servicing and financing practices that led to an increasingly large number of delinquent loans and repossessions that in turn lead to the Debtors' insolvency, deepening insolvency, and bankruptcy. CSFB knew or should have known about the Debtors' borrowing, lending, liquidity, loan servicing and financing practices since at all relevant times it played a critical role in each activity and was the Debtors' restructuring and financial advisor.  Furthermore, once CSFB officially took the title of the Debtors' exclusive restructuring and financial advisor with respect to the Debtors' significant liquidity constraints in 2002, CSFB provided restructuring advice that was negligent and ultimately led to a myriad of unnecessary expenses and obligations incurred by the Debtors. Among other things, CSFB's woefully deficient restructuring and financial advisory services ultimately resulted in the Debtors' termination of CSFB as restructuring and financial advisor.

33.    Plaintiff is informed and believes, and on that basis alleges, that well prior to its formalized restructuring advisory letter agreement in August 2002, the Debtors regularly consulted CSFB on financial and restructuring advisory matters.  But clearly, in the midst of the Debtors' downward financial spiral, the Debtors relied on CSFB—an insider and fiduciary to the Debtors – for restructuring and financial advice.  On or about August 19, 2002, CSFB and certain of the Debtors (collectively, the "Debtor Signatories") formalized the *de facto* relationship that had existed for years and entered into that certain letter agreement pursuant to which CSFB was retained to provide restructuring and financial advisory services to the Debtors and their non-Debtor affiliates in connection with certain potential restructuring transactions (the "Financial Advisory Agreement").  CSFB was rewarded for its efforts as the Debtors' *de facto*, and then actual, restructuring and financial advisor with enormous fees embedded into its underwriting and lending fees and profit, and with the intangible benefit of power and control over the Debtors' business.  At all relevant times before the actual execution of the Financial Advisory Agreement,

Plaintiff is informed and believes, and on that basis alleges that CSFB was already conducting itself in a fashion consistent with that of a party to the "inner-circle" by providing restructuring and financial advisory services.

34.    The Financial Advisory Agreement provided that CSFB would render restructuring advisory services to OHC in connection with any sale transaction and any restructuring transaction.  In addition, the Financial Advisory Agreement provides that CSFB will assist the Debtors in connection with those activities as well as performing other advisory services. CSFB further agreed to act as dealer/manager with respect to any restructuring transaction commencing on or prior to the termination date, and to act as the exclusive placement agent for the Debtors in connection with any sale of its securities.  In light of the Debtors' dire liquidity position at that time, which CSFB was aware of, or should have been well aware of, relative to CSFB's role as, at a minimum, secured lender and underwriter, CSFB's role as restructuring and financial advisor was to advise and prepare the Debtors for an eventual chapter 11 filing, including arranging for debtor-in-possession ("DIP") financing that would allow the Debtors the flexibility to continue to operate in chapter 11 and maximize the value of their business for the benefit of their creditors.  Indeed, the Financial Advisory Agreement expressly required that the Debtors attempt to employ CSFB as their excusive financial advisor in any chapter 11 case it filed. However, CSFB's failures as restructuring and financial advisor resulted in the termination of CSFB at or around the Petition Date, the Debtor filing for chapter 11 without a material amount of DIP financing[3] or the CSFB Warehouse Facility in place, and a resultant disruptive and

---

[3]    The Debtors did not obtain permanent DIP financing until January 2003 approximately 2 months after the Petition Date.

unnecessarily expensive post-petition process to find a DIP lender. CSFB dropped the ball, which resulted in the Debtors' incurring unnecessary fees and expenses.

35.    Pursuant to the Financial Advisory Agreement, CSFB received $1,811,129.54 in advisory fees from August 19, 2002 through November 15, 2002 - the dates of termination of CSFB and the corresponding Financial Advisory Agreement. And, in one of its last acts of self-dealing toward the companies to which it owed fiduciary duties, CSFB, on the eve of Debtors' bankruptcy filing, using its position as a trusted advisor and member of the inner-circle attempted to leverage a multi-million dollar payout from the Debtors as its advisor on an unperformed, and therefore, unearned contract fee.

**E.    Debtors' road to bankruptcy**

36.    Since CSFB had access to virtually all of the Oakwood Companies' financial information, CSFB knew or should have known:

- the dramatic decline in sales for the entire manufactured homes industry since at least 1998,

- the continued decline in the Debtors' operations from at least 2000 through 2002,

- that the Debtors' use of the LAP was growing at an unsustainable rate and that the LAP was draining the Debtors of precious financial resources that would otherwise have been available for use in the Debtors' operations,

- that the Debtors' LAP expenditures were subordinated to the end of the term of the affected RIC, and that the Debtors knew some advances would never be collected,

- that some of the credit quality of the borrowers was deteriorating over the life of the LAP and that the same homes were being placed into LAP three or four times, and

- that once the Debtors discontinued LAP in July 2002, the Debtors' liquidity and financial position was tenuous at best and that the Debtors needed to implement a strategy immediately to gain short-term liquidity as well as accomplish the much broader goal of restructuring its untenable capital structure.

37.    Plaintiff is informed and believes, and on that basis alleged, that CSFB, a fiduciary and insider, deliberately chose to tacitly, if not expressly, encourage Debtors' continued use of a program that CSFB knew, or should have known, was unsustainable and draining the Debtors of precious liquidity.  It is believed, and on that basis alleged, that CSFB did that to enrich itself at the expense of the Debtors and their creditors.  On or about November 15, 2002, certain Debtors filed for protection under chapter 11 of the United States Bankruptcy Code.

F.    **CSFB's proofs of claim.**

38.    CSFB-LLC is listed in the Debtors' Schedule of Assets and Liabilities (the "Schedules") as holding a claim in excess of $3,288,391.54 (the "Scheduled Claims").

39.    Defendant CSFB-LLC filed an identical proof of claim in the jointly-administered cases of Debtor Oakwood Homes Corporation, Debtor Oakwood Mobile Homes, Inc., Debtor HBOS Manufacturing, LP, and Debtor OAC in a partially contingent and

unliquidated amount of $2,082,588.04, which claims have been assigned claim numbers 6118,

6119, 6120, and 6121, respectively, for purposes of the docketing system in the Bankruptcy Cases

(collectively, the "Filed Claims" and together with the Scheduled Claims, the "CSFB-LLC

Claims").

40.     Despite Defendants' breach of the Financial Advisory Agreement, its

facilitation of the securitization process that brought about deepening insolvency, its breach of

fiduciary duty, its self-dealing, and its inequitable conduct, Defendant seeks payment for certain

fees and expenses allegedly due and owing under the Financial Advisory Agreement.

**G.      Transfers to CSFB.**

41.     Within 90 days of the Petition Date, the Oakwood Companies transferred to

CSFB a total of at least $166,811,129.54 (the "90 Day Transfers").  Below is a chart depicting the

90 Day Transfers to CSFB.

| Parent Name | Amount | Check Number | Date |
|---|---|---|---|
| Credit Suisse First Boston | $129,000,000.00 | 100533 | 08/31/02 |
| Credit Suisse First Boston | 36,000,000.00 | 100536 | 09/13/02 |
| Credit Suisse First Boston | 1,205,833.50 | 100584 | 11/01/02 |
| Credit Suisse First Boston | 300,000.00 | 100604 | 10/01/02 |
| Credit Suisse First Boston | 150,000.00 | 100288 | 11/15/02 |
| Credit Suisse First Boston | 150,000.00 | 100053 | 10/15/02 |
| Credit Suisse First Boston | 4,595.08 | 100028 | 10/15/02 |
| Credit Suisse First Boston | 700.96 | 100289 | 11/15/02 |
| Total | $166,811,129.54 | | |
| Total Fees Under Financial Advisory Agreement | $    1,811,129.54 | | |

42.     Within one year of the Petition Date, the Oakwood Companies transferred to CSFB a total of at least $595,845,398.42 (the "One Year Transfers" and together with any and all transfers to any and all CSFB entity or for the benefit of such entity, including but not limited to expenses associated with LAP, the "Transfers").  Below is a chart depicting the One Year Transfers to CSFB.

| Transferee | Transfer Amount | Date |
|:---:|:---:|:---:|
| CSFB | 546,920.14 | 11/15/2001 |
| CSFB | 562,905.23 | 12/17/2001 |
| CSFB | 423,809.21 | 1/15/2002 |
| CSFB | 520,204.17 | 2/15/2002 |
| CSFB | 507,080.00 | 3/15/2002 |
| CSFB | 482,471.75 | 4/15/2002 |
| CSFB | 588,702.92 | 5/15/2002 |
| CSFB | 599,053.76 | 6/17/2002 |
| CSFB | 470,063.68 | 7/15/2002 |
| CSFB | 602,556.22 | 8/15/2002 |
| CSFB | 587,143.61 | 9/16/2002 |
| CSFB | 511,847.52 | 10/15/2002 |
| CSFB | 633,876.15 | 11/15/2002 |
| CSFB | 627,243.90 | 12/7/2001 |
| CSFB | 345,840.00 | 2/14/2002 |
| CSFB | 513,612.67 | 2/28/2002 |
| CSFB | 179,860.00 | 3/12/2002 |
| CSFB | 839,728.30 | 5/31/2002 |
| CSFB | 286,300.00 | 6/14/2002 |
| CSFB | 705,049.65 | 8/30/2002 |
| CSFB | 117,500,000.00 | 12/7/2001 |
| CSFB | 5,000,000.00 | 12/19/2001 |
| CSFB | 88,000,000.00 | 2/28/2002 |
| CSFB | 22,000,000.00 | 3/14/2002 |
| CSFB | 144,000,000.00 | 5/31/2002 |
| CSFB | 42,000,000.00 | 6/14/2002 |
| CSFB | 129,000,000.00 | 8/31/2002 |
| CSFB | 36,000,000.00 | 9/13/2002 |
| CSFB | 300,000.00 | 10/1/2002 |
| CSFB | 154,595.08 | 10/15/2002 |
| CSFB | 1,205,833.50 | 11/1/2002 |
| CSFB | 150,700.96 | 11/15/2002 |

| Transferee | Transfer Amount | Date |
|---|---|---|
|  | $595,845,398.42 |  |

43.    Each of the above transfers is a "transfer" as that term is defined in Bankruptcy Code section 101(54).

## IV.

## OBJECTIONS TO CSFB-LLC CLAIMS

44.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 43, inclusive, as though fully set out.

45.    The Plaintiff objects to the CSFB-LLC Claims on each of the following grounds:

a.    The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(b)(1) for the reasons set forth in the Counterclaims below;

b.    The CSFB Claims should be disallowed in their entirety pursuant to 502(b)(4) based on the conduct above.  CSFB-LLC's claim exceeds the reasonable value of its purported services;

c.    The CSFB-LLC Claims should be disallowed in their entirety pursuant to Bankruptcy Code section 502(d), because CSFB-LLC is an entity from which property is recoverable under Bankruptcy Code section 550, and is a transferee of a transfer avoidable under Bankruptcy Code sections 544, 547 and 548, and applicable state law, for the reasons set forth in the Counterclaims below, and CSFB-LLC has not paid the

amount or turned over any such property for which it is liable pursuant to those

Bankruptcy Code sections to the Debtors;

        d.     The CSFB-LLC Claims should be disallowed in their entirety

because CSFB breached the Financial Advisory Agreement and caused significant harm to

the Debtors including, but not limited to, grossly unnecessary fees, expenses and interest

on the alternate DIP financing and other expenses.  Alternatively, the contingency under

which a fee for Financial Advisory Services would be paid was not satisfied; and/or

        e.     As the Debtors' cases have been substantively consolidated for

distribution purposes pursuant to the Plan as confirmed, the duplicative CSFB-LLC Claims

must be disallowed as CSFB-LLC is only entitled to recover for one claim against the

substantively consolidated estates.

        46.     In the alternative, the Plaintiff requests that the CSFB-LLC Claims, in part

or in total, be equitably subordinated to all other claims against the Debtors, pursuant to

Bankruptcy Code section 510(c) for the reasons set forth in the Counterclaims below.

V.

**COUNTERCLAIMS**

**FIRST COUNTERCLAIM FOR RELIEF**

**(Breach Of Fiduciary Duty Against All Defendants)**

        47.     Plaintiff incorporates by this reference the allegations of paragraphs 1

through 46 inclusive as thought fully set out.

48.    As a result of this multi-layered and multi-faceted relationship with the Debtors, CSFB owed the Debtors a fiduciary duty of loyalty and care.  Moreover, because the Debtors were within the zone or vicinity of insolvency for much of the period pre-petition, CSFB owed the Debtors' creditors fiduciary duties.

49.    CSFB had access to and knowledge of confidential and inside information. Despite its knowledge of the Debtors failing financial health, CSFB continued to underwrite ABS offerings and wrongly facilitated those offerings through the extension of credit from the CSFB Warehouse Facility.  These actions were a breach of fiduciary duty and took place at a time when the Debtors' financial health left Debtors in the zone of insolvency, then financially distressed, and, then, actually deepened the Debtors' insolvency.  The net effect of CSFB's knowing activity was to cause the Debtors to remain in business solely for the purpose of generating lender, investment banking, and restructuring and financial advisory fees for the benefit of CSFB.

50.    Negligently, grossly negligently, recklessly or intentionally, CSFB failed to perform its fiduciary duties, causing deepening insolvency and damages and unjustly enriching itself at the expense of the Debtors.

51.    The Liquidation Trust is entitled to demand CSFB's disgorgement of all fees and other remuneration unjustly paid to CSFB in its multiple conflicting capacities from at least 2000 through the Petition Date and to recover consequential and actual damages, and damages for deepening insolvency.

## SECOND COUNTERCLAIM FOR RELIEF

### (Negligence Against All Defendants)

52.     Plaintiff incorporates by this reference the allegations of paragraphs 1 through 51 inclusive as though fully set out.

53.     CSFB owed Oakwood Companies, including Debtors, a duty of care. CSFB breached that duty of care.  CSFB's conduct as alleged above was negligent, falling well below the standards of care for a reasonable person, caused Oakwood Companies, including Debtors damages that were foreseeable in nature.

54.     As a result of CSFB's conduct as alleged above, and because of it, Debtors suffered damages in an amount to be proved at trial.

## THIRD COUNTERCLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

55.     Plaintiff incorporates by this reference the allegations of paragraphs 1 through 54 inclusive as though fully set out.

56.     CSFB has benefited, directly or indirectly, in each and every act alleged herein, and has benefited, directly or indirectly, from the retention, use, investment, and reinvestment of proceeds of such acts.  Through the conduct alleged above, CSFB has been unjustly enriched to the detriment of the Debtors and their estate, which did not derive benefit from the acts alleged herein.

57.     Because the remedy at law is inadequate, the Liquidation Trust is entitled to disgorgement of all fees and other remuneration paid to CSFB and to all benefits derived from

such unjust enrichment from in or about 2001 through the Petition Date and/or to recover damages including, but not limited to, deepening insolvency.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Equitable Subordination Against Defendant CSFB-LLC)

58.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 57 inclusive as though fully set out.

59.    CSFB-LLC has engaged in inequitable conduct, including, without limitation, breach of fiduciary duties, and breach of contract.  CSFB-LLC used its position as underwriter, lender, equity holder, and restructuring and financial advisor to the Oakwood Companies and Debtors to serve its own interests garnering enormous fees and other advantages unjustly enriching itself.

60.    CSFB-LLC's misconduct resulted in injury to the estate, the Debtors, and other creditors and conferred an unfair advantage on CSFB-LLC.

61.    Equitable subordination of the CSFB-LLC Claims is not inconsistent with the provisions of the Bankruptcy Code.

62.    As a result of CSFB-LLC's inequitable conduct, the CSFB-LLC Claims should be equitably subordinated pursuant to Bankruptcy Code section 510(c).

## FIFTH COUNTERCLAIM FOR RELIEF

### (Avoidance And Recovery Of
### Preferential Transfers, 11 U.S.C. §§ 547 and 550 Against All
### Defendants)

63.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 62 inclusive as though fully set out.

64.    At least some, if not all, of the 90 Day Transfers were transfers of an interest of one or more of the Debtors in property.  This claim for relief applies to all of the 90 Day Transfers that are determined to be transfers of an interest of the Debtors in property.

65.    Each of such 90 Day Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the 90 Day Transfers was made.

66.    Such 90 Day Transfers were made while the Debtors were insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

67.    Such 90 Day Transfers were made or perfected by the Debtors to or for the benefit of Defendants on or within the period of ninety (90) days before the Petition Date.

68.    Such 90 Day Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtors' chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the 90 Day Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

69.    Such 90 Day Transfers constitute an avoidable preference under 11 U.S.C. § 547.

70.    Such 90 Day Transfers were made to or for the benefit of the Defendants, and consequently, Plaintiff is entitled to recover such avoided 90 Day Transfers from Defendants under 11 U.S.C. § 550.

## SIXTH COUNTERCLAIM FOR RELIEF

### (Avoidance and Recovery of Preferential Transfers to an Insider, 11 U.S.C. §§ 547 and 550 Against All Defendants)

71.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 70 inclusive as though fully set out.

72.    At least some, if not all, of the One Year Transfers were transfers of an interest of one or more of the Debtors in property.  This claim for relief applies to all of the One Year Transfers that are determined to be transfers of an interest of the Debtors in property.

73.    Each of such One Year Transfers was on account of an antecedent debt owed by the Debtors to Defendants before each of the One Year Transfers was made.

74.    Such One Year Transfers were made while the Debtor was insolvent, as "insolvent" is defined by 11 U.S.C. § 101(32).

75.    Such One Year Transfers were made or perfected by the Debtors to or for the benefit of the Defendants on or within the period of one year before the Petition Date.

76.    Such One Year Transfers made to Defendants enabled Defendants to receive more than it would have received if: (a) the Debtor's chapter 11 Bankruptcy Cases were cases under chapter 7 of the Bankruptcy Code, (b) the One Year Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided for by the Bankruptcy Code.

77.     Such One Year Transfers constitute an avoidable preference under 11 U.S.C. § 547.

78.     Such One Year Transfers were made to or for the benefit of the Defendants, and consequently, Plaintiff may recover the avoided One Year Transfers from Defendants under 11 U.S.C. § 550.

## SEVENTH COUNTERCLAIM

### (Recovery of Fraudulent Transfer, 11 U.S.C. §§ 548 and 550 Against All Defendants)

79.     Plaintiff incorporates by this reference the allegations of paragraphs 1 through 78 inclusive as though fully set out.

80.     At least some, if not all, of the Transfers were transfers of an interest of one or more Debtors in property.  This claim for relief applies to all of the Transfers that are determined to be transfers of an interest of one or more of the Debtors in property.

81.     The Transfers were made by one or more of the Debtors for less than reasonably equivalent value.

82.     The Debtors (i) were insolvent on the date of the Transfers, or became insolvent as a result of such Transfers, (ii) engaged in a business or transaction, or were about to engage in a business or transaction, for which the property that remained with the Debtors after the Transfers was an unreasonably small capital; or (iii) intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

83.    The Transfers represent an avoidable fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

84.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to 11 U.S.C. § 550 the avoidable Transfers or the value of the avoidable Transfers.

## EIGHTH COUNTERCLAIM

### (Fraudulent Transfer Under 11 U.S.C. § 544 And State Law Against All Defendants)

85.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 84, inclusive, as though fully set out.

86.    Pursuant to 11 U.S.C. § 544(b), a debtor may avoid any transfer of any interest of the debtor or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502 or that is not allowable only under 11 U.S.C. § 502(e). At least some, if not all, of the Transfers were transfers of an interest of one or more Debtors in property. This claim for relief applies to all of the Transfers that are determined to be transfers of an interest of one or more of the Debtors in property.

87.    There exist unsecured creditors of the Debtors' holding allowable claims under 11 U.S.C. § 502, and these unsecured creditors were creditors of the Debtors at the time of the Transfers, which are voidable under applicable state law by such unsecured creditors.

88.    Transfers were made by one or more of the Debtors without such Debtors receiving a reasonably equivalent value in exchange for such Transfers.

89.    The Debtors (i) were insolvent on the date of such Transfers, or became insolvent as a result of such Transfers; (ii) engaged or were about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction, or (iii) intended to incur, or believed that they would incur, debts beyond the Debtors' ability to pay as such debts became due.

90.    The Transfers represent an avoidable fraudulent transfer under applicable state law.

91.    As a result of the foregoing, Plaintiff is entitled to recover from the Defendants pursuant to applicable state law and 11 U.S.C. §§ 544(b)(1) and 550 the avoidable Transfers or the value of the avoidable Transfers.

## NINTH COUNTERCLAIM

### (Breach of Implied and Express Contract Against All Defendants)

92.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 91, inclusive, as though fully set out.

93.    At all relevant times, CSFB was either explicitly engaged as the Oakwood Companies' restructuring and financial advisor or advised the Oakwood Companies as if it had been explicitly engaged as their restructuring and financial advisor.

94.    The Debtors performed all conditions precedent to CSFB's obligations to perform restructuring and financial advisory services both implied, and under the express Financial Advisory Agreement.  Alternatively, the Debtors 'performance was excused or as a result of CSFB's own conduct.

95.    CSFB breached its obligation to provide restructuring and financial advisory services under its implied agreement to do so, as well as under the express Financial Advisory Agreement, including the covenant of good faith and fair dealing implied in both.

96.    As a proximate result of CSFB's breach, the Debtors suffered damages in an amount to be proved at trial.

## TENTH COUNTERCLAIM

### (Deepening Insolvency Against All Defendants In The Event This Is Determined To Be A Separate Claim For Relief Rather Than A Form Of Damages)

97.    Plaintiff incorporates by this reference the allegations of paragraphs 1 through 96, inclusive, as though fully set out.

98.    CSFB induced the Debtors to continue their costly borrowing and financing policies and practices, despite knowledge that the Debtors were insolvent, or in the vicinity or zone of insolvency since at least as of 2000 or 2001.

99.    Moreover, as the Debtors' fiduciary, insider, and restructuring advisor, among other things, CSFB should have been preparing the Debtors for bankruptcy by attempting to conserve all assets.  CSFB breached these and its fiduciary duties;

100.    Accordingly, because of CSFB's *de facto* control of the Debtors, and CSFB's role as facilitator, if not more, of the Oakwood Companies securitization process well after insolvency, CSFB has violated the doctrine of deepening insolvency and is liable for damages in amounts to be proved at trial.

# VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter a judgment for Plaintiff on this Complaint:

A.    For disallowance in its entirety of the CSFB-LLC Claims.

B.    That CSFB-LLC's Claims be subordinated for all purposes to the claims of all other creditors in the Bankruptcy Case.

C.    For a determination that:

(i) the 90 Day Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the 90 Day Transfers under 11 U.S.C. § 550,

(ii) the One Year Transfers are avoidable as preferential transfers under 11 U.S.C. § 547, and that Plaintiff is entitled to recover the One Year Transfers under 11 U.S.C. § 550,

(iii) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 548, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550,

(iv) the Transfers are avoidable as constructively fraudulent transfers under 11 U.S.C. § 544 and applicable state law, and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550, and

(v) the Transfers, or the value thereof, should be preserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

D.    Disgorgement of all fees, sums, payments to CSFB and any profits derived

unjustly thereon by all the Oakwood Companies.

E.    For damages according to proof.

F.    For prejudgment interest, post judgment interest, attorneys fees, and costs as

allowable by applicable law.

G.    And for such further relief as is just.


Dated: November 13, 2004
        Wilmington, Delaware

                                /s/ Marla R. Eskin
                                MARLA R. ESKIN (#2989)
                                CAMPBELL & LEVINE, LLC
                                800 N. King Street, Suite 300
                                Wilmington, DE 19801

                                AND
                                TONY CASTANARES(CA SBN 47564)
                                STEPHAN M. RAY (CA SBN 89853),
                                PAMALA J. KING (CA SBN 125786), and
                                MARGRETA M. SUNDELIN (CA SBN 224950),
                                Members of STUTMAN, TREISTER & GLATT
                                PROFESSIONAL CORPORATION
                                1901 Avenue of the Stars
                                12th Floor
                                Los Angeles, CA 90067

                                Special Counsel for the OHC Liquidation Trust

## DEMAND FOR JURY TRIAL


Plaintiff requests a trial by jury on all issues so triable.


Dated:  November 13, 2004
        Wilmington, Delaware


                 /s/ Marla R. Eskin
                 MARLA R. ESKIN (#2989)
                 CAMPBELL & LEVINE, LLC
                 800 N. King Street, Suite 300
                 Wilmington, DE 19801

                 AND

                 TONY CASTANARES(CA SBN 47564)
                 STEPHAN M. RAY (CA SBN 89853),
                 PAMALA J. KING (CA SBN 125786), and
                 MARGRETA M. SUNDELIN (CA SBN 224950),
                 Members of STUTMAN, TREISTER & GLATT
                 PROFESSIONAL CORPORATION
                 1901 Avenue of the Stars
                 12th Floor
                 Los Angeles, CA 90067

                 Special Counsel for the OHC Liquidation Trust

i

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| OAKWOOD HOMES CORPORATION, | . | Case No. 02-13396(PJW) |
| *et al.,* | . | Jointly Administered |
| | . | |
| Debtors. | . | Sept. 25, 2006 (11:30 a.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1                THE CLERK: Please rise.

2                THE COURT: Please be seated.  Sorry for the delay.

3                MR. MILLER: *No problem.  Good afternoon, Your*

4       *Honor.  For the record, Curtis Miller from Morris, Nichols,*

5       *Arsht & Tunnell, on behalf of the OHC Liquidation Trust.*

6       *We're here today for the omnibus hearing in this matter.*

7       *Does Your Honor have a copy of the agenda?*

8                THE COURT: Yes.

9                MR. MILLER: Okay.  The first six items on the

10      agenda are all continued to a future omnibus hearing, so

11      unless Your Honor has questions, we'll just move to 7.

12               THE COURT: Okay.

13               MR. MILLER: Agenda item number 7 was the motion of

14      the Liquidation Trust to extend the claims and the claims

15      objection deadline, and I understand from speaking with Your

16      Honor's clerk that you've entered that order?

17               THE COURT: Yes.

18               MR. MILLER: Okay.  Thank you, Your Honor.  Agenda

19      item number 8 is the first of two contested matters listed as

20      going forward.  Agenda item number 8 is the Liquidation

21      Trust's ninety-sixth omnibus objection to claims.  This was a

22      substantive omnibus objection and is going forward today with

23      respect to a response received from Rudolph Rambo who is also

24      in court today, Your Honor.  The Trust objected to Mr.

25      Rambo's claim on the basis of § 502(d) of the Bankruptcy

1    Code.   The Liquidation Trust filed a preference action

2    against Mr. Rambo and received a judgment against him on

3    March 28th of 2006.  As set forth in the affidavit attached to

4    the ninety-sixth omnibus objection, Mr. Rambo has not paid

5    back the avoided transfers to these estates.  Thus § 502(d)

6    of the Bankruptcy Code requires their disallowance.  Mr.

7    Rambo has raised with me a question of whether or not he

8    received adequate notice of the preference action, and I just

9    wanted to briefly go through that with Your Honor to

10   establish a record.  First, the complaint and the summons

11   were served to Mr. Rambo at the same address at which the

12   Trust served the ninety-sixth omnibus objection, thus, the

13   Trust admits that if he was able to respond to the ninety-

14   sixth omnibus objection, he also received adequate notice of

15   the complaint and summons.  Despite this notice, Your Honor,

16   Mr. Rambo never complied with the ADR requirements that were

17   entered.  He never responded to the Liquidation Trust

18   discovery requests, and he never responded to the Trust's

19   request for entry of default judgment.  In addition, Mr.

20   Rambo's attorney, an attorney by the name of John Ethridge,

21   sent various letters to the Trust's former counsel

22   demonstrating that he did actually have notice of the

23   preference action, and I have copies of those letters.

24            THE COURT: Was an answer filed?

25            MR. MILLER: No answer was ever filed, and that's

1    why a default judgment was eventually entered.  And I have

2    copies of those letters from his counsel, if you would like

3    to see those, Your Honor.

4              THE COURT: Yes, let me see them.

5              MR. MILLER: May I approach?

6              THE COURT: Yes.

7              MR. MILLER: The first three letters are from Mr.

8    John Ethridge from the Gardner Law Firm in Florence, South

9    Carolina, and the letters are dated October 21, December 3rd,

10   and December 28th of 2004.  The fourth letter in that packet,

11   Your Honor, is a letter from King & Spalding, the Liquidation

12   Trust's former counsel that was handling the preference

13   actions and was sent to both Mr. Ethridge and Mr. Rambo

14   letting them know that he was in default by failing to

15   respond to the complaint or file and otherwise respond to the

16   pleading, and that was sent on December 31 of 2005.  Despite

17   these notices, he never answered the complaint, never filed –

18             THE COURT: I'm sorry, when was the complaint filed?

19             MR. MILLER: The complaint was filed on November

20   12th, 2004.

21             THE COURT: Let's see.  I'm looking at the first

22   letter.

23             MR. MILLER: Yes, Your Honor.

24             THE COURT: Was this in response to a demand letter?

25             MR. MILLER: I believe so, Your Honor.  Our firm was

1   not handling the preference actions, but I was forwarded

2   these by counsel that was.

3          THE COURT: Okay.

4          MR. MILLER: And just a final note, Your Honor, the

5   order that's previously been entered for other claims that

6   were disallowed pursuant to § 502(d) provides a mechanism for

7   the reinstatement of the claims if Mr. Rambo subsequently

8   pays back the ordered transfers, and that's the same order,

9   the proposed order that we have here.

10         THE COURT: Okay, and how much was the judgment for?

11         MR. MILLER: I believe it was in the range of

12  $164,000, but I'm not sure if I have it with me.  I don't

13  think I brought a copy of the complaint, but I think it was

14  around $164,000, Your Honor.

15         THE COURT: Okay, and what is this claim?

16         MR. MILLER: There are two proofs of claims -

17         THE COURT: Okay, I see them.

18         MR. MILLER:  - that he filed.  I think there's only

19  actually one that's in the agenda binder.  I have the second

20  one if you'd like to see it.  The claims are 3868 and 3869,

21  and I can bring up the second one if you'd like to see it,

22  Your Honor.

23         THE COURT: Okay.  Okay.  I already have 3868 in the

24  book, and then there's a smaller one; isn't there?

25         MR. MILLER: Yes, I -

1           THE COURT: Okay, I see both of them.

2           MR. MILLER: 3869 is the --

3           THE COURT: I see both of them, the other one for

4    3,165.

5           MR. MILLER: Yes, Your Honor.

6           THE COURT: Okay.  And that's essentially it from

7    the Trust.  Mr. Rambo, I believe, would like to make some

8    comments to the Court.

9           THE COURT: Mr Rambo?

10          MR. RAMBO: Yes, Your Honor.

11          THE COURT: Do you wish to be heard?

12          MR. RAMBO: Yes, sir if you don't mind.

13          THE COURT: Yes.

14          MR. RAMBO: How are you doing this morning?  All

15   right, Your Honor, as you can see, they put a judgment

16   against me, to start with.  I'm just a little uncomfortable

17   because I don't know too much about all this, and my lawyer,

18   he's a good friend of mine.  He's a criminal lawyer, so he

19   don't know too much about it, but he's just doing it to help

20   me out is all he can.  As you see, with the first three

21   pages, of these here letters that we've been writing, we've

22   been pleading with Spalding to help us out, but the matters,

23   you know, before all this judgment stuff come about, and if

24   you'll read the letters, you'll see how hard that we was

25   trying to work with these people, trying to get them to, you

1   know, help us out, and all of a sudden, they send us this

2   paper, and that was the end of it.  We didn't know how to

3   respond to this line.  My lawyer said we didn't receive this

4   here, but, you know, they got it here, so undoubtedly we must

5   have got it somewhere, and it got mixed up or lost.  But we

6   still don't know for this here.  They filed a judgment on for

7   $164,000, that's for the last 90 days prior to them filing

8   for bankruptcy.  But they hadn't paid me for the following 45

9   days.  You know, I worked strictly labor for them.  I worked

10  in them hot mobile homes trashing them out, fixing them back

11  up, you know, degree weather, you know 120, 140 degrees.  Oh

12  my gosh, they're small people.  They work by the hour, and

13  the only thing was, we just worked, you know, strictly labor,

14  and for them to try to do us - I talked to a lady named Betty

15  Jones that was handling this thing, and she told me the only

16  way I could get out of this right here is to give her the

17  social security numbers, the addresses, and the names of my

18  employees so she could file a judgment on them.  Well, where

19  I come from, we don't do things like that.  I'm responsible

20  for my guys that work for me.  Therefore, owe was responsible

21  for me.  That's the way my granny always told me, an honest

22  dollar for an honest hour, and that's the way we always done

23  it with them.  I don't see it right, you know, for them

24  putting a judgment on me for $164,000 because it will take

25  20 years for me to pay that off.  I work by the hour, you

1    know, and that's just the way it is, and they owe me $72,000

2    – well, minus the little over 10,000 they've already paid me,

3    you know, over the last four years, and this is just not

4    right, and my lawyer told me I'm at the mercy of your

5    judgment, whatever you want to do to me that's what we have

6    to live with, but right's right, and wrong's wrong, and what

7    they're trying to do to me is wrong.

8            THE COURT: Well, you were represented by counsel,

9    and counsel was certainly put on notice that if they didn't

10   respond default judgment would be entered.

11           MR. RAMBO: He does have a phone number for you to

12   call in –

13           THE COURT: Pardon?

14           MR. RAMBO: He can be reached right now where he

15   says he doesn't have a copy of this default letter in the

16   file at all.

17           THE COURT: Well, but he certainly had knowledge of

18   the claim being asserted and – let me just look at the second

19   letter.

20           MR. RAMBO: Yes, sir, if you're reading it, it's

21   like we're trying to ask for all the help we can get, and

22   they don't want to help us because we wrote them three

23   different times, and they never wrote us back, and then all

24   of a sudden we get this here default letter thing.  We still

25   don't know what to do with it, you know, we're still a shot

1    in the dark here.

2            THE COURT: Well, I'm looking at the December 3

3    letter which was after the November 12 complaint was filed.

4    So, I have to assume that your counsel received that

5    complaint, and the address is on all the - all the letters

6    are consistent with your attorney having knowledge -

7            MR. RAMBO: Yeah, just my attorney's, mine it's not.

8            THE COURT: Pardon?

9            MR. RAMBO: I said, my address was not correct on

10   here, and they do know my correct one because they sent it to

11   my post office box all the time.  Well, the only thing I'm

12   telling you, Your Honor, we tried to talk - even after I left

13   from here, I even tried to contact the people.  I went

14   through his office to start with, I do believe.  I talked to

15   the guys that was up here.  I can't exactly remember the name

16   because I didn't write them down, for some reason, but none

17   of them wants to help us out whatsoever, at all.  You know,

18   they told me, don't do nothing here, the last time I was

19   here.  Don't say nothing or anything, we'll just get it

20   postponed.  Here I am again.  I'm 600 miles from home, still

21   don't know what I'm doing.  My lawyer don't even know what

22   we're doing here.  All in fact we want -

23           THE COURT: It's your lawyer's responsibility to

24   know what's going on.

25           MR. RAMBO: He's just a good friend.  He's not

1   getting paid.  He's doing it for me free because I can't

2   afford an attorney, and the guys up here at Delaware that

3   called me and they said, for the $164,000 judgment, that they

4   got on me, which is incorrect to start with, because they

5   don't - I didn't receive $164,000 in three months from them.

6   That's only in 45 days, you know, if you count the time -

7   unless they're counting the money they owed me too, you know,

8   against it, but it's not money they paid me for the 90 days,

9   because that's incorrect.  If you see their record you'd find

10  that out because I only made - in the last 90 days I worked

11  for him, Your Honor, I think I cleared about $100,000 - Well,

12  I didn't clear it, but that's what we turn, plus what they

13  owed us, but I had to pay off all my guys, and I went

14  bankrupt myself, you know, but I didn't file bankruptcy.  I

15  just went out of business, and I'm out of business.  So,

16  therefore, them putting a judgment on me and me worrying

17  about our, that means I can't own nothing the rest of my life

18  for my three kids or nothing, for my wife, or anything.  This

19  is just wrong.  Please just help me, that's all I ask.

20          THE COURT: Yeah, I can't help you out.  Your lawyer

21  was on notice and a default judgment was entered.

22          MR. RAMBO: We didn't never see this default

23  judgment, Your Honor.  We wrote these letters, and they never

24  responded o none of them.  If not for that one little old

25  lady, and she just told me how I was.  The only way for me to

1    get out of this here is to give her the names and numbers of

2    all the guys that worked for me, and they'll file a judgment

3    against them, and I couldn't do that.  Because those guys

4    have got families too.  This is not humanly right.  You know,

5    we slaved for Oakwood.  You know I didn't go to Oakwood

6    asking them for a job.  They tracked me down for three weeks

7    to ask me to do this, to help them out.  They asked me to do

8    everything for them, and I did, and the last 30 days prior to

9    them filing bankruptcy, this was the notice I got for me.

10   Rambo, something's coming up, within 30 days.  We need every

11   house we got in the field finished up.   Please work as hard

12   as you can and get it done.  My guys worked anywhere from 12

13   to 16 hours a day in this hot, heat and cold where they was

14   at.  This is not right, you know, and I don't know why people

15   think it is, but it's not.  You know, this is ridiculous.

16   You know, I can understand not paying me my money that you

17   owed me, for them not paying money they owed me.  Don't go

18   back and try to get me to pay them something that I don't owe

19   them, that I earned, hard.  I didn't show up for pay before.

20   I worked and I sweated and I froze my butt off for it, that's

21   all there is to it.  I just ask for mercy.

22          THE COURT: Okay, well, I'm sorry.  I can't help you

23   out.  You were represented by counsel, and -

24          MR. RAMBO: Well, would you mind calling him?

25          THE COURT: Pardon?

1      MR. RAMBO: You can reach him by phone. He'll show

2  you there's nothing, we never did get this default paper.

3  Notice of default. I got 16 stacks of paper, this here high,

4  where they sent me, and I've looked through every one of

5  them, and it's not in them. I mean, literally, stacks and

6  stacks of paper. And I've saved everyone of them.

7      THE COURT: Okay. The only comment I can add, Mr.

8  Rambo, is that in bankruptcies, a lot of people get hurt,

9  including a lot of small businesses.

10      MR. RAMBO: So, it's all right for them to come back

11  on me like that? I can understand not paying me the money

12  they owe me, which is small compared to what they want. They

13  want $164,000, which is not correct. I'm telling you, Your

14  Honor, it's not correct. If they want to call it even

15  straight right now, I done took my lick, I done wrote mine

16  off. I know I'll never get it, but don't go after me and my

17  future for my family just because it's not right.

18      THE COURT: Okay. The only thing I can suggest to

19  you is maybe you ought to file a motion to lift the default

20  judgment and to reconsider your case on the merits.

21      MR. RAMBO: How do I do that?

22      THE COURT: You'll have to consult with a lawyer to

23  file that.

24      MR. RAMBO: So I have to come to Delaware lawyer for

25  this here.

1          THE COURT: Not necessarily.

2          MR. RAMBO: So, just tell them I want to file it,

3   well, it's already put against me.

4          THE COURT: Well, you're going to need legal advise

5   to do what I'm suggesting you do.

6          MR. RAMBO: Okay, Your Honor.

7          MR. MILLER: Your Honor, I have a proposed order, if

8   I may approach?

9          THE COURT: Yes.

10          MR. MILLER: Your Honor, the next item on the agenda

11   -

12          THE COURT: Let me hand these documents back to you.

13          MR. MILLER: Sure.

14          MR. RAMBO: Excuse me, Your Honor, can I say one

15   more thing . . . (microphone not recording). That's also

16   part of this too? So they're going to expunge what they owed

17   me and then I still got to turn around . . . right?

18          THE COURT: If you file an application to have the

19   default judgment vacated and if you have a meritorious

20   defense, and I allow you to make that defense, then that

21   judgment will be vacated or dismissed and that will also

22   trigger a reinstatement of your proof of claim. I don't know

23   what other objection they would have to your claim, but that

24   issue would also come back for reconsideration. Yes.

25          MR. MILLER: Thank you, Your Honor. And just for

1    the record, the order, the proposed order for the ninety-

2    eighth omnibus objection does provide for a reinstatement of

3    the claim.  It set certain time provisions on the

4    reinstatement so that the Trust can continue to try to wind

5    down the estate.

6            THE COURT: Okay.  Well, make sure Mr. Rambo gets a

7    copy of this order.

8            MR. MILLER: I will, Your Honor.  Thank you.

9            THE COURT: Okay.

10           MR. MILLER: The next agenda item is the ninety-

11   eighth omnibus objection, this is agenda item number 9.  This

12   was a non-substantive claims objection.  The Liquidation

13   Trust received three responses to this omnibus objection, one

14   of which is going forward, and this is a response - It's

15   listed as response (a) from a Michael Asby.  The Trust

16   objected to his claims being late filed, and the debtors did

17   provide Mr. Asby with actual notice of the claims bar date,

18   and I have an affidavit from the claims agent, BSI -

19           THE COURT: I'm sorry, when was the bar date?

20   .        MR. MILLER: The bar date was January 7 of 2003,

21   Your Honor, and this claim was filed on June 5 of 2006, over

22   three years past the claims bar date.

23           THE COURT: And you say actual notice was served on

24   this?

25           MR. MILLER: Yes, Your Honor, and I have an

1   affidavit for you if you'd like to see it.

2            THE COURT: Yes.

3            MR. MILLER: May I approach?

4            THE COURT: Yes.

5            MR. MILLER: It 's the affidavit of Cathy Gerber of

6   Bankruptcy Services, LLC, and I've highlighted the page for

7   you, Your Honor.  I also spoke with -

8            THE COURT: Let me ask you a question.

9            MR. MILLER: Sure.

10           THE COURT: The bar date notice was sent out

11  February 12 of '03, and looking at the claimant's response,

12  it appears that he didn't notice the problems until October

13  of '05.  Why would you have him on the mailing list in

14  January of '03?

15           MR. MILLER: I'm not exactly sure of the reason why

16  he was on the original claims or on the bar date notice

17  mailing list, but he did also file a prior proof of claim,

18  and he filed that claim on March 13th of '03, and that claim

19  was disallowed pursuant to another order, Your Honor, not on

20  the basis of late filed but on a substantive claim objection.

21           THE COURT: Okay, that was filed when?

22           MR. MILLER: March 13th of 2003, Your Honor.

23           THE COURT: Of '03?

24           MR. MILLER: Of '03.

25           THE COURT: I gather it was for a different amount.

1        MR. MILLER: It was.  But the Trust admits that that
2    clearly shows that he had notice of the bar date.
3        THE COURT: And what was the basis for disallowing
4    the first proof of claim?
5        MR. MILLER: The first proof of claim was – the
6    asserted basis on the proof of claim was that the interest
7    rate that he was being charged was not the correct interest
8    rate amount, and there was an allegation that the loan
9    documents were forged.  It was settled, essentially, out of
10   court, and pursuant to that, he agreed to withdraw the claim
11   or just let the Trust move on with the objection, which is
12   what happened.  The basis –
13       THE COURT: I'm sorry, when was the settlement
14   reached regarding the first proof of claim?
15       MR. MILLER: It would have been right around March
16   13th of '03, Your Honor.  I didn't handle it, and that was
17   based on looking at the omnibus objection.  It essentially
18   said that the claim had been settled out of court, and that
19   was the basis for it.  Unfortunately, I didn't bring a copy
20   of the order which had the claims that were disallowed on it.
21       THE COURT: But in opposition, he indicates that he
22   first discovered this problem in October of '05.
23       MR. MILLER: Yes, Your Honor.
24       THE COURT: Which obviously he didn't have a claim
25   until October of '05, and the bar date had long since passed.

1        MR. MILLER: Well, that is what he says in his

2    response, Your Honor.  My understanding is that he filed a

3    claim against his insurance company for water damage.  His

4    insurance company came out, inspected it, and said it was a

5    manufacturer's defect.  Because of that, his claim was

6    denied, I believe it was American Bankers, and then he filed

7    this proof of claim.  I discussed it with him.  I think he

8    purchased the home in 1997, and so he's asserting a warranty

9    claim against Oakwood for a home that he purchased in '97.

10   My understanding is Oakwood never gave a manufacturer's

11   warranty longer than one year, so he wouldn't have a

12   manufacturer's warranty claim anyways, and I discussed both

13   this and the fact that it was late filed with him and told

14   him he could appear by phone, and I don't believe he did

15   choose to be on the phone today.

16       THE COURT: Okay, so you say there was only a one-

17   year warranty on this?

18       MR. MILLER: I believe the manufacturer's actual

19   warranty was only one year.  Sometimes the independent third

20   party retailers would give longer warranties, maybe like a

21   five-year warranty or something like that, but the

22   manufacturer themselves gave one-year warranties on the

23   homes.

24       THE COURT: Okay, well, I think the - I don't think

25   this claim should be disallowed as time barred.  I think, if

1    anything, it should be disallowed on the basis of no

2    liability.

3         MR. MILLER: Well, the Trust is more than willing to

4    file a second objection to the claim on the basis of no

5    warranty.

6         THE COURT: Why don't you do that.

7         MR. MILLER: Okay.

8         THE COURT: And then you can spell it out in writing

9    to the claimant.

10        MR. MILLER: Yes, Your Honor.

11        THE COURT: Okay.

12        MR. MILLER: The last item on the agenda is a status

13   conference in the adversary proceeding with OHC Liquidation

14   Trust versus Credit Suisse First Boston, and this matter is

15   being handled by Marla Eskin for the Trust, and so I'll just

16   hand this over to her, Your Honor.

17        THE COURT: Okay.

18        MS. ESKIN: Good morning, Your Honor.  Marla Eskin,

19   Campbell & Levin for OHC Liquidation Trust.  This matter will

20   be handled by Tony Castanaris.  He has already been admitted

21   *pro hac vice* to the Court.

22        THE COURT: Okay.

23        MR. CASTANARIS: Good morning, Your Honor.  I am

24   Tony Castanaris of Stutman, Treister & Glatt for the OHC

25   Liquidation Trust, and, Your Honor, my associate Whitmon Holt

1   who is a recent admittee to the bar happened to be in the

2   neighborhood on another matter and came to court this

3   morning.  It's my pleasure to introduce him to the Court this

4   morning.

5           THE COURT: Okay.

6           MR. CASTANARIS: Thank you, Your Honor.  Your Honor,

7   we have - I think counsel for Credit Suisse should probably

8   appear as well.

9           MR. OSNATO: Good morning, Your Honor.  Michael

10  Osnato from Linklakers on behalf of Credit Suisse.

11          THE COURT: Okay.

12          MR. CASTANARIS: Has Your Honor had an opportunity

13  to review our joint status report?

14          THE COURT: Yes, I did, briefly.

15          MR. CASTANARIS: And, Your Honor, I think we are

16  pleased to report that we've resolved most of the matters

17  that - the discovery disputes before now.

18          THE COURT: So I can get rid of 50 pounds of paper.

19          MR. CASTANARIS: You're going to get rid of 50 -

20          MR. OSNATO: You can recycle that.

21          MR. CASTANARIS: - and I think you've got a few that

22  - We tried to summarize the one remaining dispute in our

23  joint submissions that are Exhibits A and B, and aside from

24  those matters, I don't know how Your Honor would like us to

25  address those, if at all, this morning, but aside from those

1    matters there are two other matters that we would like the

2    Court's guidance on.  As Your Honor may see from the joint

3    statement, we have agreed to additional schedule, if it's

4    agreeable to the Court, through the briefing of dispositive

5    motions in the case.  We, on behalf of the Trust, would like,

6    if it's possible, to get additional schedule of pretrial and

7    trial, if it's convenient to the Court.  I'm prepared to

8    address the reasons for that, if the Court would like.  The

9    defendant would prefer to defer that matter till later, and

10   then there's one other issue regarding the number of

11   depositions, which I think we're very close to agreement on.

12   I would like to address that very, very briefly.  I think

13   probably counsel would like to address it as well, and I

14   think that it's not a matter that's been the subject of a

15   discovery dispute, but we raised it because we didn't want to

16   come here to Your Honor and tell you we resolved everything

17   and then find out we had another dispute later and have to

18   file another motion, and I believe that if the Court gives us

19   a few words of guidance, it will help us reach an actual

20   agreement on the matter rather than having a dispute.

21              THE COURT: Okay.  So you want more depositions?

22              MR. CASTANARIS: Your Honor, I don't know - It's

23   confusing to us whether the FRCP rule limiting depositions to

24   10 applies in the Bankruptcy Court in Delaware or not.  By

25   District Court Local Rule it doesn't apply at all.  It's

1    unclear to us whether it applies here.  We are in the

2    following position:  We are considering taking a few

3    depositions.  We have taken four, and I believe the defense

4    has taken two at this point -

5              MR. OSNATO: Two.

6              MR. CASTANARIS:  - and has two more scheduled for -

7    one more scheduled this week and then two more scheduled in a

8    couple of weeks.  We are looking at about, something between

9    four and six additional depositions of the defendant and

10   probably something like three or four potentially of third

11   parties.  So, we're looking at probably 13 or 14.  I'm not

12   quite sure what the defense plans.  I raised this with the

13   defense because I thought it might possibly become a subject

14   of dispute and we'd try to resolve it, and we've gotten this

15   far with it, Your Honor.  We ask that we just agree that we

16   be able to take a maximum of 15 each.  I don't think, if

17   there's an agreement to that, that I'm going to use them, but

18   just would avoid the need to come back here if there's a

19   dispute.  The defense has agreed to let us take 12 and then

20   if there's anything else, to address it on a case-by-case

21   basis.  My dissatisfaction with that is, I don't think any

22   lawyer wants to be in a position of having to ask the other

23   side for permission to take a deposition or to explain why,

24   and I think in good faith, Your Honor, we've resolved almost

25   everything, and I don't think that we're going to have any

1  bad faith on anybody's side, and I think we have a very good

2  relationship at this point.  I don't intend to take any

3  depositions I don't need to take, but I don't want to have to

4  come back here with a dispute about it, so I would ask for

5  the latitude within 15.  I don't think I'll use them all, and

6  if the Court would give us some guidance on this, I think we

7  will resolve it ourselves.

8        MR. OSNATO: And, Your Honor, to provide some

9  context to what Mr. Castanaris has put forth.  The reason why

10  we have settled on 12, Your Honor, is although this is a

11  complex case, admittedly, the cast of characters in this case

12  is relatively small, and our concern is that if the number

13  sets at 15, Your Honor, inexorably that will be the number of

14  depositions taken when it's not necessary.  So we propose to

15  go above the ten limit, give them two additional depositions,

16  and, Your Honor, we fully would entertain any request in good

17  faith for depositions beyond 12, but we would prefer to have

18  a firm cap so that between now and November 30th, which is

19  when fact discovery is closed, the parties focus on discovery

20  at hand, conduct very focused depositions, and move on into

21  expert discovery.  That, Your Honor, is the basis for our

22  willingness to settle at 12.

23        MR. CASTANARIS: Your Honor, I only say in response

24  that if you told me that the ten deposition rule doesn't

25  apply at all because of the local rules, or you said you can

1    take a thousand if you want to, Mr. Castanaris.  I'm only

2    probably going to take 12 or 13 or 14, but I can't be certain

3    today whether it is 12 or 13 or 14, and I just don't want to

4    have to come back here with that, Judge.  I'm not going to

5    take any depositions I don't think I need to take, but I must

6    say, Your Honor, within my office, it's under discussion

7    right now of what additional depositions we need to take.  We

8    really haven't come to a final conclusion on it.  I just

9    don't want to have to come back to Your Honor with a motion.

10   That's where we are.

11        THE COURT: Well, there's not much difference

12   between 12 and 15.  So I'll allow 15, but with the

13   observation that I would hope that to the extent you're

14   taking needless depositions, your client would step in and

15   say, What are you doing?

16        MR. CASTANARIS: I think that's clear, Your Honor.

17   We have a very active client in the case, and I think that

18   that would occur.

19        THE COURT: Okay.

20        MR. CASTANARIS: That leaves us then with the other

21   two matters, Your Honor.  The one that we provided the two

22   four-page submissions on and the issue of what additional

23   scheduling should occur.

24        THE COURT: Okay, let me hear from you briefly on

25   the remaining issue that you summarized.

1        MR. CASTANARIS: All right, Your Honor.  I think

2    I'll go first.  The issue, Your Honor, is our attempt to take

3    some discovery on affirmative defenses provided by defendant,

4    and I want to focus - there are a lot of affirmative

5    defenses, but I want to focus and our submission basically

6    focuses on specific ones because a number of them are really

7    sort of legal defenses, and a number of them are basically

8    denials of insolvencies.

9        THE COURT: Are there any affirmative defenses that

10   were not asserted?

11       MR. CASTANARIS: I'm not certain, Your Honor.

12       THE COURT: I mean, in the universe of affirmative

13   defenses?

14       MR. CASTANARIS: Well, I mean, there's no

15   contributory negligence or no assumption of risk, but on the

16   other hand - okay.  I mean there are some affirmative

17   defenses that do exist, but I think Your Honor's observation

18   implicitly shows that some of these may be kitchen sink sort

19   of affirmative defenses, and I think all lawyers have thrown

20   in waiver, estoppel, and latches in answers, and if there's -

21   I think one of two things is true.  Either there is substance

22   behind these allegations or there is not, and if there's not,

23   then I think the defendant should say so forthrightly.  If

24   there is any substance behind them, for example, if somebody

25   said at some point, we waived these claims or did something

1    that would constitute an implicit waiver of these claims, all

2    I really want to know is what it is they're claiming it was

3    so I can go take discovery on it, and I think what their

4    position is, is they're not going to tell us that until all

5    fact discovery is closed and all expert discovery is closed,

6    and therefore, I'm never going to take discovery on it.  So

7    if somebody claims to have heard, for example, the trustee of

8    my trust, or an officer of Oakwood say, We waive these

9    claims, some of these claims we've heard that said, I'm never

10   going to know who it was.  Or if somebody claims that - if

11   they claim that by reason of estoppel, they acted in

12   detrimental reliance and were damaged by it, I'm never going

13   to know what that detrimental reliance was or who claims to

14   know about it until after discovery, and I simply think that

15   the rule - the spirit of the rules is that one takes

16   discovery of claims and defenses during the discovery period

17   and not after discovery is closed, and it applies as much to

18   claims as defenses, and to me it's just as much as if we had

19   alleged in this case that they trespassed upon land, and they

20   have now asked us what land, who committed the trespass, and

21   when did it happen, and we said, we're not going to tell you

22   until discovery is closed.  I don't think that's the way

23   discovery is supposed to work.  They have put up a big

24   strawman that we're asking them to supplement this every five

25   minutes.  We have never asked them to supplement it.  All I

1   really want to know is, what they now know so that I can take

2   discovery on it.  That is essentially our position on this

3   dispute, and it applies, really, to waiver, estoppel,

4   latches, and the 547©) defenses that speak, for example, of,

5   to the extent that they have knowledge of their own ordinary

6   course of business, they should have that knowledge now, and

7   I want to know who it is at their place of business, if we

8   dispute it, that I can take that deposition or I can find out

9   what documents support it.  Whatever they know about it now,

10  they don't tell us, but they should know something about it

11  now if they pled it.  Thank you, Your Honor.

12          THE COURT: Okay.

13          MR. OSNATO: Your Honor, at the risk of stating the

14  obvious, this is not a complicated issue, and if I may, just

15  take a step back, the motion before the Court that this issue

16  pertains to does not go to these four affirmative defenses

17  alone.  It goes to a contention interrogatory that says to

18  defendants, Marshal all of the facts that underpin your

19  affirmative defenses and tell us what they are.  And in

20  conjunction with that, give us a 30(b)(6) deponent, a fact .

21  witness that you will prepare as to all of the legal

22  arguments that underpin it, narrow the facts, and also give

23  us that witness.  So the reason why we objected is because we

24  thought that was extraordinarily burdensome and a duplicative

25  way to proceed, and instead, consistent with the cases in

1   this Circuit and in fact leading treatises, we said, There

2   will be no surprises here.  The parties know what the claims

3   are and they know what the defenses are.  They're perfectly

4   capable of going out and conducting discovery.  They've done

5   that, and if there are particular claims or defenses that

6   either party is concerned about, they have the wherewithal to

7   make targeted requests or ask specific questions in

8   depositions, Your Honor.  Now, if we can, and I'm pleased

9   that the dispute has crystalized around these three - or

10  excuse me, four defenses.  We can talk for a moment about

11  them.  I think that there's a fundamental disconnect here,

12  Your Honor, between how affirmative defenses get pleaded and

13  therefore proven or not proven in the course of discovery.

14  Our job as defendants is to look at the claims in the

15  complaint and make an informed assessment about what we think

16  discovery could yield and then to go out and attempt to gain

17  facts to either support or not support those defenses.  We do

18  that for a couple of reasons, chief among them, Your Honor,

19  is the notion of waiver.  If at some point in this case we

20  learn that someone from Oakwood waived this claim, we would

21  have done our client a great disservice by not having put it

22  in as an affirmative defense, and to draw an analogy, Your

23  Honor, to claims.  When Your Honor decided the motion to

24  dismiss in this claim Your Honor rightfully cited notice

25  pleading.  It's enough to put the other party on notice of

1   your claims so they can go and conduct discovery, and as to
2   these four affirmative defenses, we're not stonewalling, Your
3   Honor.  We're happy to entertain discovery requests that go
4   to these issues.  If counsel is concerned that the chief
5   executive officer of Oakwood waived the right to one of my
6   client's employees, there's nothing that constrains him from
7   in a deposition saying, Did anyone from Oakwood ever waive a
8   right?  If not, cross it off and you move onto the next
9   witness.  The reason, Your Honor, why we think what we're
10  proposing is fair and that is to answer consolidated mutual
11  contention interrogatories at the close of discovery is, it's
12  sensible and efficient, and importantly, Your Honor, the
13  parties in this case have an agreement that if this case
14  proceeds to trial, no witness will be put on by either side
15  unless the adversary has an opportunity at pretrial to depose
16  them.  So there's not a package of affirmative defenses that
17  we're keeping off to the side to spring on them at trial.  At
18  trial every witness will have had the opportunity to be
19  deposed, and if there are particular questions about
20  defenses, we will gladly let plaintiff's counsel inquire into
21  them.  Finally, Your Honor, if I could just speak to the
22  ordinary course issue.  Discovery on that point is underway.
23  We've produced a massive amount of documentation that goes to
24  payment terms in the course of dealing between the parties.
25  The reason why we hesitate at answering a contention

1    interrogatory at this point, Your Honor, is really twofold:

2    (A) we anticipate that we may use experts to help establish

3    that defense in a particular industry standard.  We can't

4    answer an interrogatory on that point because that discovery

5    is many months away, and to the extent we put a witness on at

6    trial who will speak to ordinary course, they will have had

7    the opportunity to have deposed that individual, and we will

8    tell them in advance --

9            THE COURT: Well, in response to that interrogatory

10   on ordinary course, I think an appropriate response would be,

11   We're going to retain an expert who will testify to these

12   facts.

13           MR. OSNATO: Couldn't agree more, Your Honor.

14           THE COURT: At some point we'll identify that

15   expert, show you his report, and you can depose him.

16           MR. OSNATO: Could not agree more, Your Honor, and

17   ultimately where we end up is, the parties should go through

18   comprehensive and fair discovery, both fact and expert, and

19   at some point, well in advance of trial, 60 days, 90 days,

20   120 days, exchange comprehensive mutual contention

21   interrogatories that say, List all the facts that you intend

22   to prove at trial as to each claim or defense.  At that

23   point, Your Honor, if in good faith we conclude the record

24   has not yielded evidence of latches, of course, we're going

25   to withdraw that claim.  We're merely pleading those

1    affirmative defenses because we think, in good faith, the
2    record could yield something to support them, and if we don't
3    we waive them.  So, Your Honor, our proposal is that the
4    parties mutually respond at some date in advance of trial
5    rather than do it now, and I do appreciate counsel's point
6    about not wanting us to supplement our responses, but the
7    federal rules require us to do so, and so if we begin the
8    process now, it becomes an endless loop where after every
9    depositions we have to consider, Did someone say something
10   that spoke to *in pari delicto*, yes, we need to supplement.
11   So, we'd rather defer it and do it in a consolidated uniform
12   way, Your Honor.  Thank you.

13           MR. CASTANARIS: May I respond very briefly, Your
14   Honor?

15           THE COURT: Yes.

16           MR. CASTANARIS: First, Your Honor, I want to dispel
17   any sense that we have been imposing some sort of cumulative
18   discovery.  We attempted to do this by sending out an
19   interrogatory to try to find out what the facts were and who
20   the witnesses were to the alleged waiver, or what the facts
21   were or who the witnesses were to their alleged detrimental
22   reliance, or what the facts were or who the witnesses were to
23   whatever their own records show on ordinary course, not
24   industry standards generally which may be the subject of
25   expert testimony, but their own records.  They refused to

1    answer that on the ground that it was contention

2    interrogatory.  Then, we sent out an 30(b)(6) to try to find

3    out what those were.  They refused to produce a witness on a

4    30(b)(6) or to move for a protective order, which is the

5    appropriate procedure, on the ground that that was a waiver -

6    an end-run around their contention interrogatory and said,

7    Ask our witnesses.  When we attempted to ask their witnesses,

8    they instructed the witness not to answer on the ground that

9    that was an end-run around their contention interrogatory.

10   Second point, I'd like.  So all we really want is one method

11   of finding out what these alleged facts are if in fact there

12   are any.  Secondly, Your Honor, we have not demanded that

13   they endlessly supplement the answer to interrogatory every

14   time there is a deposition taken.  If there's a deposition

15   taken, we're going to be there, and we're going to know those

16   facts.  In fact, we have said in numerous meet and confers

17   and in writing, what we want to know is what you now know;

18   okay?  And I have never known a party to be excused from the

19   obligation to make discovery if it exists simply because

20   there's also an obligation to supplement it.  If they give us

21   a 30(b)(6) witness, they don't have any obligation at all to

22   supplement what a 30(b)(6) witness says.  But if somebody

23   once said or did something that constituted a waiver, I just

24   want to know about it now while I can still take discovery on

25   it and not after my experts can't look at it, the time has

1   already run, my experts have prepared their report and been

2   deposed, and then they tell us about it.  And I don't think,

3   really, I don't want to agree to some procedure where we

4   exchange these lengthy interrogatories after the close of the

5   discovery period.  It doesn't solve this problem, and it's a

6   whole different issue altogether, which I think we ought to

7   address if, as, and when we get to it.  But I do think that a

8   party has an obligation to make discovery on affirmative

9   defenses because of the third point I want to raise.  By the

10  very same logic that they say, Well, we have an obligation to

11  our client to raise these things because something here might

12  constitute a waiver or an estoppel or latches.  Can't I make

13  the same argument, Your Honor, and say that I have the

14  obligation to allege trespass to land because something here

15  might constitute trespass to land?  And then when they ask

16  me, What are you talking about?  What land did they trespass

17  on?  Who did it?  Who saw it?  When did it happen?  I say,

18  No, no, those are contention interrogatories, and I'm not

19  going to tell you until discovery is over, and you'll never

20  get to take discovery on it.  That's really where we are

21  right now, and I think that the federal rules have the same

22  obligations to parties for defenses that they have to

23  affirmative claims.  And if there are any facts that underlie

24  these asserted defenses, they should be made known to us now

25  so that we can take discovery on them in a timely way.  Thank

1   you, Your Honor.

2          THE COURT: Okay, I'm going to allow the plaintiff

3   to proceed with the contention interrogatories.  I don't

4   accept the argument of the defendant that substantially all

5   the discovery has to be completed and then you back up and

6   talk about affirmative defenses.  I don't think that's what

7   the federal rules suggest, but I do believe that the better

8   way to proceed is for the plaintiff to take 30(b)(6)

9   depositions first and that may enable the plaintiff to have

10   more focused interrogatories or production requests.

11          MR. CASTANARIS: Thank you.  Your Honor, I think

12   based upon Your Honor's ruling, we'll confer with counsel.

13   I'm sure we'll find a way that's mutually acceptable to

14   accomplish this, whether it's by 30(b)(6) or interrogatory, I

15   expect counsel and I will be able to work it out.

16          THE COURT: Okay, and with respect to trial dates,

17   I'm not sure we can set those today.  I gather the parties

18   are agreed upon a schedule with respect to the experts.

19          MR. OSNATO: That's correct, Your Honor.

20          MR. CASTANARIS: Yes, Your Honor.  We agree all the

21   way through the briefing of dispositive motions.  The only

22   things that aren't scheduled really are pretrial and trial,

23   and the only reason the plaintiff really would like to do

24   this is that we don't have any employees that live within the

25   jurisdiction and we don't have any employees that are still

1   employed.  All the people - I have to ask people to come up

2   to Delaware for trial, and the more notice I can give them of

3   when it's going to be, the more likelihood I have of getting

4   them here.  So, that is the main reason that I was hopeful of

5   getting a trial date.

6           THE COURT: How much time do you think you'll need?

7           MR. CASTANARIS: Your Honor, I - I thought Your

8   Honor might ask me that question.  I think - My guess in this

9   case is I would say probably three days aside?  I don't know

10  if that's -

11          MR. OSNATO: That sounds approximately correct, Your

12  Honor.

13          MR. CASTANARIS: I suspect we'll get it done in a

14  little bit less, Your Honor, but I hate to commit to that

15  because we haven't seen any experts yet, so - I suspect that

16  the fact testimony will take probably less than half of that

17  and the experts are likely to take the other half, but I

18  think that's a pretty fair estimate.

19          THE COURT: Does the defendant have any objection to

20  setting a trial date?

21          MR. OSNATO: Your Honor, our reluctance to do so is

22  that this is a large case and summary judgment pleadings will

23  probably flow both ways, and I anticipate they will be quite

24  voluminous.  The benefits of setting a date under that kind

25  of circumstances, it seems hard to understand how you can

1    pick a date without seeing the summary judgment motions and

2    the strength and breadth of them.

3            THE COURT: Well,

4            MR. SILBURGLIED: Your Honor, might we have one

5    moment before you pick a date?

6            THE COURT: Okay.

7            MR. OSNATO: Your Honor, my colleague alerted me

8    here the requirement that the deposition testimony be read

9    into the record by a live witness, and based on what will be

10   voluminous fact and expert deposition testimony in this case,

11   the defendant's view is that three days may be a bit

12   conservative.  So, we'd prefer, at least from our

13   perspective, for planning purpose, to propose at least five

14   and perhaps six days, Your Honor.

15           MR. CASTANARIS: Your Honor, the defense may need

16   five or six days to put on its defense, but I don't think I

17   need more than three to put on the plaintiff's case in this

18   case.

19           THE COURT: Well, it says you've agreed summary

20   judgment pleadings are due September, that's a year from now.

21   Why don't we, for planning purposes, set aside the week of

22   November 5, five days for a trial, but let's revisit that

23   issue at the end of September.  So we'll have a status

24   conference, let's say Tuesday, December 25 -

25           MR. CASTANARIS: September 25, Your Honor?

1              THE COURT: Yes, September 25 at 9:30.

2              MR. CASTANARIS: Would it make sense, Your Honor, to

3    set a pretrial date at the same time?  Perhaps at that time?

4              THE COURT: We'll set it at that time.  Typically, I

5    have a pretrial conference the week before the trial.

6              MR. CASTANARIS: All right, thank you, Your Honor.

7              MR. OSNATO: Your Honor, if I could raise one

8    additional point.

9              THE COURT: Let me just mark my calendar.

10             MR. OSNATO: Certainly.

11             THE COURT: Okay, November 5; right?  And the -

12   September 25, the time is 9:30.

13             MR. CASTANARIS: Thank you, Your Honor.

14             MR. OSNATO: Your Honor, one additional point which

15   I think is implicit in the Court's ruling on a contention

16   interrogatory point, and for purposes of clarification and to

17   insure we don't have to come back.  I merely ask the Court

18   confirm that that obligation is viewed as a two-way street.

19   So to the extent defendants wish to serve contention

20   interrogatories that target particular claims, they, under

21   the Court's ruling, have the ability to do so.

22             THE COURT: Yes.

23             MR. OSNATO: Okay.  Thank you, Your Honor.

24             THE COURT: Okay, is there anything else?

25             MR. MILLER: There's not, Your Honor.

```
1              THE COURT: Okay, we stand in recess.

2              MR. CASTANARIS: Thank you, Your Honor.

3              MR. OSNATO: Thank you.

4              (Whereupon at 12:22 p.m. the hearing in this matter

5      was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18              I, Elaine M. Ryan, approved transcriber for the

19     United States Courts, certify that the foregoing is a correct

20     transcript from the electronic sound recording of the    .

21     proceedings in the above-entitled matter.

22

23     /s/ Elaine M. Ryan                     September 28, 2006
       Elaine M. Ryan
       2801 Faulkland Road
       Wilmington, DE 19808
       (302) 683-0221
```

**EXHIBIT D**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: 2006 WL 318666 (D.Del.))**

Page 1

◄Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Ronald CANTOR, Ivan Snyder and James A.
Scarpone, as Trustees of the Mafco
Litigation Trust, Plaintiffs,
v.
Ronald O. PERELMAN, et al., Defendants.
**No. Civ.A. 97-586-KAJ.**

Feb. 10, 2006.

Lawrence C. Ashby, Philip Trainer, Jr., Tiffany
Geyer Lydon, Ashby & Geddes, Wilmington,
Delaware, for Plaintiffs, Edward A. Friedman,
Andrew W. Goldwater, Daniel B. Rapport, Emily A.
Stubbs, Jonathan Gottfried, Friedman Kaplan Seiler
& Adelman LLP, New York, New York, of counsel.

Thomas J. Allingham, II, Anthony W. Clark, Paul J.
Lockwood, Skadden, Arps, Slate, Meagher & Flom
LLP, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 This case involves alleged breaches of fiduciary
duty by former directors of Marvel Entertainment
Co., Inc. ("Marvel"). The original complaint was
filed by Marvel, which was then a debtor-in-
possession in bankruptcy, against Ronald O.
Perelman, William C. Bevins, Donald G. Drapkin,
MAFCO Holdings Inc., MacAndrews & Forbes
Holdings Inc., and Andrews Group Incorporated
(collectively, "Defendants"). (Docket Item ["D.I."]
1.) Pursuant to the reorganization plan from the
bankruptcy proceeding, Marvel assigned the claims
in this case to the MAFCO Litigation Trust, and the
trustees ("Plaintiffs") have been substituted as the
plaintiffs in this action (D.I.120). In their Second
Amended Complaint (D.I. 149, Ex. A; the
"Complaint"), Plaintiffs alleged (1) that Perelman,
Bevins, and Drapkin breached their fiduciary duties
as directors of Marvel and (2) that the remaining
defendants aided and abetted those breaches.

Jurisdiction is proper under 28 U.S.C. § 1334. Before
me now is Defendants' Motion to Strike Plaintiffs'
Jury Demand. (D.I. 433; the "Motion.") For the
reasons that follow, the Motion will be granted.

II. BACKGROUND

The background of this case has been set forth in
earlier opinions. Cantor v. Perelman, 414 F.3d 430,
433-35 (3d Cir.2005); Cantor v. Perelman, 235
F.Supp.2d 377, 378-80 (D.Del.2002). Because the
analysis of Plaintiffs' demand for a jury requires a
careful consideration of Plaintiffs' claims, I will
discuss that background in some detail again here.

A. Allegations in the Complaint

Perelman was a director of Marvel and Chairman of
Marvel's board. Cantor, 414 F.3d at 433. He also
owned a controlling interest in Marvel through the
following "chain of wholly-owned corporations":
Perelman owned 100% of defendant MAFCO
Holdings Inc., which owned 100% of defendant
MacAndrews & Forbes Holdings Inc., which owned
100% of Marvel III Holdings Inc. ("Marvel III"),
which owned 100% of Marvel (Parent) Holdings Inc.
("Marvel Parent"), which owned 100% of Marvel
Holdings Inc. ("Marvel Holdings") (collectively,
those five companies are referred to herein as the
"Marvel Holding Companies"). Id. (Complaint, at ¶¶
18-19, 25.) The remaining defendant, Andrews
Group Incorporated, was a wholly-owned subsidiary
of MacAndrews & Forbes Holdings Inc. (Id. at ¶ 20.)
"Marvel Parent and Marvel Holdings together held
60% to 80% of Marvel's publicly traded, outstanding
shares during the relevant period." Cantor, 414 F.3d
at 433. Bevins and Drapkin were also directors of
Marvel, and Perelman, Bevins, and Drapkin
comprised the entire board of each of the Marvel
Holding Companies. Id.

Plaintiffs alleged that, in 1993 and 1994, Defendants
caused Marvel Holdings, Marvel Parent, and Marvel
III to issue three tranches of notes. Id. Defendants
received $553.3 million in proceeds and pledged all
of their stock in Marvel as collateral. Id. "None of the
proceeds went to Marvel or were used for Marvel's
benefit." Id. Furthermore, in the note indentures, the
issuing companies agreed, through Perelman's control

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

of Marvel, to prevent Marvel from (1) issuing debt or preferred stock except under specified circumstances, (2) issuing stock that might dilute the holding companies' stake in Marvel, and (3) making "restricted payments," which were defined to include dividends and stock buybacks. *Id.* According to Plaintiffs, "[a]s a result of Perelman's agreement to these restrictions, Marvel's future access to the capital markets was inhibited, with no corresponding benefit to Marvel." (Complaint, at ¶ 34.)

*2 Plaintiffs further alleged that Defendants artificially inflated Marvel's earnings by making licensing agreements, booking the entire amount of the guaranteed license fees as income at the time the agreements were made, and later writing the fees off and never collecting them. (*Id.* at ¶¶ 40-45.) According to Plaintiffs, Defendants' accounting methods allowed them to maintain the price of Marvel stock, the only asset of the Marvel Holding Companies. (*Id.* at ¶ 36.) By artificially holding off a major decline in the price of Marvel stock, Defendants allegedly held off the bankruptcy of the Marvel Holding Companies and prevented the $553.5 million in note proceeds from being treated as preferential payments. (*Id.*) Plaintiffs further allege that, in executing that plan, Marvel employees made misrepresentations to potential licensees. (*Id.* at ¶¶ 41-45.)

Eventually, "Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 27, 1996. The Note holders have not been repaid." *Cantor, 414 F.3d at 434.* Marvel's bankruptcy was followed by the bankruptcy of Marvel Holdings, Marvel Parent, and Marvel III. (Complaint, at ¶ 36.)

Plaintiffs set forth two "Causes of Action" in their Complaint. First, Plaintiffs alleged that Perelman, Bevins, and Drapkin "breached their fiduciary duties of loyalty, care, and good faith, and are liable to plaintiffs for damages, including all benefits received as a result of their breaches of fiduciary duty, in an amount to be determined at trial, but believed to be not less than $553.3 million plus pre-judgment interest." (*Id* at ¶ 49.) Second, Plaintiffs alleged that the other defendants "knowingly participated in and aided and abetted those breaches by, *inter alia,* facilitating the receipt and distribution of the improperly obtained bond proceeds for the benefit of Perelman, Bevins and Drapkin." (*Id* at ¶ 54.) As a result, those Defendants "are liable for knowingly

participating in and aiding and abetting the foregoing breaches of duty in amounts to be determined at trial, but believed to be not less than $553.5 million plus pre-judgment interest." (*Id.* at ¶ 55.)

Plaintiffs requested the following remedies:
> (i) compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.3 million plus pre-judgment interest, and punitive damages in an amount to be determined at trial; and
> (ii) such other and further relief as the Court deems just and proper.
> (*Id* at 16-17.)

**B. Procedural History**

**1. District Court Proceedings**

This case was referred to Magistrate Judge Mary Pat Thynge on March 21, 2002. [FN1] (D.I.262.) In response to the parties' motions, Judge Thynge issued a Memorandum and Order recommending that summary judgment be granted for Defendants on the claims of breach of fiduciary duty related to the note transactions and the accompanying restrictions on Marvel. *Cantor, 235 F.Supp.2d at 381-83.* Judge Thynge determined that Delaware law required Plaintiffs to show "that Perelman caused Marvel to take action which benefitted Perelman and harmed Marvel." *Id.* at 382 (citing *Bragger v. Budacz,* C.A. No. 13376, 1994 WL 698609, at *4 (Del. Ch. Dec. 7, 1994)). "Since Marvel was not a party to the note agreements, and did not attempt to perform or refrain from one of the prohibited acts, Perelman's potential conflicting loyalties between Marvel and the holding companies never materialized and cannot form the basis of a breach of fiduciary duty claim." *Cantor, 235 F.Supp.2d at 382-83.*

> FN1. This case was originally assigned to the Honorable Roderick R. McKelvie. When he retired from the court in 2002, the case was referred to Magistrate Judge Thynge. (D.I.262.) On January 6, 2003, the case was reassigned to me. (D.I.387.)

*3 While Plaintiffs argued that Marvel had been harmed because the note restrictions prevented it "from restructuring its debt, and ultimately

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

Page 3

contributed to its bankruptcy," Judge Thynge found that the evidence showed that Marvel was prevented from financial restructuring by covenants in other credit agreements that "were more restrictive than those in the note agreements." *Id.* at 383. Thus, Plaintiffs had failed to show that Marvel was harmed, and the potential conflicts raised by the note restrictions never materialized and so could not support a claim for breach of fiduciary duty. *Id.*

As to the claimed breaches of fiduciary duty based on Defendants' alleged inflation of Marvel's earnings, Judge Thynge recommended that summary judgment be granted for the Defendants, because, by relying on the expertise of professional accountants, the directors "met [their] fiduciary duties with regard to accounting." *Id.* at 387-88. However, for claims related to misrepresentations by Marvel employees, Judge Thynge recommended that summary judgment be denied, *id* at 388-89, noting that the record lacked sufficient evidence to decide whether Defendants had failed in their oversight duties pursuant to *In re Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959 (Del. Ch.1996).

I adopted Judge Thynge's recommendations in all respects and issued an order granting summary judgment in part for Defendants, pursuant to those recommendations. (D.I.404.) Summary judgment was later granted for Defendants on the *Caremark* claim as well. [FN2] (D.I.417.)

> FN2. Plaintiffs acknowledged (D.I. 415; D.I. 419) that they could not adduce any evidence to support the remaining *Caremark* claim. Thus, summary judgment was granted for the Defendants on that claim. (D.I.417.)

2. *Third Circuit Decision*

Plaintiffs appealed the decision as to the alleged breaches of fiduciary duty related to the note restrictions, [FN3] and the United States Court of Appeals for the Third Circuit reversed in part. *Cantor,* 414 F.3d at 442. First, in a discussion section entitled "The Unjust Enrichment Claim," the Third Circuit held that it was not necessary for Plaintiffs to show that Marvel was harmed by the note restrictions. *Id.* at 435-37. Instead, if Defendants "exploited their fiduciary position for personal gain," that would support a claim for breach of fiduciary

duty, as well as a remedy for unjust enrichment, even if Defendants' gain did not come at Marvel's expense. *Id.* at 435. The Court noted that an unjust enrichment award for the entire $553.5 million benefit "could result in a windfall," suggesting that an award would be appropriately based on "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Id.* at 437 (citing *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881 (Del. Ch.1999)).

> FN3. The *Caremark* claim was not addressed by the Third Circuit.

Second, in a discussion section entitled "The Damages Claims," the Third Circuit held that there was a genuine issue of material fact as to whether the note restrictions harmed Marvel. *Cantor,* 414 F.3d at 437-38. While Defendants presented evidence that Marvel's credit agreements had restrictions that were more constraining than those accompanying the notes, the record also contained evidence from Plaintiffs' expert that Marvel's capital structure would have been different without the note restrictions and that Marvel was indeed prevented from pursuing more favorable financing by those restrictions. *Id.* That evidence was sufficient to raise a genuine issue for trial. *Id.* at 438.

*4 Finally, in a discussion that again used the titles "The Unjust Enrichment Claims" and "The Damages Claims," the Court held that the Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings, because this action was filed after the limitations period. *Id.* at 439-41. Plaintiffs' remaining claims [FN4] were remanded. *Id* at 442.

> FN4. Because the damages remedy based on the Marvel Holdings notes was time-barred, the remaining claims relate to the Marvel Parent and Marvel III notes and to remedies other than damages for the Marvel Holdings notes. *Cantor,* 414 F.3d at 442.

III. APPLICABLE LAW

Plaintiffs base their demand for a jury trial on the Seventh Amendment, which provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

Page 4

be preserved." U.S. Const. amend. VII. "[T]he thrust of the Amendment was to preserve the right to jury trial as it existed in 1791." *Curtis v. Loether,* 415 U.S. 189, 193(1974). In defining the scope of that protection, the Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." ' *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 31, 41 (1989) (emphasis in original) (quoting *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 447 (1830)). Whether a suit is legal or equitable is a question of federal law, even in a diversity case based on substantive state law. *Simler v. Conner,* 372 U.S. 221, 222 (1963).

In addition to causes of action that were decided in courts of law in 1791, the Seventh Amendment protects the right to a jury trial for causes of action that did not exist at that time but "are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty." *Granfinanciera,* 492 U.S. at 42 (citing *Curtis,* 415 U.S. at 193). To decide whether a jury trial is required for a modern cause of action, [FN5] courts must balance two factors:

> FN5. By its literal terms, the *Granfinanciera* test applies to *statutory* actions. I will use that test here, in a case based on Delaware common-law, because the parties, as well as courts in other cases, have so framed their analyses. *See Pereira v. Farace,* 413 F.3d 330, 337 (2d Cir.2005) (using *Granfinanciera* factors to decide whether the Seventh Amendment requires a jury for a claim of breach of fiduciary duty under Delaware law); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.),* 327 B.R. 537, 543-45 (D.Del.2005) (same).

First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first.

*Granfinanciera,* 492 U.S. at 42 (citing *Tull v. United States,* 481 U.S. 412, 417-18, 421 (1987)) (internal quotations and citations omitted). [FN6]

> FN6. "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment," the court must then decide whether Congress has properly assigned the claim "to a non-Article III adjudicative body that does not use a jury as a factfinder." *Granfinanciera,* 492 U.S. at 42. Because I conclude, after balancing the two factors, that Plaintiffs have no right to a jury trial in this case, the third prong is not relevant here.

## IV. DISCUSSION

### A. *Definition of Plaintiffs' Claims*

Before I analyze Plaintiffs' claims according to the *Granfinanciera* factors, I must address a preliminary dispute as to what those claims are. Plaintiffs contend that they have set forth separate claims for unjust enrichment and for compensatory damages, (D.I. 444 at 2-3, 5-6.) Because that contention is not supported by the law or by the Complaint itself, I conclude that the claims to be analyzed are the two claims set forth as causes of action in the Complaint, one for breach of fiduciary duty and one for aiding and abetting that breach.

*5 Plaintiffs note (*id.* at 6) that, "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." *Ross v. Bernhard,* 396 U.S. 531, 537-38 (1970). That proposition, while undisputed, does not settle the question as to whether there are indeed separate legal and equitable claims in this action. In *Ross,* the Court held that a legal claim does not transform into an equitable one simply because it is presented in the form a derivative suit, a procedure with historical roots in equity. *Id.* at 538-43. That case does not stand for the proposition that a particular *remedy* is an issue that must be examined separately to determine whether it is legal or equitable.

While Plaintiffs' right to a jury will not be denied based on a lack of precision in their pleadings, a careful reading of the Complaint as a whole shows

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

Page 5

that there are not separate claims for unjust enrichment and compensatory damages. See *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477-78 (1962) ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."). First, Plaintiffs have stated two claims in their First and Second Causes of Action, one for breach of fiduciary duty and one for aiding and abetting a breach of fiduciary duty, (Complaint at ¶¶ 47- 56.) Second, Plaintiffs' request for relief for unjust enrichment is intertwined with the request for compensatory damages. Plaintiffs ask for "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." (*Id.* at 16.) The unjust enrichment, i.e., the "benefits obtained by defendants," is affirmatively included as a part of the "compensatory damages." (*Id.*) Third, beyond the wording and organization of the Complaint, Plaintiffs do not allege separate breaches, some of which support an award for unjust enrichment and some of which support an award of compensatory damages. Rather, the alleged breach is based on the note transactions as a group. (*Id.* at ¶¶ 30-35, 49, 54-55.) Therefore, the Complaint appears to state a claim for breach of fiduciary duty and a claim for aiding and abetting that breach, with multiple forms of possible relief. It does not state separate claims for unjust enrichment and compensatory damages.

When read as a whole, the Third Circuit's decision is not to the contrary. According to Plaintiffs, because the Third Circuit entitled part of its discussion "The Damages Claims," *Cantor*, 414 F.3d at 437, the Complaint states a claim for compensatory damages that must be analyzed separately under the Seventh Amendment. (D.I. 444 at 5.) I disagree, since the issue of whether a compensatory damages claim exists separately from the unjust enrichment claim does not appear to have been addressed to or by the Court of Appeals. Indeed, there are other more reasonable explanations for the Court's choice of section titles.

*6 First, Judge Thynge's report made two conclusions: (1) that Plaintiffs needed to show that Marvel was forced to act to its detriment as a result of the note restrictions, and (2) that the evidence failed to show such harm. *Cantor*, 235 F.Supp.2d at 382-83. The Third Circuit disagreed with both conclusions, stating (1) that Plaintiffs did not need to show harm to recover a remedy based on unjust enrichment, and

(2) that a genuine issue of material fact remained as to whether Marvel was harmed. *Cantor*, 414 F.3d at 435-38. Thus, the Third Circuit's discussion appears to have simply tracked the issues on appeal, with corresponding section titles to organize that discussion.

Second, the Third Circuit partially affirmed the summary judgment, because Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings. *Id.* at 440. The Court followed the Delaware rule that the statute of limitations, rather than the doctrine of laches, applies when the action is for "damages or other relief which is legal in nature." *Id.* at 439 (quoting *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 169-70 (Del.1976)). But the application of the statute of limitations only indicates that the *relief* is legal in nature and not that the *claim* is legal. Under Delaware law, "whether the claim asserted is legal in nature or equitable, whenever plaintiff seeks money in a derivative suit, her claim is subject to the statute of limitations." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 274 (Del. Ch.1993). Thus, since the Third Circuit held that some money damages were time-barred, the discussion appears to have been separated and titled to reflect the different treatment of the types of relief and not to say anything at all about the nature of the claims themselves.

I conclude that the Complaint does not state separate claims for compensatory damages and unjust enrichment. Furthermore, the Third Circuit likely did not intend to decide that issue when it placed titles on its discussion sections. The Plaintiffs' claims are for breach of fiduciary duty and for aiding and abetting a breach, and the *Granfinanciera* test will be applied to those claims. Since the legal or equitable nature of the aiding and abetting claim appears to be indistinguishable from that of the underlying claim for breach, and since the parties make no distinction between the two claims for purposes of this Motion, the following analysis focuses on the breach of fiduciary duty claim, and the conclusions apply to the aiding and abetting claim as well.

### B. *Historical Roots of a Corporate Fiduciary Duty Claim*

Defendants argue (D.I. 434 at 7-9; D.I. 450 at 12), and Plaintiffs apparently concede (D.I. 444 at 9-10), that Plaintiffs' breach of fiduciary claim under Delaware corporate law is historically equitable.

Plaintiffs' concession is understandable, since the point is inarguable. "Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders." *Skeen v. Jo-Ann Stores, Inc .*, 750 A.2d 1170, 1172 (Del.2000) (citing *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998)). "Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders." *Guth v. Loft, Inc.,* 5 A.2d 503, 510 (Del.1939). Thus, a violation of those duties is treated as a breach of fiduciary duty analogous to that owed by a trustee to a beneficiary. Here, the Complaint alleges such a breach.

*7 That type of claim was historically "within the exclusive jurisdiction of courts of equity." *Chauffeurs, Local No. 391 v. Terry,* 494 U.S. 558, 567 (1990) (citing 2 J. Story, Commentaries on Equity Jurisprudence § 960, p. 266 (13th ed. 1886)). Because they "are almost uniformly actions 'in equity," 'such claims historically carry with them "no right to trial by jury." *In re Evangelist,* 760 F.2d 27, 29 (1st Cir.1985); *accord In re Hechinger,* 327 B.R. at 544. That treatment is consistent with the fact that, "[i]n Delaware, breach of fiduciary duty claims are routinely heard in chancery court, which is a court of equity." *In re Hechinger,* 327 B.R. at 544. Thus, "[w]hile federal, not state law, governs whether ... [a] claim is entitled to a jury trial, the well-established precedent in Delaware ... reinforces the common law tradition affording courts of equity jurisdiction over these matters." *Id.*

Plaintiffs point to several cases (D.I. 444 at 5) where courts looked underneath the claim for breach of fiduciary duty claim and found an underlying legal claim, based, for example, on fraud or negligence. [FN7]*Design Strategies, Inc. v. Davis,* 367 F.Supp.2d 630, 638 (S.D.N.Y.2005); *Resnick v. Resnick,* 763 F.Supp. 760, 767 (S.D.N.Y.1991); *Doyle v. Mellon Bank (East) Nat'l Ass'n (In re Globe Parcel Serv.),* 75 B.R. 381, 385 n. 9 (E.D.Pa.1987); *Stalford v. Blue Mack Transp., Inc. (In re Lands End Leasing, Inc.),* 193 B.R. 426, 433 (Bankr.D.N.J.1996); *Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.),* 118 B.R. 544, 549 (Bankr.S.D.Ohio 1990). According to those analyses, a breach of fiduciary duty claim may be historically legal. The Second Circuit recently rejected that approach, reasoning that to analyze claims that way "would effectively permit every

breach of fiduciary duty claim to be recast as an action at law such that parties seemingly would be entitled to a jury trial on any and all breach of fiduciary duty claims." *Pereira v. Farace,* 413 F.3d 330, 338 (2d Cir.2005) (internal quotations omitted). Given the deep historical roots of such claims in equity, that result seems contrary to the Seventh Amendment mandate to "preserve the right to jury trial as it existed in 1791." *Curtis,* 415 U.S. at 193. Therefore, like the Second Circuit, I decline to parse Plaintiffs' fiduciary duty claims in search of legal elements.

> FN7. In the same string of citations, Plaintiffs point to two other cases where courts refused to strike a jury demand because legal claims were joined with equitable claims. *Hays v. Equitex, (In re RDM Sports Group, Inc.),* 260 B.R. 915, 919-20 (Bankr.N.D.Ga.2001); *Miller v. Weber (In re Anchor/Davis-Jay Container Co.),* Bankr.No. 92-11720S, Adv. No. 93-0042S, 1993 WL 119818, at *2 (Bankr.E.D.Pa. Apr. 15, 1993). Those cases are only relevant here if at least one of Plaintiffs' claims is legal rather than equitable, and Plaintiffs' reliance on them simply begs that question.

Instead, I conclude that Plaintiffs' claims are historically equitable, which weighs against Plaintiffs' right to a jury.

C. *Balancing History with Remedies*

The second *Granfinanciera* factor focuses on the remedy sought for Plaintiffs' claims. Since that factor is more important than the first, *Granfinanciera,* 492 U.S. at 42, the parties spend considerable effort to show that the compensatory damages sought here constitute the type of relief, legal or equitable, that favors their respective positions. (D.I. 434 at 9-12; D.I. 444 at 5-8; D.I. 450 at 3-12.) I conclude, for purposes of this Motion, that, even if Plaintiffs are correct that such relief is legal, Plaintiffs' claims nevertheless seek both equitable and legal relief.

*8 Defendants argue that the remedy for a Delaware breach of fiduciary duty claim is equitable, regardless of whether it includes compensatory damages. (D.I. 450 at 3-12.) They point out that, under Delaware law, "significant discretion is given to the Court in

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

fashioning an appropriate remedy" for a breach of fiduciary duty. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch.1999); *see also Cantor Fitzgerald, L.P. v. Cantor*, C.A. No. 16297, 2001 WL 536911, at *5 (Del. Ch. May 11, 2001) ("[T]he Court has broad discretion to craft a remedy for a breach of the duty of loyalty."). Thus, according to Defendants, the remedy here is equitable, even if it compensates Plaintiffs for harm done to Marvel.

Plaintiffs argue (D.I. 444 at 7-8) that under federal law, which must apply to this analysis, *Simler*, 372 U.S. at 222, equitable relief is narrowly defined as remedies that "restore to the plaintiff particular funds or property *in the defendant's possession*" and not those remedies that "impose personal liability on the defendant." *Pereira*, 413 F.3d at 340 (emphasis in original) (quoting *Great-West Life & Annuity Ins. Co. v. Knudsen*, 534 U.S. 204, 214 (2002)). So, according to Plaintiffs, a remedy for the harm done to Marvel is a legal remedy, regardless of how it is treated in Delaware.

In *Pereira*, the Second Circuit agreed with that proposition. In that case, the Court used the narrow definition of "equitable relief" from the Supreme Court's decision in *Great-West* to show that the plaintiff's claims for breach of fiduciary duty under Delaware law sought a legal remedy, because that remedy was not for money that was unjustly possessed by defendants, but was instead a measure of the harm to the corporation. *Pereira*, 413 F.3d at 340 (applying *Great-West*, 534 U.S. at 214). Because the remedy was legal, the Court reasoned, and because the second *Granfinanciera* factor must be afforded greater weight, the factors weighed in favor of a Seventh Amendment jury right, even though the claims were historically equitable. *Id.* Plaintiffs argue for a similar conclusion here, but I cannot agree.

To begin with, there is some reason to doubt whether the Second Circuit's conclusion is correct. The Supreme Court's *Great-West* decision, on which the Second Circuit's opinion in *Pereira* depends, defined the term "equitable relief" as it is found in section 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(3). The Supreme Court's analysis began with the statement that, because ERISA is a "comprehensive and reticulated statute," the Court has been "especially reluctant to tamper with the enforcement scheme ... by extending remedies not specifically authorized by its text." *Great-West*, 534 U.S. at 209 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)) (internal quotations omitted). Applying the narrow definition of "equitable relief" crafted in that particular context to a common law breach of fiduciary duty claim such as this tears that definition from a key logical underpinning. Moreover, in deciding that "equitable relief" in that case only applied when the plaintiff sought "particular funds or property in the defendant's possession," *Great-West*, 534 U.S. at 214, the Supreme Court expressly held that trust remedies did not apply to "define the reach of § 502(a)(3)." *Id.* at 219. By contrast, the claims here are directly analogous to claims against a trustee by a beneficiary. *See supra* Section IV.B. It thus appears that the Second Circuit may have taken the *Great-West* decision out of context.

*9 However, I need not decide here whether *Pereira* was correctly decided. Even if Plaintiffs are correct that compensatory damages are a form of legal relief under federal law, both claims here also seek equitable relief for Defendants' alleged unjust enrichment.

Plaintiffs seek to recover "the benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.5 million." (Complaint at 16.) The dollar amount here refers directly to the proceeds received by Defendants from the note transactions at issue. That remedy for unjust enrichment is equitable even under the narrow definition used in *Great-West*.

Thus, even under a narrow definition of equitable relief, the second *Granfinanciera* factor leads to a mixed result: the claims seek both legal and equitable relief. When I consider the long history of treating breach of fiduciary duty claims as equitable and balance that with the mixed equitable and legal remedies sought here, the scales tip in favor of Plaintiffs' claims being judged equitable. To weigh the factors differently would effectively ignore the historical factor, contrary both to the Seventh Amendment's purpose to "preserve the right to jury trial as it existed in 1791," *Curtis*, 415 U.S. at 193, and to the express holding of *Granfinanciera*, 492 U.S. at 42, that history is to be accorded weight in the balancing. Therefore, I will strike Plaintiffs' demand for a jury trial of their claims. [FN8]

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: 2006 WL 318666 (D.Del.))

FN8. Because I conclude there is no right to a jury in this case, I need not address the parties' arguments over whether Plaintiffs have waived that right. (D.I. 434 at 12-14; D.I. 444 at 11-15; D.I. 450 at 16-17.)

V. CONCLUSION

For the reasons set forth herein, I will grant Defendants' Motion (D.I.433). An appropriate order will issue.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued in this matter today.

IT IS HEREBY ORDERED that the Motion to Strike Plaintiffs' Jury Demand (D.I.433) is GRANTED.

Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                                           Page 2
Not Reported in B.R., 1999 WL 97939 (Bankr.E.D.Pa.)
**(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))**

2. The Bankruptcy Code provision relating to appointment of special counsel, 11 U.S.C. § 327(e), provides as follows:

(e) The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

3. Since this section purportedly requires that special counsel "has represented the debtor" in the past, and Counsel had not, his appointment is inappropriate under this statutory provision.

4. Furthermore, alleging that "it is expected" that Counsel will be a witness in the trial of the Proceeding, his appointment violated Rule 3.7 of the Rules of Professional Conduct.

In *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 476 (3d Cir.1998), the court, discussing the provisions of § 327 generally, clarified and narrowed its holdings in *BH & P* regarding analysis of measuring the effect of conflicts of counsel as follows:

(1) Section 327(a), as well as § 327(c), imposes a per se disqualification as trustee's counsel of any attorney who has an actual conflict of interest; (2) the district court may within its discretion—pursuant to § 327(a) and consistent with § 327(c)—disqualify an attorney who has a potential conflict of interest and (3) the district court may disqualify an attorney on the appearance of conflict alone.

Although they note that Counsel has represented a creditor of the Debtor prior to his appointment to represent the Trustee, the Defendants fail to identify any actual conflict of interest between the creditor and the Trustee. *See also In re ATR Development Co.,* 1997 WL 607553, at *1- *2 (Bankr.E.D.Pa. Sept. 29, 1997). To the contrary, it appears that both have a common interest in vigorously pursuing any insurance benefits to which the Debtor is entitled from the Defendants.

The Defendants cite *In re Greater Pottstown Community Church of the Evangelical Congregational Church,* 80 B.R. 706, 711 (Bankr.E.D.Pa.1987), for the principle that

simultaneous representation of a creditor and debtor is impermissible because counsel for a debtor, under 11 U.S.C. § 327(a), must be disinterested. However, the "disinterestedness" requirement applies only to general counsel appointed pursuant to § 327(a), not to special counsel appointed, as was Counsel here, for the "specified special purpose" of pursuing this litigation, pursuant to 11 U.S.C. § 327(e). *See In re G & H Steel Service, Inc.,* 76 B.R. 508, 510 (Bankr.E.D.Pa.1987).

Although there is some support for the Defendants' reading of § 327(e) as limiting appointment of special counsel to counsel who previously represented the debtor, *e.g. Meespierson, Inc. v. Strategic Telecom, Inc.,* 202 B.R. 845, 848-49 (D.Del.1996), and cases cited therein, that interpretation of § 327(e) has not been accepted by this court. *See In re Jefsaba, Inc.,* Bankr.No. 91-23043DWS (Bankr.E.D.Pa. Dec. 1, 1994); and *In re Renninger Mason Contractors, Inc.,* 58 B.R. 516, 517 (Bankr.E.D.Pa.1986). *See also In re Fondiller,* 15 B.R. 890, 892-93 (Bankr.9 th Cir.1981).

*3 We note the presence of 11 U.S.C. § 327(c), which provides that,

[i]n a case under chapter 7, 12 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States Trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

This section allows a creditor's attorney to be appointed as special or general counsel for a trustee, as long as there is no actual conflict between the representation of the creditor and the trustee or debtor, as was the case in *Greater Pottstown, supra.*

There is, moreover, no logical reason to limit the appointment of special counsel to an attorney who previously represented a debtor. Indeed, in some of the more memorable cases in this court, prosecuting special counsel was simultaneously counsel for a creditor. *See In re Schachter,* 228 B.R. 359,362 (Bankr.E.D.Pa.1999); and *In re Main, Inc.,* 1998 WL 778017 (Bankr.E.D.Pa. Nov. 4, 1998); and *In re Clayton,* 1996 WL 537852 (Bankr.E.D.Pa. Sept. 17, 1996). In all of these cases, as in the instant case, counsel for a very active creditor was appointed as special counsel to the trustee by this court and vigorously represented the trustees' interests on

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.                                                                            Page 3
Not Reported in B.R., 1999 WL 97939 (Bankr.E.D.Pa.)
**(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))**

behalf or against the respective debtors.

Finally, we note that Counsel had already *been* appointed as the Trustee's special counsel without objection prior to his commencing the Proceeding. The more appropriate time for raising an objection to Counsel's appointment would have been at the time of appointment rather than after significant services pursuant to the appointment have already been undertaken by Counsel. *See In re Engle,* 124 F.3d 567, 580-90 (3d Cir.1997) (conc. & dis. ops.).

We therefore conclude that Counsel was properly appointed as the Trustee's special counsel under § 327(e) and that there is no actual conflict between Counsel's former representation of a creditor against the Debtor and his present representation of the Trustee requiring his disqualification. We also reject the argument that because they may call counsel as a witness, he should be for that reason, disqualified. As we noted in *G & H,*http://www.westlaw.com/Find/Default.wl? rs=FIPR1.0&vr=2.0&DB=164&FindType= Y&ReferencePositionType=S&SerialNum= 1987103960&ReferencePosition=511*supra,* 76 B.R. at 511-12, we are skeptical of this argument. It is not clear whom the Defendants actually anticipate calling as witnesses. The Plaintiffs indicate in their reply brief that they will not call Counsel, but would call his co-counsel for any testimony otherwise adducable from Counsel. The Defendants may insist on calling Counsel, but should not, for that reason, be able to eliminate him as the Trustee's chosen representative. *Id.* at 512. The Disqualification Motion will therefore be denied.

Next, we address the Jury Motion. This issue arises in what is an unusual posture. In most instances, a jury demand is interposed in a bankruptcy court proceeding by a defendant creditor who either wishes to exit the bankruptcy forum, or delay litigation against it, or both. Here, the jury demand is made by the Plaintiffs, the Trustee and the Debtor, who have consented to our conducting the requested jury trial in this court. The Defendants, meanwhile, have made no counter-jury demand and they declined to consent to our conducting the jury trial requested by the Plaintiffs.

*4 This state of affairs has unusual consequences. Because all parties do not consent to our doing so, even though the non-consenting party is not the party

demanding the jury trial, this court could not conduct any jury trial to which the Plaintiffs might be entitled by the terms of 28 U.S.C. § 157(e). In any event the Proceeding, as a complex cause of action arising solely from pre-petition events, is clearly non-core, *see Beard v. Braunstein,* 914 F.2d 434, 443-45 (3d Cir.1991), which status would also preclude our conducting a jury trial without the Defendants' consent. *Id.* at 442-43. The non-core status of the Proceeding will also preclude us from finally determining the Proceeding, if not from hearing it, even if the jury demand is stricken. *See* 28 U.S.C. § 157(c)(1).

The Defendants contend that the Plaintiffs have no right to a jury trial on their bad faith insurance claims under 42 Pa.C.S. § 8371 in any forum, citing *Younis Brothers & Co. v. CIGNA Worldwide Ins. Co.,* 882 F.Supp. 1468 (E.D.Pa.1994); *Coyne v. Allstate Ins. Co.,* 771 F.Supp. 673 (E.D.Pa.1991); and *Terletsky v. Prudential Property & Casualty Ins. Co.,* 437 Pa.Super. 108, 649 A .2d 680 (1994), *allocaturdenied,* 540 Pa. 641, 659 A.2d 560. We find, however, that, among these cases, only *Younis* actually discusses the jury trial issue and that decision concludes that a right to a jury trial *does* exist for most § 8371 claims, the only exemptions being potential claims for interest, court costs, and attorneys fees. 882 F.Supp. at 1474-77. This result is consistent with the authorities cited by the Plaintiffs which support a right to a jury trial of most § 8371 claims, *Kraeger v. Nationwide Mutual Ins. Co.,* 1997 WL 30627 (E.D.Pa. Jan. 27, 1997); and *Fahy v. Nationwide Mutual Fire Ins. Co.,* 885 F.Supp. 678, 680-81 (M.D.Pa.1985). Since the Plaintiffs would, out of bankruptcy court, have a right to a jury trial as to at last part of their claims, they would appear to retain a right to a jury trial in the Proceeding, were same not otherwise precluded. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469 (1962); and *Beacon Theatres v. Westover,* 359 U.S. 500, 510 (1959) (cases presenting intermingled jury and non-jury issues must be first tried to a jury except in narrowly-limited circumstances).

However, in our Order of February 2, 1999, we drew the parties' attentions to the decision in *In re Hutchins,* 211 B.R. 322, 324 (Bankr.E.D.Ark.1997), which cites what it terms

> [t]he vast majority of cases [which] hold that a debtor in bankruptcy has submitted his claims to the equitable jurisdiction of the bankruptcy court such that there is no entitlement to trial by jury.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.

Not Reported in B.R., 1999 WL 97939 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))**

See*Longo v. McLaren (In re McLaren),* 3 F.3d 958 (6 th Cir.1993); *N.I.S. Corp. v. Hallahan (Matter of Hallahan),* 936 F.2d 1496, 1505 (7 th Cir.1991) ("Even if we were to assume that the dischargeability action was legal in nature, however, Hallahan cannot claim a right to jury trial because, as a Chapter 7 debtor, he voluntarily submitted his case to bankruptcy court."); *Parsons v. United States (In re Parsons),* 153 B.R. 585 (M.D.Fla.1993); *Romar International Georgia, Inc. v. Southtrust Bank of Alabama, National Association (In re Romar International Georgia, Inc.),* 198 B.R. 407, 412 (Bankr.M.D.Ga.1996) ("The Court is persuaded that, by filing this adversary proceeding, Plaintiff has subjected its lender liability action to this Court's equitable powers to allow, disallow, and offset mutual debts, even though Plaintiff's claims are legal in nature."); *Crews v. Lyons (In re Lyons),* 200 B.R. 459 (Bankr.S.D.Ga.1994); *Haile Co. v. R.J. Reynolds Tobacco Co.*http://www.westlaw.com/Find/Default. wl?rs=FIPR1.0&vr=2.0&DB=164&FindT ype=Y&SerialNum=1991177962*(In re Haile Co.),* 132 B.R. 979 (Bankr.S.D.Ga.1991); *Leslie Salt Co. v. Marshland Development, Inc.*http://www.westlaw.com/Find/Default. wl?rs=FIPR1.0&vr=2.0&DB=164&FindT ype=Y&SerialNum=1991131544*(In re Marshland Development, Inc.),* 129B.R. 626 (Bankr.N.D.Cal.1991); *The Splash v. Irvine Co. (In re Lion Country Safari, Inc. California),* 124 B.R. 566 (Bankr.C.D.Cal.1991); *In re Beugen,* 81 B.R. 994 (Bankr.N.D.Cal.1988).

*\*5Accord,In re Scotland Guard Services, Inc.,* 179 B.R. 764, 767-68 (Bankr.D.P.R.1993); *In re Cummins,* 174 B.R. 1005, 1007 n. 1 (Bankr.W.D.Ark.1994); *In re Auto Imports, Inc.,* 162 B.R. 70, 71-72 (Bankr.D.N.H.1003); and *In re Oggi's Int'l Foods, Inc. Oggi's Int'l Foods, Inc. v. Hibernation,* Bankr.No. 89-11683F, Adv. No. 90-0087 (Bankr.E.D. Pa. April 30, 1990).

Despite this authority, the principle that the debtor waives a jury trial by maintaining, in the bankruptcy court, a proceeding triable in alternative forums is expressly rejected in *Germain v. Connecticut Nat'l Bank,* 988 F.2d 1323, 1330 (2d Cir.1993); and *In re Jensen,* 946 F.2d 369, 373-74 (5 th Cir.1991). The Third Circuit discussed but did not resolve the split of the Circuits in light of the contrary decisions in *McLoren* and *Hallahan,supra,* in *Billing v. Ravin,*

*Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1250-52 (3d Cir.1994). The *Billing* court ultimately held that no jury trial was permissible in the proceeding before it because it concluded that the malpractice claims asserted there by a trustee against the debtor's bankruptcy counsel were equitable in nature. *Id* at 1252-53.

This court has consistently held that the assertion of counterclaims against a debtor in the course of bankruptcy court litigation by even creditors who have not filed proofs of claim effects a waiver of any right to a jury trial by the creditor asserting the counterclaims. See*In re Labrum & Doak, LLP,* 1998 WL 233749, at *3 (Bankr.E.D.Pa. May 8, 1998); *In re Pocono Springs Co.,* 1997 WL 695617, at *2 *3 (Bankr.E.D.Pa. Nov. 6, 1997); and *In re Lloyd's Securities, Inc.,* 156 B.R. 750, 752-55 (Bankr.E.D.Pa.1993). *Cf.In re Brown,* 219 B.R. 373, 381 (Bankr.E.D.Pa.1998) (pleading counterclaims renders a proceeding as core under 28 U.S.C. § 157(b)(2)(B)). We have thus supported the principle that a party who chooses, when alternatives are available to it, to lay its claims at the door of the bankruptcy court submits itself to the equitable processes therein, as does a creditor who chooses to file a proof of claim. See*Langenkamp v. Culp,* 498 U.S. 42, 44 (1990); and *Travelers Int'l, A.G. v. Robinson,* 982 F.2d 96, 98-100 (3d Cir.1992).

The same principles which apply to creditors should apply to a debtor or a trustee. Thus, if such parties choose the bankruptcy forum when alternative forums exist, they should be prepared to forfeit their right to a jury trial in this forum. The claims asserted in the instant Proceeding clearly could have been asserted in state court and possibly also in federal district court in the first instance. Moreover, even if we reorganized the Plaintiffs' assertion of a jury demand, we would be compelled to relegate the Plaintiffs to the federal district court forum for trial as a result of our determination that this Proceeding is non-core.

See*Beard,*http://www.westlaw.com/Find/Defa ult.wl?rs=FIPR1.0&vr=2.0&DB=350&Find Type=Y&ReferencePositionType=S&Serial Num=1990135718&ReferencePosition=442 *supra,* 914 F.2d at 442-43. The only means for us to retain the Plaintiffs' chosen forum in this court is thus for us to strike their jury demand. We therefore conclude that it is appropriate for us to do so and we will so order.

Not Reported in B.R.                                                    Page 5
Not Reported in B.R., 1999 WL 97939 (Bankr.E.D.Pa.)
(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))

**\*6** The final matter remaining before us for disposition is the Dismissal Motion. In support of this Motion, the Defendants argue that the Debtor's policy was issued solely by Prupac and that the only theory under which Prudential and Pruco could possibly be held liable is by an impermissible application of vicarious liability. See *Kasprzak v. American General Life & Accident Ins. Co.*, 914 F.Supp. 144, 146-47 (E.D.Tex.1996); and *Local 397, Int'l Union of Electronics, etc. Workers v. Midwest Fasteners, Inc.*, 779 F.Supp. 788, 792-93 (D.N.J.1992).

However, it is not clear on what theory the Plaintiffs are suing Prudential and Pruco. The Amended Complaint identifies all of the Defendants collectively as the Debtor's insurer, and therefore it appears that the Plaintiffs are suing all three (and their affiliates) on the theory that one or more of them is the Debtor's actual insurer, and not on any applicable theory of vicarious liability.

We have consistently held that Motions such as these,

"based upon Federal Rule of Bankruptcy Procedure 7012(b), incorporating Federal Rule of Civil Procedure ("F.R.Civ.P.") 12(b)(6), since they seek dismissal of the Proceeding for failure to state a cause of action ....can be granted only if

" "the plaintiff includes allegations which show on the face of the complaint that there is some "insuperable bar" to relief.' *In re Katz*, 1998 WL 85165, at \*1 (Bankr.E.D.Pa. February 26, 1998) (citations omitted). Rule 12(b)(6) thus imposes a very substantial burden of proof upon the moving party because the factual allegations contained in the nonmovant's pleading at issue are presumed to be true and all factual inference must be drawn in favor of the nonmoving party and against the movant. *Id.* Thus, courts will not dismiss a complaint under F.R.Civ.P. 12(b)(6) unless the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." " *Id.*, quoting *Conley v. Gibson*, 355 U.S. 41, 45- 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *In re Main, Inc.*, 1998 WL 156684 at \* 1 (Bankr.E.D.Pa. March 31, 1998)." *In re Labrum & Doak, LLP*, 1998 WL 184413, at \*1 (Bankr.E.D. Pa. April 13, 1998) ...' *In re Labrum & Doak, LLP*, 1998 WL 295542 at \*2 (Bankr.E .D. Pa. June 1, 1998) ("Labrum III")." *In re Labrum & Doak, LLP*, 1998 WL 404301, at \*2 (Bankr.E.D.Pa. July 15, 1998).

The Complaint does not, on its face, reveal any "insuperable bar" to the Plaintiffs' obtaining relief from any of the named Defendants. It is only when we add the Defendants' apparently-disputed factual assertion that Prupac alone is the Debtor's insurer to the facts that dismissal of Prudential and Pruco is justified. If the Defendants' factual averments are in fact correct, it will be simple enough to mold a judgment holding only the correctly-identified insurer liable to the Plaintiffs. We perceive no hardship to the Defendants from deferring a decision as to which is (are) liable to the Plaintiffs because they are all represented by the same counsel. We note that we view with disfavor a pre-trial motion such as the Dismissal Motion which is of limited usefulness in shortening trials or sharpening or narrowing the issues presented at trial. See *In re Jackson*, 92 B.R. 987, 989, 1000 (Bankr.E.D.Pa.1988).

**\*7** We will therefore proceed to deny the Dismissal Motion. We add to our Order a directive that the Defendants, if necessary, promptly amend their Answers in light of the Plaintiffs' filing an Amended Complaint in order that the Proceeding can be readied for trial on March 23, 1999. The underlying bankruptcy case of the Debtor is now quite dated. The final audit papers were due to be filed on December 31, 1998, per our Order of May 11, 1998. However, it is now apparent that resolution of the Proceeding must precede completion of this case's administration. As a result, any further continuances of the trial are most unlikely. We also will schedule a status hearing in the Debtor's main case on the date of the trial to attempt to ascertain when the final audit papers will in fact be filed.

*ORDER*

AND NOW, this 19 th day of February, 1999, upon consideration of the Defendants' Motion to Dismiss certain aspects of the Plaintiffs' Complaint ("the Dismissal Motion"), their Motion to Disqualify the Plaintiffs' Counsel ("the Disqualification Motion"), and their Motion to strike the Plaintiffs' Demand for Jury Trial ("the Jury Motion") in the above-entitled proceeding ("the Proceeding"), and the parties' submissions addressing these Motions, and noting that the Plaintiffs have filed a slightly Amended Complaint, which may require slightly amended Answers prior to the scheduled trial of the Proceeding on March 23, 1999, it is hereby ORDERED as follows:

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in B.R.
Not Reported in B.R., 1999 WL 97939 (Bankr.E.D.Pa.)
**(Cite as: 1999 WL 97939 (Bankr.E.D.Pa.))**

1. The Dismissal Motion and the Disqualification Motion are DENIED.

2. The Jury Motion is GRANTED.

3. The Defendants shall file and serve any necessary Amended Answers to the Amended Complaint on or before February 26, 1999.

4. The trial of the Proceeding remains scheduled on

TUESDAY, MARCH 23, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107. No further continuances will be favored.

5. A status hearing to determine when the final audit papers in this case must be filed and how our Order of May 11, 1998, should be amended is also scheduled on March 23, 1999.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I, Lee E. Kaufman, do hereby certify that on November 26, 2007, I caused copies of the foregoing **Defendants' Motion for Leave to Appeal** to be served upon the parties on the attached service list in the manner indicated.

Lee E. Kaufman (No. 4877)

**SERVICE LIST**

**Via Hand Delivery**

Marla R. Eskin, Esq.
Kathleen Campbell Davis, Esq.
Campbell & Levine
800 North King Street
Suite 300
Wilmington, DE 19801


William F. Taylor, Jr.
Katharine L. Mayer
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
*Counsel to the Official
Committee of Unsecured
Creditors*

**Via Federal Express**

Tony Castanares, Esq.
Stephen M. Ray, Esq.
Carol Chow, Esq.
Whitman L. Holt, Esq.
Stutman, Treister & Glatt, PC
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

**TRANSMITTAL SHEET FOR WITHDRAWAL OF REFERENCE, Notice of Appeal and Motion for Leave to Appeal TO THE U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**Adversary Case #:04-57060  OHC v. Credit Suisse**
**Related Bankruptcy Case #: 02-13396 Oakwood Homes Corporation**

| | |
|---|---|
| **Deputy Clerk Transferring Case:** | Mary Ellen Behornar |
| **Case Type:** | Adversary |
| **Nature of Suit:** | 454 Recover Money/Property |
| **Cause of Transmittal:** | **Motion for Withdrawal of Reference, Notice of Appeal and Motion for Leave to Appeal** |
| **Parties:** | OHC Liquidation Trust v. Credit Suisse |
| **Plaintiff's Counsel:** | Kathleen Campbell Davis, Mark T. Hurford, Marla Rosoff Eskin |

Campbell & Levine, LLC

800 King Street

Suite 300

Wilmington, DE 19801

**Defendant's Counsel:**    Cynthia L. Collins, Lee E. Kaufman, Mark D. Collins, Russell C. Silberglied

Richards Layton & Finger

One Rodney Square

PO Box 551

Wilmington, DE 19899

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, et al., | ) Case No. 02-13396 (PJW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adv. Proc. No. 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

ORDER

For the reasons set forth in the Court's memorandum opinion of this date, the motion of OHC Liquidation Trust for determination of Plaintiff's rights to a jury trial (Doc. # 198) is granted to the extent that three of the 10 counts in the complaint are entitled to a jury trial.

Peter J. Walsh
United States Bankruptcy Judge

Date: November 15, 2007

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Mark D. Collins
Russell C. Silberglied
Lee E. Kaufman
Christopher M. Samis
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Marla Rosoff Eskin
Kathleen Campbell Davis
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

2

R. Paul Wickes
Mary K. Warren
Michael J. Osnato, Jr.
J. Justin Williamson
LINKLATERS
1345 Avenue of the Americas
New York, New York 10105

Attorneys for Defendants,

Tony Castanares
Stephan M. Ray
Scott H. Yun
Whitman L. Holt
Stutman, Treister & Glatt P.C.
1901 Avenue of the Stars
12th Floor
Los Angeles, CA 90067

Special Counsel for the OHC
Liquidation Trust

Date: November 15, 2007

3

**Walsh, J.**

This opinion is regarding the motion of OHC Liquidation Trust ("Plaintiff" or "Trust") for determination of Plaintiff's right to a jury trial (Doc. # 198) in this adversary proceeding. Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC,(f/k/a Credit Suisse First Boston LLC), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants") oppose the motion. For the reasons stated below, the Court will grant the motion.

## Background

Oakwood Homes Corporation ("OHC") together with its subsidiaries and affiliates ("Debtors" or "Oakwood Companies") designed and manufactured various models of homes at a modest or affordable price. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 12). As part of their business, Oakwood Companies also provided their customers with mortgage financing or retail installment sales contracts (collectively "installment contracts"). Oakwood Companies obtained the necessary funds for the installment contracts through a two-step, asset-backed securitization process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). Defendants were the underwriter for this process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). The asset-backed securitization process was commenced by Oakwood Companies using the installment contracts as collateral to

4

borrow against the warehouse facility ("Warehouse Facility")[1].
Warehouse Facility was a short-term facility used specifically to
fund the mortgages for manufactured home buyers. (Doc. # 202,
Decl. Murphy, Ex. A, ¶ 17.b). Once the Warehouse Facility had
accumulated a sufficient amount of installment contracts, usually
about $150 million to $200 million, the installment contracts were
bundled and sold to private and institutional investors through a
real estate mortgage investment trust. (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 14).

The Warehouse Facility was one of three lines of credit
Oakwood Companies used to finance their operations; they also had
a revolving line of credit and a servicer advance facility. (Doc.
# 202, Decl. Murphy, Ex. A, ¶ 17.a-c). The Warehouse Facility was
provided by an affiliate of Bank of America until 2001. (Doc. #
202, Decl. Murphy, Ex. A, ¶ 17.b).

Starting in 1999 the manufactured home industry was going
through a difficult period, and Oakwood Companies' businesses were
struggling. By the second half of 2000, Bank of America wanted to
cease its role as the warehouse lender. (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 26). This was a critical junction for Oakwood Companies,
if they did not have the Warehouse Facility, their securitization
business would have collapsed. (Doc. # 202, Decl. Murphy, Ex. A,

---

[1] Defendants refer to the Warehouse Facility as the Loan
Purchase Facility.

5

¶ 26).  Eventually after some negotiations, Defendants agreed to assume the role of lender and agent on the Warehouse Facility.  On February 9, 2001, Oakwood Companies and Defendants signed various documents to finalize Defendants' new role.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 26).  The main document was a Class A Note Purchase Agreement ("Note Purchase Agreement").

The business continued to slump.  On November 15, 2002, Oakwood Companies filed petition for bankruptcy protection under chapter 11 of title 11 of the United State Code, 11 U.S.C. §§ 101 et seq.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 37).  Defendants filed four proofs of claim, seeking payments of fees and expenses stemming from an August 19, 2002 letter agreement ("Engagement Letter").  Pursuant to the Engagement Letter, Oakwood Companies employed Defendants as the exclusive financial advisor for the contemplated restructuring transaction.  (Doc. # 202, Decl. Murphy, Ex. B, ¶ 3).

On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims.  The objections and counterclaims are: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) equitable subordination; (5) avoidance and recovery of 90 day preferential transfers pursuant to 11 U.S.C. §§ 547, 550; (6) avoidance and recovery of one year preferential transfer pursuant to 11 U.S.C. §§ 547, 550; (7) avoidance and recovery of fraudulent

6

transfers pursuant to 11 U.S.C. §§ 544, 550, and applicable state law; (9) breach of implied and express contract; and (10)deepening insolvency.  (Doc. # 201, pp. 2-3).  The alleged facts giving rise to this extensive list occurred both prior to and after the Engagement Letter.  (Doc. # 198, p. 2).

Plaintiff is prepared to litigate various causes of action arising from two sets of distinct nucleus of operative facts.  The first set of facts is centered around the parties' relationship pre-Engagement Letter.  According to Plaintiff: (1) Prior to the Engagement Letter, Oakwood Companies and Defendants "enjoyed a close and intimate relationship," (Doc. # 198, p. 2), which presumably is because of Defendants' role as the underwriter and then a secured lender to Oakwood Companies.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 11).  (2) Plaintiff alleged that the trust and confidence between the parties created both a fiduciary duty and an implied advisory contract.  (Doc. # 198, p. 2).  (3) Defendants, however, did not exercise reasonable care in carrying out their obligations.  (Doc. # 198, p. 3).

For Defendants' alleged failures, Plaintiff claims that they earned massive fees and caused substantial economic damage to the Oakwood Companies.  (Doc. # 198, p. 3).  For Defendants' alleged breach of fiduciary duty, negligence, and breach of implied contract claims, Plaintiff is requesting recovery of all fees and other remuneration paid to Defendants, _and_ actual and consequential

7

damages.  (See Doc. # 201, pp. 4-5).

The second set of facts is based on the performance under the Engagement Letter.  Plaintiff accuses Defendants of not fulfilling their obligations under the Engagement Letter; therefore their claim should be disallowed.  Plaintiff wants to be awarded additional damages, and recovery under 11 U.S.C. §§ 547 & 548. (Doc. # 198, p. 3).

Plaintiff's complaint asserts a right to a jury trial. Plaintiff has moved to have a jury trial for the causes of action related to the first set of operative facts. (Doc. # 198, pp. 3-4). The causes of action related to the second set of facts are not covered by the motion because they relate to the allowance of Defendants' claims.  (Doc. # 198, pp. 3-4).

## Discussion

Generally, "the bankruptcy court is an appropriate tribunal for determining whether there is a right to a trial by jury of issues for which a jury trial is demanded." Official Comm. Of Unsecured Creditors v. TSG Equity Fund L.P. (In re EnvisionNet Computer Servs.), 276 B.R. 1, 6-7 (D. Me. 2002); In re Wash. Mfg. Co., 128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991).

Defendants put forth a number of grounds contesting Plaintiff's motion.  First, the types of claims and forms of relief Plaintiff is raising are equitable rights, thus there is no right to a jury trial attached.  Second, even if Plaintiff has the right

8

to jury trial it is unenforceable because the claims are part of the "claims-allowance process." Third, in connection with the Note Purchase Agreement, several of the Oakwood Companies executed contracts in which they waived the right to a jury trial. Finally, Defendants argue that because Plaintiff brought these actions in a court of equity, Plaintiff has forfeited its right to a jury trial.

<u>Right To a Jury Trial</u>

The right to a jury trial in a civil case is preserved in the Seventh Amendment of the U.S. Constitution. It states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." <u>U.S. Const. amend. VII</u>. As for the meaning of "suits at common law," the Supreme Court has interpreted it to mean "'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" <u>Granfinanciera, S.A. v. Nordberg</u>, 492 U.S. 33, 40-41 (1989) (quoting <u>Parsons v. Bedford</u>, 3 Pet. 433, 447 (1830)). In other words, a right to a jury trial attaches to those cases involving legal right and not those involving only equitable claims and remedies. <u>Billing v. Ravin, Greenberg & Zackin, P.A.</u>, 22 F.3d 1242, 1245 (3d Cir. 1994).

The Supreme Court in <u>Granfinanciera</u> provided the analytical framework to determine whether there is a right to a

jury trial:

> First, we compare the statutory action to
> 18th-century actions brought in the courts of
> England prior to the merger of the courts of
> law and equity.  Second, we examine the remedy
> sought and determine whether it is legal or
> equitable in nature.  The second stage of this
> analysis is more important than the first.
> If, on balance, these two factors indicate
> that a party is entitled to a jury trial under
> the Seventh Amendment, we must decide whether

Congress may assign and has assigned resolution of the relevant
claim to a non-Article III adjudicative body that does not use a
jury as fact finder.

Granfinanciera, 492 U.S. at 43.  The determination is a matter of

federal law.  Simler v. Conner, 372 U.S. 221, 222 (1963); Byrd v.

Blue Ridge Rural Elec. Coop., 365 U.S. 525, 537-39 (1958).  When a

court is deciding if there is a right to a jury trial, it must

remember that because "the right to jury trial is a constitutional

one, . . . while no similar requirement protects trials by the

court, [the court's] discretion is very narrowly limited and must,

wherever possible, be exercised to preserve jury trial.  Beacon

Theatres, Inc. v. Westover, 359 U.S. 500, 510 (1959); Turner v.

Johnson & Johnson, 809 F.2d 90,99 (1st Cir. 1986)("[I]f we must

err, we choose to do so on the side of preserving plaintiffs' right

to a jury trial."); Prudential Oil Corp. v. Phillips Petrol. Co.,

392 F.Supp. 1018, 1022 (S.D.N.Y. 1975)("[T]he inescapable teaching

of recent Supreme Court decisions is that there is a clear federal

policy in light of the Seventh Amendment favoring jury trials and

that, in doubtful cases, that policy should be favored.").

First Stage: Legal or Equitable Claims

    For the first stage of the <u>Granfinanciera</u> analysis, this
Court must determine whether Plaintiff's claims of negligence,
breach of implied contract, and breach of fiduciary duty would have
been considered legal or equitable claims in 18th century English
courts.   Plaintiff characterizes the negligence and breach of
implied contract claims as historically legal actions, while the
breach of fiduciary claim as an equitable claim.  (Doc. # 198, p.
10)   Defendants do not challenge the characterization in their
brief.  (Doc. # 201, pp. 7-8).   They do, however, contest that
because the negligence and breach of implied contract claims arose
from the same nucleus of operative facts as the breach of fiduciary
duty claim they are not separate and independent causes of action.
(Doc. # 202, p. 11-12).   Rather, they are just breach of fiduciary
duty claim in different names, hence, are equitable claims.

    I disagree.  The notion that a single act of malfeasance
can violate several distinct equitable and legal duties is a
fundamental principle of Anglo-American jurisprudence. <u>See</u> Germain
v. Conn. Nat'l Bank, 988 F.2d 1323, 1329 (2nd Cir. 1993) (stating
that both legal and equitable claims can arise from the same fact).
For example, it is possible that a jury could conclude that
although the parties enjoyed a close relationship, it was not
enough to create a fiduciary duty.   Such a finding would not
preclude a finding of negligence or of breach of contract with

11

respect to an implied advisory contract. Likewise, Defendants always owed Oakwood Companies a duty of reasonable care in rendering their services, the breach of which could give rise to damages even in the absence of any fiduciary relationship. <u>See</u>, <u>e.g.</u>, <u>Balaber-Strauss v. N.Y. Tel.</u> (<u>In re Coin Phones, Inc.</u>), 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996). Thus, the claims are each separate and independent, and must be characterized individually.

Plaintiff's characterization of each claim is accurate. It has been well settled that tort claims, such as negligence, are legal actions. <u>See</u> <u>City of Monterey v. Del Monte Dunes</u>, 526 U.S. 687, 710 (stating that the Seventh Amendment covers all actions that "sound basically in tort"); <u>Arkwright Mut. Ins. Co. v. Phila. Elec. Co.</u>, 427 F.2d 1273, 1275 (3d Cir. 1970)(stating in common law a jury is required for negligence cases); 8-38 MOORE'S FED. PRACTICE § 38.30. This is applicable to persons as well as to corporate parties. <u>See</u>, <u>e.g.</u>, <u>Ross v. Bernhad</u>, 396 U.S. 531, 542 (1970)(explaining how a corporation "would have been entitled to a jury's determination, at a minimum, . . . of its rights against its own directors because of their negligence").

Claims for breach of contract, expressed or implied, are also legal rights under the common law. <u>Donovan v. Robbins</u>, 579 F.Supp. 817, 822 (N.D. Ill. 1984) (claims seeking "money damages for breach of express or implied contracts . . . are clearly legal and [] the Seventh Amendment would require a jury trial as to

them"); 8-38 MOORE'S FED. PRACTICE § 38.30 ("Actions for money damages for breach of contract are legal in nature and are triable to a jury.").

Claims for breach of fiduciary duty, however, are historically equitable rights. Pereira v. Farace, 413 F.3d 330, 338 (2d Cir. 2005), cert denied, 126 S. Ct. 2286 (2006); In re Hutchinson, 5 F.3d 750, 757 (4th Cir. 1993). The best evidence in support, as Defendants point out in their brief, is that the Delaware Chancery Court still has exclusive jurisdiction to hear breach of fiduciary duty cases. Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163 (Del. Ch. 2002).

With two legal rights and one equitable right Plaintiff has a mixture of claims. In such situation "a party will not be denied a jury trial just because other claims arising out of the same facts are equitable." Germain, 988 F.2d at 1329. The "right to jury trial on the legal claims . . . must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." Ross, 396 U.S. at 538. Meaning, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 422-23 (5th Cir. 1998); Mirant Corp. v. Southern Co., 337 B.R. 107, 120 (N.D. Tex. 2006)("[J]oinder of

equitable claims with legal claims does not deprive a party of the right to a jury trial on the legal claim."). Consequently, even though Plaintiff asserts an equitable right, under the first prong of the Granfinanciera analysis it still retains its right to a jury trial as to the two legal rights.

Second Stage: Legal or Equitable Relief

    The second stage of the Granfinanciera analysis requires this Court to characterize the type of remedy sought. This stage is more important than the first stage. Granfinanciera, 492 U.S. at 42. Plaintiff argues that the relief it seeks is a legal remedy because it is for compensatory money damages. (Doc. # 198, pp. 11-12). Even though Plaintiff has a mix of legal and equitable claims, he argues that when the relief for the breach of fiduciary duty claim is a legal remedy, the "action assumes legal attributes." Mirant, 337 B.R. at 120.

    Plaintiff cites the Second Circuit Court of Appeals's Pereira case in support. In Pereira, the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. 413 F.3d at 335-37. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace under the defendants' watch. Id. at 336. The defendants maintained "that they were entitled to a jury trial on the [t]rustee's beach of fiduciary duty claim because

the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution." <u>Id.</u> at 337. The district court rejected this argument. It classified the remedy as restitution, thus, equitable, and the defendants were not entitled to a jury trial. <u>See id.</u> at 339. The Second Circuit reversed the district court's holding. Applying the <u>Granfinanciera</u> test, the court concluded that for the first stage the breach of fiduciary duty claim "would have been equitable in 18th century England." <u>Id.</u> at 339. For the second stage, the Second Circuit looked to <u>Great-West Life & Annuity Insurance Company v. Knudson</u>, 534 U.S. 204 (2002), for guidance. In <u>Great-West</u>, the Supreme Court stated that "'for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.'" <u>Pereira</u>, 413 F.3d at 340 (quoting <u>Great-West</u>, 534 U.S. at 214). Because the trustee's claim was for compensatory damages, rather than any particular property in the defendants' possession, the second prong of the <u>Granfinanciera</u> test rendered his suit legal in nature and required a jury trial. <u>Id.</u> at 341.

Here, Defendants contend that the relief sought is a mix of legal and equitable remedies, thus Plaintiff is not entitled to a jury trial. (Doc. # 202, pp. 8-11). Defendants try to distinguish the <u>Pereira</u> case from the present case on account that

15

the defendants in <u>Pereira</u> were not personally enriched from the breach of fiduciary duty, therefore, the relief was for damage. Whereas, in the present case Defendants enriched themselves and Plaintiff is seeking "classically equitable remedies, including disgorgement and equitable subordination." (Doc. # 201, p. 9).

For support, Defendants offer <u>Cantor v. Perelman</u>, No. Civ.A.97-586-KAJ, 2006 WL 318666 (D. Del. Feb.6, 2006). In <u>Cantor</u>, the trustee sued the directors of a corporation for breach of fiduciary duty and aiding and abetting in the breach. <u>Id.</u> at *2. The trustee sought to recover "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." <u>Id.</u> The court applied the <u>Granfinanciera</u> test. The first prong weighed against right to a jury trial because both of the plaintiff's claims were historically equitable. <u>Id.</u> at *7. The second prong resulted in a mix of equitable and legal remedy. <u>Id.</u> at *9. The court concluded, after commenting on the <u>Pereira</u> decision, that "compensatory damages" was legal in nature, while "benefits obtained by defendants" was an equitable remedy. <u>Id.</u> at *8-9. In its final balancing the court held that where the claims were equitable and the relief sought were both legal and equitable, it weighed against right to jury trial.

The <u>Cantor</u> case is not the proper comparison for the

16

present case.  First, in Cantor there were only two historically equitable claims at issue; breach of fiduciary duty and aiding and abetting the same.  The court noted that its analysis would have been impacted "if at least one of Plaintiff's claims [had been] legal rather than equitable."  Id. at *7 n.7.  That is the case here.  Plaintiff has two causes of action that have always been legal in nature and one that is historically equitable.  Second, the trustee in Cantor was clearly focused on recovering specific sums received by the directors in connection with certain transactions, see id. at *1, which made the remedy equitable.  See id. at *9.  Here, in contrast, the thrust of Plaintiff's case is on remedying the alleged harm incurred by the Debtors, rather than on merely recovering illicit gains.  Thus, Cantor is distinguishable from the present case.

The more appropriate case for this Court to look to is Pereira.  Plaintiff is seeking to recover fees and other remuneration paid to Defendants, and actual and consequential damages.  This relief is very similar to the relief the trustee in Pereira sought; for monetary damage and improperly transferred fees. The Second Circuit held that to be legal relief.  Applying the Great-West test, the relief that Plaintiff is seeking is to impose personal liability on Defendants for the damage they have caused, it is not to recover any particular fund that Defendants have in their possession.  Thus, the relief Plaintiff seeks is

compensatory monetary damages, which is "the classic form of legal relief." <u>Great-West</u>, 534 U.S. at 210 (quoting <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 255 (1993)); <u>see also, e.g.</u>, <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469, 477 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed."); <u>Billing</u>, 22 F.3d at 1245.

Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has right to a jury trial. Plaintiff in this case has presented two legal and one equitable claim and is seeking legal relief. Thus, the weighing clearly favors Plaintiff having the right to a jury trial. In sum, after balancing the two prongs of the <u>Granfinanciera</u> analysis, this Court holds that Plaintiff has the right to a jury trial.

<u>Third Stage: Claim-allowance Process or Not</u>

The third step in the <u>Granfinanciera</u> analysis is to determine whether this is a matter that Congress has assigned to a non-Article III court for adjudication without a jury. The Third Circuit has extrapolated from this prong an embedded limitation on the Seventh Amendment right. <u>Billing</u>, 22 F.3d at 1247. The limitation arises when a cause of action "falls within the process of the allowance and disallowance of claims." <u>Id.</u> at 1253. There, neither the debtor's estate nor the defendant has a Seventh

18

Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." Id.; Germain, 988 F.2d at 1330 ("For waiver to occur, the dispute must be part of the claims-allowance process.... Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue."). This limitation originated from Katchen v. Landy, 382 U.S. 323 (1966). The Supreme Court in Katchen noted that part of Congress's intent for the Bankruptcy Act of 1898 was to place the resolution of disputed claims in summary proceeding in the bankruptcy court rather than proceeding at law. Id. at 329; see Billing, 22 F.3d at 1247. It was intended to promote expediency and judicial efficiency. See Katchen, 382 U.S. at 328.

Plaintiff asserts that the subject counterclaims are not part of the claim-allowance process and offers two reasons in support. First, the causes of action are unrelated to the Engagement Letter and are not products of the Bankruptcy Code. Instead, they are state law claims that could have been asserted by Oakwood Companies against Defendants prior to the Engagement Letter. (Doc. # 198, p. 18). Second, the success or failure of Plaintiff's counterclaims would not affect the allowance or disallowance of Defendants' claims under 11 U.S.C. § 502(d). (Doc. # 198, p. 18). If Plaintiff succeeds or fails on its non-bankruptcy legal claims, only the size of the Debtors' estate would

19

be affected.

Defendants hold the opposing view.  They contend that Plaintiff's counterclaims are in response to Defendants' proofs of claim, and the relief Plaintiff seeks is a resolution of Defendants claims.  (Doc. # 201, p. 18).  They also argue that when Plaintiff requested the Court to disallow or otherwise equitably subordinate Defendants' proofs of claim it has invoked and submitted to the equitable jurisdiction of this Court.  (Doc. # 201, p. 15). According to Defendants, the fact that Plaintiff seeks affirmative recovery on his counterclaims and could have brought his counterclaims in other forum does not affect their conclusion. (Doc. # 201 pp. 15, 18).

Claim-allowance process means that "the resolution of the dispute in which a jury trial is sought must affect the allowance of the creditors's claim in order to be part of that process." Germain, 988 F.2d at 1327.  An action that "would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process."  Id. The action is only augmenting the estate "if [the trustee] wins, the estate is enlarged, and this may affect the amount . . . creditors ultimately recover on their claims, but it has no effect whatever on the allowance of the [defendant's] claim."  Id. Generally, lender liability actions augment the estate.  Id.

The Court is persuaded that the subject counterclaims are

20

not part of the claim-allowance process.  As Plaintiff carefully points out in its motion, the claims that Defendants assert arise from the Engagement Letter, whereas the subject counterclaims that Plaintiff asserts originate from the period prior to the Engagement Letter.  The subject counterclaims are based on the financial institutions' alleged misconduct, separate from Defendants' proofs of claim for services performed pursuant to the Engagement Letter.  Furthermore, Plaintiff's subject counterclaims only augment the estate.  Plaintiff may raise the counterclaims in a separate trial, under applicable state law, and succeed on some or all of the counterclaims, yet it would not affect the allowance of Defendants' claims.  The only effect that will result is that if it wins, the estate will be augmented by the compensatory monetary damage from Defendants.  Thus, Plaintiff's counterclaims are not part of the claim-allowance process, and do not limit its right to a jury trial.

Legal Claims in a Court of Equity

As for Defendants' argument that Plaintiff submitted itself to the equitable jurisdiction of this Court by raising these counterclaims, the Court does not agree.  Defendants argue that the Trust's choice to combine claim objections with affirmative litigation before this Court somehow makes the entire adversary proceeding part of the claims-allowance process or otherwise triggered a categorical submission to the equitable jurisdiction of

this Court.

Circuits are split on Defendants' core proposal - that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates any and all of the estate's jury trial rights forever. See Germain, 988 F.2d 1330 ("We conclude that neither precedent nor logic supports the proposition that either the creditor or the debtor automatically waives all right to a jury trial whenever a proof of claim is filed."); In re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (debtor's petition in the bankruptcy court does not affect its right to a jury trial). But see N.I.S Corp. v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th Cir. 1991) (holding debtor consented to jurisdiction by filing bankruptcy petition and thereby waived right to jury trial); Bayless v. Crabtree Through Adams, 108 B.R. 299, 305 (Bankr. W.D. Okla. 1998), aff'd, 930 F.2d 32 (10th Cir. 1991) (holding legal assertions, otherwise subject to jury trial, brought by trustee or debtor are "open to adjudication in equity by Bankruptcy Judges under their power to afford complete relief").

The Third Circuit has not adopted Defendant's position.

The fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis. A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims. See Katchen, 382 U.S. at 336, 86 S.Ct. at 476.

22

<u>Billing</u>, 22 F.3d at 1252, n. 14.    This Court believes that Defendants' core proposal flies in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." <u>Ross</u>, 396 U.S. at 538.    Thus, the Court rejects Defendants' position.

## Contractual Waiver of Jury Trial

The last ground that Defendants raise in opposition is that Plaintiff contractually waived its right to a jury trial.  In connection with the Note Purchase Agreement, on February 9, 2001, two Oakwood Companies (OHC and Oakwood Acceptance Corporation, LLC) executed agreements with a Credit Suisse entity.  Those agreements contain a jury trial waiver whereby each party

> HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES,
> TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY
> RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY
> LEGAL ACTION OR PRECEDING RELATING DIRECTLY OR
> INDIRECTLY TO THIS AGREEMENT OR ANY OTHER
> DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR
> ANY COUNTERCLAIM THEREIN.

(Doc. # 202, Decl. Murphy, Ex. E, p. 6).  According to Defendants, Plaintiff, in charge of liquidating the Debtors' estates, is the successor in interest to these two Oakwood Companies, and is prohibited by the waiver from seeking a jury trial on any claims "related directly or indirectly to the Note Purchase Agreement or any of the contracts related thereto under the loan purchase facility."  (Doc. # 201, p. 22).

23

There are several reasons why this contractual waiver does not apply here. The first is the identity of the contracting parties. The purported waiver only involves two of the Debtors. The Trust succeeded to the rights of fifteen Debtor entities[2] pursuant to a plan of reorganization that effected a substantive consolidation of all the Debtors. The Credit Suisse entity that is a party to the two agreements bears the name of "Credit Suisse First Boston, New York Branch," as agent for the warehouse facility. (Doc. # 202, Decl. Murphy, Ex. "D" at signature page, Ex. "E" at signature page.) None of Defendants here bear that name.

In their answer to the complaint (Doc. # 132), Defendants very carefully note their separateness. Footnote 1 on p. 2 of the answer states:

> The Defendants' use of "Defendants" to refer to the named Credit Suisse affiliated defendants is used for convenience only and is not an admission that any one of the Defendants is not a distinct and separate entity, or that any one of the Defendants is responsible for the liabilities of any other Defendant. Nor is any reference to "Defendants" an admission that any Defendant named or referenced in the Complaint

---

[2] These are: Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, and Oakwood MHD4, LLC.

24

    participated in any of the acts alleged in the
complaint, except as specifically admitted
herein.

In their response to the motion, Defendants specifically identify
"Credit Suisse Securities (USA), LLC" as the target of the jury
trial counts: "The remaining claims - on which the Trust now seeks
a jury trial - are claims arising out of the relationship between
Oakwood and [Credit Suisse Securities (USA), LLC] prior to August,
2002." (Doc. # 201, p. 7).  Obviously, Credit Suisse Securities
(USA), LLC is not a party to the two agreements containing the jury
trial waiver and thus it has no standing to enforce the waiver even
if the Trust were bound by the commitment of two of the fifteen
Debtors.

    It is fundamental that, "[g]enerally, a jury waiver
provision in a contract or lease affects only the rights of the
parties to that contract or lease," Hulsey v. West, 966 F.2d 579,
581 (10th Cir. 1992) (guarantor of corporate loan was not bound by
jury waiver in an agreement that he did not execute in his personal
capacity).  Thus, Defendants, including Credit Suisse Securities
(USA), LLC, cannot all claim shelter in a waiver signed only by
Credit Suisse First Boston, New York Branch.  Nor can that waiver
diminish the rights of thirteen Debtors that did not sign it -
rights that now belong to the Trust.

    Even if one were to ignore the "New York Branch"

25

identification, the result remains the same.  If the two agreements are read to intend that the Credit Suisse entity is simply "Credit Suisse First Boston, a Swiss banking corporation," the caption of this case identifies "Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation)" as a Defendant, but Defendants acknowledge that the target of the jury trial counts is the Defendant "Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC)."

The second problem relates to the scope of the waiver itself.  At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the Warehouse Facility.  But the legal claims are not about any breach of those agreements, or about whether Credit Suisse First Boston, New York Branch adequately performed thereunder.  Rather, it is about whether Defendants breached far broader duties, not arising from any written contract, by partaking a myriad of alleged illicit transactions with the Oakwood Companies.

Because this action is about much more than the Warehouse Facility and related agreements, it falls outside the scope of the purported waiver.  Other courts have reached the same conclusion in similar circumstances.  See, e.g., Nichols Motorcyle Supply Inc. v. Dunlop Tire Corp., 913 F. Supp. 1088, 1146-47 (N.D. Ill. 1995) (broad jury waiver in "Distributor Agreement" did not encompass any "claims that do not directly arise or have their basis in the

Distributor Agreement"); <u>Nat'l Acceptance Co. v. Myca Prods., Inc.</u>, 381 F. Supp. 269, 269-70 (W.D. Pa. 1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); <u>see also</u> <u>OHC Liquidation Trust v. Credit Suisse First Boston (In re</u> <u>Oakwood Homes Corp.)</u>, 340 B.R. 510, 519-20 (Bankr. D. Del. 2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties).  The purported contractual waiver is far too limited to apply here.

          The final problem with Defendants' contractual waiver theory is that Defendants have not proffered any evidence to meet their burden of showing that there was no gross disparity in power between the two Oakwood Companies and Credit Suisse First Boston, New York Branch.

          The Supreme Court and the Third Circuit all agree that "because the 'right of jury trial [in a civil case] is fundamental, courts [should] indulge every reasonable presumption against waiver.'" <u>Tracinda Corp. V. DaimlerChrysler AG.</u>, 2007 U.S. App. LEXIS 22221, *22-23 (3d Cir. Sept. 18, 2007) (quoting <u>Aetna, Inc.</u> <u>v. Kennedy</u>, 301 U.S. 3890, 393 (1937)); <u>Collins v. Gov't of Virgin</u> <u>Islands</u>, 366 F.2d 279, 284 (3d Cir. 1966).  A valid, enforceable waiver clause must meet the knowing and voluntary standard, which requires that: (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business

27

entities; (3) the parties had opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous.  First Union Nat'l Bank v. United States, 164 F.Supp. 2d 660, 663 (E.D. Pa, 2001); Tracinda Corp., 2007 U.S. App. LEXIS 22221 at *23.  Given the presumption against waiver "the burden of proving that a waiver was done knowingly and intelligently falls upon the party seeking enforcement of a waiver . . . clause."  First Union Nat'l Bank, 164 F.Supp. 2d at 663.

In this case Defendants bear the burden of proving the waiver clause is enforceable.  Looking at the factors, there is no question as to the sophistication and intelligence of the parties who entered into the agreements.  Question arises, however, regarding the bargaining positions of the parties when they entered into the Note Purchase Agreement.

Plaintiff points to a video deposition by Mr. Douglas R. Muir, a officer of OHC.  In the deposition Mr. Muir stated that finding a successor facility to its then credit providers, Bank of America, was critical and had to be done.  (Doc. # 204, Decl. Holt, Ex. B, at 52:13-16).  However, there was not "a half a dozen credit providers lined up at the door, each of which was offering to do [the] transaction.  At the time [Defendants] w[ere] the only game in town."  (Doc. # 204, Decl. Holt, Ex. B, at 51:13-16).  Additionally, there was pressure from Bank of America to take it out of the facility, or it would have charged Oakwood Companies

28

large fees.  (Doc. # 204, Decl. Holt, Ex. B, at 52:6-12).  Given the critical nature of the transaction, the lack of candidates, and the pressure from Bank of America, there is a good argument that the two Oakwood Companies were at a severely disadvantaged bargaining possession.  Thus, they did not have any leverage to fairly negotiate the terms of the Note Purchase Agreement.  Because Defendants did not offer any evidence to the contrary, Defendants failed to meet its burden of proof that the parties had equal bargaining position.  Consequently, because this Court must construe the waiver narrowly and any ambiguity is to be decided against the waiver, the waiver is not enforceable here.

## **Conclusion**

_____For the reasons stated above, Plaintiff's motion for determination of Plaintiff's rights to a jury trial is granted. Plaintiff does have the right to a jury trial on three of its 10 counts.

_____