**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Re: Adv. Proc. D.I. No. 215** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S ANSWER IN OPPOSITION TO
DEFENDANTS' MOTION FOR LEAVE TO APPEAL**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..........................................1

ARGUMENT ......................................................4

    A.   Because There Is A Key Distinction Between
        Decisions Recognizing The Constitutional
        Jury Right And Decisions Denying That Right,
        The Jury Trial Opinion Involves No
        Controlling Question Of Law.........................5

    B.   Because The Bankruptcy Court Appropriately
        Considered And Applied Controlling Case Law,
        There Are No "Substantial Grounds" For
        Disagreement........................................8

        1.   Controlling Case Law Makes Clear That A
             Jury Right Exists Whenever Any "Legal"
             Claims Are Present Or "Legal" Relief Is
             Sought..........................................10

        2.   Controlling Case Law Makes Clear That A
             Claim Must Be A Necessary Part Of The
             "Claims-Allowance Process" In Order To
             Result In An Implied Waiver Of A Jury
             Right...........................................13

        3.   Controlling Case Law Rejects The Notion
             That A Jury Right Is Lost When A Legal
             Suit Is Brought In A Court Of Equity............16

        4.   Controlling Case Law Requires That
             Contractual Jury Waivers Be Narrowly
             Construed; The Bankruptcy Court
             Properly Limited The Purported Waiver
             On The Facts Before It..........................18

    C.   An Appeal At This Juncture Will Not
        Materially Advance The Progress Of This
        Litigation, But Will Only Create Further
        Expense And Delay..................................22

    D.   This Case Does Not Involve Any "Exceptional
        Circumstances" That Could Justify An
        Immediate And Premature Appeal.....................26

CONCLUSION ....................................................30

## TABLE OF AUTHORITIES

**CASES**

*Aetna Ins. Co. v. Kennedy*,
301 U.S. 389 (1937) ................................... 19, 20

*Allegheny Int'l, Inc. v. Allegheny Ludlum Steel
Corp.*,
920 F.2d 1127 (3d Cir. 1990) .............................. 6

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959) .................................... 6, 7

*Billing v. Ravin, Greenberg & Zackin, P.A.*,
22 F.3d 1242 (3d Cir. 1994), *cert. denied*, 513
U.S. 999 (1994) ..................................... *passim*

*Bowie Produce Co. v. Magic Am. Cafe, Inc. (In re
Magic Rests., Inc.)*,
202 B.R. 24 (D. Del. 1996) ........................... 5, 29

*Cantor v. Perelman*,
No. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb.
10, 2006) ............................................... 11

*Chaplin v. Harbison Group*,
119 B.R. 433 (S.D.N.Y. 1990) ............................. 6

*Chauffeurs, Teamsters & Helpers v. Terry*,
494 U.S. 558 (1990) ...................................... 7

*City of New York v. Beretta U.S.A. Corp.*,
317 F. Supp. 2d 193 (E.D.N.Y. 2004) ...................... 7

*In re Crown Vantage, Inc.*,
No. 02-03836, 2002 U.S. Dist. LEXIS 26109 (N.D.
Cal. Dec. 16, 2002) ..................................... 15

*Dairy Queen, Inc. v. Wood*,
369 U.S. 469 (1962) .................................. 10, 11

*Dal-Tile Intl., Inc. v. Color Tile, Inc.*,
203 B.R. 554 (D. Del. 1996) .............................. 5

*In re Del. & Hudson Ry. Co.*,
96 B.R. 469 (D. Del. 1989), *aff'd*, 884 F.2d
1383 (3d Cir. 1989) ..................................... 27

*Dimick v. Schiedt*,
293 U.S. 474 (1935) ...................................... 7

*EEOC v. Blue Star Foods, Inc.*,
    No. 78-5-W, 1980 U.S. Dist. LEXIS 11131 (S.D.
    Iowa Mar. 7, 1980) ......................................... 7

*EEOC v. Waffle House, Inc.*,
    534 U.S. 279 (2002) ....................................... 19

*Educ. Testing Servs. v. Katzman*,
    670 F. Supp. 1237 (D.N.J. 1987) ........................... 7

*Enron Corp. v. Springfield Assocs., L.L.C. (In re
    Enron Corp.)*,
    No. M-47 (SAS), 2006 U.S. Dist. LEXIS 63223
    (S.D.N.Y. Sept. 5, 2006) ........................... 9, 25, 29

*First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re
    Hooker Invs., Inc.)*,
    937 F.2d 833 (2d Cir. 1991) .............................. 25

*First Union Nat'l Bank v. United States*,
    164 F. Supp. 2d 660 (E.D. Pa. 2001) ...................... 20

*In re Franklin Towne Lodge Ltd. P'ship*,
    No. 91-2702, 1992 U.S. Dist. LEXIS 18817 (E.D.
    Pa. Nov. 25, 1992) ....................................... 16

*Germain v. Conn. Nat'l Bank*,
    988 F.2d 1323 (2d Cir. 1993) ..................... 13, 15, 16

*In re Globe Parcel Serv., Inc.*,
    75 B.R. 381 (E.D. Pa. 1987) .............................. 16

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ................................... 10, 12

*Harriscom Svenska AB v. Harris Corp.*,
    947 F.2d 627 (2d Cir. 1991) .............................. 21

*Hays v. Equitex, Inc. (In re RDM Sports Group)*,
    260 B.R. 915 (Bankr. N.D. Ga. 2001) ..................... 16

*Hulmes v. Honda Motor Co.*,
    936 F. Supp. 195 (D.N.J. 1996) ........................ 9, 23

*Int'l Union, United Auto., Aerospace & Agric.
    Implement Workers of Am. v. Midland Steel
    Prods. Co.*,
    771 F. Supp. 860 (N.D. Ohio 1991) ....................... 27

*Kennard v. United Parcel Serv., Inc.*,
    531 F. Supp. 1139 (E.D. Mich. 1982) ..................... 24

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ....................................... 14

*Lauro Lines s.r.l. v. Chasser*,
    490 U.S. 495 (1989) ...................................... 27

*Link v. Mercedes-Benz of N. Am.*,
    550 F.2d 860 (3d Cir. 1977), *cert. denied*, 431
    U.S. 933 (1977) ............................................ 5

*MCI WorldCom Commc'ns v. Commc'ns Network Int'l,*
    *Ltd. (In re WorldCom, Inc.)*,
    358 B.R. 76 (S.D.N.Y. 2006) ............................. 21

*M&E Contractors v. Kugler-Morris Gen. Contractors*,
    67 B.R. 260 (N.D. Tex. 1986) ............................ 16

*McClelland v. Braverman Kaskey & Caprara, P.C. (In*
    *re McClelland)*,
    332 B.R. 90 (Bankr. S.D.N.Y. 2005) ...................... 14

*Milbert v. Bison Labs.*,
    260 F.2d 431 (3d Cir. 1958) ............................... 5

*Mirant Corp. v. Southern Co.*,
    337 B.R. 107 (N.D. Tex. 2006) ........................... 15

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*,
    203 B.R. 905 (D. Del. 1996) ............................. 16

*Official Comm. of Unsecured Creditors v. Qwest*
    *Commc'ns Corp. (In re A.P. Liquidating Co.)*,
    350 B.R. 752 (E.D. Mich. 2006) ........................... 6

*Orson, Inc. v. Miramax Film Corp.*,
    867 F. Supp. 319 (E.D. Pa. 1994) ......................... 5

*Parsons v. Bedford*,
    3 Pet. 433 (1830) ....................................... 10

*Pereira v. Farace*,
    413 F.3d 330 (2d Cir. 2005), *cert. denied*, 126
    S. Ct. 2286 (2006) ...................................... 11

*Rafoth v. Nat'l Union Fire Ins. Co. (In re Baker &*
    *Getty Fin. Servs., Inc.)*,
    954 F.2d 1169 (6th Cir. 1992) ........................... 27

*Ross v. Bernhard*,
    396 U.S. 531 (1970) ................................. 16, 17

*Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp.*,
    294 F.2d 486 (5th Cir. 1961) ............................ 10

*Tracinda Corp. v. DaimlerChrysler AG*
    502 F.3d 212 (3d Cir. 2007) ......................... 18, 20

*Urban Outfitters, Inc. v. 166 Enter. Corp.*,
    136 F. Supp. 2d 273 (S.D.N.Y. 2001) ....................... 20

*United States v. Kramer*,
    19 F. Supp. 2d 273 (D.N.J. 1998) ......................... 28

*United States v. McAlister*,
    630 F.2d 772 (10th Cir. 1980) ............................ 7

*Vodusek v. Bayliner Marine Corp.*,
    71 F.3d 148 (4th Cir. 1995) .............................. 6

*Williston v. Eggleston*,
    410 F. Supp. 2d 274 (S.D.N.Y. 2006) ..................... 18

*Zygmuntowicz v. Hospitality Invs., Inc.*,
    828 F. Supp. 346 (E.D. Pa. 1993) ........................ 22

## STATUTES AND RULES

28 U.S.C. § 157(e) ........................................... 27

28 U.S.C. § 158(a) ....................................... *passim*

28 U.S.C. § 1292(b) .......................................... 24

Fed. R. Bankr. P. 8003(a) ..................................... 1

## OTHER AUTHORITIES

U.S. Const. amend. VII .................................... *passim*

Webster's Third New International Dictionary (unabridged
    2002) ................................................... 28

Pursuant to Federal Rule of Bankruptcy Procedure 8003(a), Plaintiff OHC Liquidation Trust ("**Plaintiff**"), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby submits this answer in opposition to the "Defendants' Motion For Leave To Appeal" (the "**Motion**") filed on November 26, 2007 by the Defendants in the above-captioned adversary proceeding (collectively, "**Defendants**" or "**Credit Suisse**").

<u>**PRELIMINARY STATEMENT**</u>

This would-be interlocutory appeal arises out of a thoughtful and comprehensive memorandum opinion (the "**Jury Trial Opinion**"[1]) issued by the United States Bankruptcy Court for the District of Delaware, Walsh, J. (the "**Bankruptcy Court**") on November 15, 2007.  In the Jury Trial Opinion, which was rendered after substantial briefing by the parties, the Bankruptcy Court cogently explained why controlling Supreme Court and Third Circuit cases lead to the conclusion

---

[1]  A true and correct copy of the Jury Trial Opinion [Adv. Proc. D.I. No. 207] is attached as Exhibit "A" to the accompanying Declaration of Whitman L. Holt (the "**Holt Declaration**").  All capitalized terms used but not otherwise defined herein have the meaning set forth in the Jury Trial Opinion.  Further, rather than burden this Court with yet another summary of the proceedings below, Plaintiff respectfully refers the Court to the background material provided by the Bankruptcy Court on pages 3-7 of the Jury Trial Opinion, as well as that set forth on pages 3-11 of the pending motion to withdraw the reference (the "**Motion to Withdraw Reference**," a copy of which is attached as Exhibit "B" to the Holt Declaration) that Plaintiff filed on November 19, 2007 based upon the Jury Trial Opinion.

that Plaintiff has a constitutional right to a jury trial as
to three of its counterclaims against Credit Suisse.  In the
process, the Bankruptcy Court expressly considered and
rejected all of the unjustifiable theories that Credit Suisse
now attempts to repackage for this Court's consideration.

Frustrated by their loss before the Bankruptcy
Court, Defendants go to desperate lengths – including
mischaracterizing cases, obfuscating the record, and griping
about aspects of the proceedings below that have no relevance
to their requested relief – to convince this Court that the
Jury Trial Opinion is one of those rare decisions that meets
the stringent standards for interlocutory review.  Defendants'
efforts fall flat, however, because they cannot demonstrate
that all four of the conditions necessary for an interlocutory
appeal exist here.  In fact, not even one of those required
conditions is satisfied.

First, Defendants improperly conflate the
distinction between a lower court opinion ***denying*** a jury right
and one ***recognizing*** a jury right.  The difference is crucial
because, as the Supreme Court has explained, the right to a
jury is a fundamental one, enshrined in the Constitution, but
there is no corresponding right to a non-jury trial.

Second, Defendants attempt to manufacture the
"substantial ground for a difference of opinion" necessary to

indict the Jury Trial Opinion.  Yet the Bankruptcy Court
merely referenced and applied the Supreme Court and Third
Circuit decisions that control the outcome of this dispute.
The fact that Defendants may be unhappy with the Bankruptcy
Court's analysis, or that there may be non-binding cases which
are allegedly not in accord with the Jury Trial Opinion, is
simply not enough to establish the ***substantial*** judicial
disagreement required for an interlocutory appeal.

Third, Defendants hardly bother to argue that an
appeal at this juncture will materially advance the ultimate
termination of the adversary proceeding.  Defendants' feeble
attempt is easily explained by the fact that their proposed
interlocutory appeal: (i) will not resolve even a single
disputed issue, but rather will merely determine the fact-
finder for a static body of issues; (ii) will generate lengthy
and time-consuming briefing that will unnecessarily increase
the costs to the parties and delay a trial on the merits; and
(iii) raises questions that could be reanimated by either of
the parties following the entry of a final order.  Moreover,
the case law is clear that where, as here, discovery has
concluded and the parties are ready for trial, interlocutory
appeals do not advance the litigation's ultimate termination.

Fourth, Defendants cite no truly "exceptional
circumstances" that merit a piecemeal appeal.  The fact that a

corporate defendant disputes a plaintiff's Seventh Amendment right to a jury and threatens to raise that issue in a future appeal from a final judgment is a fact-pattern presented by legions of high-stakes commercial cases. Such a timeless tale hardly embodies the "exceptional" case – one that threatens fundamental rights or entire markets – for a premature appeal.

In sum, none of the factors courts consider when analyzing whether to grant leave to appeal under 28 U.S.C. § 158(a) are present. As such, the Motion should be denied.

## ARGUMENT

The Jury Trial Opinion and the associated order represent an interlocutory decision by a bankruptcy court, which means Credit Suisse cannot appeal as a matter of right. Rather, Credit Suisse may appeal only "with leave of the court" under 28 U.S.C. § 158(a).

Section 158(a) does not provide criteria for determining whether "leave" should be granted, but the Motion properly recites the applicable standards; in order to justify their requested relief, Defendants must establish that:

1.  The Jury Trial Opinion involves a controlling issue of law;

2.  There is a **substantial** ground for difference of opinion about the Bankruptcy Court's rulings;

3.  An immediate appeal will materially advance the ultimate termination of this adversary proceeding; **_and_**

4.    This case involves some "exceptional circumstances" that justify departing from the general policy against piecemeal appeals.[2]

*See* Motion at pp. 8-9; *see also, e.g.*, *Dal-Tile Intl., Inc. v. Color Tile, Inc.*, 203 B.R. 554, 557 (D. Del. 1996); *Bowie Produce Co. v. Magic Am. Cafe, Inc. (In re Magic Rests., Inc.)*, 202 B.R. 24, 26 (D. Del. 1996).

Because the test for interlocutory appeal is conjunctive, Defendants bear the burden of proving that **all four** criteria have been satisfied.  This is fatal since, as detailed below, not even one of these factors is present here.

## A.    Because There Is A Key Distinction Between Decisions Recognizing The Constitutional Jury Right And Decisions Denying That Right, The Jury Trial Opinion Involves No Controlling Question Of Law.

In a desperate attempt to clear the hurdles of pursuing an interlocutory appeal, Defendants baldly assert that the Jury Trial Opinion raises a controlling question of law because "the allowing of a jury trial where no jury right exists would plainly be reversible error."  (Motion at p. 9.) Rather than cite a single authority that actually supports

---

[2]    In this Circuit there exists a strong policy against piecemeal appeals, and interlocutory relief should be "sparingly applied" and "used only in exceptional cases."  *Milbert v. Bison Labs.*, 260 F.2d 431, 433 (3d Cir. 1958); *see also, e.g., Link v. Mercedes-Benz of N. Am.*, 550 F.2d 860, 863 (3d Cir. 1977) ("[W]e cannot sanction an erosion of the prohibition against 'piecemeal' appellate review."), *cert. denied*, 431 U.S. 933 (1977); *Orson, Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 321 (E.D. Pa. 1994).

this position, Defendants cite *Official Committee of Unsecured Creditors v. Qwest Communications Corp. (In re A.P. Liquidating Co.)*, 350 B.R. 752 (E.D. Mich. 2006), and *Chaplin v. Harbison Group*, 119 B.R. 433 (S.D.N.Y. 1990). Defendants, however, have completely misapplied the holdings of each case; both *A.P. Liquidating Co.* and *Chaplin* hold that the **denial** of the constitutional right to a jury trial raises a controlling question of law. There is no corresponding right to a bench trial. *See, e.g.*, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) (explaining that "the right to jury trial is a constitutional one," and "no similar requirement protects trials by the court"); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 152-53 (4th Cir. 1995) ("While the Seventh Amendment guarantees a jury trial in cases 'at common law,' no constitutional provision guarantees, or indeed prohibits, jury trials for cases tried in equity or in admiralty.").

The obvious distinction between **recognizing** a fundamental right and **denying** that right is crucial when considering whether to exercise discretionary judicial powers. For instance, the Third Circuit has explained that the "drastic" remedy of a writ of mandamus is an appropriate method of **protecting** a party's right to a jury trial. *See, e.g.*, *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*,

920 F.2d 1127, 1133-34 (3d Cir. 1990).[3]  No comparable relief

exists with respect to the non-right to a non-jury trial.

In fact, the constitutional character of the jury

right has led courts affirmatively to conclude that they

should commit Credit Suisse's allegedly "reversible error" in

close cases.  As powerfully explained by one court:

> the right to a trial by jury is one of the most
> precious of the rights guaranteed by the
> Constitution, and should be one of the most
> jealously guarded.  In view of this, if the Court
> is to err in its holding, it chooses to err in
> favor of granting a right to trial by jury, as
> opposed to denying such an important right.

*EEOC v. Blue Star Foods, Inc.*, No. 78-5-W, 1980 U.S. Dist.

LEXIS 11131, at *11 (S.D. Iowa Mar. 7, 1980).[4]  The Bankruptcy

---

[3]  Likewise, the Supreme Court has repeatedly emphasized that the
"'[m]aintenance of the jury as a fact-finding body is of such
importance and occupies so firm a place in our history and
jurisprudence that any seeming curtailment of the right to a jury
trial should be scrutinized with the utmost care.'"  *Chauffeurs,
Teamsters & Helpers v. Terry*, 494 U.S. 558, 565 (1990) (quoting
*Beacon Theatres*, 359 U.S. at 501 (quoting *Dimick v. Schiedt*, 293
U.S. 474, 486 (1935))).

[4]  *See also, e.g.*, *Beacon Theatres,* 359 U.S. at 510 ("Since the
right to jury trial is a constitutional one . . . [judicial]
discretion is very narrowly limited and must, wherever possible,
be exercised to preserve jury trial.");  *United States v.
McAlister*, 630 F.2d 772, 774 (10th Cir. 1980) (noting how if a
decision will "require too many jury trials, we properly err on
the side of protecting a constitutional right");  *City of New York
v. Beretta U.S.A. Corp.*, 317 F. Supp. 2d 193, 196 (E.D.N.Y. 2004)
("One guiding beacon has been lit by the Supreme Court: when in
doubt, grant a jury trial.");  *Educ. Testing Servs. v. Katzman*,
670 F. Supp. 1237, 1243 (D.N.J. 1987) (Barry, J.) (concluding
that if court erred by denying motion to strike, it "erred on the
side of protecting an important constitutional right, fundamental
to the fair administration of justice").

Court analyzed the instant dispute in a fashion wholly
consistent with principle. (*See* Jury Trial Opinion at p. 9.)

Defendants have failed to cite even a single case
where the granting of a jury trial has been held to raise a
controlling question of law for the purposes of pursuing an
interlocutory appeal. Accordingly, Defendants are unable to
carry their burden of proving this first criterion.

**B.    Because The Bankruptcy Court Appropriately
Considered And Applied Controlling Case Law, There
Are No "Substantial Grounds" For Disagreement.**

The Jury Trial Opinion unfolded in several phases,
each of which rejected arguments made in Defendants' lengthy
briefing before the Bankruptcy Court. <u>First</u>, the Bankruptcy
Court scrutinized the historical nature of Plaintiff's claims
and the character of its requested relief, concluding that a
jury right would obtain outside of bankruptcy. (*See* Jury
Trial Opinion at pp. 10-17.) <u>Second</u>, the Bankruptcy Court
juxtaposed the counterclaims as to which Plaintiff requests a
jury with Plaintiff's substantive objections to the proofs of
claim filed by a Defendant, reasoning that those counterclaims
were not a ***necessary*** part of the "claims-allowance process."
(*See id.* at pp. 17-20.) <u>Third</u>, the Bankruptcy Court
considered and rejected Credit Suisse's radical suggestion
that a debtor or bankruptcy trustee may never file suit in a
bankruptcy court without losing its jury rights. (*See id.* at

20-22.)  <u>Fourth</u> and finally, the Bankruptcy Court held that a purported contractual jury waiver did not bind Plaintiff, either as a matter of law ***or of fact***.  (*See id.* at 22-28.)

        Defendants aver that there are substantial grounds for difference of opinion about all four parts of the Jury Trial Opinion.  Defendants are wrong.  As explained below, the Bankruptcy Court carefully considered and applied the controlling Supreme Court and Third Circuit authorities and reached a proper result with respect to each issue before it. Defendants proffer no new case law that went unconsidered by the Bankruptcy Court; rather, they simply want a second bite at the apple.  Credit Suisse's own confusion about the Bankruptcy Court's analysis is not the litmus test for whether the ***substantial*** legal uncertainty required for interlocutory appeals exists, however.  *See, e.g.*, *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, No. M-47 (SAS), 2006 U.S. Dist. LEXIS 63223, at *19 (S.D.N.Y. Sept. 5, 2006) (explaining that an interlocutory appeal will not lie merely because "the relevant case law is 'less than clear' or allegedly 'not in accord' or that there is a 'strong disagreement among the parties'" (footnotes omitted)); *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996) ("A party's disagreement with the district court's ruling does not constitute a 'substantial ground for difference of

opinion' . . . . Rather, the difference of opinion must arise
out of genuine doubt as to the correct legal standard.").

> 1. **Controlling Case Law Makes Clear That A Jury Right Exists Whenever Any "Legal" Claims Are Present Or "Legal" Relief Is Sought.**

As the Supreme Court explained in *Dairy Queen, Inc.
v. Wood*, "[i]t would make no difference if the equitable cause
clearly outweighed the legal cause so that the basic issue of
the case taken as a whole is equitable. ***As long as any legal
cause is involved the jury rights it creates control***." 369
U.S. 469, 473 n.8 (1962) (emphasis added) (quoting *Thermo-
Stitch, Inc. v. Chemi-Cord Processing Corp.*, 294 F.2d 486, 491
(5th Cir. 1961)); *see also Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33, 41 (1989) (underscoring the key distinction
between "suits in which *legal* rights were to be ascertained
and determined, in contradistinction to those where ***equitable
rights alone*** were recognized, and equitable remedies were
administered" (bolded emphasis added) (quoting *Parsons v.
Bedford*, 3 Pet. 433, 447 (1830))). The Bankruptcy Court
correctly recognized and applied *Dairy Queen* and
*Granfinanciera* by rejecting Defendants' "mixed relief" theory.

Unable to argue that there is substantial
disagreement about whether *Dairy Queen* and *Granfinanciera* are
controlling law and mean what they say (or dispute that their
"mixed relief" thesis parallels the "incidental" construct

forcefully rejected in *Dairy Queen*), Defendants resort to mischaracterization of both the law and the facts.  Such intellectual sleight-of-hand clearly cannot create the "substantial" disputes required for leave to appeal.

First, Defendants state that both *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 2286 (2006), and *Cantor v. Perelman*, No. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb. 10, 2006), involved "a mixture of legal and equitable claims." (*See* Motion at p. 10.)  This is an issue of reading comprehension, if not deliberate misstatement; the **only** claims at issue in both cases related to alleged breaches of fiduciary duty, which both courts concluded were "equitable" in nature.  In fact, Judge Jordan expressly noted how the analysis in *Cantor* would have been different "if at least one of Plaintiffs' claims [had been] legal rather than equitable." 2006 WL 318666, at *7 n.7.  Indeed, the Bankruptcy Court distinguished *Cantor* from the instant case on precisely those grounds. (*See* Jury Trial Opinion at pp. 15-16.)  This was the proper result because two of Plaintiff's claims – negligence and breach of implied contract – are wholly "legal" claims.  Credit Suisse's misreading of the case law should not change this conclusion.

Second, Defendants improperly suggest that Plaintiff's complaint and subsequent damages requests have

been focused on "disgorgement" and not compensatory damages.
(*See* Motion at p. 5, p. 11 n.6.)  But Defendants know better,
for at least three reasons:

>      1.    Plaintiff's initial recitation of each of the
>            relevant claims expressly included requests for
>            damages, including compensatory damages (*see*
>            Motion Ex. "B" at ¶¶ 51 (seeking "to recover
>            consequential and actual damages" for Credit
>            Suisse's breach of fiduciary duty), 54 (seeking
>            "damages in an amount to be proved at trial"
>            for the negligence claim), 96 (same for the
>            breach of implied contract claim));
>
>      2.    Plaintiff provided Defendants with a 10-page
>            supplemental Rule 26(a)(1) initial disclosure
>            of its claimed damages, which supplement
>            described forms of compensatory damages sought
>            for each of the relevant claims (*see* Holt
>            Declaration Ex. "C"); and
>
>      3.    During the process of preparing for a possible
>            bench trial before the Bankruptcy Court,
>            Plaintiff's counsel expressly informed
>            Defendants' counsel that Plaintiff intends to
>            seek compensatory damages of at least $50
>            million at trial (*see* Holt Declaration ¶ 7).

Defendants' attempt to impugn the Bankruptcy Court's analysis
of the Plaintiff's requested relief thus rings quite hollow.

In sum, the Bankruptcy Court followed the precise
analytic process prescribed by the Court in *Granfinanciera*.
The undisputedly "legal" character of two of Plaintiff's
claims, combined with the "legal" nature of its requested
relief, creates no question – let alone a "substantial" one –
that the Bankruptcy Court reached the correct result.

2.    **Controlling Case Law Makes Clear That A Claim Must Be A Necessary Part Of The "Claims-Allowance Process" In Order To Result In An Implied Waiver Of A Jury Right.**

The case law is clear that when a cause of action "falls within the process of the allowance and disallowance of claims," neither the debtor's estate nor the defendant has a Seventh Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate."  *See Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1253 (3d Cir. 1994), *cert. denied*, 513 U.S. 999 (1994).  In contrast, when a legal cause of action is not integrally related to the claims-allowance process, but instead seeks to garner additional funds that will "augment" the bankruptcy estate, both the debtor and the defendant retain their constitutional right to have a jury try such an action.  *See, e.g.*, *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1327 (2d Cir. 1993) (explaining how "suits . . . which would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process").

Credit Suisse suggests that the claims-allowance process is implicated merely by the procedural posture of this case, i.e., because the proceeding involves "counterclaims filed by a liquidation trust in response to a proof of claim."

(*See* Motion at p. 11.)  But this paints with **far** too broad a brush; the critical task for any court faced with this issue is to "ask whether the resolution of the particular dispute at issue is **necessarily part of the process** of the disallowance and allowance of claims" against the bankruptcy estate. *Billing*, 22 F.3d at 1252 n.14 (emphasis added).[5]

---

[5] Beyond being facially inconsistent with *Billing*, Credit Suisse's blunderbuss argument has been roundly rejected by courts outside of the Third Circuit.  As one court explained:

> Unlike the act of filing a proof of claim, **the assertion of a counterclaim by the debtor does not automatically result in waiver of the right to trial by jury on those counterclaims**.  Moreover, counterclaims such as the ones in this case often go beyond the mere allowance or disallowance of the filed claim to seek affirmative recovery against the claimant.  The Court must consider whether the counterclaims are "integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's equity jurisdiction," which would dispense with [the] right to a jury trial on those counterclaims.

*McClelland v. Braverman Kaskey & Caprara, P.C. (In re McClelland)*, 332 B.R. 90, 95 (Bankr. S.D.N.Y. 2005) (emphasis added) (quoting *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990)).  In *McClelland*, the estate's counterclaims were "integrally related to the allowance or disallowance of the [creditor-Claimants'] claims" because "[t]he very services for which Claimants seek compensation in their proofs of claim are the same services, for the same time periods during which the Debtor counterclaims that the Claimants engaged in negligence and malpractice."  *See id.* at 97-98.  As explained in the text and as found by the Bankruptcy Court, that clearly is not the case here; the relevant proofs of claim are based solely upon "services" allegedly provided to the Oakwood Companies between August 19, 2002 and November 15, 2002, but Plaintiff's counterclaims as to which the Bankruptcy Court held it has a jury right stem from other "services" provided to the Oakwood Companies in a different time period.  (*See* Jury Trial Opinion at pp. 19-20.)

When applying this rule, courts approach the issue
claim-by-claim, in each instance asking whether a particular
cause of action bears a necessary logical relationship to the
allowance or disallowance of a creditor's claim in bankruptcy.
*See, e.g.*, *Germain*, 988 F.2d at 1327-32; *Mirant Corp. v.
Southern Co.*, 337 B.R. 107, 120-22 (N.D. Tex. 2006); *In re
Crown Vantage, Inc.*, No. 02-03836, 2002 U.S. Dist. LEXIS
26109, at *9-12 (N.D. Cal. Dec. 16, 2002).  This is precisely
what the Bankruptcy Court did here; there are no "substantial
grounds" for concluding it applied the wrong legal standard.

Nor can there be any real dispute about whether the
Bankruptcy Court made the proper finding.  The basic problem
with Defendants' position below was their inability to explain
why common law claims – negligence, breach of fiduciary duty,
and breach of implied contract – based upon a pattern of
misconduct beginning years before the contract underlying the
relevant proofs of claim was executed have a necessary logical
relationship to whether claims based on that contract should
be allowed in bankruptcy.  The Motion makes no better effort
to address this obvious problem – or to explain why ***all***
aspects of a multi-year relationship must be crammed into a
contract covering only the last 88 days of that relationship –
because it cannot be solved; the counterclaims as to which the
Bankruptcy Court affirmed Plaintiff's jury rights could be

15

resolved apart from the proofs of claim, and thus they are not necessarily part of the "claims-allowance process."[6]

### 3. Controlling Case Law Rejects The Notion That A Jury Right Is Lost When A Legal Suit Is Brought In A Court Of Equity.

The Supreme Court has clearly instructed that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970).[7]  The Third Circuit has similarly

---

[6]  Indeed, as a purely logical matter, the counterclaims that encompass pre-August 19, 2002 conduct are utterly separate from the proofs of claim; it is conceivable that Plaintiff could succeed on some or all of those claims yet fail in its claim objections, or vice versa.  As explained in the pending Motion to Withdraw Reference, judicial economy strongly favors withdrawing the reference as to all of the Plaintiff's counterclaims and then conducting one trial – with a jury resolving issues of fact and law pertaining to the claims as to which Plaintiff has a Seventh Amendment right, and this Court resolving the remaining issues. (*See* Motion to Withdraw Reference at pp. 16-21.)  Nevertheless, such a process is not ***strictly*** necessary; the pre-August 19, 2002 counterclaims could in theory be tried as a completely separate action, which trial could occur either before or after the proofs of claim are resolved.  Absent compelling reasons to favor this plainly inefficient result, it is proper to advance judicial economy and minimize unnecessary cost and delay to the parties.

[7]  Numerous district courts in this Circuit similarly reject Credit Suisse's rigid forum-based rule, often using *Ross*'s clear guidance as a foothold.  *See, e.g.*, *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 912-13 (D. Del. 1996); *In re Franklin Towne Lodge Ltd. P'ship*, No. 91-2702, 1992 U.S. Dist. LEXIS 18817, at *8-10 (E.D. Pa. Nov. 25, 1992); *In re Globe Parcel Serv., Inc.*, 75 B.R. 381, 383 (E.D. Pa. 1987).  These decisions are in accord with circuit-, district-, and bankruptcy-level authority from other circuits.  *See, e.g.*, *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993); *M&E Contractors v. Kugler-Morris Gen. Contractors*, 67 B.R. 260, 266-67 (N.D. Tex. 1986); *Hays v. Equitex, Inc. (In re RDM Sports Group)*, 260 B.R. 915, 920-25 (Bankr. N.D. Ga. 2001).

expressed its belief that a waiver theory based solely on a
bankruptcy forum "raises as many questions as it answers," and
the mere "fact that the debtor may have voluntarily submitted
itself to the bankruptcy court's equitable jurisdiction does
not complete the analysis. *A court must also ask whether the
resolution of the particular dispute at issue is necessarily
part of the process of the disallowance and allowance of
claims*." *See Billing v. Ravin, Greenberg & Zackin, P.A.*, 22
F.3d 1242, 1251-52, n.14 (3d Cir. 1994) (emphasis added),
*cert. denied*, 513 U.S. 999 (1994).  As discussed above, the
Bankruptcy Court properly followed this structure by analyzing
whether each of the Plaintiff's counterclaims is a *necessary*
component of the "claims-allowance process."

        Moreover, the Bankruptcy Court also correctly
followed the teachings of *Ross* and *Billing* and rejected Credit
Suisse's *per se* "waiver" theory.  (*See* Jury Trial Opinion at
pp. 21-22.)  There can be no dispute that *Ross* and *Billing* are
controlling law here or that Credit Suisse's extreme
suggestion is obviously foreclosed by those opinions.  Credit
Suisse's disagreement with Plaintiff about how to read those
cases (even combined with a reference to a handful of
decisions, virtually all from other circuits, which arguably
support some other result) does not give rise to "substantial"
questions about whether the Bankruptcy Court is correct on

this issue.  *See, e.g.*, *Williston v. Eggleston*, 410 F. Supp. 2d 274, 277 (S.D.N.Y. 2006) (noting how "the fact that the parties themselves disagree as to the interpretation of persuasive authority [does not] constitute 'a difference of opinion' sufficient to warrant certification").

> **4.   Controlling Case Law Requires That Contractual Jury Waivers Be Narrowly Construed; The Bankruptcy Court Properly Limited The Purported Waiver On The Facts Before It.**

Credit Suisse further argues that "the Bankruptcy Court's conclusion that [a purported] contractual waiver is wholly inapplicable provides substantial ground for difference of opinion."  (Motion at p. 15.)  Yet Credit Suisse conveniently neglects to mention that the Bankruptcy Court rejected their contractual waiver argument ***for three separate reasons***, any one of which would be sufficient to render that waiver inoperative.  (*See* Jury Trial Opinion at pp. 22-28.)

As explained below, all three prongs of the Bankruptcy Court's waiver analysis are well-supported. Perhaps most importantly, however, all of the Bankruptcy Court's analysis was performed through the lens of the repeated instruction that, "[b]ecause the 'right of jury trial is fundamental, ***courts indulge every reasonable presumption against waiver***.'"  *Tracinda Corp. v. DaimlerChrysler AG*, 502

18

F.3d 212, 222 (3d Cir. 2007) (emphasis added) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)).

     The Bankruptcy Court's first problem with the purported waiver was that the relevant contracts were not executed by even close to all the parties to this litigation, either on Plaintiff's side or on Defendants' side. (*See* Jury Trial Opinion at pp. 22-25.) It is difficult to understand how Defendants could dispute this conclusion, which likely explains why it goes unmentioned in the Motion.[8] *See, e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

     The Bankruptcy Court's second problem with the purported waiver was that it only applies to actions relating to a single financing transaction, whereas the gravamen of this litigation "is about whether Defendants breached far broader duties, not arising from any written contract, by partaking in a myriad of alleged illicit transactions with the Oakwood Companies," which falls far outside the scope of the purported waiver. (*See* Jury Trial Opinion at p. 25.) Beyond

---

[8]  Among the Bankruptcy Court's conclusions was that the sole
     beneficiary of the purported waiver – "Credit Suisse First
     Boston, New York Branch" – is separate from the other Defendants,
     and may not even be a party to the action.  The Motion makes no
     mention of this issue, perhaps because Defendants' counsel is
     unwilling definitively to state whether "New York Branch" is or
     is not a party to this litigation.  (*See* Holt Declaration ¶ 8.)

merely asserting "that the waiver is both broad and explicit"
(Motion at p. 15), Credit Suisse makes no attempt to explain
why there are substantial grounds for disagreement about this
conclusion.  In fact, there are no such grounds since the
Bankruptcy Court's narrow reading of the purported waiver was
required under *Aetna Insurance Co.* and *Tracinda*.  *See also,*
*e.g.*, *Urban Outfitters, Inc. v. 166 Enter. Corp.*, 136 F. Supp.
2d 273, 275 (S.D.N.Y. 2001) ("Courts are to strictly construe
jury waiver clauses, as the right to a jury trial is
fundamental and protected by the Seventh Amendment.").

        The third part of the Bankruptcy Court's waiver
analysis also goes unmentioned in the Motion, for reasons that
will be clear shortly.  This part of the Jury Trial Opinion
applied the framework of *First Union National Bank v. United*
*States*, 164 F. Supp. 2d 660 (E.D. Pa. 2001), to this case's
facts.  (*See* Jury Trial Opinion at pp. 26-28.)  Under *First*
*Union*, the party seeking to enforce a purported waiver must
proffer some "evidence that there was not a gross disparity in
bargaining power between" the parties, which is particularly
important when the signatory corporation is in poor "financial
straits at the time the documents were executed, [since] it is
highly likely that there was a severe disparity in bargaining
power" in such circumstances.  *See* 164 F. Supp. 2d at 665.
Here, the Bankruptcy Court reviewed testimony from the record

and concluded that "there is a good argument that the two
Oakwood Companies were at a severely disadvantaged bargaining
[position]" when they negotiated the purported waiver, and
because "Defendants did not offer any evidence to the
contrary," they had failed to meet their burden of proof on
this issue.  (*See* Jury Trial Opinion at p. 28.)

The Bankruptcy Court's factual finding and stated
need for more evidence is critically important, because it can
be reversed on appeal only if Credit Suisse offers contrary
evidence.  Questions of fact, or mixed issues of law and fact,
do not satisfy the requirements for an interlocutory appeal,
however.  *See, e.g., Harriscom Svenska AB v. Harris Corp.*, 947
F.2d 627, 631 (2d Cir. 1991) ("Where, as here, the controlling
issues are questions of fact, or, more precisely, questions as
to whether genuine issues of material fact remain to be tried,
the federal scheme does not provide for an immediate appeal
solely on the ground that such an appeal may advance the
proceedings in the district court."); *MCI WorldCom Commc'ns v.
Commc'ns Network Int'l, Ltd. (In re WorldCom, Inc.)*, 358 B.R.
76, 79 (S.D.N.Y. 2006).  Thus, granting leave for an
interlocutory appeal would not provide a venue in which Credit
Suisse could obtain a reversal on this issue in any event,
even assuming *arguendo* that the evidentiary burden unmet

before the Bankruptcy Court could somehow be satisfied on appeal (which Credit Suisse never contends in the Motion).

In sum, the Bankruptcy Court's rejection of Defendants' contractual waiver argument – like all of the Jury Trial Opinion – was based on a cogent analysis and application of the applicable authorities.  There simply is no ***substantial*** ground upon which to question the Bankruptcy Court's reasoning, and Credit Suisse fails to persuade otherwise.

**C.    An Appeal At This Juncture Will Not Materially Advance The Progress Of This Litigation, But Will Only Create Further Expense And Delay.**

In the Motion, Defendants make a half-hearted attempt to explain why granting leave for interlocutory appeal at this time will advance the litigation.  (*See* Motion at p. 15 ¶ 34.)  This conclusory effort fails for several reasons.

<u>First</u>, Defendants' entire argument on this point rests on the unsupported and completely self-serving allegation that the United States District Court for the District of Delaware (the **"<u>District Court</u>"**) is too busy to schedule the jury trial required in this adversary proceeding, whereas the Bankruptcy Court can supposedly schedule a bench trial at any time.  Unfortunately for Defendants, mere conjectures or hypotheses about a court's schedule or imagined savings of time and expense are inadequate to justify an interlocutory appeal.  *See Zygmuntowicz v. Hospitality Invs.,*

*Inc.*, 828 F. Supp. 346, 353-54 (E.D. Pa. 1993). Furthermore, Defendants' proposed appeal would only add to the Court's schedule. Defendants, therefore, have simply failed to carry their initial burden of proof on this criterion.

Second, even a cursory review of the established facts demonstrates that allowing Defendants to take an interlocutory appeal at this juncture will only create further expense and delay, including potentially subjecting the parties to two trials. Shortly before the entry of the Jury Trial Opinion, both Plaintiff and Defendants emphatically informed the Bankruptcy Court that they were ready for trial. (*See* Motion to Withdraw Reference at pp. 8-9.) Furthermore, Plaintiff has requested in the Motion to Withdraw Reference that the District Court schedule a pre-trial conference and a trial date at the earliest opportunity. (*See id.* at p. 16.)

Thus, the best way to materially advance the termination of this adversary proceeding is to expeditiously proceed with ***an actual jury trial*** before the District Court instead of potentially staying the litigation in order to allow Defendants to appeal an interlocutory order. In fact, numerous courts have held that where discovery has been concluded and the parties are ready for trial, a request to pursue an interlocutory appeal should be denied. *See, e.g.*, *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 212 (D.N.J.

1996); *Kennard v. United Parcel Serv., Inc.*, 531 F. Supp. 1139, 1149 (E.D. Mich. 1982) ("[D]iscovery has closed in this matter and the parties are currently preparing summary judgment motions and a final pretrial order.  This case could be tried in its entirety before appellate review of the proposed interlocutory appeal takes place.").

Although the proximity of this case to trial is determinative regarding this criterion, it is important not to forget the expense and delay attendant to ***any*** appeal before this Court.[9]  If leave to take an interlocutory appeal is granted, a meaningful appellate briefing schedule will have to be set.  Both sides will undoubtedly incur material costs preparing their appellate briefs and arguing the appeal. During this very same period of time, however, the parties' resources and effort could be directed toward trying the case on the merits, the results of which trial could eliminate either party's desire to appeal and provide a forum in which any number of alleged errors could be addressed.  Defendants'

---

[9]  Additionally, it is unlikely that this dispute will stop at this Court if leave to appeal is granted.  Regardless of the result on appeal, it seems likely that the losing party will seek certification under 28 U.S.C. § 1292(b) or otherwise attempt to put the issue to the U.S. Court of Appeals for the Third Circuit. While the disagreement between the parties may be the sort that ultimately must be resolved by the Third Circuit, it seems best to allow that lengthy and costly process to unfold ***after*** a verdict on the merits, rather than at this point in the case.

proposed alternative would merely complicate the litigation and waste the resources of both the Court and the parties.

Third, the specific issues presented by this would-be appeal are even less worthy than many other potential interlocutory issues (such as the denial of motions to dismiss or for summary judgment) insofar as a reversal here would not dispose of **even one** of Plaintiff's claims.  As explained by the Second Circuit, a determination of the parties' jury rights "merely prescribes the method of fact-finding to be applied to the underlying dispute; it obviously does not dispose of the dispute."  *First Fid. Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.)*, 937 F.2d 833, 837 (2d Cir. 1991).  In other words, the precise universe of issues will exit Credit Suisse's proposed appeal as entered it, and all those issues will still remain to be tried following the appeal; the sole effect of a reversal on appeal would be to shift the form of fact-finder from a jury to a bankruptcy judge.  Thus, the potential ramifications of this appeal (tabling, for the moment, the constitutional implications vis—a-vis Plaintiff) are of a notably lesser degree than those of other cases where leave has been granted.  *Cf. Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, No. M-47 (SAS), 2006 U.S. Dist. LEXIS 63223, at *37-38 (S.D.N.Y. Sept. 5, 2006) ("The third prong is easily met, because granting

leave to appeal both the subordination and disallowance opinions may result in the disposition of the Adversary Proceedings in their entirety. . . .  If both of these opinions are reversed, Enron's case may be dismissed.").

In the final analysis, it is very clear what will materially advance the resolution of this litigation: to promptly set a jury trial so that this case may proceed apace toward the entry of a final judgment on the merits.  Then, when that process is over, either party may appropriately raise whatever issues it wishes on appeal.  Critically, the jury trial required by the Jury Trial Opinion could occur during the exact same time-frame as Credit Suisse's proposed appellate briefing.  The intractable problems this fact presents for Defendants' position likely explains why they devote a mere two sentences of the Motion to developing the argument.  This tepid effort is not nearly enough to satisfy Defendants' affirmative burden on this element – which **must** be met in order to justify their requested relief – and this conclusion alone is sufficient reason to deny the Motion.

**D.    This Case Does Not Involve Any "Exceptional Circumstances" That Could Justify An Immediate And Premature Appeal.**

Defendants argue that "exceptional circumstances" exist to justify an immediate appeal because, if the Jury Trial Opinion is ultimately reversed on appeal, the parties

may have to incur the expenses of re-trying some things before
the Bankruptcy Court. (*See* Motion at pp. 15-16.)  Courts,
however, universally reject this argument as a justification
for an interlocutory appeal.  *See, e.g.*, *Lauro Lines s.r.l. v.
Chasser*, 490 U.S. 495, 499 (1989) (declining "to find the
costs associated with unnecessary litigation to be enough to
warrant allowing the immediate appeal of a pretrial order");
*Int'l Union, United Auto., Aerospace & Agric. Implement
Workers of Am. v. Midland Steel Prods. Co.*, 771 F. Supp. 860,
862 (N.D. Ohio 1991) (possibility that the parties may have to
incur the expense of another trial is insufficient to justify
an interlocutory appeal); *In re Del. & Hudson Ry. Co.*, 96 B.R.
469, 473 (D. Del. 1989) (budgetary restriction of a party does
not constitute exceptional circumstances to justify an
interlocutory appeal), *aff'd*, 884 F.2d 1383 (3d Cir. 1989).
An interlocutory appeal simply is not a proper vehicle for an
early review of the Jury Trial Opinion, and Defendants fail to
cite any case law that supports their position.[10]

---

[10] The solitary case Defendants cite – *Rafoth v. National Union Fire
Insurance Co. (In re Baker & Getty Financial Services, Inc.)*, 954
F.2d 1169 (6th Cir. 1992) – involved a totally different issue
and is not relevant here.  The underlying dispute in *Rafoth*
related to the constitutional question of whether bankruptcy
judges, as non-Article III courts, could constitutionally conduct
jury trials.  This problem was resolved by Congress's
codification of 28 U.S.C. § 157(e) in 1994, but was still an open
and important issue when *Rafoth* was decided.  *See id.* at 1172
("We have not decided whether bankruptcy courts may conduct jury

Other than the hypothetical costs of retrying some matters before the Bankruptcy Court, Defendants have offered no other example of "exceptional circumstances."[11]  In fact, there is nothing exceptional or extraordinary about the underlying adversary proceeding or about the Jury Trial Opinion.  Litigation against investment banks and/or financial advisory firms is hardly uncommon in the District of Delaware, and disputes over the right to a jury trial often arise in adversary proceedings relating to large chapter 11 bankruptcy cases.  In addition, Plaintiff's counterclaims against Credit

---

trials, and the three circuits which have decided this issue are split.").  The Sixth Circuit concluded that the resolution of this thorny issue of constitutional import merited interlocutory review, *see id.*, but its decision had nothing to do with whether any party actually had jury rights since it was clear **a jury trial would be conducted regardless of the court's ultimate conclusion** about whether that trial could be supervised by a bankruptcy judge or had to go to the district court.  *See id.* This is a very different issue than whether interlocutory relief ought to be based on Defendants' non-right to a non-jury trial.

[11] Indeed, the facts that Defendants allege are "exceptional" – i.e., a corporate defendant, who has failed in its attempt to repudiate a plaintiff's constitutional right to a jury trial, raising the specter of rearguing that issue in a post-trial appeal – are a common occurrence in contentious litigation.  If such a scenario justifies interlocutory review **in this case**, then **every case** involving a similar set of facts would necessarily be an "exceptional" one.  Such a construct does extreme violence to the plain meaning of "exceptional."  *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 791 (unabridged 2002) (defining "exceptional" as, among other things, "being out of the ordinary" and "uncommon, rare").  *Cf. United States v. Kramer*, 19 F. Supp. 2d 273, 282 n.12 (D.N.J. 1998) ("[I]f most settling parties nonetheless believe they are paying more than their fair shares, [defendant]land is a bit like Garrison Keillor's Lake Wobegon, 'where all the children are above average.'").

Suisse do not implicate fundamental human rights, risk irreparable injury, or carry the potential to undermine billion dollar markets. *Cf. Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, No. M-47 (SAS), 2006 U.S. Dist. LEXIS 63223, at *5 (S.D.N.Y. Sept. 5, 2006) (granting leave to appeal in part "because of the uncertainty that [the bankruptcy court's] rulings – if left undisturbed – would inject into the market for the sale of postpetition claims"). Instead, the adversary proceeding is mainly about monetary damages, and Plaintiff has a cardinal right to try three of its counterclaims to redress those damages before a jury.

Rather than providing an "exceptional" set of facts, the proceedings below and the Jury Trial Opinion represent what ought to be the norm under the pertinent authorities. Defendants failed to persuade the Bankruptcy Court otherwise, and their desire for a premature second bite at the apple before this Court does not come anywhere close to the standards required to justify interlocutory relief. *See, e.g.*, *Bowie Produce Co. v. Magic Am. Cafe, Inc. (In re Magic Rests., Inc.)*, 202 B.R. 24, 26 (D. Del. 1996) ("Although [a defendant] asserts that determining this issue now would save time and avoid having to resolve other factual and legal matters, [the defendant] has not sufficiently established an urgency that sets this case apart from the typical case.").

Finally, even Defendants are uncertain about whether their requested relief is justified.  Rather than allow the Motion to proceed in due course, Credit Suisse has mounted a thinly-disguised collateral attack on the Jury Trial Opinion.[12] Defendants' fear of a jury trial on the merits neither compels a premature appeal nor excuses an improper collateral attack.

## CONCLUSION

For the reasons and based on the authorities presented above, the Motion should be denied in its entirety.

Respectfully submitted,

Dated:  December 4, 2007
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*
MARLA ROSOFF ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

-and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the
OHC Liquidation Trust

---

[12] Plaintiff's forthcoming Reply Brief in support of the Motion to Withdraw Reference will detail the problems with this strategy.

# Appendix of Unpublished Decisions

1.  *Cantor v. Perelman*,
    No. 97-586-KAJ, 2006 WL 318666 (D. Del. Feb. 10, 2006)

2.  *In re Crown Vantage, Inc.*,
    No. 02-03836, 2002 U.S. Dist. LEXIS 26109 (N.D. Cal. Dec.
    16, 2002)

3.  *EEOC v. Blue Star Foods, Inc.*,
    No. 78-5-W, 1980 U.S. Dist. LEXIS 11131 (S.D. Iowa Mar.
    7, 1980)

4.  *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron
    Corp.)*,
    No. M-47 (SAS), 2006 U.S. Dist. LEXIS 63223 (S.D.N.Y.
    Sept. 5, 2006)

5.  *In re Franklin Towne Lodge Ltd. P'ship*,
    No. 91-2702, 1992 U.S. Dist. LEXIS 18817 (E.D. Pa. Nov.
    25, 1992)



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Cantor v. Perelman
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Ronald CANTOR, Ivan Snyder and James A.
Scarpone, as Trustees of the Mafco Litigation Trust,
Plaintiffs,
v.
Ronald O. PERELMAN, et al., Defendants.
**No. Civ.A. 97-586-KAJ.**

Feb. 10, 2006.

Lawrence C. Ashby, Philip Trainer, Jr., Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, Delaware, for Plaintiffs, Edward A. Friedman, Andrew W. Goldwater, Daniel B. Rapport, Emily A. Stubbs, Jonathan Gottfried, Friedman Kaplan Seiler & Adelman LLP, New York, New York, of counsel. Thomas J. Allingham, II, Anthony W. Clark, Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION
JORDAN, J.

I. INTRODUCTION

*1 This case involves alleged breaches of fiduciary duty by former directors of Marvel Entertainment Co., Inc. ("Marvel"). The original complaint was filed by Marvel, which was then a debtor-in-possession in bankruptcy, against Ronald O. Perelman, William C. Bevins, Donald G. Drapkin, MAFCO Holdings Inc., MacAndrews & Forbes Holdings Inc., and Andrews Group Incorporated (collectively, "Defendants"). (Docket Item ["D.I." ] 1.) Pursuant to the reorganization plan from the bankruptcy proceeding, Marvel assigned the claims in this case to the MAFCO Litigation Trust, and the trustees ("Plaintiffs") have been substituted as the plaintiffs in this action (D.I.120). In their Second Amended Complaint (D.I. 149, Ex. A; the "Complaint"), Plaintiffs alleged (1) that Perelman, Bevins, and Drapkin breached their fiduciary duties

as directors of Marvel and (2) that the remaining defendants aided and abetted those breaches. Jurisdiction is proper under 28 U.S.C. § 1334. Before me now is Defendants' Motion to Strike Plaintiffs' Jury Demand. (D.I. 433; the "Motion.") For the reasons that follow, the Motion will be granted.

II. BACKGROUND

The background of this case has been set forth in earlier opinions. Cantor v. Perelman, 414 F.3d 430, 433-35 (3d Cir.2005); Cantor v. Perelman, 235 F.Supp.2d 377, 378-80 (D.Del.2002). Because the analysis of Plaintiffs' demand for a jury requires a careful consideration of Plaintiffs' claims, I will discuss that background in some detail again here.

A. Allegations in the Complaint

Perelman was a director of Marvel and Chairman of Marvel's board. Cantor, 414 F.3d at 433. He also owned a controlling interest in Marvel through the following "chain of wholly-owned corporations": Perelman owned 100% of defendant MAFCO Holdings Inc., which owned 100% of defendant MacAndrews & Forbes Holdings Inc., which owned 100% of Marvel III Holdings Inc. ("Marvel III"), which owned 100% of Marvel (Parent) Holdings Inc. ("Marvel Parent"), which owned 100% of Marvel Holdings Inc. ("Marvel Holdings") (collectively, those five companies are referred to herein as the "Marvel Holding Companies").Id. (Complaint, at ¶ ¶ 18-19, 25.) The remaining defendant, Andrews Group Incorporated, was a wholly-owned subsidiary of MacAndrews & Forbes Holdings Inc. (Id. at ¶ 20.)"Marvel Parent and Marvel Holdings together held 60% to 80% of Marvel's publicly traded, outstanding shares during the relevant period."Cantor, 414 F.3d at 433. Bevins and Drapkin were also directors of Marvel, and Perelman, Bevins, and Drapkin comprised the entire board of each of the Marvel Holding Companies. Id.

Plaintiffs alleged that, in 1993 and 1994, Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 2
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

caused Marvel Holdings, Marvel Parent, and Marvel III to issue three tranches of notes. *Id.* Defendants received $553.3 million in proceeds and pledged all of their stock in Marvel as collateral. *Id.*"None of the proceeds went to Marvel or were used for Marvel's benefit."*Id.* Furthermore, in the note indentures, the issuing companies agreed, through Perelman's control of Marvel, to prevent Marvel from (1) issuing debt or preferred stock except under specified circumstances, (2) issuing stock that might dilute the holding companies' stake in Marvel, and (3) making "restricted payments," which were defined to include dividends and stock buybacks. *Id.* According to Plaintiffs, "[a]s a result of Perelman's agreement to these restrictions, Marvel's future access to the capital markets was inhibited, with no corresponding benefit to Marvel."(Complaint, at ¶ 34.)

**\*2** Plaintiffs further alleged that Defendants artificially inflated Marvel's earnings by making licensing agreements, booking the entire amount of the guaranteed license fees as income at the time the agreements were made, and later writing the fees off and never collecting them. (*Id.* at ¶ ¶ 40-45.)According to Plaintiffs, Defendants' accounting methods allowed them to maintain the price of Marvel stock, the only asset of the Marvel Holding Companies. (*Id.* at ¶ 36.)By artificially holding off a major decline in the price of Marvel stock, Defendants allegedly held off the bankruptcy of the Marvel Holding Companies and prevented the $553.5 million in note proceeds from being treated as preferential payments. (*Id.*) Plaintiffs further allege that, in executing that plan, Marvel employees made misrepresentations to potential licensees. (*Id.* at ¶ ¶ 41-45.)

Eventually, "Marvel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 27, 1996. The Note holders have not been repaid."*Cantor, 414 F.3d at 434.* Marvel's bankruptcy was followed by the bankruptcy of Marvel Holdings, Marvel Parent, and Marvel III. (Complaint, at ¶ 36.)

Plaintiffs set forth two "Causes of Action" in their Complaint. First, Plaintiffs alleged that Perelman, Bevins, and Drapkin "breached their fiduciary duties of loyalty, care, and good faith, and are liable to plaintiffs for damages, including all benefits received as a result of their breaches of fiduciary duty, in an amount to be determined at trial, but believed to be not less than $553.3 million plus pre-judgment interest."(*Id.* at ¶ 49.)Second, Plaintiffs alleged that the other defendants "knowingly participated in and aided and abetted those breaches by, *inter alia,*

facilitating the receipt and distribution of the improperly obtained bond proceeds for the benefit of Perelman, Bevins and Drapkin."(*Id.* at ¶ 54.)As a result, those Defendants "are liable for knowingly participating in and aiding and abetting the foregoing breaches of duty in amounts to be determined at trial, but believed to be not less than $553.5 million plus pre-judgment interest."(*Id.* at ¶ 55.)

Plaintiffs requested the following remedies:
(i) compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.3 million plus pre-judgment interest, and punitive damages in an amount to be determined at trial; and
(ii) such other and further relief as the Court deems just and proper.

(*Id.* at 16-17.)


B. *Procedural History*

1. *District Court Proceedings*


This case was referred to Magistrate Judge Mary Pat Thynge on March 21, 2002.[FN1] (D.I.262.) In response to the parties' motions, Judge Thynge issued a Memorandum and Order recommending that summary judgment be granted for Defendants on the claims of breach of fiduciary duty related to the note transactions and the accompanying restrictions on Marvel. *Cantor, 235 F.Supp.2d at 381-83.* Judge Thynge determined that Delaware law required Plaintiffs to show "that Perelman caused Marvel to take action which benefitted Perelman and harmed Marvel."*Id. at 382* (citing *Bragger v. Budacz, C.A. No. 13376, 1994 WL 698609, at \*4 (Del. Ch. Dec. 7, 1994)).*"Since Marvel was not a party to the note agreements, and did not attempt to perform or refrain from one of the prohibited acts, Perelman's potential conflicting loyalties between Marvel and the holding companies never materialized and cannot form the basis of a breach of fiduciary duty claim."*Cantor, 235 F.Supp.2d at 382-83.*


FN1. This case was originally assigned to the Honorable Roderick R. McKelvie. When he retired from the court in 2002, the case was referred to Magistrate Judge Thynge.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(D.I.262.) On January 6, 2003, the case was reassigned to me. (D.I.387.)

**\*3** While Plaintiffs argued that Marvel had been harmed because the note restrictions prevented it "from restructuring its debt, and ultimately contributed to its bankruptcy," Judge Thynge found that the evidence showed that Marvel was prevented from financial restructuring by covenants in other credit agreements that "were more restrictive than those in the note agreements."*Id.* at 383.Thus, Plaintiffs had failed to show that Marvel was harmed, and the potential conflicts raised by the note restrictions never materialized and so could not support a claim for breach of fiduciary duty.*Id.*

As to the claimed breaches of fiduciary duty based on Defendants' alleged inflation of Marvel's earnings, Judge Thynge recommended that summary judgment be granted for the Defendants, because, by relying on the expertise of professional accountants, the directors "met [their] fiduciary duties with regard to accounting."*Id.* at 387-88.However, for claims related to misrepresentations by Marvel employees, Judge Thynge recommended that summary judgment be denied, *id.* at 388-89, noting that the record lacked sufficient evidence to decide whether Defendants had failed in their oversight duties pursuant to *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch.1996).

I adopted Judge Thynge's recommendations in all respects and issued an order granting summary judgment in part for Defendants, pursuant to those recommendations. (D.I.404.) Summary judgment was later granted for Defendants on the *Caremark* claim as well.[FN2](D.I.417.)

> [FN2.](#) Plaintiffs acknowledged (D.I. 415; D.I. 419) that they could not adduce any evidence to support the remaining *Caremark* claim. Thus, summary judgment was granted for the Defendants on that claim. (D.I.417.)

### 2. *Third Circuit Decision*

Plaintiffs appealed the decision as to the alleged breaches of fiduciary duty related to the note restrictions,[FN3] and the United States Court of Appeals for the Third Circuit reversed in part. *Cantor,* 414 F.3d at 442. First, in a discussion section entitled "The Unjust Enrichment Claim," the Third Circuit held that it was not necessary for Plaintiffs to

show that Marvel was harmed by the note restrictions. *Id.* at 435-37.Instead, if Defendants "exploited their fiduciary position for personal gain," that would support a claim for breach of fiduciary duty, as well as a remedy for unjust enrichment, even if Defendants' gain did not come at Marvel's expense. *Id.* at 435.The Court noted that an unjust enrichment award for the entire $553.5 million benefit "could result in a windfall," suggesting that an award would be appropriately based on "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation."*Id.* at 437 (citing *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881 (Del. Ch.1999)).

> [FN3.](#) The *Caremark* claim was not addressed by the Third Circuit.

Second, in a discussion section entitled "The Damages Claims," the Third Circuit held that there was a genuine issue of material fact as to whether the note restrictions harmed Marvel. *Cantor,* 414 F.3d at 437-38. While Defendants presented evidence that Marvel's credit agreements had restrictions that were more constraining than those accompanying the notes, the record also contained evidence from Plaintiffs' expert that Marvel's capital structure would have been different without the note restrictions and that Marvel was indeed prevented from pursuing more favorable financing by those restrictions.*Id.* That evidence was sufficient to raise a genuine issue for trial. *Id.* at 438.

**\*4** Finally, in a discussion that again used the titles "The Unjust Enrichment Claims" and "The Damages Claims," the Court held that the Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings, because this action was filed after the limitations period.*Id.* at 439-41.Plaintiffs' remaining claims [FN4] were remanded. *Id.* at 442.

> [FN4.](#) Because the damages remedy based on the Marvel Holdings notes was time-barred, the remaining claims relate to the Marvel Parent and Marvel III notes and to remedies other than damages for the Marvel Holdings notes. *Cantor,* 414 F.3d at 442.

### III. APPLICABLE LAW

Plaintiffs base their demand for a jury trial on the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Seventh Amendment, which provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."U.S. Const. amend. VII. "[T]he thrust of the Amendment was to preserve the right to jury trial as it existed in 1791."*Curtis v. Loether,* 415 U.S. 189, 193 (1974). In defining the scope of that protection, the Supreme Court has "consistently interpreted the phrase 'Suits at common law' to refer to 'suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." ' *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 31, 41 (1989) (emphasis in original) (quoting *Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 447 (1830)). Whether a suit is legal or equitable is a question of federal law, even in a diversity case based on substantive state law. *Simler v. Conner,* 372 U.S. 221, 222 (1963).

In addition to causes of action that were decided in courts of law in 1791, the Seventh Amendment protects the right to a jury trial for causes of action that did not exist at that time but "are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty."*Granfinanciera,* 492 U.S. at 42 (citing *Curtis,* 415 U.S. at 193). To decide whether a jury trial is required for a modem cause of action,[FN5] courts must balance two factors:

> FN5. By its literal terms, the *Granfinanciera* test applies to *statutory* actions. I will use that test here, in a case based on Delaware common-law, because the parties, as well as courts in other cases, have so framed their analyses. *See Pereira v. Farace,* 413 F.3d 330, 337 (2d Cir.2005) (using *Granfinanciera* factors to decide whether the Seventh Amendment requires a jury for a claim of breach of fiduciary duty under Delaware law); *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.),* 327 B.R. 537, 543-45 (D.Del.2005) (same).

First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.
Second, we examine the remedy sought and determine whether it is legal or equitable in nature. The second stage of this analysis is more important

than the first.

*Granfinanciera,* 492 U.S. at 42 (citing *Tull v. United States,* 481 U.S. 412, 417-18, 421 (1987)) (internal quotations and citations omitted).[FN6]

> FN6."If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment," the court must then decide whether Congress has properly assigned the claim "to a non-Article III adjudicative body that does not use a jury as a factfinder."*Granfinanciera,* 492 U.S. at 42. Because I conclude, after balancing the two factors, that Plaintiffs have no right to a jury trial in this case, the third prong is not relevant here.

IV. DISCUSSION

A. *Definition of Plaintiffs' Claims*

Before I analyze Plaintiffs' claims according to the *Granfinanciera* factors, I must address a preliminary dispute as to what those claims are. Plaintiffs contend that they have set forth separate claims for unjust enrichment and for compensatory damages, (D.I. 444 at 2-3, 5-6.) Because that contention is not supported by the law or by the Complaint itself, I conclude that the claims to be analyzed are the two claims set forth as causes of action in the Complaint, one for breach of fiduciary duty and one for aiding and abetting that breach.

**5** Plaintiffs note (*id.* at 6) that, "where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims."*Ross v. Bernhard,* 396 U.S. 531, 537-38 (1970). That proposition, while undisputed, does not settle the question as to whether there are indeed separate legal and equitable claims in this action. In *Ross,* the Court held that a legal claim does not transform into an equitable one simply because it is presented in the form a derivative suit, a procedure with historical roots in equity. *Id.* at 538-43.That case does not stand for the proposition that a particular *remedy* is an issue that must be examined separately to determine whether it is legal or equitable.

While Plaintiffs' right to a jury will not be denied

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

based on a lack of precision in their pleadings, a careful reading of the Complaint as a whole shows that there are not separate claims for unjust enrichment and compensatory damages. *See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 477-78 (1962)* ("[T]he constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings."). First, Plaintiffs have stated two claims in their First and Second Causes of Action, one for breach of fiduciary duty and one for aiding and abetting a breach of fiduciary duty, (Complaint at ¶¶ 47-56.) Second, Plaintiffs' request for relief for unjust enrichment is intertwined with the request for compensatory damages. Plaintiffs ask for "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty."(*Id.* at 16.)The unjust enrichment, i.e., the "benefits obtained by defendants," is affirmatively included as a part of the "compensatory damages." (*Id.*) Third, beyond the wording and organization of the Complaint, Plaintiffs do not allege separate breaches, some of which support an award for unjust enrichment and some of which support an award of compensatory damages. Rather, the alleged breach is based on the note transactions as a group. (*Id.* at ¶¶ 30-35, 49, 54-55.)Therefore, the Complaint appears to state a claim for breach of fiduciary duty and a claim for aiding and abetting that breach, with multiple forms of possible relief. It does not state separate claims for unjust enrichment and compensatory damages.

When read as a whole, the Third Circuit's decision is not to the contrary. According to Plaintiffs, because the Third Circuit entitled part of its discussion "The Damages Claims," *Cantor, 414 F.3d at 437,* the Complaint states a claim for compensatory damages that must be analyzed separately under the Seventh Amendment. (D.I. 444 at 5.) I disagree, since the issue of whether a compensatory damages claim exists separately from the unjust enrichment claim does not appear to have been addressed to or by the Court of Appeals. Indeed, there are other more reasonable explanations for the Court's choice of section titles.

**\*6** First, Judge Thynge's report made two conclusions: (1) that Plaintiffs needed to show that Marvel was forced to act to its detriment as a result of the note restrictions, and (2) that the evidence failed to show such harm.*Cantor, 235 F.Supp.2d at 382-83.* The Third Circuit disagreed with both conclusions, stating (1) that Plaintiffs did not need to show harm to recover a remedy based on unjust enrichment, and

(2) that a genuine issue of material fact remained as to whether Marvel was harmed. *Cantor, 414 F.3d at 435-38.* Thus, the Third Circuit's discussion appears to have simply tracked the issues on appeal, with corresponding section titles to organize that discussion.

Second, the Third Circuit partially affirmed the summary judgment, because Plaintiffs were time-barred from seeking damages arising from the issuance of notes by Marvel Holdings. *Id.* at 440.The Court followed the Delaware rule that the statute of limitations, rather than the doctrine of laches, applies when the action is for "damages or other relief which is legal in nature."*Id.* at 439 (quoting *Laventhol, Krekstein, Horwath & Horwath v. Tuckman, 372 A.2d 168, 169-70 (Del.1976)*). But the application of the statute of limitations only indicates that the *relief* is legal in nature and not that the *claim* is legal. Under Delaware law, "whether the claim asserted is legal in nature or equitable, whenever plaintiff seeks money in a derivative suit, her claim is subject to the statute of limitations."*Kahn v. Seaboard Corp., 625 A.2d 269, 274 (Del. Ch.1993)*. Thus, since the Third Circuit held that some money damages were time-barred, the discussion appears to have been separated and titled to reflect the different treatment of the types of relief and not to say anything at all about the nature of the claims themselves.

I conclude that the Complaint does not state separate claims for compensatory damages and unjust enrichment. Furthermore, the Third Circuit likely did not intend to decide that issue when it placed titles on its discussion sections. The Plaintiffs' claims are for breach of fiduciary duty and for aiding and abetting a breach, and the *Granfinanciera* test will be applied to those claims. Since the legal or equitable nature of the aiding and abetting claim appears to be indistinguishable from that of the underlying claim for breach, and since the parties make no distinction between the two claims for purposes of this Motion, the following analysis focuses on the breach of fiduciary duty claim, and the conclusions apply to the aiding and abetting claim as well.

### B. *Historical Roots of a Corporate Fiduciary Duty Claim*

Defendants argue (D.I. 434 at 7-9; D.I. 450 at 12), and Plaintiffs apparently concede (D.I. 444 at 9-10), that Plaintiffs' breach of fiduciary claim under Delaware corporate law is historically equitable. Plaintiffs' concession is understandable, since the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

point is inarguable. "Directors of Delaware corporations are fiduciaries who owe duties of due care, good faith and loyalty to the company and its stockholders."*Skeen v. Jo-Ann Stores, Inc ., 750 A.2d 1170, 1172 (Del.2000)* (citing *Malone v. Brincat, 722 A.2d 5, 10 (Del.1998)*)."Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders."*Guth v. Loft, Inc., 5 A.2d 503, 510 (Del.1939).* Thus, a violation of those duties is treated as a breach of fiduciary duty analogous to that owed by a trustee to a beneficiary. Here, the Complaint alleges such a breach.

**\*7** That type of claim was historically "within the exclusive jurisdiction of courts of equity."*Chauffeurs, Local No. 391 v. Terry, 494 U.S. 558, 567 (1990)* (citing 2 J. Story, Commentaries on Equity Jurisprudence § 960, p. 266 (13th ed. 1886)). Because they "are almost uniformly actions 'in equity," 'such claims historically carry with them "no right to trial by jury." *In re Evangelist, 760 F.2d 27, 29 (1st Cir.1985)*; *accord In re Hechinger, 327 B.R. at 544.* That treatment is consistent with the fact that, "[i]n Delaware, breach of fiduciary duty claims are routinely heard in chancery court, which is a court of equity." *In re Hechinger, 327 B.R. at 544.* Thus, "[w]hile federal, not state law, governs whether ... [a] claim is entitled to a jury trial, the well-established precedent in Delaware ... reinforces the common law tradition affording courts of equity jurisdiction over these matters." *Id.*

Plaintiffs point to several cases (D.I. 444 at 5) where courts looked underneath the claim for breach of fiduciary duty claim and found an underlying legal claim, based, for example, on fraud or negligence.[FN7]*Design Strategies, Inc. v. Davis, 367 F.Supp.2d 630, 638 (S.D.N.Y.2005)*; *Resnick v. Resnick, 763 F.Supp. 760, 767 (S.D.N.Y.1991)*; *Doyle v. Mellon Bank (East) Nat'l Ass'n (In re Globe Parcel Serv.), 75 B.R. 381, 385 n. 9 (E.D.Pa.1987)*; *Stalford v. Blue Mack Transp., Inc. (In re Lands End Leasing, Inc.), 193 B.R. 426, 433 (Bankr.D.N.J.1996)*; *Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.), 118 B.R. 544, 549 (Bankr.S.D.Ohio 1990)*. According to those analyses, a breach of fiduciary duty claim may be historically legal. The Second Circuit recently rejected that approach, reasoning that to analyze claims that way "would effectively permit every breach of fiduciary duty claim to be recast as an action at law such that parties seemingly would be entitled to a jury trial on

any and all breach of fiduciary duty claims."*Pereira v. Farace, 413 F.3d 330, 338 (2d Cir.2005)* (internal quotations omitted). Given the deep historical roots of such claims in equity, that result seems contrary to the Seventh Amendment mandate to "preserve the right to jury trial as it existed in 1791."*Curtis, 415 U.S. at 193.* Therefore, like the Second Circuit, I decline to parse Plaintiffs' fiduciary duty claims in search of legal elements.

> FN7. In the same string of citations, Plaintiffs point to two other cases where courts refused to strike a jury demand because legal claims were joined with equitable claims. *Hays v. Equitex, Inc. (In re RDM Sports Group, Inc.), 260 B.R. 915, 919-20 (Bankr.N.D.Ga.2001)*; *Miller v. Weber (In re Anchor/Davis-Jay Container Co.), Bankr.No. 92-11720S, Adv. No. 93-0042S, 1993 WL 119818, at \*2 (Bankr.E.D.Pa. Apr. 15, 1993)*. Those cases are only relevant here if at least one of Plaintiffs' claims is legal rather than equitable, and Plaintiffs' reliance on them simply begs that question.

Instead, I conclude that Plaintiffs' claims are historically equitable, which weighs against Plaintiffs' right to a jury.

### C. Balancing History with Remedies

The second *Granfinanciera* factor focuses on the remedy sought for Plaintiffs' claims. Since that factor is more important than the first, *Granfinanciera,* 492 U.S. at 42, the parties spend considerable effort to show that the compensatory damages sought here constitute the type of relief, legal or equitable, that favors their respective positions. (D.I. 434 at 9-12; D.I. 444 at 5-8; D.I. 450 at 3-12.) I conclude, for purposes of this Motion, that, even if Plaintiffs are correct that such relief is legal, Plaintiffs' claims nevertheless seek both equitable and legal relief.

**\*8** Defendants argue that the remedy for a Delaware breach of fiduciary duty claim is equitable, regardless of whether it includes compensatory damages. (D.I. 450 at 3-12.) They point out that, under Delaware law, "significant discretion is given to the Court in fashioning an appropriate remedy" for a breach of fiduciary duty. *Bomarko, Inc. v. Int'l Telecharge, Inc., 794 A.2d 1161, 1184 (Del. Ch.1999)*; *see also Cantor Fitzgerald, L.P. v. Cantor, C.A. No. 16297,*

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

2001 WL 536911, at *5 (Del. Ch. May 11, 2001) ("[T]he Court has broad discretion to craft a remedy for a breach of the duty of loyalty."). Thus, according to Defendants, the remedy here is equitable, even if it compensates Plaintiffs for harm done to Marvel.

Plaintiffs argue (D.I. 444 at 7-8) that under federal law, which must apply to this analysis, *Simler,* 372 U.S. at 222, equitable relief is narrowly defined as remedies that "restore to the plaintiff particular funds or property *in the defendant's possession"* and not those remedies that "impose personal liability on the defendant."*Pereira,* 413 F.3d at 340 (emphasis in original) (quoting *Great-West Life & Annuity Ins. Co. v. Knudsen,* 534 U.S. 204, 214 (2002)). So, according to Plaintiffs, a remedy for the harm done to Marvel is a legal remedy, regardless of how it is treated in Delaware.

In *Pereira,* the Second Circuit agreed with that proposition. In that case, the Court used the narrow definition of "equitable relief" from the Supreme Court's decision in *Great-West* to show that the plaintiff's claims for breach of fiduciary duty under Delaware law sought a legal remedy, because that remedy was not for money that was unjustly possessed by defendants, but was instead a measure of the harm to the corporation. *Pereira,* 413 F.3d at 340 (applying *Great-West,* 534 U.S. at 214). Because the remedy was legal, the Court reasoned, and because the second *Granfinanciera* factor must be afforded greater weight, the factors weighed in favor of a Seventh Amendment jury right, even though the claims were historically equitable. *Id.* Plaintiffs argue for a similar conclusion here, but I cannot agree.

To begin with, there is some reason to doubt whether the Second Circuit's conclusion is correct. The Supreme Court's *Great-West* decision, on which the Second Circuit's opinion in *Pereira* depends, defined the term "equitable relief" as it is found in section 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(3). The Supreme Court's analysis began with the statement that, because ERISA is a "comprehensive and reticulated statute," the Court has been "especially reluctant to tamper with the enforcement scheme ... by extending remedies not specifically authorized by its text."*Great-West,* 534 U.S. at 209 (quoting *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251 (1993); *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 147 (1985)) (internal quotations omitted). Applying the narrow definition of "equitable relief" crafted in that particular context to a common law breach of fiduciary duty claim such

as this tears that definition from a key logical underpinning. Moreover, in deciding that "equitable relief" in that case only applied when the plaintiff sought "particular funds or property in the defendant's possession,"*Great-West,* 534 U.S. at 214, the Supreme Court expressly held that trust remedies did not apply to "define the reach of § 502(a)(3)."*Id. at 219.*By contrast, the claims here are directly analogous to claims against a trustee by a beneficiary. *See supra* Section IV.B. It thus appears that the Second Circuit may have taken the *Great-West* decision out of context.

**\*9** However, I need not decide here whether *Pereira* was correctly decided. Even if Plaintiffs are correct that compensatory damages are a form of legal relief under federal law, both claims here also seek equitable relief for Defendants' alleged unjust enrichment.

Plaintiffs seek to recover "the benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty, in an amount to be determined at trial, but believed to be no less than $553.5 million."(Complaint at 16.) The dollar amount here refers directly to the proceeds received by Defendants from the note transactions at issue. That remedy for unjust enrichment is equitable even under the narrow definition used in *Great-West.*

Thus, even under a narrow definition of equitable relief, the second *Granfinanciera* factor leads to a mixed result: the claims seek both legal and equitable relief. When I consider the long history of treating breach of fiduciary duty claims as equitable and balance that with the mixed equitable and legal remedies sought here, the scales tip in favor of Plaintiffs' claims being judged equitable. To weigh the factors differently would effectively ignore the historical factor, contrary both to the Seventh Amendment's purpose to "preserve the right to jury trial as it existed in 1791,"*Curtis,* 415 U.S. at 193, and to the express holding of *Granfinanciera,* 492 U.S. at 42, that history is to be accorded weight in the balancing. Therefore, I will strike Plaintiffs' demand for a jury trial of their claims.[FN8]

> FN8. Because I conclude there is no right to a jury in this case, I need not address the parties' arguments over whether Plaintiffs have waived that right. (D.I. 434 at 12-14; D.I. 444 at 11-15; D.I. 450 at 16-17.)

## V. CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 8

For the reasons set forth herein, I will grant Defendants' Motion (D.I.433). An appropriate order will issue.

For the reasons set forth in the Memorandum Opinion issued in this matter today.

IT IS HEREBY ORDERED that the Motion to Strike Plaintiffs' Jury Demand (D.I.433) is GRANTED.

D.Del.,2006.
Cantor v. Perelman
Not Reported in F.Supp.2d, 2006 WL 318666 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 U.S. Dist. LEXIS 26109, *

In re: CROWN VANTAGE, INC., Debtor. Employer I.D. # 54-1752384

No. C 02-03836 WHA Consolidated Cases

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2002 U.S. Dist. LEXIS 26109

December 16, 2002, Decided
December 16, 2002, Filed

**SUBSEQUENT HISTORY:** Motions ruled upon by, Claim dismissed by In re Crown Vantage, Inc., 2004 U.S. Dist. LEXIS 13810 (N.D. Cal., July 12, 2004)

**DISPOSITION:** Motion to strike jury demand denied.

**COUNSEL:** [*1]

For Crown Paper Liquidating Trust, Plaintiff: Allan Steyer, Lowenthal & Boodrookas LLP, San Francisco, CA. David D. Rodgers, Leo R. Beus, Malcolm Loeb, Beus Gilbert, Scottsdale, AZ. Edward Egan Smith, Steyer Lowenthal Boodrookas Alvarez, San Francisco, CA. Richard Thomas, Beus Gilbert PLLC, Pheonix, AZ.

For Coopers and Lybrand, Defendant: Kenyoon Woolley, O'Melveny & Meyers LLP, Los Angeles, CA.

For Ernst & Young, LLP, Defendant: Dale L. Bratton, Hillary E. Ware, Laurence Andrew Weiss, Michael L. Rugen, Heller, Ehrman, White & McAuliffe, San Francisco, CA.

For McGuire, Woods, Battle & Booth, Defendants: John V. Cogbill, III, Richmond, VA.

For Merril Lynch & Co., Defendant: David Zonana, George B. Curtis, Scott A. Fink, Gibson Dunn & Crutcher LLP, San Francisco, CA.

For Merrill, Lunch, Pierce Fenner & Smith, Salomon Bros., Defendant: Robert Fraley, New York, NY.

For Donaldson, Lufkin & Jenrette, Houlihan Lokey Howard & Zukin, Defendants: Blaine I. Green, Bruce A. Ericson, Pillsbury Winthrop LLP, San Francisco, CA. Scott Solomon, Los Angeles, CA.

For Clifford Cutchins, Defendant: John V. Cogbill, III, Richmond, VA.

For Stephen Hare, Ernest [*2] Leopold, Defendants: Benjamin K. Riley, David E. Garrett, Cooley Godward, San Francisco, CA.

For E. Lee Showalter, William Daniel, Joseph T. Piedmont, Defendants: A. William Urquhart, Loren Kieve, Quinn Emanuel Urquhart Oliver & Hedges L, Los Angeles, CA.

Robert C. Williams, Defendant, Pro se, Maidens, VA.

For Credit Suisse First Boston Corporation, Defendant: David P. Chiappetta, Stephen D. Hibbard, Bingham McCutchen LLP, San Francisco, CA.

For Fort James Corporation, Fort James International Holdings, LTD, Fort James Operating Company, Fort James Fiber Company, Defendants: David Boies, Philip C. Korologos, Boies Schiller & Flexner, Armonk, NY. Joseph F. Coyne, Jr., Kenneth A. O'Brien, Michelle Sherman, Sheppard Mullin Richter & Hampton, Los Angeles, CA.

For PricewaterhouseCoopers LLP, Defendant: James M. Pearl, Kenyon Woolley, Linda J. Smith, O'Melveny & Myers LLP, Los Angeles, CA.

For McGuire Woods LLP, Defendants: James C. Krieg, Stan G. Roman, Krieg Keller Sloan Reilley & Roman LLP, San Francisco, CA.

Randall J. Newsome, Pro se, U.S. Bankruptcy Court, Oakland, CA.

USBC Manager, Pro se, USBC Manager, U.B. Bankruptcy Court, Oakland, CA.

**JUDGES:** William [*3] Alsup, United States District Judge.

**OPINIONBY:** William H. Alsup

**OPINION:**

2002 U.S. Dist. LEXIS 26109, *

**ORDER DENYING DEFENDANT FORT JAMES'S MOTION TO STRIKE PLAINTIFF'S JURY DEMAND**

### INTRODUCTION

Defendants Fort James Corporation, Fort James Operating Company, and Fort James International Holdings, Ltd. (collectively, "Fort James") move to strike the jury demand of plaintiffs Crown Vantage, Inc. and Crown Paper Company (collectively, "Crown") in an action for intentional fraudulent conveyance, constructive fraudulent conveyance, violations of the Virginia Conspiracy Act, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, negligent misrepresentation, unjust enrichment, conversion, common law fraud, aiding and abetting fraud, fraudulent deceit, and tortious breach of the covenant of good faith and fair dealing.

### STATEMENT

This action arises from Crown's spin-off from Fort James in 1995. The spin-off took place pursuant to an August 1995 agreement between the parties. In accordance with the terms of the agreement, the newly-incorporated Crown received certain assets and liabilities from Fort James associated with the latter's communication papers and food and consumer packaging [*4] businesses. In return, Fort James received from Crown approximately $ 500 million in cash, derived substantially from a $ 250 million public offering of high-yield notes and a $ 350 million credit facility from a syndicate of lenders. Crown also issued to Fort James $ 100 million in pay-in-kind notes.

On March 15, 2000, Crown voluntarily filed a petition for bankruptcy. According to Crown, Fort James was largely responsible for Crown's financial troubles. Crown alleges that Fort James, along with various associated professionals, conspired to destroy Crown's business for their own gain.

As a creditor of Crown, Fort James filed several proofs of claim against the Crown estates. On April 14, 2001, Fort James filed in the Bankruptcy Court for the Northern District of California an action against Crown (Case No. C 02-3838, the "*Fort James* case") seeking a declaration that the spin-off transaction and Fort James's claims are neither avoidable nor recoverable under the Bankruptcy Code or any other law. The bankruptcy court granted Crown's motion to stay the proceeding on the condition that Crown file against Fort James any case it had arising from the spin-off by September 28, 2001. [*5]

Crown accordingly filed suit against Fort James in the Bankruptcy Court for the Northern District of California on September 26, 2001 (Case No. C 02-3839, the "*Crown Vantage* case"). The *Fort James* case and the *Crown Vantage* case were consolidated pursuant to Federal Rule of Bankruptcy Procedure 7042(a) on November 19, 2001.

On March 14, 2002, Crown filed a complaint in state court against various professionals, alleging that they were also responsible for Crown's financial downfall (Case No. C 02-3836, the "*Liquidating Trust* case"). The action was removed to bankruptcy court on April 19.

The bankruptcy court certified the *Fort James, Crown Vantage,* and *Liquidating Trust* cases for automatic withdrawal of the reference. In district court, pursuant to this Court's September 20 case management order, the three actions were consolidated for pretrial purposes.

Fort James now moves to strike Crown's jury demand in the *Fort James* and *Crown Vantage* actions. Previously, Fort James moved to strike Crown's jury demand when the cases were in bankruptcy court. After a hearing, Bankruptcy Court Judge Randall Newsome denied Fort James's motion to strike the jury [*6] demand in an order dated April 23, 2002.

### ANALYSIS

This case concerns Crown's right under the Seventh Amendment to a jury trial for its claims of intentional fraudulent conveyance, constructive fraudulent conveyance, violations of the Virginia Conspiracy Act, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, negligent misrepresentation, unjust enrichment, conversion, common law fraud, aiding and abetting fraud, fraudulent deceit, and tortious breach of the covenant of good faith and fair dealing.

#### 1. The Law-of-the-Case Doctrine

As a preliminary matter, Crown argues that because Bankruptcy Judge Newsome previously denied a motion by Fort James to strike the jury demand, the law-of-the-case doctrine compels the denial of Fort James's instant motion as well. "Under the law-of-the-case doctrine, a court will not reexamine an issue previously decided by the same or higher court in the same case." *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 766, (9th Cir.2001). Irrespective of the fact that the bankruptcy court is neither the same as nor higher than this Court, the law-of-the-case doctrine does not [*7] dispose of defendant's motion automatically, It is well established that the doctrine "is not a limitation of a tribunal's power, but rather a guide to discretion." *Rebel Oil Co. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir. 1998) (quoting *United States v. Alexander*, 106 F.3d 874, 876 (9th cit. 1997)); see also *Arizona v. California*, 460 U.S. 605, 619, n.8, 75 L. Ed. 2d 318, 103 S. Ct. 1382 (1983). Nevertheless, even upon reconsideration of whether Crown is entitled to a jury trial, this order ar-

2002 U.S. Dist. LEXIS 26109, *

rives at the same conclusion that Judge Newsome did. Accordingly, defendant's motion to strike plaintiff's jury demand is, once again, denied.

## 2. The *Granfinanciera* Test

The Seventh Amendment guarantees the right to a jury trial for the determination of legal, as opposed to equitable, rights and remedies. *Feltner v. Columbia Pictures TV*, 523 U.S. 340, 347-48, 140 L. Ed. 2d 438, 118 S. Ct. 1279 (1998). In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989), the Supreme Court set forth a three-part test for determining whether a party asserting a statutory [*8] cause of action is entitled to a jury trial under the Seventh Amendment in the context of bankruptcy litigation, First, a court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id*. at 42. Second, it must "examine the remedy sought and determine whether it is legal or equitable in nature." *Ibid*. "If, on balance, these two factors indicate that a party is entitled to a jury trial under the Seventh Amendment," the third step is to "determine whether Congress may assign and has assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a jury as factfinder." *Ibid*. Elaborating on this last step, the Court explained that Congress may assign resolution of a claim to a non-Article III body that does not use a jury as a factfinder only if the claim is based on a public, rather than private, right. *Id*. at 51. Not every claim that arises from a bankruptcy proceeding necessarily implicates a public right. *See id*. at 55-58. A claim is a matter of public right only when it arises "as part of the process [*9] of allowance and disallowance of claims." *Id*. at 58 (quoting *Katchen v. Landy*, 382 U.S. 323, 336, 15 L. Ed. 2d 391, 86 S. Ct. 467, (1996)).

Here, it is beyond dispute that the first two inquiries favor a jury trial. The controversy centers on the third part of the *Granfinanciera* test. Fort James contends that Crown's claims are inextricably intertwined with Fort James's' proof of claim and that the bankruptcy court, a non-Article III adjudicative body, has jurisdiction to decide all of Crown's claims against Fort James without a jury. Crown, on the other hand, maintains that it is entitled to a jury trial for its claims against Fort James because they are not part of the claims-allowance process and do not affect the hierarchical reordering of creditor claims.

Of these opposing arguments, Crown's is the more persuasive. Bankruptcy Judge Newsome rightly concluded that the resolution of Crown's numerous claims against Fort James will have only a "negligible impact" on the claims-allowance process (Order dated Apr. 23, 2002 at 20). Crown is not disputing the validity of Fort

James's claim to the paid-in-kind-notes; rather, Crown is making the analytically [*10] distinct argument that the notes' issuance was fraudulently induced (Hearing Tr. dated Apr. 3, 2002 at 55-58). Even if Fort James's proof of claim and Crown's claims against Fort James arose from the same agreement or are otherwise related, this does not deprive Crown of the right to a jury trial. When, as here, the resolution of a party's legal claims arising from a bankruptcy proceeding will have but a negligible impact on the claims-allowance process, the right to a jury trial is preserved. n1

> n1 The Supreme Court's holdings in *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 77 L. Ed. 185, 53 S. Ct. 50 (1932), *Katchen v. Landy*, 382 U.S. 323, 15 L. Ed. 2d 391, 86 S. Ct. 467 (1966), and *Langenkamp v. Culp*, 498 U.S. 42, 112 L. Ed. 2d 343, 111 S. Ct. 330 (1990) are consistent with this result. As Fort James concedes, these rulings concern the rights of creditors, not debtors (Fort James Br. at 9). Moreover, *Schoenthal* and *Katchen* do not undermine the *Granfinanciera* test, as it is described above, as much as they inform it. *See Granfinanciera*, 492 U.S. at 56-59 (deriving from *Schoenthal* and *Kaidien* the rule that a claim is based on a public right when it arises as part of the process of allowance and disallowance of claims).

[*11]

## 3. Submission to the Court's Equitable Jurisdiction

Fort James's various arguments concerning waiver and the submission to the equitable jurisdiction of the court are unconvincing. To the extent that the Ninth Circuit has expressed any opinion regarding the issue of whether and how parties' submission to a court's equitable jurisdiction affects a debtor's right to a jury trial, its view seems to comport with that expressed in *Germain v. Connecticut National Bank*, 988 F.2d 1323 (2d Cir. 1993). In *Germain*, the Second Circuit concluded that "a creditor or debtor who submits to the equity jurisdiction of the bankruptcy court thereby waives any right to a jury trial for the resolution of disputes vital to the bankruptcy process," retaining the right to a jury trial for disputes "only incidentally related to the bankruptcy process." *Id*. at 1329-30. The Ninth Circuit utilized this standard when it noted that by filing a proof of claim, a creditor "waived any right to a jury trial for the resolution of disputes vital to the bankruptcy process of allowance and disallowance of the claims." *In re Conejo Enters.*, 96 F.3d 346, 354 n.6 (9th Cir. 1996) [*12] (citing

*Germain*); *see also In re Hashemi*, 104 F.3d 1122, 1125 (9th Cir. 1996) (quoting *Conejo*).

Applying this standard to the instant case confirms the result of the *Granfinanciera* analysis above. Because the resolution of Crown's legal claims has only a "negligible impact" on the bankruptcy process of allowance and disallowance of claims (Order dated Apr. 23, 2002 at 20), Crown cannot be said to have waived the right to a jury trial for those claims.

Fort James's reliance on In re Hallahan, 936 F.2d 1496 (7th Cir. 1991) and *In re Jensen*, 946 F.2d 369 (5th Cir. 1991) is misplaced. Citing *Halahan*, Fort James argues that a debtor loses the right to a jury trial simply by filing for bankruptcy. Similarly, citing *Jensen*, Fort James posits that a creditor's filing of a proof of claim deprives the debtor of the right to have claims against that creditor tried by a jury. n2. These propositions are by no means settled law. *See Jensen*, 946 F.2d at 373-74 (disagreeing with the reasoning of *Hallahan*); *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1252 (3rd Cir. 1994) (declining [*13] to adopt the *Jensen* holding); *Germain*, 998 F.2d at 1330 (rejecting *Jensen*). More importantly, they have not been adopted by the Ninth Circuit. Following the Ninth Circuit's *Conejo* and *Hashemi* rulings, this order concludes, as did Judge Newsome (Hearing Tr. at 51), that it is the *Germain* standard that applies.

n2 Fort James also argues that Crown's claims should be disposed of in an equitable proceeding because they are essentially counter-claims to Fort James's proof of claim. This analogy is questionable. Furthermore, Fort James offers no Ninth Circuit precedent confirming that this analysis applies on these facts. *In re Simon*, 153 F.3d 991 (9th Cir. 1998) concerned a creditor's right to a jury trial, not a debtor's.

**4. Retention of Jurisdiction**

Because this order denies Fort James's motion to strike Crown's jury demand, it need not reach the issue of whether the Court should retain jurisdiction after the jury demand has been struck.

**CONCLUSION** [*14]

For the foregoing reasons, Fort James's motion to strike the jury demand is **DENIED** without prejudice to bring a motion to strike the jury demand with regard to individual claims at the pretrial conference.

**IT IS SO ORDERED.**

Dated: December 16, 2002.

/s/ WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

Case 1:07-mc-00215-JJF    Document 2-2    Filed 12/07/2007    Page 14 of 30

Page 1

1980 U.S. Dist. LEXIS 11131, *; 22 Fair Empl. Prac. Cas. (BNA) 504

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION v. BLUE STAR FOODS, INC.,**

**No. 78-5-W Civil.**

**United States District Court for the Southern District of Iowa**

**1980 U.S. Dist. LEXIS 11131; 22 Fair Empl. Prac. Cas. (BNA) 504**

**March 7, 1980**

COUNSEL: [*1] James R. Neely, Jr., Regional Attorney, St. Louis, Mo., for plaintiff.

William T. Oakes, Omaha, Neb., and Philip J. Willson, Council Bluffs, Iowa, for defendant.

OPINION BY: O'BRIEN

OPINION

O'BRIEN, District Judge: -- This is an action brought by the Equal Employment Opportunity Commission (EEOC) [1] on behalf of two individuals, alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq. On September 10, 1979, plaintiff filed its demand for a trial by jury. Defendant moved to strike plaintiff's jury demand on September 24, 1979. Plaintiff has resisted defendant's motion to strike. For the reasons set out herein, the Court finds that plaintiff is entitled to a trial by jury of all questions of fact in this case and that defendant's motion to strike should therefore be denied.

> 1   As enacted, the ADEA and the Fair Labor Standards Act provided that the Secretary of Labor could initiate suit on behalf of an aggrieved individual. All functions vested in the Secretary of Labor under the ADEA pursuant to 29 U.S.C. § 626 were transferred to the EEOC by § 2 of the 1978 Reorganization Plan #1, 43 F.R. 19807. Therefore the EEOC is the named plaintiff in this action. All references to the Secretary herein apply equally to the EEOC.

[*2] Defendant's basic contention is that there is no right to trial by jury when the EEOC brings suit for violations of the ADEA. Defendant submits that the right to trial by jury attaches only when an action is brought for legal relief under common law. Defendant urges that the right to jury trial does not necessarily arise in actions for equitable relief or in actions brought pursuant to a statute under which there is no comparable cause of action provided by common law. See the Seventh Amendment to

the United States Constitution. Defendant claims that this is such a suit and that there is no right to trial by jury. The Court does not agree.

The ADEA broadly prohibits arbitrary discrimination in the work place based upon age. 29 U.S.C. § 623(a). The enforcement scheme for the statute is complex. Basically, § 626(b) provides that the provisions of the ADEA shall be enforced in accordance with the powers, remedies, and procedures set out in the enforcement provisions of the Fair Labor Standards Act (FLSA), specifically, 29 U.S.C. § 211(b), § 216 (except (a)), and § 217. A further enforcement provision is contained within the ADEA itself at § 626(c). "Amounts owing" [*3] under the ADEA are treated as unpaid minimum wages or unpaid overtime compensation under the FLSA (except that liquidated damages are available under the ADEA only for willful violations). A summary of each of these enforcement provisions sections appears in the following paragraphs.

Section 211(b) provides that the Sectretary may utilize the services of state and local agencies to assist in the enforcement of the FLSA.

Section 216(b) provides that an employee may bring suit on behalf of himself or himself and all others similarly situated against his employer. The employee may recover damages in the form of unpaid minimum wages or unpaid overtime compensation, plus a like amount as liquidated damages. Legal or equitable relief is available, including reinstatement, promotion, payment of wages lost, and an additional equal amount as liquidated damages, attorney's fees and costs. The right of an employee to bring such an action ends when the Secretary brings an action under § 217 in which the Secretary seeks either (a) that the employer be restrained from withholding unpaid compensation or (b) seeks legal or equitable relief.

Section 216(c) provides that the Secretary [*4] may bring suit against an employer on behalf of an employee to recover unpaid minimum wages or for unpaid overtime compensation and an additional amount as liquidated damages. If the Secretary brings such an action, the

Case 1:07-mc-00215-JJF    Document 2-2    Filed 12/07/2007    Page 15 of 30

Page 2
1980 U.S. Dist. LEXIS 11131, *; 22 Fair Empl. Prac. Cas. (BNA) 504

employee's right to bring an action under § 216(b) is terminated.

Section 217 provides that the district courts have jurisdiction to restrain violations of the FLSA. This section specifically includes the power to restrain employers from withholding payment or overtime compensation.

Rather than being "borrowed" from the FLSA, § 626(c) is contained within the ADEA itself. That section provides that a civil action for legal or equitable relief may be brought by any person aggrieved. This section will be taken up in more detail later in this opinion.

The Court has studied cases brought for violations of the FLSA and the ADEA with regard to the right to a trial by jury. If there is a pattern, it appears to be that a jury trial is generally available for cases seeking legal relief, Murphy v. American Motors Sales Company, 570 F.2d 1226, 17 FEP Cases 180 (5th Cir. 1978); Kennedy v. Mountain States Tel. and Tel. Company, 449 F.Supp. 1008, 17 FEP Cases 616 (D. [*5] Colo. 1978); Quinn v. Bowmar Pub. Company, 445 F.Supp. 780, 18 FEP Cases 1468 (D. Md. 1978), but not in actions seeking equitable relief, Paradise Valley Investigation and Patrol Services v. U.S. District Court, 521 F.2d 1342 (9th Cir. 1975); Hodgson v. Stewart In-Fra-Red Commissary, Inc., 370 F.Supp. 503, 21 WH Cases 193 (E. D.Pa. 1973); Usery v. Venagngo Diagnostic and Training Center, Inc., 72 F.R.D. 469, 23 WH Cases 3 (W. D.Pa. 1976). A possibly related generalization that may be drawn from these cases is that a jury trial is more frequently available in suits under § 216 than those under § 217. The EEOC in the present action seeks both legal and equitable relief (monetary damages in the way of back wages and reinstatement) and brings its action pursuant to both § 216 and § 217 as well as other sections.

Prior to 1978, the Circuit Courts were divided on whether there was a right to a jury trial in an action brought by an individual under the ADEA. See Morelock v. NCR Corp., 546 F.2d 682, 14 FEP Cases 65 (8th Cir. 1976) (holding there was no right to a jury trial), and Rogers v. Exxon Research & Engineering Company, 550 F.2d 834, 14 FEP Cases 518 (3d Cir. 1977) (holding [*6] there was a right to a jury trial). This issue was resolved by the Supreme Court in Lorillard v. Pons, 434 U.S. 575, 16 FEP Cases 885 (1978), which held that there was a right to a trial by jury in a private civil action for lost wages under the ADEA. The Supreme Court moved away from the traditional legal relief-equitable relief distinction [2] in this area by interpreting the terms "legal or equitable relief" in 29 U.S.C. § 626(b), reasoning that:

2   Concerning the difference between legal and equitable remedies under the ADEA, the Su-

preme Court in Lorillard stated in a footnote at 434 U.S. 583, n. 11, 16 FEP Cases 888:

29 U.S.C. § 626(b) does not specify which of the listed categories of relief are legal and which are equitable. However, since it is clear that judgments compelling "employment, reinstatement or promotion" are equitable, see 5 J. Moore, Federal Practice P38.21 (1977), Congress must have meant the phrase "legal relief" to refer to judgments "enforcing... liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation."

This inference is buttressed by the examination of the language Congress chose to describe the available remedies [*7] under the ADEA. Section 7(b), 29 U.S.C. § 626(b), empowers a court to grant "legal or equitable relief" and § 7(c), 29 U.S.C. § 626(c), authorizes individuals to bring actions for "legal or equitable relief" (emphasis added). The word "legal" is a term of art: in cases in which legal relief is available and legal rights are determined, the Seventh Amendment provides a right to jury trial..." [Where] words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary."... We can infer, therefore, that by providing specifically for "legal" relief, Congress knew the significance of the term "legal" and intended that there would be a jury trial on demand to "enforce... liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation."

434 U.S. at 583, 16 FEP Cases at 888.

Shortly after the Supreme Court decided Lorillard, its decision was legislatively approved when Congress amended § 626(c) to add subsection (2) thereof.

Section 626(c) provides in full that:

(1) Any person aggrieved may bring a civil [*8] action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter: provided, that the right of any person to bring such action shall terminate upon the commencement of an action by the Secretary to enforce the right of such employee under this chapter.

(2) In an action brought under paragraph (1), a person shal be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter, regardless of whether equitable relief is sought by any party in such action.

Defendant concedes that an individual bringing suit on his own behalf is entitled to a trial by jury, pursuant to Lorillard and § 626(c)(2). Nevertheless, defendant con-

1980 U.S. Dist. LEXIS 11131, *; 22 Fair Empl. Prac. Cas. (BNA) 504

tends that there is no such right when an action is commenced by the Secretary. The Court does not agree.

In § 626(c), the words "person", "Secretary", "employee" and "party" are used. It is not clear from the face of the statute whether "person" refers to only the individual employee of whether it includes the "Secretary" as a party entitled to a trial by jury. Perhaps more importantly, the statute does not explicitly [*9] forbid a trial by jury in actions brought by the Secretary. The Court cannot say that the Secretary is not a "person" within the meaning of the Statute. For this and other reasons set out herein, the Court holds that there is a right to trial by jury in actions commenced by the Secretary for violation of the ADEA.

As noted, § 626(c)(2) provides for a jury trial in actions to recover amounts owing regardless of whether equitable relief is sought. In the Court's view, this significantly impairs the distinction between equitable and legal relief previously mentioned. At a minimum, § 626(c)(2) provides for a jury trial when legal relief is sought in addition to equitable relief. This is further supported by § 626(b), which provides in part that: "In any action brought to enforce this chapter, the Court shall have jurisdiction to grant such legal or equitable relief as may be appropriate." The Court can discern no reason to deny a party a right to trial by jury as to issues of fact merely because he seeks reinstatement or other equitable relief in addition to the "legal" remedies such as back wages and monetary damages.

The Court had an additional reason for holding that a [*10] right to trial by jury exists in actions brought by the Secretgary. As shown above, an individual bringing suit on his own behalf is entitled to a trial by jury. However, before an individual may commence such an action, he must file a charge of unlawful discrimination with the Secretary. 29 U.S.C. § 626(d). The Secretary must then attempt to eliminate the allegedly unlawful practice by informal means. § 626(b) and (d). Failing such informal resolution, the Secretary may file a suit against the employer. Presumably this may be done without the individual's consent and conceivably against his wishes. Once the Secretary has filed suit, the individual's right to commence his own action is terminated. § 216(b), § 216(c), and § 626(c). If there is no right to trial by jury in actions brought by the Secretary, the individual's right to a jury trial curt be circumvented merely by commencement of an action by the Secretary, a procedure designed to benefit and not hinder the individual. This Court is of the opinion that Congress could not have intended such a result.

In closing, the Court notes the lack of case law on this subject. The Court has found no other case concerning [*11] the right of trial by jury in actions commenced by the Secretary for violations of the ADEA. The Court further notes that there is some merit to defendant's argument. However, the right to a trial by jury is one of the most precious of the rights guaranteed by the Constitution, and should be one of the most jealously guarded. In view of this, if the Court is to err in its holding, it chooses to err in favor of granting a right to trial by jury, as opposed to denying such an important right.

For all of the reasons set ut herein, the Court holds that plaintiff in this case is entitled to a trial by jury of all issues of fact in this action. Accordingly,

IT IS ORDERED that defendant's motion to strike plaintiff's jury demand is denied.

2006 U.S. Dist. LEXIS 63223, *

In re: ENRON CORP., et al., Reorganized Debtors. ENRON CORP., Plaintiff, -against- SPRINGFIELD ASSOCIATES, L.L.C. and WESTPAC BANKING CORPORATION, Defendants. ENRON CORP., Plaintiff, -against- AVENUE SPECIAL SITUATIONS FUND II, LP, DK ACQUISITION PARTNERS, LP, RCG CARPATHIA MASTER FUND LTD., RUSHMORE CAPITAL-I, L.L.C. and RUSHMORE CAPITAL-II, L.L.C., Defendants. ENRON CORP., ENRON NORTH AMERICA CORP., NATIONAL ENERGY PRODUCTION CORPORATION, ENRON POWER MARKETING, INC., ENRON POWER & INDUSTRIAL CONSTRUCTION COMPANY, NEPCO SERVICES INTERNATIONAL, INC. and NEPCO POWER PROCUREMENT COMPANY, Plaintiffs, -against- BEAR, STEARNS & CO. INC. and RUSHMORE CAPITAL-I, L.L.C., Defendants. ENRON CORP., Plaintiff, -against- AVENUE SPECIAL SITUATIONS FUND II, LP, DK ACQUISITION PARTNERS, LP, RCG CARPATHIA MASTER FUND LTD., RUSHMORE CAPITAL-I, L.L.C. and RUSHMORE CAPITAL-II, L.L.C., Defendants. ENRON CORP., ENRON NORTH AMERICA CORP., NATIONAL ENERGY PRODUCTION CORPORATION, ENRON POWER MARKETING, INC., ENRON POWER & INDUSTRIAL CONSTRUCTION COMPANY, NEPCO SERVICES INTERNATIONAL, INC. and NEPCO POWER PROCUREMENT COMPANY, Plaintiffs, -against- BEAR, STEARNS & CO. INC. and RUSHMORE CAPITAL-I, L.L.C., Defendants. ENRON CORP., ENRON NORTH AMERICA CORP., NATIONAL ENERGY PRODUCTION CORPORATION, ENRON POWER MARKETING, INC., ENRON POWER & INDUSTRIAL CONSTRUCTION COMPANY, NEPCO SERVICES INTERNATIONAL, INC. and NEPCO POWER PROCUREMENT COMPANY, Plaintiffs, -against- BEAR, STEARNS & CO. INC., DK ACQUISITION PARTNERS, LP, MORGAN STANLEY EMERGING MARKETS, INC., RUSHMORE CAPITAL-II, L.L.C., STRATEGIC VALUE MASTER FUND, LTD. and MAN MAC 3 LIMITED, Defendants.

M-47 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 63223

September 5, 2006, Decided
September 5, 2006, Filed

**PRIOR HISTORY:**    **[*1]**  Chapter 11 No. 01-16034, Jointly Administered, Adversary Proceeding No. 05-01025, Adversary Proceeding No. 05-01029, Adversary Proceeding No. 05-01074, Adversary Proceeding No. 05-01029, Adversary Proceeding No. 05-01074, Adversary Proceeding No. 05-01105.
Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.), 2006 Bankr. LEXIS 1122 (Bankr. S.D.N.Y., Apr. 5, 2006)

**COUNSEL:** For Enron Corp., et al., debtors-in-possession: Albert Togut, Esq., Scott E. Ratner, Esq., Richard K. Milin, Esq., TOGUT SEGAL & SEGAL LLP, New York, NY.

Special Litigation Counsel for Enron Corp., et al., debtors-in-possession: H. Lee Godfrey, Esq., Kenneth S. Marks, Esq., Mary Kathryn Sammons, Esq., SUSMAN GODFREY L.L.P., Houston, TX.

Special Litigation Counsel for Enron Corp., and Enron North America Corp., debtors-in-possession and plaintiffs: Richard L. Wasserman, Esq., VENABLE LLP, Baltimore, MD.

For defendants Rushmore Capital - I, L.L.C. Rushmore Capital - II, L.L.C.: David Lee Evans, Esq., Theodore J. Folkman, Esq., HANIFY & KING, P.C., Boston, MA.

2006 U.S. Dist. LEXIS 63223, *

For defendants Strategic Value Master Fund, Ltd. and Man Mac 3 Limited: Jonathan L. Hochman, Esq., SCHINDLER COHEN & HOCHMAN LLP, New York, NY.

For defendant DK Acquisition Partners, LP: Martin Eisenberg, Esq., Anna Karpman, Esq., EMMET, MARVIN & MARTIN, [*2] LLP, New York, NY.

For defendant Bear, Stearns & Co. Inc.:Stephen M. Sinaiko, Esq., Jonathan A. Popolow, Esq., KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY.

For defendant Springfield Associates, L.L.C.: David Parker, Esq., Edward Grosz, Esq., KLEINBERG, KAPLAN, WOLFF & COHEN, P.C., New York, NY.

For Intervenors Citibank, N.A.: Stephen J. Shimshak, Esq., Douglas R. Davis, Esq., Brad S. Karp, Esq., Claudia L. Hammerman, Esq., PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, NY.

For Intervenors Barclays Bank PLC and its Affiliates: Hugh McDonald, Esq., ALLEN & OVERY LLP, New York, NY; David H. Braff, Esq., Michael T. Tomaino, Jr. Esq., Jeffrey T. Scott, Esq., SULLIVAN & CROMWELL LLP, New York, NY.

For Intervenors Merrill Lynch & Co., Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch Capital Services, Inc.:Herbert Washer, Esq., William J. F. Roll III, Esq., Seth M. Kean, Esq., SHEARMAN & STERLING LLP, New York, NY.

For Intervenors Credit Suisse First Boston LLC and its Affiliates: Richard W. Clary, Esq.,Julie A. North, Esq., Darin P. McAtee, Esq., CRAVATH, SWAINE & MOORE LLP, New York, NY.

For Intervenor The Toronto-Dominion [*3] Bank: John H. Maddocka, III, Esq., McGUIREWOODS LLP, New York, NY; Robert Plotkin, Esq., Dion W. Hayes, Esq., McGUIREWOODS LLP, Washington, D.C.

For FleetBoston Financial Corp., Fleet National Bank, DK Acquisition Partners, L.P., Rushmore Capital-I, L.L.C., Rushmore Capital-II, L.L.C., and RCG Carpathia Master Fund, Ltd.: David S. Elkind, Esq., Marc F. Skapof, Esq., ROPES & GRAY LLP, New York, NY; Matthew M. Burke, Esq., Stephen Moeller-Sally, Esq., ROPES & GRAY LLP, Boston, MA.

JUDGES: Shira A. Scheindlin, U.S.D.J.

OPINION BY: Shira A. Scheindlin

OPINION

OPINION AND ORDER

SHIRA A. SCHEINDLIN, U.S.D.J.:

Certain defendants and permitted intervenors in the above-captioned coordinated adversary proceedings (the "Adversary Proceedings") request leave to file an interlocutory appeal from two orders of the Bankruptcy Court of the Southern District of New York (Gonzalez, J.) denying defendants' motions to dismiss claims for equitable subordination and for disallowance filed by Enron Corporation and certain of its affiliates (collectively, "Enron"). [1] In these opinions the Bankruptcy Court held that a transferee's claim against a bankrupt's estate can be subordinated or disallowed [*4] solely because of its predecessor-in-interest's misconduct or failure to return avoidable transfers even when there is no finding of wrongdoing or receipt of avoidable transfers by the transferee.

> 1  The published order from which leave to appeal is sought with respect to equitable subordination is *Enron Corp. v. Avenue Special Situations Fund, II, LP (In re Enron Corp.)*, 333 B.R. 205 (Bankr. S.D.N.Y. 2005) (the "subordination opinion"). The Bankruptcy Court issued substantially similar unpublished opinions in the three other adversary proceedings that have been coordinated for the purposes of this motion, as explained *infra* in Part I of this Opinion. The published order on claim disallowance is *Enron Corp. v. Avenue Special Situations Fund, II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) (the "disallowance opinion"). The Bankruptcy Court has not issued similar opinions in the three other adversary proceedings as of today's date, although it has so-ordered a stipulation allowing defendants and permitted intervenors to brief the issue as if similar orders had already been entered in the three other proceedings.

[*5]  Defendants and permitted intervenors move for leave to appeal on the grounds that both the subordination and disallowance opinions are erroneous as a matter of law and that immediate appeal is warranted because of the uncertainty that these rulings -- if left undisturbed -- would inject into the market for the sale of postpetition claims. They argue, in the alternative, that if a claim can be subordinated and disallowed based solely on a transferor's acts or omissions, then the Bankruptcy Court erred by not allowing a "safe harbor" defense for claims that are acquired in good faith and for value. They

argue that these holdings unfairly make transferees strictly liable for their transferors' conduct.

Enron, in turn, argues that the opinions were correctly decided based on both statutory construction and equitable principles, despite the absence of any controlling authority. Enron argues that if a transferor can immunize its claims from being subordinated and disallowed by transferring them to a good faith purchaser, this would encourage claim holders who have acted inequitably or who have failed to repay avoidable transfers to "wash" their claims by transferring them. Enron asserts **[*6]** that such an outcome would defeat the very purposes behind equitable subordination and claim disallowance.

Although the parties have separately briefed the subordination and disallowance opinions, both motions for leave to appeal are addressed here together because they both involve the same question -- whether a transferee's claim can be subordinated or disallowed solely because of the acts or omissions of its predecessor-in-interest. For the following reasons, defendants and intervenors' motions for leave to appeal are granted.

## I. BACKGROUND

On December 2, 2001 (the "Petition Date"), Enron filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). [2] As of the Petition Date, Enron was an obligor under various credit agreements (the "Credit Arrangements") with certain participating banks (collectively, the "Transferors" or "Intervenors") whose proofs of claim were authorized by the Bankruptcy Court. [3] After the Petition Date, the Transferors, who were the original holders of claims asserted against Enron's estate, directly or indirectly transferred the claims to the defendants (or "Transferees") in this case. **[*7]** [4]

2  *See In re Enron,* 333 B.R. at 211.

3  *See id.* at 212.

4  *See id.*

On September 24, 2003, Enron filed an adversary proceeding (the "MegaComplaint Proceeding," Docket No. 03-09266) against ten large bank groups, including all of the Transferors that have been allowed by the Bankruptcy Court to intervene in this motion. [5] In that action, Enron alleges that the Transferors received certain preferences and fraudulent conveyances and that they aided and abetted Enron's accounting fraud thereby injuring Enron's creditors. Enron seeks recovery of the allegedly improper transfers to the Transferees and equitable subordination of the banks' claims under the Credit

Agreements based on allegations of the Transferors' inequitable conduct. The Bankruptcy Court has not yet adjudicated the allegations in the MegaComplaint Proceeding, which the Transferors "vigorously contest." [6]

5  *See id. See also* Debtors' Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims. Enron filed amended complaints on December 1, 2003, April 30, 2004, June 14, 2004 and January 10, 2005.

**[*8]**

6  Intervenor Banks' Memorandum of Law in Support of Defendants' Motions for Leave to Appeal From the Decision of the Bankruptcy Court Regarding Section 510(c) ("Intervenors' Subordination Mem.") at 4; Intervenor Banks' Memorandum of Law in Support of Defendants' Motions for Leave to Appeal From the Decision of the Bankruptcy Court Regarding Section 502(d) of the Bankruptcy Code ("Intervenors' Disallowance Mem.") at 5.

Enron commenced adversary proceedings in the Bankruptcy Court on January 10, 2005, seeking to subordinate and disallow the claims against Enron's estate, which were held by the Transferors as of the Petition Date and subsequently transferred to and asserted by the defendants in these Adversary Proceedings. [7] The complaints filed in these Proceedings each assert two causes of action, one for the disallowance of claims under section 502(d) of the Bankruptcy Code and the other for equitable subordination of claims under section 510(c). [8]

7  *See, e.g.,* Complaint for the Disallowance and Equitable Subordination of Claims Against the Reorganized Debtor Formerly Held by Citigroup, Inc., or its Affiliates, No. 05-01025, dated January 10, 2005 (the "Citigroup Proceedings"). Enron filed similarly styled complaints (collectively, the "Adversary Complaint") against: claims formerly held by Fleet National Bank or its affiliates on January 12, 2005, No. 05-01029 (the "Fleet Proceeding"); claims formerly held by Credit Suisse First Boston or its affiliates on January 19, 2005, No. 05-01074 (the "CFSB Proceeding"); and claims formerly held by Barclays Bank or its affiliates on February 2, 2005, No. 05-01105 (the "Barclays Proceeding").

**[*9]**

8  *See* Adversary Complaint PP 50-61.

Enron asserts that if the claims still belonged to the Transferors, they would have been subject to disallow-

ance under section 502(d) and subordination under section 510(c). [9] Enron then argues that the transferred claims should be subordinated and disallowed to the same extent as if the Transferors still held them even though there is no allegation that any of the Transferees did anything improper, nor that they received any avoidable transfers. [10] Therefore, the sole basis for Enron's section 502(d) and section 510(c) allegations is the alleged acts and omissions of defendants' predecessors-in-interest coupled with the argument that the transference of such claims should have no impact on the applicability of disallowance or subordination.

9  *See id.* PP 52-53, 58.

10  *See id.* PP 54, 59.

After defendants moved to dismiss these adversary proceedings, the Bankruptcy **[*10]**  Court entered an order on April 27, 2005 to coordinate briefing on the following issues: whether a claim asserted by a transferee is subject to subordination under section 510(c) or disallowance under section 502(d) solely because the transferor is found to have engaged in conduct that would warrant equitable subordination or disallowance if the claims were still held by the transferor. [11] This order also allowed the Intervenor Banks, who are named defendants in the MegaComplaint Proceeding, to intervene for the purposes of briefing and arguing these issues. [12] The Transferors have been and remain interested in these adversary proceedings because they may ultimately be liable for the claims they transferred. That is, if such claims are found to be subject to subordination and disallowance and therefore lose monetary value, then the Transferees are likely to seek indemnity from their Transferors. [13]

11  *See* 4/27/05 Coordinated Scheduling and Intervention Order P 2 ("[W]hether a claim asserted by a transferee that acquired its claim on or after [the Petition Date] directly or indirectly, from a defendant in the MegaComplaint Proceeding (each, a 'MegaDefendant') that is alleged to have held such claim on the Petition Date, is subject to (a) subordination under section 510(c) of the Bankruptcy Code solely because such MegaDefendant transferor is found to have engaged in wrongful or inequitable conduct that would warrant equitable subordination of such claim in the hands of such MegaDefendant transferor, or (b) disallowance under section 502(d) of the Bankruptcy Code to the extent that a MegaDefendant transferor(s) that held the claim on or after the Petition Date is found to be an entity from which property is recoverable, or a transferee of avoid-

ance transfers, under section 502(d) of the Bankruptcy Code.").

**[*11]**

12  *See id.*

13  At least one of the Transferees has already brought suit against its Transferor, referencing the suit that Enron has brought against it in the Adversary Complaint and seeking damages for breach of warranty based, in part, on an indemnity clause in the contract. *See* 8/4/05 Complaint in *Westpac Banking Corp. v. Citibank, N.A.,* No. 05 Civ 6939 (MBM). This case has been transferred by the Judicial Panel on Multidistrict Litigation to the Southern District of Texas. *See* 2/15/06 Transfer Order.

On November 17, 2005, the Bankruptcy Court denied the motion to dismiss with respect to Enron's equitable subordination claim in the Fleet Proceeding. [14] The Bankruptcy Court made two rulings of first impression in the Second Circuit. *First,* the court held that "a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief, as if, [sic] such claim were still held by the transferor." [15] *Second,* the court **[*12]**  held that "the policy underlying the 'good faith' defense in various provisions of the Bankruptcy Code does not warrant the extension of such defense to purchasers of claims." [16] The court also concluded that even if such a good faith defense was available, it could not be invoked by the defendants because as purchasers of post-petition bankruptcy claims, the transferees were on notice of the risk that such claims could be subordinated. [17]

14  *See supra* note 1. On November 28, 2005, the Bankruptcy Court issued opinions in the Citigroup, CSFB and Barclays Proceedings that are substantially identical to the November 17 equitable subordination ruling in the Fleet Proceeding. On December 20 and 23, 2005, the Bankruptcy Court entered orders implementing its equitable subordination rulings in the various adversary proceedings. On December 23, 2005, the Bankruptcy Court entered an order coordinating the Fleet, Citigroup, CSFB and Barclays Proceedings for purposes of briefing the motion for leave to appeal the orders denying the motions to dismiss the claims for equitable subordination. That order also permitted the Transferors to brief the issue and they have filed the principal memorandum in support of the motions for leave to appeal the subordination ruling.

**[*13]**

15  *In re Enron,* 333 B.R. at 210.

16  *Id.* at 211.

17  *See id.* The defendants who have moved for leave to appeal the subordination ruling have either joined in the Intervenors' brief without filing their own brief, or have filed a brief in their own name that is substantially identical to the Intervenors' brief. The parties and motions before the Court on the subordination ruling are: (1) Springfield Associates LLC, one of two defendants in the Citigroup Proceeding, has filed a memorandum substantially identical to that filed by the Intervenor Banks; (2) Bear Stearns & Co., Inc. ("Bear"), one of two defendants in the CSFB Proceeding, has moved for leave to appeal relying solely on the Intervenor Banks' brief; (3) Bear, DK Acquisition Partners ("DK"), Strategic Value Master Fund, Ltd. and Man Mac 3 Limited, four of the six defendants in the Barclays Proceeding, have moved for leave to appeal based on their memorandum of law joining in the Intervenors' arguments; (4) DK, RCG Carpathia Master Fund, Ltd. ("RCG"), Rushmore Capital-I, L.L.C. (Rushmore I) and Rushmore Capital-II, L.L.C. (Rushmore II), four of the five defendants in the Fleet Proceeding, have filed a memorandum for leave to appeal that is substantially identical to the Intervenors' brief.

[*14]  On March 31, 2006, the Bankruptcy Court denied the motions to dismiss with respect to Enron's claim for disallowance in the Fleet Proceeding. The central holding of that ruling is: "Once it is established that a claim in the hands of the transferor would be subject to disallowance, such claim in the hands of a transferee should . . . be disallowed to the same extent that such claim would be subject to disallowance in the hand of a transferor." [18] As in its subordination ruling, the Bankruptcy Court held as a matter of law that Transferees cannot assert a good faith defense against claims for disallowance, but even if they could, the defense would fail because Transferees had notice of the risk that the claims they purchased might be disallowed. [19] On April 28, 2006, the Bankruptcy Court entered an order implementing its disallowance ruling in the Fleet Proceeding. [20]

18  *In re Enron,* 340 B.R. at 199. This issue has been addressed by only two other district courts which reached opposite conclusions. *See In re Metiom, Inc.,* 301 B.R. 634 (Bankr. S.D.N.Y. 2003) (holding that disallowance under section 502(d) applies to the claim and not the claimant) *and Section 1102(A)(1) Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood*

*& Locker, Inc.),* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D.Tex. June 20, 1988) (holding that disallowance only applies to a claimant).

[*15]
19  *Id.* at 205-08.

20  Because the disallowance ruling was only entered in the Fleet Proceeding, no defendant from any other proceeding has submitted a brief requesting leave to appeal. In the Fleet Proceeding, DK, RCG, Rushmore I and Rushmore II have submitted a memorandum of law that is substantially identical to the Intervenors' brief. The Transferors once again filed the principal memorandum for leave to appeal the disallowance ruling. Therefore, the Court will only cite to and address the arguments raised in the Intervenors' memoranda on both motions.

## II. LEGAL STANDARD

### A. Interlocutory Orders Under Section 158(a)(3)

Appeals from non-final bankruptcy court orders may be taken pursuant to section 158(a)(3) of title 28 of the United States Code. [21] In deciding whether to grant leave to appeal, reviewing courts apply the standards of section 1292(b) of title 28 of the United States Code, which governs the appealability of interlocutory district court orders. [22] In order to permit an interlocutory appeal pursuant to section 1292(b), [*16]  the order being appealed must "(1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion," and the movant must also show that "(3) an immediate appeal would materially advance the ultimate termination of the litigation." [23] This standard is strictly applied as interlocutory appeals from bankruptcy courts' decisions are "disfavored" in the Second Circuit. [24]

21  *See also* 28 U.S.C. § 158(c)(2) ("An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.").

22  *See In re Adelphia Commc'ns Corp.,* 2006 U.S. Dist. LEXIS 29741, No. 03 Civ. 8848, 2006 WL 1114054, at *3 (S.D.N.Y. Apr. 26, 2006).

23  28 U.S.C. § 1292(b).

24  *In re Enron Corp.,* 2006 U.S. Dist. LEXIS 57422, Nos. M-41, 01-16034, 03-93371, 03-

93388, 03-93373, 2006 WL 1222035, at *1 (S.D.N.Y. May 3, 2006).

[*17]  In addition, leave to appeal is warranted only when the movant demonstrates the existence of "exceptional circumstances" [25] to overcome the "general aversion to piecemeal litigation" [26] and to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." [27] Interlocutory appeal "is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation,' . . . and is not intended as a vehicle to provide early review of difficult rulings in hard cases." [28] The decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion. [29]

25  *Williston v. Eggleston,* 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006).

26  *In re AroChem Corp.,* 176 F.3d 610, 619 (2d Cir. 1999). *Accord Ted Lapidus, S. A. v. Vann,* 112 F.3d 91, 95 (2d Cir. 1997).

27  *Flor v. Bot Fin. Corp. (In re Flor),* 79 F.3d 281, 284 (2d Cir. 1996) (quotation marks and citations omitted).

28  *Liebert v. Levine (In re Levine),* 2004 U.S. Dist. LEXIS 6025, No. 94-44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004) (quoting *German v. Federal Home Loan Mortgage Corp.,* 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995)).

[*18]
29  *See, e.g., In re Kassover,* 343 F.3d 91, 94 (2d Cir. 2003); *D.M. Rothman Co., Inc. v. Cohen Marketing Int'l, Inc.,* 2006 U.S. Dist. LEXIS 52073, No. 98 Civ. 7905, 2006 WL 2128064, at *1 (S.D.N.Y. July 27, 2006).

"In regard to the first prong, the 'question of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." [30] The question must also be "controlling" in the sense that reversal of the bankruptcy court's order would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome. [31]

30  *In re Worldcom,* 2003 U.S. Dist. LEXIS 11160, No. M-47, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

31  *See In re XO Commc'ns, Inc.,* 2004 U.S. Dist. LEXIS 2879, Nos. 02-12947, 03 Civ. 1898, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004);

*North Fork Bank v. Abelson,* 207 B.R. 382, 389-90 (E.D.N.Y. 1997).

[*19]  As to the second prong, the "substantial ground for a difference of opinion" must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard. [32] The requirement that such a substantial ground exists may be met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." [33] However, it is not sufficient that the relevant case law is "less than clear" or allegedly "not in accord" [34] or that there is a "strong disagreement among the parties." [35] The mere presence of a disputed issue that is a question of first impression, without more, is insufficient to satisfy this prerequisite. [36] The district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is *substantial* ground for dispute." [37] Finally, in regard to the third prong, "'[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial.'" [38] Courts place particular emphasis [*20] on the importance of this last factor. [39]

32  *See In re Worldcom,* 2003 U.S. Dist. LEXIS 11160, 2003 WL 21498904, at *10 (citation omitted).

33  *In re Lloyd's Am. Trust Fund Litig.,* 1997 U.S. Dist. LEXIS 11937, No. 96 Civ. 1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (citing *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir. 1990)).

34  *North Fork Bank,* 207 B.R. at 390 (holding that disagreement between parties about meaning of the term "business trust" did not rise to a level of a "substantial ground for a difference of opinion," because definition of term was not a matter of first impression in the Circuit).

35  *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* 2003 U.S. Dist. LEXIS 11119, Nos. 99-45005, 01-02952, M-47, 2003 WL 21507196, at *1 (S.D.N.Y. June 30, 2003) (stating that to demonstrate that there is a substantial ground for difference of opinion a party "must show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties") (quotation omitted).

36  *See In re Flor,* 79 F.3d at 284. The Bankruptcy Court notes in both rulings that there is no

controlling precedent. *See In re Enron*, 333 B.R. at 216 ("Enron asserts that its position is based on equitable principles, not on the holding of any particular case cited by it."); *id.* at 224 (stating that in determining whether equitable subordination applies, "no case has limited such consideration in the context of a transferred claim to only the conduct of the current holder"); *In re Enron*, 340 B.R. at 195-96 ("The Court has not found any case law mandating that the creditor who received an avoidable transfer be the same entity that actually asserts such claim against the debtor in the bankruptcy proceeding in order for a debtor to assert a section 502(d) disallowance against such a claim.")

**[*21]**

37    *In re Flor*, 79 F.3d at 284 (quotation omitted). *Accord Marlin v. U.S. Trustee*, 333 B.R. 14, 20 (W.D.N.Y. 2005).

38    *Transp. Workers Union, Local 100 v. N.Y. City Transit Auth.*, 358 F. Supp. 2d 347, 350 (S.D.N.Y. 2005) (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998)).

39    *See Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865-66 (2d Cir. 1996) ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."); *Lerner v. Millenco, L.P.*, 23 F. Supp. 2d 345, 347 (S.D.N.Y. 1998) ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal.").

**B. Motion to Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure is incorporated into bankruptcy procedure by Rule 7012(b) of the Bankruptcy Rules. A motion to dismiss pursuant to Rule 12(b)(6) should be granted **[*22]** only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'" [40] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor. [41] "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." [42] Even though the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible. [43]

40    *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v.*

*Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

41    *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 392 (2d Cir. 2006) (citation omitted).

42    *Law Offices of Curtis V. Trinko, L.L.P., v. Bell Atl. Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation omitted).

**[*23]**

43    *See Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

**III. DISCUSSION**

This is one of the rare cases in which an immediate review of an interlocutory order is warranted. The three prongs of section 1292(b) are met here and exceptional circumstances exist. The Bankruptcy Court's two rulings -- that equitable subordination and disallowance travel with the claim and that there is no good faith defense -- mean that if the Transferors' claims are found to be subject to equitable subordination and disallowance in the MegaComplaint Proceeding, then these findings will automatically subordinate and/or disallow defendants' claims. Enron correctly argues that the denials of the motions to dismiss may never need to be reviewed if the MegaComplaint defendants are not found liable of misconduct or of having received avoidable transfers or if there are settlements in either the MegaComplaint or Adversary Proceedings that end the actions against the defendants. [44] But it is precisely the risk that these orders will go unreviewed that makes this an exceptional case.

44    *See* Enron's Memorandum of Law in Opposition to Defendants' Motions for Leave to Appeal From the Bankruptcy Court's Decisions Concerning Equitable Subordination of Claims ("Enron's Subordination Mem.") at 10-11 (citing *U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, 2003 U.S. Dist. LEXIS 12909, No. 02 Civ. 2854, 2003 WL 21738964, at *4 (S.D.N.Y. July 28, 2003) ("[d]eciding an issue now, which may never need to be decided, does not help to advance the litigation")); Declaration of Richard K. Milin, plaintiff's counsel, in support of Enron's Memorandum of Law in Opposition to Defendants' Motion for Leave to Appeal From the Bankruptcy Court's Ruling Concerning Temporary Disallowance of Transferred Claims under 11 U.S.C. § 502(d) ("Enron's Disallowance Mem.") at P 2 (referring to settlements in the MegaComplaint proceeding).

**[*24]** With respect to the first prong of section 1292(b), the orders being appealed involve pure ques-

tions of law and there is no need to make any factual determinations in order to decide whether the rulings are correct. Assuming that the allegations against the Transferors are true -- and there are no allegations of impropriety against the transferee-defendants -- the question is whether Enron can prevail, as a matter of law, on its equitable subordination and disallowance claims against the defendants. [45] If the answer is yes, then the next question is whether defendants are permitted to assert the defense of being good faith purchasers. Neither of these issues require any factual determination. Finally, the orders involve a controlling question of law. If the Bankruptcy Court's rulings denying the dismissal of Enron's two causes of action in the Adversary Proceeding are reversed, this may result in the dismissal of these actions in their entirety.

> 45   *See In re Enron,* 333 B.R. at 215 ("Thus for purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint. Further, for purposes of this motion, the Defendants do not dispute any of the factual allegations regarding the [Transferor]. The focus of the Defendant's [sic] motion is that, even if such allegations were true, the cause of action for equitable subordination fails as a matter of law.").

[*25]   The second prong requires the Court to analyze the strength of the Intervenors' arguments to determine if there is a "substantial ground for difference of opinion." [46] The Intervenors argue that the Bankruptcy Court erred in its subordination opinion by ignoring well-established "principles of equitable subordination" found in the language of section 510(c) and its legislative history, and instead inappropriately relied on analogies to the law of assignments and the assignment of priority wage claims. [47] The Bankruptcy Court drew these analogies to support its conclusion that a transferee could enjoy no greater rights than the transferor. [48] "On the contrary, case law has affirmed the principle that under a bankruptcy proceeding, '[a]n assignee stands in the shoes of the assignor and subject to all equities against the assignor.'" [49] The Bankruptcy Court also referenced two cases holding that the assignment of a claim for wages cannot change the statutory priority of that claim; rather, the claim for wages has the same priority when held by the assignee as it would have had were it still held by the wage earner. [50]

> 46   28 U.S.C. § 1292(b).

[*26]

> 47   *See* Intervenors' Subordination Mem. at 9-16.

> 48   *See In re Enron,* 333 B.R. at 223.

> 49   *Id.* (quoting *Goldie v. Cox,* 130 F.2d 695, 720 (8th Cir. 1942) (citing *Fidelity Mut. Life Ins. Co. v. Clark,* 203 U.S. 64, 74, 27 S. Ct. 19, 51 L. Ed. 91 (1906))).

> 50   *See id.* at 223-24 (citing *Shropshire, Woodliff & Co. v. Bush et al.,* 204 U.S. 186, 189, 27 S. Ct. 178, 51 L. Ed. 436 (1907) and *In re Missionary Baptist Foundation, Inc.,* 667 F.2d 1244, 1247 (5th Cir. 1982)).

The Intervenors further argue that the analogy to the law of assignments is misguided because the Bankruptcy Court assumed the truth of its conclusion. [51] If equitable subordination is required no matter who owns the claim, then the analogy to assignment law logically follows. But if the correct interpretation of section 510(c) is that equitable subordination can only apply to a claimant because of its own wrongdoing, then the law of assignments is simply not relevant. [52]

> 51   *See* Intervenors' Subordination Mem. at 14-16.

[*27]

> 52   *See id.*

The Intervenors also argue that the Bankruptcy Court erred in interpreting section 510(c) by selectively focusing on one part of the statute and ignoring the rest. [53] Section 510(c) states: "[A]fter notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another claim. . . ." The Bankruptcy Court focused on the fact that section 510(c) mentions "claims" instead of "claimants" which the Court interpreted to mean that Congress did not intend to limit the section's application to the claimant at the time that the claim was asserted. [54] By contrast, the Intervenors point to the importance of the phrase "principles of equitable subordination" which they claim that the Bankruptcy Court failed to consider. [55]

> 53   *See id.* at 9-10.

> 54   *See id.* at 9-14. *See also In re Enron,* 333 B.R. at 225.

> 55   *See* Intervenors' Mem. at 9-10.

[*28]   The Intervenors provide a substantial and facially persuasive argument that the language of section 510(c) and its legislative history, as well as case law, indicate that the "principles of equitable subordination" do not allow the doctrine to be applied to innocent claim holders. [56] Without deciding the merits of this argument, I note that in its leading opinion on equitable subordination, the Supreme Court stated that it "need not decide

today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." [57] But the Court did state that "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." [58]

> 56    Because the Supreme Court has already explained that legislative history is useful in interpreting the meaning of the phrase the "principles of equitable subordination" in the context of section 510(c), the Court need not examine whether other avenues of interpretation have been exhausted before considering the legislative history. *See United States v. Noland,* 517 U.S. 535, 543, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996). *See also United States v. Boccagna,* 450 F.3d 107, 114 (2d Cir. 2006) ("Only if we conclude that statutory language is ambiguous 'do we resort . . . to canons of construction and, if the meaning [still] remains ambiguous, to legislative history.'") (quoting *Daniel v. American Bd. of Emergency Med.,* 428 F.3d 408, 423 (2d Cir. 2005)).

[*29]

> 57    *Noland,* 517 U.S. at 543.

> 58    *Id.*

The important question raised by the Intervenors is whether the Bankruptcy Court, in holding that equitable subordination may be applied to an innocent claim holder, impermissibly operated at "the level of policy choice" which is reserved for Congress. Intervenors make the same argument with respect to the Bankruptcy Court's holding that an innocent transferee cannot assert a good faith defense to a claim of equitable subordination. Intervenors argue that this holding contradicts the Congressional policy choice, revealed in various sections of the Bankruptcy Code, that protects the claims of innocent transferees. [59]

> 59    *See* Intervenors' Subordination Mem. at 16-18; *see also* Intervenors' Disallowance Mem. at 17-18.

Enron argues that the Bankruptcy Court's holding that transferring a claim cannot immunize it from subordination is correct "as a matter of [*30] precedent, policy, equity and common sense." [60] To reverse this holding would authorize creditors to "wash" their claims through transfer, thereby eliminating the remedy of equitable subordination, which no court decision has ever endorsed. [61] Enron maintains that the Intervenors' argument that an innocent transferee's claims can never be subordinated is erroneous. [62] As noted earlier, the Supreme Court in *Nolan* left open the question of whether there

must always be creditor misconduct before a claim may be subordinated. After *Nolan,* two appellate courts have held that in certain circumstances, such as stock redemption claims and prepetition tax penalties, creditor misconduct is not a prerequisite for the application of disallowance. [63]

> 60    Enron's Subordination Mem. at 5.

> 61    *See id.* at 26-28.

> 62    *See id.* at 32-35.

> 63    *See id.* at 33 (citing *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 224 B.R. 27, 35 (6th Cir. B.A.P. 1998) and *In re Lifschultz Fast Freight,* 132 F.3d 339, 348 (7th Cir. 1997)).

[*31]    Enron next argues that purchasers of postpetition claims are well aware of the risk that the claims they purchase may be subordinated, and protect themselves from this risk by obtaining contractual indemnities which are not available to those creditors whose claims arose prepetition. Relying on such indemnities (or other contractual rights), some Transferees in these proceedings have sued their Transferors for transferring tainted claims. [64] Enron argues that this explains why the Transferors have taken the lead in litigating this motion: "the Transferors are asking this Court to make an immediate ruling that Enron must pay 'innocent' claim assignees so that the Transferors -- despite the inequitable conduct alleged in [MegaComplaint Proceeding] -- do not have to. Nothing could be more inequitable." [65] Enron asserts that the subordination ruling correctly held that as a practical matter, it would be unduly burdensome to require bankruptcy estates to make distributions to all innocent claimants and then bring an action against transferors for recompense. Finally, Enron argues that the Congressional policy of protecting innocent transferees is best served by protecting Enron's prepetition [*32] creditors who have acted in good faith and by not requiring them to share their recoveries from the estate with creditors, or their transferees, who "acted inequitably to the innocent creditors' detriment." [66]

> 64    *See id.* at 36.

> 65    *Id.* at 27-28.

> 66    *Id.* at 41.

This summary of the various arguments reveals a substantial ground for a difference of opinion on a difficult issue of first impression in this circuit. Thus, the requirements of the second prong are met with respect to

the issues raised on the appeal of the subordination ruling.

The same is true of the disallowance ruling. The Intervenors argue that the Bankruptcy Court ignored both the plain language of, and the purpose behind, section 502(d), relying instead on its own policy preferences. [67] Section 502(d) states:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), [*33] 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(I), 542, 543, 550, or 553 of this title.

The Bankruptcy Court interpreted this statute to mean that disallowance applies to a claim without reference to its holder: "This statutory reference is to *any claim*. There is no requirement that a claim subject to a section 502(d) disallowance be related to an avoidable transfer." [68]

67  *See* Intervenors' Disallowance Mem. at 1-3.

68  *In re Enron,* 340 B.R. at 194.

The Intervenors argue that the Bankruptcy Court erroneously isolated the words "any claim" from the rest of section 502(d) and that the correct statutory reference is to "any claim of any entity that is a transferee of a transfer avoidable" under the Bankruptcy Code. [69] The statutory language does not focus on "any claim" but rather on *"any entity"* that has received [*34] an avoidable transfer. Because there are no allegations that the defendants have received any avoidable transfers, their claims cannot be disallowed by the first clause of section 502(d). This reading is further supported by the final clause of section 502(d) ("unless such entity . . . .") which explains that disallowance cannot be applied when the entity has "turned over" any transfer for which it is liable. The Intervenors argue that this last clause again shows that the focus of section 502(d) is on the entity and not the claim, because only the entity that has received the avoidable transfer is capable of turning it over so as to prevent the claims from being disallowed. [70]

69  *See* Intervenors' Disallowance Mem. at 10 (quoting § 502(d)).

70  *See id.* at 11.

The legislative history of section 502(d), as well as the case law, indicate that its purpose is to promote a fair distribution of the estate's assets by disallowing a creditor from asserting a claim until he pays the estate what he owes. [*35] [71] The Intervenors argue that this purpose is not implicated here because the Transferors who allegedly received avoidable transfers are not asserting claims against the estate while the Transferees who are asserting claims are not alleged to have improperly received transfers. [72] The Bankruptcy Court found that the coercive purpose of section 502(d) in forcing debts to be repaid could be effectively met by disallowing defendants' claims, thereby forcing them to seek indemnity from the Transferors. [73] The Transferors argue that this indirect attempt at coercion will not be effective when transferees lack indemnity agreements and that it contravenes the Congressional policy choice of protecting good faith purchasers. [74] Finally, the Intervenors claim that the Bankruptcy Court erroneously relied on policy justifications in holding that claims can be disallowed regardless of who holds them. [75]

71  *See id.* at 14-16 (citing, *inter alia, Campbell v. United States (In re Davis),* 889 F.2d 658, 662-63 (5th Cir. 1989); *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.),* 322 B.R. 440, 452 (N.D. Okla. 2003)).

[*36]

72  *See id.* at 15.

73  *See In re Enron,* 340 B.R. at 202-03.

74  *See* Intervenors' Disallowance Mem. at 17.

75  *See In re Enron,* 340 B.R. at 205 ("When one balances the harm to the other members of the injured-creditor class as against the risks to a claim-purchaser who voluntarily becomes a participant in the bankruptcy process, the interests of the other members of the injured-creditor class prevail.").

Enron, by contrast, argues that the Bankruptcy Court correctly applied the disallowance provision of section 502(d) by refusing to allow creditors to immunize their claims by transferring them. [76] Enron argues that bankruptcy law has consistently found that transferees cannot stand in any better position than their assignor. [77] For example, a creditor's rights are generally determined by reference to the petition date, such that postpetition transferors are unable to alter a claim's characteristics. [78] Enron disputes Transferors' assertion that no case before *Metiom* disallowed a transferred claim, noting that while "the Transferors may [*37] have found no *published*

2006 U.S. Dist. LEXIS 63223, *

*opinion* directly on point, [] that may mean only that no one *disputed* that transferred claims could be disallowed." [79] Finally, Enron argues that transferees can protect themselves from the risk that their claims will be disallowed through contractual provisions. But if transferred claims are not subject to disallowance, then bankruptcy estates are unprotected as they cannot prevent disreputable creditors from transferring their claims. [80] For these reasons, the disallowance motion meets the requirements of the second prong of section 1292(b) because the issues for appeal raise substantial grounds for dispute.

76    *See* Enron's Disallowance Mem. at 2-3; *see id.* at 15-16. *See also In re Metiom,* 301 B.R. at 643 (holding that allowing an assignment to immunize a claim would be a "pernicious result").

77    *See* Enron's Disallowance Mem. at 19-20.

78    *See id.* at 20.

79    *Id.* at 19.

80    *See id.* at 20-21.

The third prong is easily **[*38]** met, because granting leave to appeal both the subordination and disallowance opinions may result in the disposition of the Adversary Proceedings in their entirety. In its Adversary Complaint, Enron alleged only two causes of action, one for subordination and one for disallowance. The Bankruptcy Court ruled that both causes of action are viable. If both of these opinions are reversed, Enron's case may be dismissed.

**V. CONCLUSION**

For the foregoing reasons, the defendants and Intervenors' motions for leave to appeal are granted. The parties are to agree on and submit an expedited briefing schedule no later than September 12, 2006.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

September 5, 2006

1992 U.S. Dist. LEXIS 18817, *

**IN RE: FRANKLIN TOWNE LODGE LIMITED PARTNERSHIP, d/b/a QUALITY INN CENTER CITY; FEDOR CORPORATION, trading as FRANKLIN TOWNE LODGE LIMITED PARTNERSHIP, d/b/a QUALITY INN CENTER CITY v. COHEN, SHAPIRO, POLISHER, SHIEKMAN & COHEN v. LAWRENCE GOLDBERG, ESQUIRE and GOLDBERG and DICKMAN, P.C.**

**Civil Action No. 91-2702**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1992 U.S. Dist. LEXIS 18817**

**November 25, 1992, Decided**
**November 25, 1992, Filed and Entered**

**PRIOR HISTORY:**   [*1]  CHAPTER 11 No. 90-12608S. Adversary No. 91-0095S

**DISPOSITION:**   IT IS ORDERED that defendant's motion is denied.

**COUNSEL:** For FEDOR CORPORATION d/b/a FRANKLIN TOWNE LEDGE LIMITED d/b/a QUALITY INN CENTER CITY, PLAINTIFF: JOSEPH F. RODA, RONALD C. MESSMANN, JOSEPH F. RODA, P.C., 36 E. KING ST., 301 CIPHER BLDG, LANCASTER, PA 17602, USA.

For COHEN, SHAPIRO, POLISHER, SHIEKMAN, & COHEN, DEFENDANT: MICHAEL FALLON BROWN, BROAD AND CHESTNUT STS., 1100 P.N.B. BLDG., PHILA, PA 19107, USA. ALFRED W. PUTNAM, JR., DRINKER, BIDDLE & REATH, BROAD & CHESTNUT STREETS, 1100 P.N.B. BUILDING, PHILA, PA 19107, USA. JOSEPH F. RIGA, 1100 PHILADELPHIA NATIONAL BANK BLDG., BROAD & CHESTNUT ST., PHILADELPHIA, PA 19107.

For COHEN, SHAPIRO, POLISHER, SHIEKMAN, & COHEN, THIRD-PARTY PLAINTIFF: MICHAEL FALLON BROWN, BROAD AND CHESTNUT STS., 1100 P.N.B. BLDG., PHILA, PA 19107, USA.

For LAWRENCE GOLDBERG, THIRD-PARTY DEFENDANT: JAMES B. DOUGHERTY, JR., CARL ANTHONY MAIO, MARGOLIS, EDELSTEIN, SCHERLIS, SAROWITZ & KRAEMER, THE CURTIS CTR., 4TH FL., INDEPENDENCE SQ. WEST, PHILA, PA 19106-3304, USA.

**JUDGES:** BECHTLE

**OPINION BY:** LOUIS C. BECHTLE

**OPINION**

***MEMORANDUM and ORDER***

Presently before the court is the motion of defendant Cohen, Shapiro, Polisher, Shiekman **[*2]**  & Cohen ("Cohen, Shapiro") to strike plaintiff's demand for a jury trial. For the reasons set forth below, defendant's motion will be denied.

*Background*

In this case, the Fedor Corporation ("Fedor"), trading as Franklin Towne Lodge Limited Partnership, employed the services of Cohen, Shapiro in its effort to secure a bond refinancing from Home Unity Savings Bank ("Home Unity") for a property owned by Fedor.

On June 25, 1990, Fedor filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Thereafter, on February 4, 1991, Fedor initiated an adversary proceeding against Cohen, Shapiro by filing a complaint with the bankruptcy court alleging breach of contract and legal malpractice. Fedor's complaint alleges that Cohen, Shapiro failed in its duty to provide in a timely manner an environmental report that was necessary to secure Home Unity's commitment to refinance the bond and that such failure was a factor in Home Unity's decision to deny refinancing.

On February 12, 1991, Fedor filed an amended complaint, which incorporated the original complaint by reference and also contained an expanded statement of jurisdiction pursuant to Bankruptcy **[*3]**  Rule 7008(a). Both the complaint and amended complaint included a demand for a jury trial.

On or about March 5, 1991, Fedor filed a motion with the bankruptcy court seeking to have the reference

1992 U.S. Dist. LEXIS 18817, *

of its adversary proceeding withdrawn and to have the action reassigned to the district court pursuant to 28 U.S.C. § 157(d). Fedor's unopposed motion to withdraw the reference was granted, and the adversary proceeding was assigned to this court.

### Discussion

To determine whether the Seventh Amendment right to a jury trial attaches to a particular claim, the court must conduct an examination into the historical treatment of the plaintiff's claims at common law. [1] *Ross v. Bernhard,* 396 U.S. 531, 542-43 (1970). In addition, the court, in order to ascertain whether a proceeding is brought at law or lies in equity, must examine the nature of the remedies sought, resolving all ambiguities in favor of providing a jury trial. *Id.*

> 1    The Seventh Amendment reads:
>
>      In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury shall be otherwise reexamined in any Court of the United States, than according to the rules of common law.

[*4]  The pleadings, in this case, contain no claims for equitable relief, but, rather, assert only monetary damages for breach of contract and legal malpractice. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 477-78 (1962). A claim for breach of contract was customarily treated as legal in nature. *Id.* at 479. Moreover, a claim for legal malpractice is traditionally considered an action at law and thus the Seventh Amendment applies. *See Hodgeson v. Bigelow,* 7 A.2d 338, 342 (Pa. 1939) (professional malpractice is grounded in common law negligence principles); *Brennan v. Reed, Smith, Shaw & McClay,* 450 A.2d 740, 747 (Pa. Super. 1982) (legal malpractice liability to be determined upon common law negligence theories). Fedor, therefore, absent an express waiver, would have a Seventh Amendment right to a jury trial on its state law claims brought in this adversary proceeding.

The crux of Cohen, Shapiro's argument, however, is that a debtor, who files an adversary proceeding in bankruptcy court, simply waives its Seventh Amendment right to a jury trial solely on the basis [*5]  that the debtor initiated the petition or adversary proceeding in the bankruptcy court. In support of this argument, Cohen, Shapiro cites to *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33 (1989), in which the Supreme Court explained that by filing a claim against a bankruptcy estate, a creditor triggers the "process of allowance and disallowance of claims" that is integral to the restructuring of debtor-creditor relations, thereby subjecting himself to the bankruptcy court's equitable power. *Id.* at 58 and 59 n.14. *See*

*also Langenkamp v. Culp,* 498 U.S. 42 (1990) (claims against bankruptcy estate are integral to restructuring of debtor-creditor relationship through bankruptcy court's equity jurisdiction and thus no right to jury trial exists). By consenting to the equity jurisdiction of the bankruptcy court, the Supreme Court ruled that the creditor waived its right to a jury trial.

Cohen, Shapiro argues that the "waiver" principle of *Granfinanciera* [2] should logically apply to a debtor who files a petition in bankruptcy court and then subsequently brings an adversary proceeding alleging state [*6]  law claims. In specific, Cohen, Shapiro cites to *In re Haile,* 132 Bankr. 979 (Bkrtcy. S.D. Ga. 1991), where the court held that the debtor voluntarily selected the bankruptcy court rather than state court and thereby waived its right to a jury trial. *Id.* at 980-81. To support its ruling, the *Haile* court applied the "waiver" principle of *Granfinanciera* and *Langenkamp* to a debtor who had filed an adversary proceeding alleging state law claims. *Id.* Other courts have similarly ruled that a party, whether a creditor or debtor, waives its right to a jury trial solely on the basis of having submitted itself to the equity jurisdiction of the bankruptcy court. *See, e.g., Matter of Hallahan,* 936 F.2d 1496 (7th Cir. 1991) (debtor, who voluntarily filed for bankruptcy, has no right to a jury trial where he is a defendant in an adversary proceeding brought by plaintiff creditor).

> 2    The *Granfinanciera* Court made an important distinction that the creditor did not waive his right to a jury trial as much as he consented to the equitable jurisdiction of the bankruptcy court to hear his claim as part of the claims allowance process. *Granfinanciera,* 492 U.S. at 59 n.14.

[*7]  However, Cohen, Shapiro, the *Haile* court and the other decisions cited by Cohen, Shapiro in its motion, fail to acknowledge that the Supreme Court in *Granfinanciera* and *Langenkamp* found no Seventh Amendment right to a jury because the claims asserted by the creditor were "integral to the restructuring of the debtor-creditor relations," and thus uniquely within the equity jurisdiction of the bankruptcy court. *See Granfinanciera,* 492 U.S. at 58; *Langenkamp,* 498 U.S. at 43-44. Other courts have recognized this principle underlying the Supreme court decisions. *See, e.g., In re Glen Eagle Square, Inc.,* 132 Bankr. 106, 112 (Bkrtcy. E.D. Pa. 1991) ("the filing of a proof of claim constitutes a creditor's complete submission to bankruptcy court jurisdiction"); *In re McLaren,* 129 Bankr. 480, 483 (Bkrtcy. N.D. Ohio 1991) (debtor not entitled to jury trial where creditor sought determination that claims were nondischargeable and such determination was integral to restructuring of debtor-creditor relations); *In re Marshland Dev., Inc.,* 129 Bankr. 626, 630 (Bkrtcy. N.D. Cal. 1991)

[*8]  ("adversary proceeding was the functional equivalent of a claims objection proceeding, and thus involves public rights rather than private rights"); *In re Lion Country Safari, Inc.,* 124 Bankr. 566, 572 (Bkrtcy. N.D. Cal. 1991) (debtor voluntarily submitted to equitable jurisdiction of bankruptcy court to adjust debtor's financial relations with its creditors).

In contrast, this adversary proceeding is not equitable in nature, but rather, asserts an action at law. Both parties agree that the adversary proceeding involves non-core related issues, defined by 28 U.S.C. § 157(c), that was brought with the hope of augmenting the bankrupt estate. The claims presented by the adversary proceeding in this case are not "integral to the restructuring of the debtor-creditor relations." Moreover, the adversary proceeding presently before the court does not involve "public rights" that are part of a public regulatory scheme whose adjudication congress has assigned to a specialized court of equity, but rather, private rights that involve a dispute between private parties, Fedor and Cohen, Shapiro. *See Granfinanciera,* 492 U.S. at 51 n.8 and 55 n.10. [*9]  By asserting its private rights, Fedor has not implicitly waived its jury right by commencing an adversary proceeding in the bankruptcy court, as legal claims cannot be magically converted into equitable claims by their presentation to a court of equity. [3] *See Ross,* 396 U.S. at 538.

> 3    Similarly, the United States Court of Appeals for the Fifth Circuit has affirmed this principle. In *In re Jensen,* 946 F.2d 369 (5th Cir. 1991), the Fifth Circuit ruled that a debtor, by filing a petition in bankruptcy, does not waive its right to a jury trial for pre-petition state-law claims that are brought against a non-creditor third party to augment the bankruptcy estate. *Id.* at 374. *Accord In re Globe Parcel Serv., Inc.,* 75 Bankr. 381, 383 (Bkrtcy. E.D. Pa. 1987) (forum chosen as an arena for litigation is not dispositive on issue of whether seventh Amendment right to jury trial is waived).
>
> The Fifth Circuit distinguished another Court of Appeals decision, *In re Hallahan,* 936 F.2d 1496 (7th Cir. 1991), which was relied on by Cohen, Shapiro in its motion. The *Hallahan* court had ruled that a debtor was not entitled to a jury trial in an action brought by a creditor to determine the "dischargeability" of a debt. The court's holding was two-fold. First, *Hallahan* ruled that the dischargeability claim was "a type of equita-

ble claim for which a party cannot obtain a jury trial." *Id.* at 1505. Second, *Hallahan* ruled that, even if the proceeding were to present a legal claim, the debtor, as a defendant to an action at law, would still not have a right to a jury trial because the debtor had voluntarily submitted the petition in bankruptcy court. *Id.*

The *Jensen* Court, though agreeing with *Hallahan's* result, disagreed with the second half of the *Hallahan* reasoning that the act of filing a petition in bankruptcy somehow waived the debtor's rights to a jury trial for any subsequent actions at law. Rather, *Jensen* held that the touchstone of whether a party waived its right to a jury trial is whether the proceedings are "integral to the restructuring of debtor-creditor relations" and, thus, intimately entwined with the bankruptcy court's equity jurisdiction. *Id. See also Ross v. Bernhard,* 396 U.S. 531, 538 (1970) ("The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action.")

[*10]  Nor has Fedor affirmatively waived its Seventh Amendment right to a jury trial. There are significant constitutional concerns that govern a waiver of a constitutional right. *See Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 510 (1959) (courts must indulge in every reasonable presumption against waiver of seventh Amendment right to jury trial); *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938) (waiver of a constitutional right must be knowing, voluntary, and intelligent). This court is not satisfied that those concerns have been answered.

Upon consideration of the constitutional issues, and the reasoning set forth above, this court is unwilling to hold that Fedor has waived its Seventh Amendment right to a jury trial for the state law claims brought in the adversary proceeding. These claims constitute actions at law that are not integral to the process of allowance and disallowance of claims. For these reasons, Cohen, Shapiro's motion is *denied.*

### ORDER

AND NOW, TO WIT, this 25th day of November, 1992, upon consideration of defendant's motion to strike plaintiff's demand for a jury trial, and plaintiff's response [*11]  filed thereto, IT IS ORDERED that defendant's motion is *denied.*

LOUIS C. BECHTLE, CH. J.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. |
| v. | ) | 04-57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Kathryn S. Keller, of Campbell & Levine, LLC, hereby certify that on December 4, 2007, I caused a copy of the ***Plaintiff's Answer in Opposition of Defendant's Motion for Leave to Appeal***, to be served upon the individuals listed below via the method indicated.

| Lee E. Kaufman, Esq. | Mary K. Warren, Esq. |
|---|---|
| Russell C. Silberglied, Esq. | Michael Osnato, Esq. |
| Richards, Layton & Finger, P.A. | J. Justin Williamson, Esq. |
| | Paul R. Wickes, Esq. |
| One Rodney Square | Linklaters |
| 920 North King Street | 1345 Avenue of the Americas |
| Wilmington, DE 19801 | Nineteenth Floor |
| **VIA HAND DELIVERY** | New York, NY 10105 |
| | **VIA U.S. MAIL** |

Dated: December 4, 2007          CAMPBELL & LEVINE, LLC


                                 */s/ Kathryn S. Keller*
                                 Marla Rosoff Eskin (No. 2989)
                                 Kathryn S. Keller (No. 4660)
                                 800 N. King Street, Suite 300
                                 Wilmington, DE 19801
                                 (302) 426-1900