## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, et al., | ) Case No. 02-13396 (PJW) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. |
| v. | ) 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) **Re: Adv. Proc. D.I. No. 220** |
| | ) |
| Defendants. | ) |

## DECLARATION OF WHITMAN L. HOLT IN SUPPORT OF THE PLAINTIFF'S ANSWER IN OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO APPEAL

I, Whitman L. Holt, declare as follows:

1.    I am over 18 years of age, and I have personal knowledge of each of the facts stated in this declaration.  If called as a witness, I could and would testify as to the matters set forth below based upon my personal knowledge.

2.    I submit this declaration in support of the "Plaintiff's Answer In Opposition To Defendants' Motion For Leave To Appeal" filed by the OHC Liquidation Trust (the "**Trust**") in the above-captioned adversary proceeding (the "**Adversary Proceeding**").

3.    I am an attorney at the law firm of Stutman, Treister & Glatt, P.C., special counsel for the Trust in the Adversary Proceeding.

4.    Attached hereto as Exhibit "A" is a true and correct copy of the memorandum opinion issued by the Honorable U.S. Bankruptcy Judge Peter J. Walsh on November 15, 2007 [Adv. Proc. D.I. No. 207] (the "**Jury Trial Opinion**").

5.    Attached hereto as Exhibit "B" is a true and correct copy of the "Plaintiff's Motion To Withdraw The Reference And To Set Dates For A Pre-Trial Conference And Jury Trial Before The District Court" (the "**Motion to Withdraw Reference**"), which was filed by the Trust on November 19, 2007.

6.    Attached hereto as Exhibit "C" is a true and correct copy of the "Plaintiff OHC Liquidation Trust's Supplement To Its Rule 26(a)(1) Initial Disclosures," which was served on Defendants' counsel on May 1, 2006.

7.   During the week of October 21-27, 2007, I assisted in the preparation of various pre-trial materials in anticipation of a possible bench trial before the United States Bankruptcy Court for the District of Delaware, Walsh, J.  Among those pre-trial materials was a statement of the Trust's case, which made clear that the Trust intends to seek compensatory damages of at least $50,000,000 at trial.  On October 24, 2007, I transmitted certain of these materials, including the aforementioned statement, to, among others, Mary K. Warren, Esq. of Linklaters LLP, who is co-counsel for the Defendants in the Adversary Proceeding.

8.   During the course of the pre-trial preparation described in paragraph 7, an issue arose about whether the sole signatory/beneficiary of the purported contractual jury waiver – i.e., "Credit Suisse First Boston, New York Branch" ("**New York Branch**") – is among the defendant entities in this Adversary Proceeding.  Seeking clarity on the issue, my colleague, Scott H. Yun, Esq., and I had a telephone conference with two attorneys from Linklaters LLP (Mary K. Warren, Esq. and J. Justin Williamson, Esq.) on October 23, 2007.  During the course of this call, I expressly asked Ms. Warren whether New York Branch is or is not a defendant entity in the Adversary Proceeding.  Ms. Warren refused to answer the question.  In fact, Credit Suisse has, to date, steadfastly refused to adopt any definite position about whether New York Branch is or is not a party to this litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 4, 2007 at Los Angeles, California.

Whitman L. Holt

# Exhibit "A"

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, et al., | ) Case No. 02-13396 (PJW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Adv. Proc. No. 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Mark D. Collins
Russell C. Silberglied
Lee E. Kaufman
Christopher M. Samis
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

Marla Rosoff Eskin
Kathleen Campbell Davis
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801

2

R. Paul Wickes                          Tony Castanares
Mary K. Warren                          Stephan M. Ray
Michael J. Osnato, Jr.                  Scott H. Yun
J. Justin Williamson                    Whitman L. Holt
LINKLATERS                              Stutman, Treister & Glatt P.C.
1345 Avenue of the Americas             1901 Avenue of the Stars
New York, New York 10105                12th Floor
                                        Los Angeles, CA 90067
Attorneys for Defendants,
                                        Special Counsel for the OHC
                                        Liquidation Trust


Date: November 15, 2007

3

**Walsh, J.**

This opinion is regarding the motion of OHC Liquidation Trust ("Plaintiff" or "Trust") for determination of Plaintiff's right to a jury trial (Doc. # 198) in this adversary proceeding. Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC,(f/k/a Credit Suisse First Boston LLC), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (U.S.A.), Inc.) (collectively, "Defendants") oppose the motion. For the reasons stated below, the Court will grant the motion.

### Background

Oakwood Homes Corporation ("OHC") together with its subsidiaries and affiliates ("Debtors" or "Oakwood Companies") designed and manufactured various models of homes at a modest or affordable price. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 12). As part of their business, Oakwood Companies also provided their customers with mortgage financing or retail installment sales contracts (collectively "installment contracts"). Oakwood Companies obtained the necessary funds for the installment contracts through a two-step, asset-backed securitization process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). Defendants were the underwriter for this process. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 14). The asset-backed securitization process was commenced by Oakwood Companies using the installment contracts as collateral to

4

borrow against the warehouse facility ("Warehouse Facility")[1].
Warehouse Facility was a short-term facility used specifically to
fund the mortgages for manufactured home buyers. (Doc. # 202,
Decl. Murphy, Ex. A, ¶ 17.b). Once the Warehouse Facility had
accumulated a sufficient amount of installment contracts, usually
about $150 million to $200 million, the installment contracts were
bundled and sold to private and institutional investors through a
real estate mortgage investment trust. (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 14).

     The Warehouse Facility was one of three lines of credit
Oakwood Companies used to finance their operations; they also had
a revolving line of credit and a servicer advance facility. (Doc.
# 202, Decl. Murphy, Ex. A, ¶ 17.a-c). The Warehouse Facility was
provided by an affiliate of Bank of America until 2001. (Doc. #
202, Decl. Murphy, Ex. A, ¶ 17.b).

     Starting in 1999 the manufactured home industry was going
through a difficult period, and Oakwood Companies' businesses were
struggling. By the second half of 2000, Bank of America wanted to
cease its role as the warehouse lender. (Doc. # 202, Decl. Murphy,
Ex. A, ¶ 26). This was a critical junction for Oakwood Companies,
if they did not have the Warehouse Facility, their securitization
business would have collapsed. (Doc. # 202, Decl. Murphy, Ex. A,

---

[1] Defendants refer to the Warehouse Facility as the Loan
Purchase Facility.

5

¶ 26).  Eventually after some negotiations, Defendants agreed to assume the role of lender and agent on the Warehouse Facility.  On February 9, 2001, Oakwood Companies and Defendants signed various documents to finalize Defendants' new role.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 26).  The main document was a Class A Note Purchase Agreement ("Note Purchase Agreement").

The business continued to slump.  On November 15, 2002, Oakwood Companies filed petition for bankruptcy protection under chapter 11 of title 11 of the United State Code, 11 U.S.C. §§ 101 et seq.  (Doc. # 202, Decl. Murphy, Ex. A, ¶ 37).  Defendants filed four proofs of claim, seeking payments of fees and expenses stemming from an August 19, 2002 letter agreement ("Engagement Letter").  Pursuant to the Engagement Letter, Oakwood Companies employed Defendants as the exclusive financial advisor for the contemplated restructuring transaction.  (Doc. # 202, Decl. Murphy, Ex. B, ¶ 3).

On November 13, 2004, Plaintiff commenced the adversary proceeding by filing an Objection to the Proof of Claim and Counterclaims.  The objections and counterclaims are: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; (4) equitable subordination; (5) avoidance and recovery of 90 day preferential transfers pursuant to 11 U.S.C. §§ 547, 550; (6) avoidance and recovery of one year preferential transfer pursuant to 11 U.S.C. §§ 547, 550; (7) avoidance and recovery of fraudulent

6

transfers pursuant to 11 U.S.C. §§ 544, 550, and applicable state law; (9) breach of implied and express contract; and (10)deepening insolvency. (Doc. # 201, pp. 2-3). The alleged facts giving rise to this extensive list occurred both prior to and after the Engagement Letter. (Doc. # 198, p. 2).

Plaintiff is prepared to litigate various causes of action arising from two sets of distinct nucleus of operative facts. The first set of facts is centered around the parties' relationship pre-Engagement Letter. According to Plaintiff: (1) Prior to the Engagement Letter, Oakwood Companies and Defendants "enjoyed a close and intimate relationship," (Doc. # 198, p. 2), which presumably is because of Defendants' role as the underwriter and then a secured lender to Oakwood Companies. (Doc. # 202, Decl. Murphy, Ex. A, ¶ 11). (2) Plaintiff alleged that the trust and confidence between the parties created both a fiduciary duty and an implied advisory contract. (Doc. # 198, p. 2). (3) Defendants, however, did not exercise reasonable care in carrying out their obligations. (Doc. # 198, p. 3).

For Defendants' alleged failures, Plaintiff claims that they earned massive fees and caused substantial economic damage to the Oakwood Companies. (Doc. # 198, p. 3). For Defendants' alleged breach of fiduciary duty, negligence, and breach of implied contract claims, Plaintiff is requesting recovery of all fees and other remuneration paid to Defendants, <u>and</u> actual and consequential

7

damages.  (See Doc. # 201, pp. 4-5).

The second set of facts is based on the performance under the Engagement Letter.  Plaintiff accuses Defendants of not fulfilling their obligations under the Engagement Letter; therefore their claim should be disallowed.  Plaintiff wants to be awarded additional damages, and recovery under 11 U.S.C. §§ 547 & 548. (Doc. # 198, p. 3).

Plaintiff's complaint asserts a right to a jury trial. Plaintiff has moved to have a jury trial for the causes of action related to the first set of operative facts. (Doc. # 198, pp. 3-4). The causes of action related to the second set of facts are not covered by the motion because they relate to the allowance of Defendants' claims.  (Doc. # 198, pp. 3-4).

## Discussion

Generally, "the bankruptcy court is an appropriate tribunal for determining whether there is a right to a trial by jury of issues for which a jury trial is demanded." Official Comm. Of Unsecured Creditors v. TSG Equity Fund L.P. (In re EnvisionNet Computer Servs.), 276 B.R. 1, 6-7 (D. Me. 2002); In re Wash. Mfg. Co., 128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991).

Defendants put forth a number of grounds contesting Plaintiff's motion.  First, the types of claims and forms of relief Plaintiff is raising are equitable rights, thus there is no right to a jury trial attached.  Second, even if Plaintiff has the right

8

to jury trial it is unenforceable because the claims are part of the "claims-allowance process." Third, in connection with the Note Purchase Agreement, several of the Oakwood Companies executed contracts in which they waived the right to a jury trial. Finally, Defendants argue that because Plaintiff brought these actions in a court of equity, Plaintiff has forfeited its right to a jury trial.

Right To a Jury Trial

The right to a jury trial in a civil case is preserved in the Seventh Amendment of the U.S. Constitution. It states: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S. Const. amend. VII. As for the meaning of "suits at common law," the Supreme Court has interpreted it to mean "'suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.'" Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 40-41 (1989) (quoting Parsons v. Bedford, 3 Pet. 433, 447 (1830)). In other words, a right to a jury trial attaches to those cases involving legal right and not those involving only equitable claims and remedies. Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242, 1245 (3d Cir. 1994).

The Supreme Court in Granfinanciera provided the analytical framework to determine whether there is a right to a

9

jury trial:

> First, we compare the statutory action to
> 18th-century actions brought in the courts of
> England prior to the merger of the courts of
> law and equity.  Second, we examine the remedy
> sought and determine whether it is legal or
> equitable in nature.  The second stage of this
> analysis is more important than the first.
> If, on balance, these two factors indicate
> that a party is entitled to a jury trial under
> the Seventh Amendment, we must decide whether

Congress may assign and has assigned resolution of the relevant
claim to a non-Article III adjudicative body that does not use a
jury as fact finder.

Granfinanciera, 492 U.S. at 43.  The determination is a matter of

federal law.  Simler v. Conner, 372 U.S. 221, 222 (1963); Byrd v.

Blue Ridge Rural Elec. Coop., 365 U.S. 525, 537-39 (1958).  When a

court is deciding if there is a right to a jury trial, it must

remember that because "the right to jury trial is a constitutional

one, . . . while no similar requirement protects trials by the

court, [the court's] discretion is very narrowly limited and must,

wherever possible, be exercised to preserve jury trial.  Beacon

Theatres, Inc. v. Westover, 359 U.S. 500, 510 (1959); Turner v.

Johnson & Johnson, 809 F.2d 90,99 (1st Cir. 1986)("[I]f we must

err, we choose to do so on the side of preserving plaintiffs' right

to a jury trial."); Prudential Oil Corp. v. Phillips Petrol. Co.,

392 F.Supp. 1018, 1022 (S.D.N.Y. 1975)("[T]he inescapable teaching

of recent Supreme Court decisions is that there is a clear federal

policy in light of the Seventh Amendment favoring jury trials and

that, in doubtful cases, that policy should be favored.").

First Stage: Legal or Equitable Claims

        For the first stage of the Granfinanciera analysis, this
Court must determine whether Plaintiff's claims of negligence,
breach of implied contract, and breach of fiduciary duty would have
been considered legal or equitable claims in 18th century English
courts.   Plaintiff characterizes the negligence and breach of
implied contract claims as historically legal actions, while the
breach of fiduciary claim as an equitable claim.   (Doc. # 198, p.
10)   Defendants do not challenge the characterization in their
brief.   (Doc. # 201, pp. 7-8).   They do, however, contest that
because the negligence and breach of implied contract claims arose
from the same nucleus of operative facts as the breach of fiduciary
duty claim they are not separate and independent causes of action.
(Doc. # 202, p. 11-12).   Rather, they are just breach of fiduciary
duty claim in different names, hence, are equitable claims.

        I disagree.   The notion that a single act of malfeasance
can violate several distinct equitable and legal duties is a
fundamental principle of Anglo-American jurisprudence. See Germain
v. Conn. Nat'l Bank, 988 F.2d 1323, 1329 (2nd Cir. 1993) (stating
that both legal and equitable claims can arise from the same fact).
For example, it is possible that a jury could conclude that
although the parties enjoyed a close relationship, it was not
enough to create a fiduciary duty.   Such a finding would not
preclude a finding of negligence or of breach of contract with

respect to an implied advisory contract.  Likewise, Defendants always owed Oakwood Companies a duty of reasonable care in rendering their services, the breach of which could give rise to damages even in the absence of any fiduciary relationship.  See, e.g., Balaber-Strauss v. N.Y. Tel. (In re Coin Phones, Inc.), 203 B.R. 184, 200-01 (Bankr. S.D.N.Y. 1996).  Thus, the claims are each separate and independent, and must be characterized individually.

Plaintiff's characterization of each claim is accurate. It has been well settled that tort claims, such as negligence, are legal actions.  See City of Monterey v. Del Monte Dunes, 526 U.S. 687, 710 (stating that the Seventh Amendment covers all actions that "sound basically in tort"); Arkwright Mut. Ins. Co. v. Phila. Elec. Co., 427 F.2d 1273, 1275 (3d Cir. 1970)(stating in common law a jury is required for negligence cases);  8-38 MOORE'S FED. PRACTICE § 38.30.  This is applicable to persons as well as to corporate parties.  See, e.g., Ross v. Bernhad, 396 U.S. 531, 542 (1970)(explaining how a corporation "would have been entitled to a jury's determination, at a minimum, . . . of its rights against its own directors because of their negligence").

Claims for breach of contract, expressed or implied, are also legal rights under the common law.  Donovan v. Robbins, 579 F.Supp. 817, 822 (N.D. Ill. 1984) (claims seeking "money damages for breach of express or implied contracts . . . are clearly legal and [] the Seventh Amendment would require a jury trial as to

them"); 8-38 MOORE'S FED. PRACTICE § 38.30 ("Actions for money damages for breach of contract are legal in nature and are triable to a jury.").

Claims for breach of fiduciary duty, however, are historically equitable rights. Pereira v. Farace, 413 F.3d 330, 338 (2d Cir. 2005), cert denied, 126 S. Ct. 2286 (2006); In re Hutchinson, 5 F.3d 750, 757 (4th Cir. 1993). The best evidence in support, as Defendants point out in their brief, is that the Delaware Chancery Court still has exclusive jurisdiction to hear breach of fiduciary duty cases. Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163 (Del. Ch. 2002).

With two legal rights and one equitable right Plaintiff has a mixture of claims. In such situation "a party will not be denied a jury trial just because other claims arising out of the same facts are equitable." Germain, 988 F.2d at 1329. The "right to jury trial on the legal claims . . . must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims." Ross, 396 U.S. at 538. Meaning, "the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims." Allison v. Citgo Petroleum Corp., 151 F.3d 402, 422-23 (5th Cir. 1998); Mirant Corp. v. Southern Co., 337 B.R. 107, 120 (N.D. Tex. 2006)("[J]oinder of

equitable claims with legal claims does not deprive a party of the right to a jury trial on the legal claim."). Consequently, even though Plaintiff asserts an equitable right, under the first prong of the Granfinanciera analysis it still retains its right to a jury trial as to the two legal rights.

Second Stage: Legal or Equitable Relief

The second stage of the Granfinanciera analysis requires this Court to characterize the type of remedy sought. This stage is more important than the first stage. Granfinanciera, 492 U.S. at 42. Plaintiff argues that the relief it seeks is a legal remedy because it is for compensatory money damages. (Doc. # 198, pp. 11-12). Even though Plaintiff has a mix of legal and equitable claims, he argues that when the relief for the breach of fiduciary duty claim is a legal remedy, the "action assumes legal attributes." Mirant, 337 B.R. at 120.

Plaintiff cites the Second Circuit Court of Appeals's Pereira case in support. In Pereira, the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. 413 F.3d at 335-37. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace under the defendants' watch. Id. at 336. The defendants maintained "that they were entitled to a jury trial on the [t]rustee's beach of fiduciary duty claim because

14

the nature of the underlying action was legal and the remedy sought was compensatory damages, not equitable restitution." Id. at 337. The district court rejected this argument.   It classified the remedy as restitution, thus, equitable, and the defendants were not entitled to a jury trial.   See id. at 339.   The Second Circuit reversed the district court's holding.  Applying the Granfinanciera test, the court concluded that for the first stage the breach of fiduciary duty claim "would have been equitable in 18th century England."  Id. at 339.  For the second stage, the Second Circuit looked to Great-West Life & Annuity Insurance Company v. Knudson, 534 U.S. 204 (2002), for guidance.   In Great-West, the Supreme Court stated that "'for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.'" Pereira, 413 F.3d at 340 (quoting Great-West, 534 U.S. at 214).  Because the trustee's claim was for compensatory damages, rather than any particular property in the defendants' possession, the second prong of the Granfinanciera test rendered his suit legal in nature and required a jury trial.  Id. at 341.

Here, Defendants contend that the relief sought is  a mix of legal and equitable remedies, thus Plaintiff is not entitled to a jury trial.   (Doc. # 202, pp. 8-11).   Defendants try to distinguish the Pereira case from the present case on account that

the defendants in <u>Pereira</u> were not personally enriched from the breach of fiduciary duty, therefore, the relief was for damage. Whereas, in the present case Defendants enriched themselves and Plaintiff is seeking "classically equitable remedies, including disgorgement and equitable subordination." (Doc. # 201, p. 9).

          For support, Defendants offer <u>Cantor v. Perelman</u>, No. Civ.A.97-586-KAJ, 2006 WL 318666 (D. Del. Feb.6, 2006). In <u>Cantor</u>, the trustee sued the directors of a corporation for breach of fiduciary duty and aiding and abetting in the breach. <u>Id.</u> at *2. The trustee sought to recover "compensatory damages, including all benefits obtained by defendants as a result of their breaches of fiduciary duty or participation in breaches of fiduciary duty." <u>Id.</u> The court applied the <u>Granfinanciera</u> test. The first prong weighed against right to a jury trial because both of the plaintiff's claims were historically equitable. <u>Id.</u> at *7. The second prong resulted in a mix of equitable and legal remedy. <u>Id.</u> at *9. The court concluded, after commenting on the <u>Pereira</u> decision, that "compensatory damages" was legal in nature, while "benefits obtained by defendants" was an equitable remedy. <u>Id.</u> at *8-9. In its final balancing the court held that where the claims were equitable and the relief sought were both legal and equitable, it weighed against right to jury trial.

          The <u>Cantor</u> case is not the proper comparison for the

present case.  First, in Cantor there were only two historically equitable claims at issue; breach of fiduciary duty and aiding and abetting the same.  The court noted that its analysis would have been impacted "if at least one of Plaintiff's claims [had been] legal rather than equitable."  Id. at *7 n.7.  That is the case here.  Plaintiff has two causes of action that have always been legal in nature and one that is historically equitable.  Second, the trustee in Cantor was clearly focused on recovering specific sums received by the directors in connection with certain transactions, see id. at *1, which made the remedy equitable.  See id. at *9.  Here, in contrast, the thrust of Plaintiff's case is on remedying the alleged harm incurred by the Debtors, rather than on merely recovering illicit gains.  Thus, Cantor is distinguishable from the present case.

The more appropriate case for this Court to look to is Pereira.  Plaintiff is seeking to recover fees and other remuneration paid to Defendants, and actual and consequential damages.  This relief is very similar to the relief the trustee in Pereira sought; for monetary damage and improperly transferred fees. The Second Circuit held that to be legal relief.  Applying the Great-West test, the relief that Plaintiff is seeking is to impose personal liability on Defendants for the damage they have caused, it is not to recover any particular fund that Defendants have in their possession.  Thus, the relief Plaintiff seeks is

compensatory monetary damages, which is "the classic form of legal relief." <u>Great-West</u>, 534 U.S. at 210 (quoting <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 255 (1993)); <u>see also, e.g.</u>, <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469, 477 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed."); <u>Billing</u>, 22 F.3d at 1245.

Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has right to a jury trial. Plaintiff in this case has presented two legal and one equitable claim and is seeking legal relief. Thus, the weighing clearly favors Plaintiff having the right to a jury trial. In sum, after balancing the two prongs of the <u>Granfinanciera</u> analysis, this Court holds that Plaintiff has the right to a jury trial.

<u>Third Stage: Claim-allowance Process or Not</u>

The third step in the <u>Granfinanciera</u> analysis is to determine whether this is a matter that Congress has assigned to a non-Article III court for adjudication without a jury. The Third Circuit has extrapolated from this prong an embedded limitation on the Seventh Amendment right. <u>Billing</u>, 22 F.3d at 1247. The limitation arises when a cause of action "falls within the process of the allowance and disallowance of claims." <u>Id.</u> at 1253. There, neither the debtor's estate nor the defendant has a Seventh

18

Amendment right to trial by jury "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." Id.; Germain, 988 F.2d at 1330 ("For waiver to occur, the dispute must be part of the claims-allowance process.... Even there the right to a jury trial is lost not so much because it is waived, but because the legal dispute has been transformed into an equitable issue."). This limitation originated from Katchen v. Landy, 382 U.S. 323 (1966). The Supreme Court in Katchen noted that part of Congress's intent for the Bankruptcy Act of 1898 was to place the resolution of disputed claims in summary proceeding in the bankruptcy court rather than proceeding at law. Id. at 329; see Billing, 22 F.3d at 1247. It was intended to promote expediency and judicial efficiency. See Katchen, 382 U.S. at 328.

Plaintiff asserts that the subject counterclaims are not part of the claim-allowance process and offers two reasons in support. First, the causes of action are unrelated to the Engagement Letter and are not products of the Bankruptcy Code. Instead, they are state law claims that could have been asserted by Oakwood Companies against Defendants prior to the Engagement Letter. (Doc. # 198, p. 18). Second, the success or failure of Plaintiff's counterclaims would not affect the allowance or disallowance of Defendants' claims under 11 U.S.C. § 502(d). (Doc. # 198, p. 18). If Plaintiff succeeds or fails on its non-bankruptcy legal claims, only the size of the Debtors' estate would

19

be affected.

Defendants hold the opposing view.  They contend that Plaintiff's counterclaims are in response to Defendants' proofs of claim, and the relief Plaintiff seeks is a resolution of Defendants claims.  (Doc. # 201, p. 18).  They also argue that when Plaintiff requested the Court to disallow or otherwise equitably subordinate Defendants' proofs of claim it has invoked and submitted to the equitable jurisdiction of this Court.  (Doc. # 201, p. 15).  According to Defendants, the fact that Plaintiff seeks affirmative recovery on his counterclaims and could have brought his counterclaims in other forum does not affect their conclusion. (Doc. # 201 pp. 15, 18).

Claim-allowance process means that "the resolution of the dispute in which a jury trial is sought must affect the allowance of the creditors's claim in order to be part of that process." Germain, 988 F.2d at 1327.  An action that "would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process."  Id. The action is only augmenting the estate "if [the trustee] wins, the estate is enlarged, and this may affect the amount . . . creditors ultimately recover on their claims, but it has no effect whatever on the allowance of the [defendant's] claim."  Id. Generally, lender liability actions augment the estate.  Id.

The Court is persuaded that the subject counterclaims are

20

not part of the claim-allowance process.  As Plaintiff carefully
points out in its motion, the claims that Defendants assert arise
from the Engagement Letter, whereas the subject counterclaims that
Plaintiff asserts originate from the period prior to the Engagement
Letter.  The subject counterclaims are based on the financial
institutions' alleged misconduct, separate from Defendants' proofs
of claim for services performed pursuant to the Engagement Letter.
Furthermore, Plaintiff's subject counterclaims only augment the
estate.  Plaintiff may raise the counterclaims in a separate trial,
under applicable state law, and succeed on some or all of the
counterclaims, yet it would not affect the allowance of Defendants'
claims.  The only effect that will result is that if it wins, the
estate will be augmented by the compensatory monetary damage from
Defendants.  Thus, Plaintiff's counterclaims are not part of the
claim-allowance process, and do not limit its right to a jury
trial.

Legal Claims in a Court of Equity

As for Defendants' argument that Plaintiff submitted
itself to the equitable jurisdiction of this Court by raising these
counterclaims, the Court does not agree.  Defendants argue that the
Trust's choice to combine claim objections with affirmative
litigation before this Court somehow makes the entire adversary
proceeding part of the claims-allowance process or otherwise
triggered a categorical submission to the equitable jurisdiction of

this Court.

Circuits are split on Defendants' core proposal - that any adversary proceeding filed by the representative of a debtor's estate in a bankruptcy court, rather than in some alternative forum, categorically eliminates any and all of the estate's jury trial rights forever. See Germain, 988 F.2d 1330 ("We conclude that neither precedent nor logic supports the proposition that either the creditor or the debtor automatically waives all right to a jury trial whenever a proof of claim is filed."); In re Jensen, 946 F.2d 369, 373-74 (5th Cir. 1991) (debtor's petition in the bankruptcy court does not affect its right to a jury trial). But see N.I.S Corp. v. Hallahan (In re Hallahan), 936 F.2d 1496, 1505 (7th Cir. 1991) (holding debtor consented to jurisdiction by filing bankruptcy petition and thereby waived right to jury trial); Bayless v. Crabtree Through Adams, 108 B.R. 299, 305 (Bankr. W.D. Okla. 1998), aff'd, 930 F.2d 32 (10th Cir. 1991) (holding legal assertions, otherwise subject to jury trial, brought by trustee or debtor are "open to adjudication in equity by Bankruptcy Judges under their power to afford complete relief").

> The Third Circuit has not adopted Defendant's position.
>
> The fact that the debtor may have voluntarily submitted itself to the bankruptcy court's equitable jurisdiction does not complete the analysis.  A court must also ask whether the resolution of the particular dispute at issue is necessarily part of the process of the disallowance and allowance of claims.  See Katchen, 382 U.S. at 336, 86 S.Ct. at 476.

22

<u>Billing</u>, 22 F.3d at 1252, n. 14.    This Court believes that Defendants' core proposal flies in the face of the Supreme Court's clear instruction that "legal claims are not magically converted into equitable issues by their presentation to a court of equity." <u>Ross</u>, 396 U.S. at 538.    Thus, the Court rejects Defendants' position.

<u>Contractual Waiver of Jury Trial</u>

The last ground that Defendants raise in opposition is that Plaintiff contractually waived its right to a jury trial.  In connection with the Note Purchase Agreement, on February 9, 2001, two Oakwood Companies (OHC and Oakwood Acceptance Corporation, LLC) executed agreements with a Credit Suisse entity.  Those agreements contain a jury trial waiver whereby each party

> HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LEGAL ACTION OR PRECEDING RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER DOCUMENT OR INSTRUMENT RELATED HERETO AND FOR ANY COUNTERCLAIM THEREIN.

(Doc. # 202, Decl. Murphy, Ex. E, p. 6).  According to Defendants, Plaintiff, in charge of liquidating the Debtors' estates, is the successor in interest to these two Oakwood Companies, and is prohibited by the waiver from seeking a jury trial on any claims "related directly or indirectly to the Note Purchase Agreement or any of the contracts related thereto under the loan purchase facility."  (Doc. # 201, p. 22).

There are several reasons why this contractual waiver does not apply here. The first is the identity of the contracting parties. The purported waiver only involves two of the Debtors. The Trust succeeded to the rights of fifteen Debtor entities[2] pursuant to a plan of reorganization that effected a substantive consolidation of all the Debtors. The Credit Suisse entity that is a party to the two agreements bears the name of "Credit Suisse First Boston, New York Branch," as agent for the warehouse facility. (Doc. # 202, Decl. Murphy, Ex. "D" at signature page, Ex. "E" at signature page.) None of Defendants here bear that name.

In their answer to the complaint (Doc. # 132), Defendants very carefully note their separateness. Footnote 1 on p. 2 of the answer states:

> The Defendants' use of "Defendants" to refer to the named Credit Suisse affiliated defendants is used for convenience only and is not an admission that any one of the Defendants is not a distinct and separate entity, or that any one of the Defendants is responsible for the liabilities of any other Defendant. Nor is any reference to "Defendants" an admission that any Defendant named or referenced in the Complaint

---

[2] These are: Oakwood Homes Corporation, Oakwood Mobile Homes, Inc., Oakwood Acceptance Corporation, LLC, HBOS Manufacturing, LP, Suburban Home Sales, Inc., FSI Financial Services, Inc., Home Service Contract, Inc., Tri-State Insurance Agency, Inc., New Dimension Homes, Inc., Dreamstreet Company, LLC, Golden West Leasing, LLC, Crest Capital, LLC, Oakwood Shared Services, LLC, Preferred Housing Services, LP, and Oakwood MHD4, LLC.

24

> participated in any of the acts alleged in the
> complaint, except as specifically admitted
> herein.

In their response to the motion, Defendants specifically identify "Credit Suisse Securities (USA), LLC" as the target of the jury trial counts: "The remaining claims - on which the Trust now seeks a jury trial - are claims arising out of the relationship between Oakwood and [Credit Suisse Securities (USA), LLC] prior to August, 2002." (Doc. # 201, p. 7). Obviously, Credit Suisse Securities (USA), LLC is not a party to the two agreements containing the jury trial waiver and thus it has no standing to enforce the waiver even if the Trust were bound by the commitment of two of the fifteen Debtors.

It is fundamental that, "[g]enerally, a jury waiver provision in a contract or lease affects only the rights of the parties to that contract or lease," Hulsey v. West, 966 F.2d 579, 581 (10th Cir. 1992) (guarantor of corporate loan was not bound by jury waiver in an agreement that he did not execute in his personal capacity). Thus, Defendants, including Credit Suisse Securities (USA), LLC, cannot all claim shelter in a waiver signed only by Credit Suisse First Boston, New York Branch. Nor can that waiver diminish the rights of thirteen Debtors that did not sign it - rights that now belong to the Trust.

Even if one were to ignore the "New York Branch"

25

identification, the result remains the same.  If the two agreements are read to intend that the Credit Suisse entity is simply "Credit Suisse First Boston, a Swiss banking corporation," the caption of this case identifies "Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation)" as a Defendant, but Defendants acknowledge that the target of the jury trial counts is the Defendant "Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC)."

The second problem relates to the scope of the waiver itself.  At its broadest, the waiver pertains only to an action "relating directly or indirectly to" the agreements establishing the Warehouse Facility.  But the legal claims are not about any breach of those agreements, or about whether Credit Suisse First Boston, New York Branch adequately performed thereunder.  Rather, it is about whether Defendants breached far broader duties, not arising from any written contract, by partaking a myriad of alleged illicit transactions with the Oakwood Companies.

Because this action is about much more than the Warehouse Facility and related agreements, it falls outside the scope of the purported waiver.  Other courts have reached the same conclusion in similar circumstances.  See, e.g., Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp., 913 F. Supp. 1088, 1146-47 (N.D. Ill. 1995) (broad jury waiver in "Distributor Agreement" did not encompass any "claims that do not directly arise or have their basis in the

26

Distributor Agreement"); <u>Nat'l Acceptance Co. v. Myca Prods., Inc.</u>, 381 F. Supp. 269, 269-70 (W.D. Pa. 1974) (jury waiver in loan agreement purporting to affect "any action" between the parties did not apply to claim alleging breach of a separate oral agreement); <u>see also</u> <u>OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)</u>, 340 B.R. 510, 519-20 (Bankr. D. Del. 2006) (indemnification provision of August 19 Contract does not apply to actions for breach of independent, non-contractual duties).  The purported contractual waiver is far too limited to apply here.

⎯⎯⎯⎯⎯⎯⎯The final problem with Defendants' contractual waiver theory is that Defendants have not proffered any evidence to meet their burden of showing that there was no gross disparity in power between the two Oakwood Companies and Credit Suisse First Boston, New York Branch.

⎯⎯⎯⎯⎯⎯⎯The Supreme Court and the Third Circuit all agree that "because the 'right of jury trial [in a civil case] is fundamental, courts [should] indulge every reasonable presumption against waiver.'" <u>Tracinda Corp. V. DaimlerChrysler AG.</u>, 2007 U.S. App. LEXIS 22221, *22-23 (3d Cir. Sept. 18, 2007) (quoting <u>Aetna, Inc. v. Kennedy</u>, 301 U.S. 3890, 393 (1937)); <u>Collins v. Gov't of Virgin Islands</u>, 366 F.2d 279, 284 (3d Cir. 1966).  A valid, enforceable waiver clause must meet the knowing and voluntary standard, which requires that: (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business

entities; (3) the parties had opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous. <u>First Union Nat'l Bank v. United States</u>, 164 F.Supp. 2d 660, 663 (E.D. Pa, 2001); <u>Tracinda Corp.</u>, 2007 U.S. App. LEXIS 22221 at *23. Given the presumption against waiver "the burden of proving that a waiver was done knowingly and intelligently falls upon the party seeking enforcement of a waiver . . . clause." <u>First Union Nat'l Bank</u>, 164 F.Supp. 2d at 663.

In this case Defendants bear the burden of proving the waiver clause is enforceable. Looking at the factors, there is no question as to the sophistication and intelligence of the parties who entered into the agreements. Question arises, however, regarding the bargaining positions of the parties when they entered into the Note Purchase Agreement.

Plaintiff points to a video deposition by Mr. Douglas R. Muir, a officer of OHC. In the deposition Mr. Muir stated that finding a successor facility to its then credit providers, Bank of America, was critical and had to be done. (Doc. # 204, Decl. Holt, Ex. B, at 52:13-16). However, there was not "a half a dozen credit providers lined up at the door, each of which was offering to do [the] transaction. At the time [Defendants] w[ere] the only game in town." (Doc. # 204, Decl. Holt, Ex. B, at 51:13-16). Additionally, there was pressure from Bank of America to take it out of the facility, or it would have charged Oakwood Companies

28

large fees.    (Doc. # 204, Decl. Holt, Ex. B, at 52:6-12).    Given

the critical nature of the transaction, the lack of candidates, and

the pressure from Bank of America, there is a good argument that

the two Oakwood Companies were at a severely disadvantaged

bargaining possession.    Thus, they did not have any leverage to

fairly negotiate the terms of the Note Purchase Agreement.    Because

Defendants did not offer any evidence to the contrary, Defendants

failed to meet its burden of proof that the parties had equal

bargaining position.    Consequently, because this Court must

construe the waiver narrowly and any ambiguity is to be decided

against the waiver, the waiver is not enforceable here.

## **Conclusion**

For the reasons stated above, Plaintiff's motion for

determination of Plaintiff's rights to a jury trial is granted.

Plaintiff does have the right to a jury trial on three of its 10

counts.

# Exhibit "B"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Oakwood Homes Corporation, et al., | ) Case No. 02-13396 (PJW) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| _____ | ) |
| OHC Liquidation Trust, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. |
| v. | ) 04-57060 (PJW) |
| | ) |
| Credit Suisse (f/k/a Credit | ) |
| Suisse First Boston, a Swiss | ) |
| banking corporation), Credit | ) |
| Suisse Securities (USA), LLC | ) |
| (f/k/a Credit Suisse First | ) |
| Boston LLC), Credit Suisse | ) |
| Holdings (USA), Inc. (f/k/a | ) |
| Credit Suisse First Boston, | ) |
| Inc.), and Credit Suisse (USA), | ) |
| Inc. (f/k/a Credit Suisse First | ) |
| Boston (U.S.A.), Inc.), the | ) |
| subsidiaries and affiliates of | ) |
| each, and Does 1 through 100, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**PLAINTIFF'S MOTION TO WITHDRAW THE REFERENCE**
**AND TO SET DATES FOR A PRE-TRIAL CONFERENCE AND JURY TRIAL**
**BEFORE THE DISTRICT COURT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..........................................2

SUMMARY OF PROCEEDINGS BEFORE THE BANKRUPTCY COURT ..............3

ARGUMENT ......................................................11

    A.   Plaintiff Has A Seventh Amendment Right To A
        Jury Trial. ........................................13

    B.   The Adversary Proceeding Is Now "Trial Ready." .......14

    C.   Considerations Of Judicial Economy Favor
        Withdrawing The Reference As To The Entire
        Adversary Proceeding. ..............................16

CONCLUSION ....................................................22

**TABLE OF AUTHORITIES**

<u>CASES</u>

*In re Adelphi Inst., Inc.,*
    112 B.R. 534 (S.D.N.Y. 1990) .............................. 12

*Century Glove, Inc. v. First Am. Bank,*
    860 F.2d 94 (3d Cir. 1988) ................................ 21

*Citicorp Venture Capital v. Comm. of Creditors*
    *Holding Unsecured Claims,*
    160 F.3d 982 (3d Cir. 1998) .............................. 17

*Cong. Credit Corp. v. AJC Int'l, Inc.,*
    42 F.3d 686 (1st Cir. 1994) .............................. 16

*Dairy Queen, Inc. v. Wood,*
    369 U.S. 469 (1962) ...................................... 19

*Gray v. Solvay Polymers, Inc. (In re Dooley Plastic*
    *Co.),*
    182 B.R. 73 (D. Mass. 1994) .............................. 11

*Growe v. Bilodard Inc.,*
    325 B.R. 490 (D. Me. 2005) ............................... 11

*In re Hardesty,*
    190 B.R. 653 (D. Kan. 1995) .............................. 11

*Kowal v. Malkemus (In re Thompson),*
    965 F.2d 1136 (1st Cir. 1992) ............................ 21

*Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins.*
    *Servs.,*
    388 F. Supp. 2d 292 (S.D.N.Y. 2005) ..................... 17

*Michaelesco v. Shefts,*
    303 B.R. 249 (D. Conn. 2004) ......................... 12, 15

*Mirant Corp. v. Southern Co.,*
    337 B.R. 107 (N.D. Tex. 2006) ............................ 16

*NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),*
    203 B.R. 905 (D. Del. 1996) ........................... 11, 12

*OHC Liquidation Trust v. Credit Suisse First Boston*
    *(In re Oakwood Homes Corp.),*
    340 B.R. 510 (Bankr. D. Del. 2006) ....................... 5

*Peachtree Lane Assocs. v. Granader,*
    175 B.R. 232 (N.D. Ill. 1994) ............................ 11

*Shubert v. Julius Kraft Co. (In re Winstar Commc'ns, Inc.),*
    321 B.R. 761 (D. Del. 2005) ........................... 12, 15

*Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.),*
    335 B.R. 539 (D. Del. 2005) ............................... 17

*In re Tastee Donuts, Inc.,*
    137 B.R. 204 (E.D. La. 1992) .............................. 16

*Travelers Cas. & Sur. Co. v. Skinner Engine Co. (In re Am. Capital Equip., LLC),*
    325 B.R. 372 (W.D. Pa. 2005) ............................. 12

*United Orient Bank v. Green (In re Green),*
    200 B.R. 296 (S.D.N.Y. 1996) ............................. 16

*Wakefern Food Corp. v. C&S Wholesale Grocers, Inc. (In re Big V Holding Corp.),*
    No. 01-233 (GMS), 2002 U.S. Dist. LEXIS 12609 (D. Del. July 11, 2002) ............................... 12, 13

## STATUTES AND RULES

28 U.S.C. § 157(d) ......................................... *passim*

28 U.S.C. § 157(e) ............................................. 13

FED. R. CIV. P. 38(b) ........................................... 4

FED. R. BANKR. P. 5011(a) ....................................... 1

FED. R. BANKR. P. 9015(a) ....................................... 4

D. Del. LR 51.1(a) ............................................ 14

Del. Bankr. L.R. 5011-1 ........................................ 1

Pursuant to 28 U.S.C. § 157(d), Federal Rule of Bankruptcy Procedure 5011(a), and Rule 5011-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware,[1] Plaintiff OHC Liquidation Trust (**"Plaintiff"**), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby moves to (1) withdraw the reference of the entire above-captioned adversary proceeding[2] (the **"Adversary Proceeding"**), which is currently pending before the U.S. Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**); and (2) set dates for a pre-trial conference and jury trial before the U.S. District Court for the District of Delaware (the **"District Court"**) so that this case may proceed apace.

---

[1]  Although Plaintiff's right to a jury trial on three "trial ready" counterclaims, combined with basic considerations of judicial economy, provides the basis (or "cause") for withdrawal of the reference here, Plaintiff has nevertheless complied with Local Rule 5011-1 by filing a concurrent motion with the Bankruptcy Court to determine whether this proceeding is "core." Because the "core"/"non-core" distinction is not a basis to withdraw the reference in this particular instance, and because the resolution of that issue should not alter the outcome of the instant motion, Plaintiff has also requested that the Bankruptcy Court decline to require extensive briefing on the question and instead inform the District Court that the instant motion can be promptly decided solely on the basis of the papers filed with the District Court.

[2]  Specifically, Plaintiff now moves to withdraw the reference as to Adversary Proceeding No. 04-57060 (PJW), currently pending before the Honorable U.S. Bankruptcy Judge Peter J. Walsh. Items on the docket sheet for the Adversary Proceeding are cited herein as "Adv. Proc. D.I. No. __"; a "Record Appendix" including copies of all the cited material will be provided to the District Court.

## **PRELIMINARY STATEMENT**

This motion stems from an adversary proceeding that has been actively litigated before the Bankruptcy Court and is now ready for the final jury trial phase of the case. During this time, (i) all the parties' consensual and court-approved deadlines for discovery and dispositive motions have passed; (ii) both sides affirmed to the Bankruptcy Court (and to each other) that they are "trial ready"; and (iii) the case was just weeks before trial in the Bankruptcy Court were that court to rule there was no right to a jury trial. Prior to the entry of a pre-trial order, however, the Bankruptcy Court ruled that Plaintiff has a constitutional right to try certain claims against the Defendants in the Adversary Proceeding (collectively, "**Defendants**" or "**Credit Suisse**") before a jury.

Because the Bankruptcy Court has not been authorized to conduct jury trials, and Credit Suisse will not consent to such a trial in any event, Plaintiff's Seventh Amendment rights will be validated only if a jury trial is conducted by the District Court. This fact constitutes sufficient (and in this case dispositive) "cause" to withdraw the reference. Moreover, considerations of judicial economy clearly favor withdrawal as to the entirety of the proceeding. Thus, given that both sides agree that the Adversary Proceeding is "trial ready," it is now proper for the reference to be withdrawn.

## SUMMARY OF PROCEEDINGS BEFORE THE BANKRUPTCY COURT

On November 15, 2002 (the "**Petition Date**"), Oakwood Homes Corporation ("**Oakwood**") and certain of its affiliates (collectively, the "**Debtors**" and together with the non-Debtor affiliates, the "**Oakwood Entities**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The remaining Debtors filed for chapter 11 protection on March 5, 2004.  The Debtors' chapter 11 cases were jointly administered before the Bankruptcy Court as Case No. 02-13396 (PJW).

By order entered on March 31, 2004, the Bankruptcy Court confirmed the Debtors' "Second Amended Joint Consolidated Plan of Reorganization of Oakwood Homes Corporation and Its Affiliated Debtors and Debtors in Possession" (the "**Plan**").  Plaintiff is the Debtors' successor in interest pursuant to the Plan and the related Liquidation Trust Agreement dated April 13, 2004.

Defendant Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC) ("**CSS**") filed four identical proofs of claim in the Debtors' bankruptcy cases.  In those proofs of claim, CSS asserted an entitlement to various liquidated and unliquidated amounts, *all* of which stemmed from a certain letter agreement dated August 19, 2002 (the "**August 19 Contract**"), which agreement was attached as an exhibit to the rider CSS filed with its proofs of claim.

3

Plaintiff commenced the Adversary Proceeding on November 13, 2004 via an objection to CSS's proofs of claim, which objection was coupled with ten counterclaims against the Defendants (the "**Objection/Counterclaims**" [Adv. Proc. D.I. No. 1]).  Plaintiff's counterclaims included claims against CSS and the other Credit Suisse Defendants for malfeasance unrelated to the August 19 Contract, including for breach of fiduciary duty, negligence, and breach of implied contract. (*See* Objection/Counterclaims at ¶¶ 47-54, 92-96.)  The Objection/Counterclaims contained numerous allegations of fact that pre-dated the parties' execution of the August 19 Contract.  (*See, e.g., id.* at ¶¶ 11, 18-32.)  The cover page of the Objection/Counterclaims explicitly stated "**JURY TRIAL DEMANDED**," a point Plaintiff reiterated in the pleading's text (*see id.* at ¶ 3 ("Plaintiff demands a jury trial of any issue triable by a jury.")), and via a separately attached document entitled "**DEMAND FOR JURY TRIAL**" (*see id.* at p. 38).  This constituted a timely jury demand pursuant to Federal Rule of Civil Procedure 38(b), made applicable to the Adversary Proceeding by Federal Rule of Bankruptcy Procedure 9015(a).

Defendants filed a motion to dismiss certain counts of the Objection/Counterclaims, which motion was denied by the Bankruptcy Court on March 31, 2006 as to all but one of Plaintiff's ten counterclaims (more specifically, the motion

was left pending as to the claim for "deepening insolvency")
[Adv. Proc. D.I. Nos. 127-128; *see also OHC Liquidation Trust
v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, 340
B.R. 510 (Bankr. D. Del. 2006)].  Defendants subsequently
filed their "Answer and Affirmative Defenses" (the **"Answer"**
[Adv. Proc. D.I. No. 132]).

        In the Answer, Defendants denied that Plaintiff has
any rights to a jury trial.  (*See id.* at ¶ 3.)  Nevertheless,
Defendants did not then move to strike Plaintiff's timely
demand for a jury trial – indeed, they ***never*** moved to strike
or otherwise raised the issue before the Bankruptcy Court.

        On July 7, 2005, the Bankruptcy Court entered a
Scheduling Order (the **"Scheduling Order"** [Adv. Proc. D.I. No.
42]) to govern the timing of initial disclosures and fact
discovery in the Adversary Proceeding.  Pursuant to the
Scheduling Order, discovery in the form of document requests,
interrogatories, depositions, and requests for admissions was
to begin in August 2005 and conclude in November 2006.
Although some contentious discovery disputes arose along the
way, and although certain limited agreed exceptions allowed
some fact discovery to proceed after November 2006, virtually
all of the parties' fact discovery was completed by November
30, 2006, and ***all*** discovery was completed by October 22, 2007.

In connection with a status conference before the Bankruptcy Court on September 25, 2006, the parties negotiated and filed a status conference report (the **"2006 SCR"** [Adv. Proc. D.I. No. 159]). In the 2006 SCR, the parties consensually agreed to certain cut-off deadlines for the completion of expert discovery and for the filing of any motions for summary judgment. (*See* 2006 SCR at p. 2.) At the September 25, 2006 status conference, the Bankruptcy Court approved the deadlines set forth in the 2006 SCR and preliminarily set the week of November 5, 2007 for trial.

Following the September 25, 2006 status conference, the parties completed the remainder of the discovery process and engaged in multiple settlement discussions. Such talks ultimately proved unsuccessful – the parties were not able to reach any consensual resolution of the Adversary Proceeding.

In connection with the parties' settlement discussions, Defendants requested an extension of the expert discovery deadlines, which extension was (i) agreed to by Plaintiff and (ii) approved by the Bankruptcy Court. (*See* Adv. Proc. D.I. Nos. 172-173.) Plaintiff served two initial expert reports by the deadline on April 30, 2007. (*See* Adv. Proc. D.I. No. 175.) Defendants filed no expert reports by the April 30 deadline.

In June 2007, the parties again attempted to settle the Adversary Proceeding.  In connection with these discussions, Defendants requested a second extension of the deadline for their submission of "rebuttal" expert reports. Plaintiff again agreed to, and the Bankruptcy Court again approved, Defendants' requested extension.  (*See* Adv. Proc. D.I. Nos. 178-179.)  Notwithstanding this further extension, Defendants filed no expert report by the July 18 deadline. Rather, Defendants filed a discovery motion, which motion the Bankruptcy Court resolved via a letter ruling dated September 13, 2007 (the **"Letter Ruling"** [Adv. Proc. D.I. No. 194]).

Defendants timely completed a deposition of one of Plaintiff's experts, Dr. Alan Shapiro, by September 10, 2007. The deposition of the other expert, Dr. Michael Tennenbaum, was delayed on account of the Defendants' discovery motion.

Following the Letter Ruling, the parties negotiated and filed a status conference report (the **"2007 SCR"** [Adv. Proc. D.I. No. 195]) in anticipation of a status conference before the Bankruptcy Court on October 4, 2007.  In the 2007 SCR, the parties agreed that Defendants would depose Dr. Tennenbaum by October 22, 2007, and that "[f]ollowing the completion of the expert discovery process . . ., the parties believe that this adversary proceeding will be nearly 'trial ready.'"  (*See* 2007 SCR at pp. 1-2.)

The 2007 SCR further provided that, notwithstanding their repeated failure to meet the previously-agreed deadlines, Defendants would have until October 4, 2007 to decide whether to submit any expert "rebuttal" reports. (*See id.* at p. 1.) Via an e-mail dated October 3, 2007, Defendants' counsel informed Plaintiff's counsel that Defendants decided not to submit any expert witness reports.

The 2007 SCR also noted a residual issue which stemmed from the fact that "Plaintiff has timely demanded a jury trial on all issues triable by jury" but "Defendants do not consent to a jury trial conducted by this [Bankruptcy] Court." (*See id.* at p. 2.) Unmoved by this open issue, Defendants stated in the 2007 SCR that they were "prepared to proceed to trial before this [Bankruptcy] Court on November 5, 2007, and object to any delay." (*Id.*)

The parties' long-agreed September 14, 2007 deadline for summary judgment motions passed without either side filing any motions for summary judgment.

On October 4, 2007, the parties attended a status conference before the Bankruptcy Court.[3] At this conference:

---

[3] A true and correct copy of the official transcript for the October 4, 2007 status conference [Adv. Proc. D.I. No. 206] is attached as Exhibit "A" to the accompanying Declaration of Whitman L. Holt and is cited herein as "SC Tr. at __."

- The parties informed the Bankruptcy Court of Defendants' decision not to rely on any expert witnesses, including as "rebuttal" witnesses to Plaintiff's experts.  (*See* SC Tr. at 3:23 - 4:2.)

- The Defendants' counsel explained to the Bankruptcy Court that Defendants had intentionally decided not to file any summary judgment motions by the parties' long-agreed deadline.  (*See id.* at 8:9-13.)

- The Defendants' counsel informed the Bankruptcy Court of Defendants' belief that the Adversary Proceeding was "essentially trial ready."  (*See id.* at 6:13-15.)

- Plaintiff's counsel likewise informed the Bankruptcy Court that Plaintiff believed the Adversary Proceeding would be "entirely ready for trial" following the close of expert discovery on October 22, 2007.  (*See id.* at 4:2-8.)

- Notwithstanding its readiness for trial, Plaintiff's counsel explained that Plaintiff believed it had a constitutional right to a jury and, since the matter was nearly "trial ready," would promptly move to withdraw the reference if the Bankruptcy Court so determined.  (*See id.* at 4:7 – 5:12; 17:14-25.)

- After a brief colloquy between the Bankruptcy Court and counsel, the Bankruptcy Court agreed to set an expedited briefing schedule whereby the parties could set forth their respective positions about Plaintiff's rights to a jury trial *vel non*.  (*See id.* at 16:7 – 17:3; *see also* Adv. Proc. D.I. No. 200 (order setting forth briefing schedule regarding jury trial issue).)

- Pending the outcome of the parties' briefing regarding the jury trial issue, the Bankruptcy Court scheduled preliminary dates for the submission of a pre-trial order, a pre-trial conference, and a bench trial before the Bankruptcy Court.  (*See* SC Tr. at 18:17 – 19:13; *see also* Adv. Proc. D.I. No. 200 (order setting certain trial-related deadlines).)

Consistent with the October 4, 2007 status conference and the Bankruptcy Court's subsequent order, the parties filed lengthy and detailed briefs setting forth their respective positions regarding whether Plaintiff has a constitutional right to a jury trial. (*See* Adv. Proc. D.I. Nos. 198, 201, 203.) Likewise, Defendants completed their final expert deposition (of Dr. Tennenbaum) by the October 22, 2007 deadline. Thus, as of the conclusion of that deposition, *all* discovery in this Adversary Proceeding has been completed and *all* agreed deadlines for dispositive motions have run.

On October 25, 2007 – one day prior to the deadline for the parties to file a draft pre-trial order – the Bankruptcy Court scheduled a telephonic conference at which the parties were informed of the Bankruptcy Court's tentative ruling that Plaintiff has a constitutional right to a jury trial on certain of its claims. Following this conference, the parties agreed that deadlines related to the trial preparation process would be suspended pending the Bankruptcy Court's ruling and proceedings before the District Court.

On November 15, 2007, the Bankruptcy Court issued a detailed memorandum opinion (the "**Jury Trial Opinion**" [Adv. Proc. D.I. No. 207; Holt Decl. Ex. "B"]) in which the Bankruptcy Court held that Plaintiff has the constitutional

right to a jury trial with respect to three of its counterclaims; specifically, the counterclaims for breach of fiduciary duty, negligence, and breach of implied contract.

## ARGUMENT

Pursuant to 28 U.S.C. § 157(d), the District Court "may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  A party's fundamental right to a jury trial can, by itself, constitute sufficient "cause" to withdraw the reference.[4]  This conclusion follows from the fact that "absent the express consent of both parties and a special designation of jurisdiction by the district court, the bankruptcy court may not hold a jury trial."  *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 908

---

[4] *See, e.g.*, *Growe v. Bilodard Inc.*, 325 B.R. 490, 492 (D. Me. 2005) ("A bankruptcy court may not conduct a jury trial without the consent of the parties.  Therefore, a valid jury demand can have the effect of mandating withdrawal to the District Court for trial." (citation omitted)); *In re Hardesty*, 190 B.R. 653, 655 (D. Kan. 1995) ("Sufficient cause for withdrawal of reference exists where the adversary proceeding concerns matters for which there is a right to a jury trial, a timely demand for a jury trial, and no mutual consent to trial before the bankruptcy court."); *Gray v. Solvay Polymers, Inc. (In re Dooley Plastic Co.)*, 182 B.R. 73, 81 (D. Mass. 1994) (the fact "that the Bankruptcy Court is not authorized to conduct a jury trial . . . constitutes good cause for withdrawing the reference"); *Peachtree Lane Assocs. v. Granader*, 175 B.R. 232, 235 (N.D. Ill. 1994) ("Because the bankruptcy court may not conduct a jury trial, 'cause' to withdraw the reference automatically exists in cases where the party seeking withdrawal is entitled to a jury trial under the Seventh Amendment." (citation and quotations omitted)).

(D. Del. 1996); *see also id.* at 914 ("Because the parties have not expressly allowed the bankruptcy court to hold a jury trial in this adversary proceeding and because this court has not made a special designation of jurisdiction, the bankruptcy court is not statutorily empowered to hold a jury trial in this matter. ***For this reason alone withdrawal is compelled.***" (emphasis added)).

Notwithstanding that a party's Seventh Amendment rights give rise to adequate "cause" for withdrawal of the reference, courts in this and other districts hold that "[w]ithdrawal of the reference based on the ground that a party is entitled to a jury trial should be deferred until the case is 'trial ready.'" *Wakefern Food Corp. v. C&S Wholesale Grocers, Inc. (In re Big V Holding Corp.)*, No. 01-233 (GMS), 2002 U.S. Dist. LEXIS 12609, at *17 (D. Del. July 11, 2002) (citing cases).[5]  Thus, even if a party has a jury right, the

---

[5]  *See also, e.g., Travelers Cas. & Sur. Co. v. Skinner Engine Co. (In re Am. Capital Equip., LLC)*, 325 B.R. 372, 378 (W.D. Pa. 2005) ("It is appropriate, efficient, and logical that withdrawal of the reference in such circumstances can be deferred until the case is trial ready."); *Shubert v. Julius Kraft Co. (In re Winstar Commc'ns, Inc.)*, 321 B.R. 761, 764 (D. Del. 2005) ("A district court may consider a demand for a jury trial insufficient cause for discretionary withdrawal if the motion is made at an early stage of the proceedings and dispositive motions may resolve the matter."); *Michaelesco v. Shefts*, 303 B.R. 249, 253 (D. Conn. 2004) ("The appropriateness of removal of the case to a district court for trial by jury, on asserted Seventh Amendment grounds, will become a question ripe for determination if and when the case becomes trial ready." (quoting *In re Adelphi*

bankruptcy court must administer the case through the end of the discovery phase and the expiration of the deadline for dispositive motions. *See id.* at *18-19. Only when those processes are completed and the matter is actually ready for trial is a motion to withdraw the reference timely and ripe.

**A.    Plaintiff Has A Seventh Amendment Right To A Jury Trial.**

As the Bankruptcy Court cogently explains in its comprehensive Jury Trial Opinion, which opinion was rendered after detailed briefing by Plaintiff and Defendants, Plaintiff has a constitutional right to have a jury try three of its claims against Credit Suisse in the Adversary Proceeding.

Defendants made clear in the 2007 SCR that they will not consent to a jury trial conducted by the Bankruptcy Court. (*See* 2007 SCR at p. 2 ("The Defendants do not consent to a jury trial conducted by this Court.").) This fact alone bars the Bankruptcy Court from conducting a jury trial pursuant to 28 U.S.C. § 157(e). Moreover, the Bankruptcy Court has not been specially designated by the District Court to conduct jury trials in any event, which would also be required by section 157(e). Accordingly, Plaintiff's core constitutional rights can be protected if and only if the reference is withdrawn once the Adversary Proceeding is "trial ready."

---

*Inst., Inc.*, 112 B.R. 534, 538 (S.D.N.Y. 1990))).

**B.    The Adversary Proceeding Is Now "Trial Ready."**

As both sides to the Adversary Proceeding expressly represented to the Bankruptcy Court on the record at the October 4, 2007 status conference, *everything* now has been completed in the Adversary Proceeding except for the trial itself.  In fact, had the Bankruptcy Court not convened a telephonic conference on October 25, 2007, a pre-trial order would have been filed on October 26, 2007, thereby moving the Adversary Proceeding further toward the potential bench trial scheduled to begin on November 5, 2007.[6]  Any matter that is potentially less than two weeks from the start of trial is plainly at a sufficiently advanced stage so as to make withdrawal of the reference a proper and efficient response.

---

[6]  The fact that a pre-trial order has not actually been entered by the Bankruptcy Court should not alter the conclusion that the Adversary Proceeding is "trial ready."  Indeed, given the distinct pre-trial procedures outlined in the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, any pre-trial order entered by the Bankruptcy Court would need to be retooled for use before the District Court.  As but one example, District Court Local Rule 51.1(a) requires that proposed jury instructions be submitted "at least 3 business days before the pretrial conference."  D. Del. LR 51.1(a).  Since the Bankruptcy Court cannot conduct jury trials, all procedures relating to jury trials – including those required by Rule 51.1(a) – necessarily must be completed in the District Court, and since some of that process must occur *prior to* any pre-trial conference, it is clear that a pre-trial conference before the Bankruptcy Court cannot be a prerequisite to withdrawing the reference on Seventh Amendment grounds.  To the contrary, the appropriate point of cleavage would seem to be after the time for discovery and dispositive motions has run but before the pre-trial conference has occurred.  This is precisely the point at which the Adversary Proceeding now rests.

Indeed, if the Defendants' own statements to the Bankruptcy Court are not dispositive, even a superficial review of the status of the Adversary Proceeding confirms that it is now "trial ready." Specifically, the deadlines for the following events, some of which were repeatedly extended at Defendants' request, have passed: fact discovery, expert discovery, and dispositive motions. Furthermore, the parties have tried to settle the Adversary Proceeding, but all such efforts have proven unsuccessful to date. At bottom, then, all that remains is for the Adversary Proceeding to proceed to trial. Courts have regularly withdrawn the reference on Seventh Amendment grounds in other cases that were at an equivalent point in their life cycle. *See, e.g.*, *Shubert v. Julius Kraft Co. (In re Winstar Commc'ns, Inc.)*, 321 B.R. 761 (D. Del. 2005) (granting motion to withdraw the reference on jury trial grounds in case that was not "at an early stage of the proceedings" but rather mere months from trial); *Michaelesco v. Shefts*, 303 B.R. 249, 253-54 (D. Conn. 2004) (granting motion to withdraw reference when party had right to a jury trial and scheduled trial date in the bankruptcy court made it "clear that the case is going to trial"). A similar conclusion should obtain here; the reference should be withdrawn because the Adversary Proceeding now is, but only recently became, "trial ready."

15

Beyond withdrawing the reference, Plaintiff also moves to set dates for a pre-trial conference and trial before the District Court.  Because Plaintiff desires to try the Adversary Proceeding on the merits before a jury at the earliest available opportunity, Plaintiff asks to schedule both dates as soon as is convenient for the District Court.

**C.   Considerations Of Judicial Economy Favor Withdrawing The Reference As To The Entire Adversary Proceeding.**

Numerous courts have elected to use the powers granted by 28 U.S.C. § 157(d) to withdraw the bankruptcy reference as to all aspects of an adversary proceeding in order to promote judicial economy, even when certain parts of that proceeding theoretically could have remained before a bankruptcy court for a second trial.[7]  In the instant case, it

---

[7]   *See, e.g.*, *Cong. Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d 686, 690-91 (1st Cir. 1994) (instructing district court to withdraw the reference and consolidate proceedings "because bringing the preference claims into the district court will allow all facets of these controversies affecting the same property and the same defendants to be disposed of by one tribunal having undoubted jurisdiction and authority"); *Mirant Corp. v. Southern Co.*, 337 B.R. 107, 122 (N.D. Tex. 2006) (finding that any "overlap in the judicial activities related to the adjudications to be made as to the withdrawn claims and the determinations to be made as to [a defendant's] claims in bankruptcy . . . could be eliminated by a withdrawal of the reference of [the defendant's] proofs of claim and objections thereto"); *United Orient Bank v. Green (In re Green)*, 200 B.R. 296, 299 (S.D.N.Y. 1996) (withdrawing reference as to entire proceeding since not doing so "likely would result in duplicative presentations on substantially overlapping factual matters" and "cause unnecessary delay and deplete both judicial resources and the assets of the bankruptcy estate"); *In re Tastee Donuts, Inc.*, 137 B.R. 204, 207 (E.D. La. 1992) ("Even if this

would unquestionably be more efficient for the District Court to withdraw the reference as to the entire Adversary Proceeding and to thereafter set and hold a single trial.

First, although Plaintiff's three counterclaims which are unrelated to the August 19 Contract are analytically and legally distinct from Plaintiff's objections to CSS's proofs of claim (and the "claims-allowance process" more broadly, *see* Jury Trial Opinion at pp. 17-20), there nevertheless are certain overlapping factual issues.

For instance, the entire history of Credit Suisse's relationship with the Oakwood Entities bears on the nature and scope of the duties owed, as well as on whether Credit Suisse occupied the status of a fiduciary or "insider," both ***before and after*** the execution of the August 19 Contract. *See, e.g.*, *Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-92 (3d Cir. 1998); *Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 547 (D. Del. 2005); *Lumbermens Mut. Cas. Co. v. Franey Muha Alliant Ins. Servs.*, 388 F. Supp. 2d 292, 305-06 (S.D.N.Y. 2005). Likewise, the knowledge obtained by Credit Suisse's employees prior to August 19, 2002 about the Oakwood

---

adversary proceeding involves core matters as well, the Court finds that the interests of judicial efficiency require that the reference be withdrawn for the entire adversary proceeding.").

Entities' finances, capital structure, and operations is
unquestionably relevant to an analysis of the quality of their
services rendered after the August 19 Contract was executed.

Thus, the interests of judicial economy, and of
avoiding the potential for inconsistent findings, plainly
weigh heavily in favor of having any such overlapping factual
issues – which may be germane to counterclaims as to which
Plaintiff has a jury right and to counterclaims as to which it
does not – determined at the same time and in a single forum.

Second, even in the absence of overlapping questions
of fact, it is indisputable that a common set of witnesses
must be called with respect to every one of Plaintiff's
counterclaims.  This consideration is particularly important
in light of the fact that the two key former Oakwood employees
now work for different corporations and cannot be compelled to
testify in this matter.[8]  Those former Oakwood employees have
agreed to travel to this district and appear for one trial,
and it is critical that their testimony be heard live by the
jury.  But there is no reason to ask these non-parties to

---

[8]  Specifically, Oakwood's former CEO, Mr. Myles E. Standish,
currently lives in North Carolina and is affiliated with a
manufactured housing company based in Idaho, to which Mr.
Standish regularly commutes.  Likewise, Oakwood's former
executive vice-president, treasurer, and secretary, Mr. Douglas
R. Muir, also lives in North Carolina and is presently CFO of
Krispy Kreme Doughnuts, a publicly traded company.

consider inconveniencing themselves and their current
employers twice for a second trial, nor is there any reason to
assume that they will agree to such an overreaching request.
Rather, it is far more efficient for the former Oakwood
employees and their current employers (as well as for the
employees of Plaintiff's own trustee and, presumably, for the
employees of Credit Suisse) that they be asked to appear just
once, for a consolidated trial before the District Court.

Third, basic scheduling considerations also support
a single proceeding before the District Court.  To the extent
that any common issues of fact bear on counterclaims as to
which Plaintiff has a constitutional jury right and on
counterclaims as to which Plaintiff does not have a jury
right, all such issues should first be put to the jury.  *See,
e.g.*, *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472-73 (1962);
*see also* Jury Trial Opinion at pp. 12-13.  Consequently, the
practical reality is that any proceedings left before the
Bankruptcy Court would likely be stayed, pending final
resolution of the matters tried by jury before the District
Court.  This would cause the Adversary Proceeding to occupy an
active docket before two federal courts in Delaware, and would
further require both parties to navigate at least two tracks
of scheduling and preparing for trial.  Clearly the more
efficient route, which will minimize the final sum of judicial

resources that are consumed by this Adversary Proceeding, is to have the entire matter proceed before a single court.

Fourth, considerations of cost further weigh in favor of maintaining a single, consolidated action. Plaintiff is an entity created to liquidate and distribute the limited assets of a bankrupt corporation. Thus, each marginal dollar spent in connection with the Adversary Proceeding is one that potentially could be used to satisfy the claims of innocent unsecured creditors – creditors who are unlikely to receive full satisfaction. As such, Plaintiff seeks to minimize the ultimate expense of this litigation (and although they are not now bankrupt or a liquidating entity, Defendants presumably share this goal). Dividing the Adversary Proceeding in two necessarily increases the costs for all parties: two distinct pre-trial orders will need to be negotiated; two trials will occur; and thorny disputes regarding bilateral procedures, appeals, and scheduling could arise. All these incremental – yet ultimately unnecessary – costs can be avoided simply by preserving the Adversary Proceeding's unitary nature and holding one consolidated jury trial before the District Court.

Fifth, allowing the Adversary Proceeding to continue as a combined action also advances important federal policies. Courts have repeatedly recognized that bankruptcy law is uniquely driven by the need for matters to proceed quickly and

efficiently, so that debtors' estates may be timely administered and closed.  *See, e.g.*, *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992) (noting "the important policy favoring efficient bankruptcy administration"); *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988) (emphasizing how "issues central to the progress of the bankruptcy petition, those likely to affect the distribution of the debtor's assets, or the relationship among the creditors, should be resolved quickly" (citation and quotations omitted)).  Here, the Adversary Proceeding is the main remaining matter in chapter 11 cases that are many years old.  Splitting the proceeding into parts only further delays the date on which Plaintiff can close the Oakwood estate and make its final distribution to creditors.

In sum, myriad legal and practical considerations create ample "cause" for the District Court to exercise its discretion to withdraw the reference as to the whole Adversary Proceeding.  A withdrawal only as to certain aspects or counterclaims would raise the possibility of inconsistent factual findings, unnecessarily increase the cost and duration of this litigation, unduly inconvenience non-parties, and contravene recognized bankruptcy policy.  Basic principles of judicial economy, which are to guide the application of 28 U.S.C. § 157(d), should preclude these avoidable results.

## CONCLUSION

For the reasons and based on the authorities presented above, Plaintiff hereby requests that (1) the reference to the Bankruptcy Court be withdrawn as to the entire Adversary Proceeding, and (2) dates be scheduled for a pre-trial conference and jury trial before the District Court.

Respectfully submitted,

Dated:  November 19, 2007
Wilmington, Delaware

/s/ *Marla Rosoff Eskin*
MARLA ROSOFF ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

-and-

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the
OHC Liquidation Trust

# Exhibit "C"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Oakwood Homes Corporation, et al., | ) | Case No. 02-13396 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| OHC Liquidation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding No. 04- |
| v. | ) | 57060 (PJW) |
| | ) | |
| Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.), the subsidiaries and affiliates of each, and Does 1 through 100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF OHC LIQUIDATION TRUST'S SUPPLEMENT TO
ITS RULE 26(a)(1) INITIAL DISCLOSURES**

Plaintiff OHC Liquidation Trust ("Trust" or "Plaintiff"), by and through its duly appointed trustee, Alvarez & Marsal, LLC, hereby submits the following supplement to its Rule 26(a)(1) initial disclosures to Defendants Credit Suisse (f/k/a Credit Suisse First Boston, a Swiss banking corporation), Credit Suisse Securities (USA), LLC (f/k/a Credit Suisse First Boston, LLC), Credit Suisse Holdings (USA), Inc. (f/k/a Credit Suisse First Boston, Inc.), and Credit Suisse (USA), Inc. (f/k/a Credit Suisse First Boston (USA), Inc.) (collectively, "CSFB" or "Defendants") as follows:

## I. INTRODUCTION

The Court, in its Memorandum Opinion entered on March 31, 2006, ordered the Trust to provide additional information regarding its preliminary damage calculations pursuant to Federal Rule of Civil Procedure 26(a)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7026. For convenience, the Trust has created the following categories for its computation of damages: (a) Preferential and Fraudulent Transfers (the Fifth, Sixth, Seventh, and Eighth Counterclaims); (b) Breach of Fiduciary Duty and Negligence (the First and Second Counterclaims); (c) Unjust Enrichment (the Third Counterclaim); (d) Breach of Implied and Express Contract (the Ninth Counterclaim); (e) Deepening Insolvency (the Tenth Counterclaim); and (f) Objection to CSFB's Claim and Equitable Subordination (the Fourth Counterclaim). Calculations of damages set forth herein are initial estimates based upon the best information currently available to the Trust

and are subject to modification. Fact discovery is still on-going in this adversary proceeding, and no depositions have taken place.  Expert discovery will follow the completion of fact discovery.  The Trust, therefore, reserves the right to amend, supplement, or modify its initial estimated damage calculations from time to time as additional information becomes available and additional analyses are performed.

The Trust either has already produced or will produce all documents in its possession, which are not privileged or protected from disclosure, on which its computation of damages is based, including material bearing on the nature and extent of damages suffered.  The Trust, however, will reproduce certain principal documents bearing on its damage calculations shortly after service of this supplement.[1]

## II.  CALCULATION OF DAMAGES

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| I. Preferential and Fraudulent Transfers | | |
| | Fifth Counterclaim (90 Day Transfers) | Subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within 90 days of the petition date (the "90 Day Transfers") as preferential transfers pursuant to section 547(b) of Title 11 of the United States Code (the |

---

[1]  There are other documents that may bear on the Trust's damage calculations.  The Trust is merely grouping together and reproducing certain material documents as a courtesy to CSFB.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | "Bankruptcy Code"), plus interest. The 90 Day Transfers, the sum of which is approximately $166,811,129.54, are described in paragraph 41 of the Trust's objection to claim and counterclaims (the "Objection/Counterclaims"). |
| | Sixth Counterclaim (One Year Transfers) | The Trust asserts that CSFB was an insider of the Debtors. Accordingly, subject to any valid defenses, the Trust seeks to recover all transfers made to CSFB on or within one year of the petition date (the "One Year Transfers") as preferential transfers pursuant to Bankruptcy Code section 547(b), plus interest. The One Year Transfers, the sum of which is approximately $595,845,154.45, are described in paragraph 42 of the Objection/Counterclaims.[2] |
| | Seventh Counterclaim (Fraudulent Transfers under Bankruptcy Code section 548) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB as fraudulent transfers under Bankruptcy Code section 548(a)(1)(B), plus interest. |
| | Eighth Counterclaim (Bankruptcy Code section 544(b) and Applicable State Law) | Subject to any valid defenses, the Trust seeks to recover the One Year Transfers from CSFB under applicable state fraudulent transfer and/or conveyance laws, plus interest. The Trust may also be entitled to recover transfers made to CSFB more than one year prior to the petition date |

---

[2]  In paragraph 42 of the Objection/Counterclaims, the Trust listed $595,845,398.42 in transfers, which contains a minor mathematical error. The proper sum of the One Year Transfers is $595,845,154.45.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | pursuant to applicable state laws. |
| II.<br><br>Breach of Fiduciary Duty and Negligence | | |
| | First Counterclaim (Breach of Fiduciary Duty) | The Trust asserts that as a result of the multi-layered and multi-faceted relationship with the Debtors (as the lender, underwriter, powerful warrant holder, and financial/restructuring advisor), CSFB was an insider and owed the Debtors fiduciary duties. Moreover, because the Debtors were insolvent or within the zone or vicinity of insolvency up to two or more years prior to bankruptcy, CSFB owed the Debtors' creditors fiduciary duties. CSFB had access to and knowledge of confidential and inside information.<br><br>Despite its knowledge of the Debtors' failing financial health, the Trust asserts that CSFB continued to underwrite asset-backed securitization offerings and facilitated those offerings through extensions of credit under the warehouse facility. In addition, CSFB encouraged the Debtors' use of the Loan Assumption Program ("LAP"). CSFB acted for its own benefit, and at the detriment of the Debtors. As a result of these and other breaches of fiduciary duties, CSFB unjustly enriched itself, and so the Trust is entitled to recover from CSFB all fees and other remuneration paid to CSFB and to recover consequential and actual damages, |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | including, but not limited to: |
| | | 1.    Fees, costs, and expenses incurred by the Debtors for the LAP. The Trust estimates that the LAP cost the Debtors approximately $56.5 million. |
| | | 2.    In order to fund the LAP, the Debtors were forced to borrow more under their credit facilities. |
| | | a.    CSFB Warehouse Facility |
| | |     i.    Fees for establishing the warehouse facility with CSFB – approximately $2.5 million. |
| | |     ii.    Approximately twenty-one payments of $416,666.67 in monthly maintenance fees to CSFB for the warehouse facility, for a total of approximately $8,750,000. |
| | |     iii.   Interest payments for the warehouse facility for the period from February 2001 to the petition date – approximately $3,464,767.90. |
| | |     iv.    Other professional fees and costs incurred in connection with this facility. |
| | | b.    Servicer Advance Facility: costs of approximately $2.4 million. |
| | | 3.    Fees and Costs of Securitizations |
| | | a.    Underwriting fees paid to CSFB (for the 1999-E; 2000- A, B, C, & D; 2001- B, C, D, & E; LOTUS II, III, & IV; and 2002- A, B, & C series of securitizations): approximately $11.93 million. |
| | | b.    Fees and costs paid to various |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | professionals related to securitizations and credit facilities, including, but not limited to, fees and costs paid to Hunton & Williams; Loeb & Loeb; Rayburn Cooper & Durham; Richards Layton & Finger; Simpson Thacher & Bartlett; Sullivan & Worcester; and Wachtell, Lipton, Rosen & Katz.

c.    Fees paid to Chase Manhattan Bank (later JP Morgan Chase) as indenture trustee for REMICs: to be determined.

d.    Cost of running the Loan Origination Department for the LAP: approximately $44.2 million.

4.    The Debtors' obligations, including guarantee payments made, on account of defaults on REMICs: to be determined.

5.    Prejudgment interest. |
| | Second Counterclaim (Negligence) | Damages for this Counterclaim are substantially similar to the damages sought for breach of fiduciary duty, which are discussed above.  The same facts that support the breach of fiduciary Counterclaim may support this Counterclaim.  Nevertheless, this Counterclaim is a separate Cause of Action on which the Trust may recover damages. |
| **III.**<br><br>**Unjust Enrichment** | | |
| | Third Counterclaim (Unjust Enrichment) | For this Counterclaim, the Trust seeks restitution and disgorgement of profits from CSFB.  With respect to the restitution component, the damages sought are substantially similar to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | the damages sought for the breach of fiduciary duty and negligence Counterclaims, which are discussed above.  With respect to the second component, the Trust seeks the disgorgement of profits CSFB earned by using the funds that it illicitly received from the Debtors.  As a result of CSFB's refusal to respond to interrogatories or produce documents related to its profits (including collateral profits, or so-called "profits on profits"), the Trust is unable to calculate this component of damages.  If the Trust prevails on its unjust enrichment claim, it may request that the Court order CSFB to disgorge its profits calculated based on the annual rate of return to CSFB's equity on a global/consolidated basis as reported in CSFB's SEC and other additional filings, compounded annually. |
| **IV.**<br><br>**Breach of Implied and Express Contract** | | |
| | Ninth Counterclaim (Breach of Implied and Express Contract) | The Trust asserts that CSFB breached both its implied and express contract with the Debtors to act as their restructuring and financial advisors. The Trust alleges that CSFB breached its contractual obligations to the Debtors by, among other things, improperly prolonging the prepetition operations of the Debtors, failing to find a suitable debtor-in-possession financing and/or warehouse line prior to the petition date, failing to adequately prepare the Debtors for the bankruptcy filing, and failing to |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | adequately advise the Debtors that CSFB could not act as a restructuring and financial advisor to the Debtors once in bankruptcy as a result of CSFB's role as underwriters for the Debtors.  The Trust seeks to recover the following damages, plus interest, from CSFB: |
| | | 1.   Express Contracts – approximately $1,811,129.54 paid by the Debtors to CSFB under the Financial Advisory Agreement. |
| | | 2.   Excess cost of the debtor-in-possession financing ("DIP Financing"): approximately $7.8 million. |
| | | 3.   Amounts paid to FTI Consulting to arrange the DIP Financing as a result of CSFB's failure: at least $323,290 pursuant to FTI Consulting's fee application.  The Debtors and/or bankruptcy estates also incurred additional fees and costs to Rayburn Cooper & Durham; Morris Nichols; Deloitte & Touche; Hunton & Williams; and Akin Gump. |
| | | 4.   All other expenses of reorganization:  to be determined. |
| | | 5.   Postpetition Warehouse Facility. It cost the Debtors approximately $2 million in fees to restart the warehouse facility post-petition. |
| | | 6.   Implied contract damages.  The Trust asserts that well before the date of its written contract, CSFB acted as the financial advisor to the Debtors.  The damages for breaching this implied contract include consequential damages suffered by the Debtors as a result of CSFB's failure |

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| | | to advise the Debtors to stop the asset-backed securitizations, which did not benefit the Debtors but only deepened their insolvency.  The amount sought for CSFB's breach of the implied contract is substantially similar to the damage calculation for the Tenth Counterclaim (i.e., Deepening Insolvency), which is discussed below. |
| V.<br><br>Deepening Insolvency | | |
| | Tenth Counterclaim (Deepening Insolvency) | Existing case law provides the Trust with several different methods for calculating its damages for deepening insolvency, and the Trust's expert witness has not yet concluded his analysis.  Although the Trust has not yet completed its calculation of damages for this Counterclaim, one way to measure the damages would be to calculate the amount needed to pay the Trust's constituents (i.e., the general unsecured creditors) in full, plus pre- and post-judgment interest and reimbursement of expenses.  As of the date of this supplement, the shortfall to general unsecured creditors is approximately 59% of the value of the claims against the Debtors' estates.[3] |

---

[3]  Due to active trading of claims filed in these cases and instruments issued prior to bankruptcy, the Trust believes that it is unable to provide additional information regarding the shortfall without an agreement with CSFB that: (a) the information to be provided will be covered by the Agreed Protective Order entered by the Court on October 21, 2005; and (b) CSFB will not use the information provided to engage in buying, selling, or trading of any claims and/or instruments.

| CATEGORY | COUNTERCLAIM | DAMAGES SOUGHT AND GENERAL ANALYSIS |
|---|---|---|
| **VI.**<br><br>**Objection to Claim and Equitable Subordination** | | |
| | Objection to Claim and Fourth Counterclaim (Equitable Subordination) | The Trust seeks to disallow CSFB's claim in the amount of $3,288,391.54 (including a contingent claim asserted by CSFB) on the grounds that such amount was not due or earned, pursuant to Bankruptcy Code section 502(d), and based on the facts supporting the Counterclaims. Alternatively, the Trust seeks to subordinate CSFB's claim to the other general unsecured creditors as a result of CSFB's inequitable conduct and unfair advantage, and the damages caused to the Debtors, all as discussed above. |

Dated:   May 1, 2006
         Wilmington, Delaware

/s/ Marla R. Eskin
MARLA R. ESKIN (No. 2989)
KATHLEEN CAMPBELL DAVIS (No. 4229)
CAMPBELL & LEVINE, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(302) 426-1900

and

TONY CASTAÑARES (CA SBN 47564)
STEPHAN M. RAY (CA SBN 89853)
CAROL CHOW (CA SBN 169299)
SCOTT H. YUN (CA SBN 185190)
WHITMAN L. HOLT (CA SBN 238198)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Fl.
Los Angeles, CA 90067
(310) 228-5600

Special Counsel for the OHC
Liquidation Trust